UNITED STATES BANKRUPTCY COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

In re:  Chapter 11

SCRUB ISLAND DEVELOPMENT
GROUP LIMITED,  Case No. 8:13-bk-15285-MGW

Jointly Administered with

SCRUB ISLAND CONSTRUCTION
LIMITED,  Case No. 8:13-bk-15286-MGW

       Debtors.

_____/

**MOTION OF FIRSTBANK PUERTO RICO FOR RELIEF FROM THE AUTOMATIC STAY PURSUANT TO SECTION 362(d) OF THE BANKRUPTCY CODE**

     FirstBank Puerto Rico ("*FirstBank*"), in its capacity as a secured creditor of both Debtors[1] in the above-captioned chapter 11 cases (collectively, the "*Chapter 11 Cases*") respectfully submits this motion (the "*Motion*") for relief from the automatic stay pursuant to Section 362(d) in order to exercise its post-default secured party rights and remedies under applicable British Virgin Islands law, including the rights to proceed in a prepetition receivership if it remains pending at the time an order regarding the Motion enters, or commencing a receivership proceeding to the extent the prepetition receivership has terminated by the time an order regarding the Motion enters, which receivership is expected to result in a disposition of the Debtors' property that is subject to FirstBank's liens and delivery by the receiver to FirstBank of the proceeds obtained through that disposition in partial satisfaction for FirstBank's claims.

---

[1] The Debtors are Scrub Island Development Group Limited and Scrub Island Construction Limited (collectively, the "*Debtors*").

Factual Background

1.  The Debtors are companies formed and existing under the laws of the British Virgin Islands ("***BVI***").  The Debtors own a hotel, residential and marina project (the "***Scrub Island Resort***") located on Scrub Island in the BVI, which, prior to November 1, 2013, the Debtors had operated as a Marriott Autograph Collection property.  Upon information and belief, the Scrub Island Resort was the Debtors' principal, if not only, asset and source of revenue.

2.  FirstBank is a secured creditor of both Debtors by virtue of certain obligations secured by liens on substantially all of the Debtors' BVI-located assets and the products and proceeds thereof.

3.  The Debtors' relationship with FirstBank dates back to November 28, 2007, when FirstBank, the Debtors, and the Debtors' principal, Joe C. Collier III, serving as guarantor ("***Collier***"), entered into the first of a series of loan agreements, as periodically amended, under which FirstBank extended secured credit to the Debtors to finance the construction and development of the Scrub Island Resort (collectively, the "***Loans***"). The Loans were further supported and evidenced by a series of promissory notes executed in favor of FirstBank (the "***Notes***"), and loan documents granting FirstBank security interests in the Debtors' property and improvements.

4.  The Loans and Notes, secured by assignments and land charges recorded with the Land Registry in the BVI, executed by the Debtors, both incorporated under the laws of the BVI, and relating to the Scrub Island Resort and other assets of the Debtors, all or substantially all of which are located in the BVI, are governed by the laws of the BVI.

5.  More specifically, each of the Debtors' indebtedness to FirstBank is evidenced through a series of Notes executed at varying times over the course of the parties' relationship.

2

The Notes are U.S. Dollar denominated notes, generally have a maturity of between one and three years, and bear non-default interest at a base rate of JP Morgan Chase prime plus between zero and 150 basis points.

6. The Notes were issued pursuant to, and are on their face governed by the terms of, Loan Agreements that each of the Debtors initially executed on November 20, 2007. Pursuant to those Loan Agreements, the Debtors were obligated to make monthly payments of the then-accrued interest with all principal coming due on the earlier of maturity of a disposition of any parcel of the Debtors' real property. In the event of a default, the Loan Agreements provided for an increase in the interest rate to JP Morgan prime plus 300 basis points. The Loan Agreements granted to FirstBank as security for the Debtors' obligations, liens on and assignments of substantially all of the Debtors' assets, most importantly including a "Charge" on all of the Debtors' "Real Property." That Real Property was identified in appendixes to the Loan Agreements.

7. The Charges granted by the Debtors were perfected though registry and recordation with the Virgin Islands Land Registry as Instruments 173/2007 and 294/2008. The security interests granted in non-real estate assets were perfected through registration in accordance with the BVI Business Companies Act as Charge ID: 9NGZQD.

8. After experiencing financial difficulty, the Debtors and FirstBank entered into a forbearance agreement (the "*Workout Agreement*") dated as of June 10, 2011. In that Workout Agreement, the Debtors acknowledged the then-outstanding principal balance of their obligations to FirstBank to be $100,519,966. Subsequent to that time and through the Petition Date, FirstBank advanced additional funds of approximately $7 million to cover the Debtors' unrelenting operational shortfalls, yielding a current principal balance due from the Debtors to

3

FirstBank of $108,025,428.45.  Unpaid interest as of the Petition Date was $13,940,171.44, yielding a balance due to FirstBank of $121,965,599.89.

9. In the Workout Agreement, the Debtors acknowledged the existence of defaults and of FirstBank's right to exercise post-default remedies, including foreclosure.  After a successful effort by the Debtors to obtain a Marriott Autograph Collection designation was unsuccessful in generating the hoped-for degree of additional revenues so that the Debtors' operations could cash flow for the first time in their existence, FirstBank initiated the process of protecting its interests and enforcing its rights in the collateral under BVI law, in accordance with the designation of BVI law in the Loan Agreements and Notes, regarding the Debtors' BVI located real property.  On November 1, 2013, the Eastern Caribbean Supreme Court in the High Court of Justice entered an Order (the "***Receivership Order***") duly appointing Meade Malone of MWM Corporate Services Limited as the receiver (the "***Receiver***") of the assets and undertakings of Scrub Island Development Group Limited (the "***BVI Receivership***"). [*See Receivership Order, attached as Exhibit A*].

10. On November 19, 2013 (the "***Petition Date***"), eighteen days after the BVI Receivership was commenced and in contravention of the Receivership Order, the Debtors filed voluntary petitions in this Court for relief under chapter 11 of the United States Bankruptcy Code ("***Bankruptcy Code***").

11. FirstBank sought dismissal of these cases for lack of jurisdiction and as bad faith filings.  In the alternative, FirstBank sought abstention.  Those motions were denied.

## Motion

12. The Bankruptcy Code provides that upon "request of a party in interest after notice and a hearing, the court shall grant relief from the [automatic stay]," for cause, including a lack of adequate protection, or where the debtor lacks equity in the property and the property is

not necessary for an effective reorganization. 11 U.S.C. § 362(d)(1), (d)(2). Both bases are present here.

13. These Debtors have never, and do not currently, cash flow. They have survived primarily on the largess of FirstBank, advancing funds despite existing defaults and insufficient value to support a fraction of the outstanding indebtedness. This inability to meet even basic operating expenses threatens the Debtors' ability to continue to operate, with an adjunct threat to their ability to maintain the value of FirstBank's collateral, depriving FirstBank of adequate protection and entitling it to relief from stay pursuant to Section 362(d)(1).

14. As an initial matter, even if FirstBank were inclined to continue to cover the Debtors' cash flow shortfalls, which it is not, the lack of authority for the Debtors to obtain debtor-in-possession financing prevents them, or any other party, from doing so. The Debtors, therefore, have not shown the ability to meet all of their critical obligations necessary to maintain their high-end resort operations without FirstBank's assistance.

15. Their historical operating shortfalls, however, have been exacerbated by the pendency of these Chapter 11 proceedings and the jurisdictional disconnect they impose. As a result of the commencement of these cases, BVI-based creditors over whom this Court has no jurisdiction have demanded payment of prepetition balances as well as required cash on delivery arrangements going forward. The Debtors have insufficient cash on hand to meet these demands and the Receiver has had to manage payables to focus on paying the most essential expenses. Even if they had the required funds, they are precluded from making the demanded payments of prepetition obligations--a concept with which U.S. bankruptcy lawyers are well-acquainted but for which BVI-based vendors not subject to this Court's jurisdiction have little regard. As a result, vendors have at least threatened to cease shipping, the BVI utilities indicated earlier an

intention of cutting off power to the resort, and necessary repairs to the engine on the ferry that brings guests to the Debtors' resort have not been made, requiring alternative and more expensive transportation.

16.     In addition, FirstBank is entitled to relief from stay pursuant to Section 362(d)(2). FirstBank is owed in excess of $120 million, and while the Debtors' Case Management Summary statement of value unhelpfully provides only the cost basis that the Debtors carry on their books, their statements in open court as to value are consistent with FirstBank's internal valuations suggesting a view that the property constituting FirstBank's collateral would at best garner $40 million, rendering FirstBank undersecured by some $80 million and yielding the unassailable conclusion that the Debtors have no equity in their property.

17.     While unclear on the Debtors' view of valuation, the Debtors' Case Management Summary is clear that there are no circumstances under which they can confirm a plan. The Case Management Summary indicates that each Debtors' creditors fall into no more than two classes. They indicate that there are no secured claims other than the claims held by FirstBank, and that all unsecured claims other than FirstBank's will be unimpaired under any plan. Putting aside for a minute whether paying all unsecured claims other than FirstBank's unsecured deficiency claim constitutes confirmation preclusive unfair discrimination, 11 U.S.C. §1129(b)(1), with FirstBank either the only impaired creditor under a plan or in control of all classes because their unsecured deficiency claim dwarfs the aggregate of all other unsecured claims, the Debtors will be unable to meet Section 1129(a)(10)'s prerequisite to confirmation that

at least one impaired class vote to accept a plan because FirstBank will most assuredly vote to reject and substantively object to any plan the Debtors have the capability of proffering.[2]

18. Any plan the Debtors may contemplate will also suffer from an inability to meet the restrictions of the absolute priority rule as codified in Section 1129(b)(2)(B)(ii), and an inability to prove feasibility as required by Section 1129(a)(11).

**I. FirstBank is Entitled to Relief from the Automatic Stay for Cause Pursuant to §362(d)(1)**

19. Relief from the stay is mandated "for cause, including the lack of adequate protection of an interest in property of such party in interest . . . ." 11 U.S.C. § 362(d)(1).

20. While the filing of a bankruptcy petition operates to impose the automatic stay, creditors are not without recourse to protect their rights, and are entitled to adequate protection of these rights during the pendency of the bankruptcy proceedings. *See Chrysler-Credit Corp. v. Ruggiere* (*In re George Ruggiere Chrysler-Plymouth, Inc.*), 727 F.2d 1017, 1020 (11th Cir. 1984); *Orix Credit Alliance Inc. v. Delta Resources, Inc.* (*In re Delta Resources, Inc.*), 54 F.3d 722, 730 (11th Cir. 1984). The purpose of adequate protection is to ensure that secured creditors do not suffer the burden of declining value of their collateral while the automatic stay is in effect. *In re Immenhausen*, 164 B.R. 347, 350 (Bankr. M.D. Fla. 1994); *In re Wrecclesham Grange, Inc.*, 221 B.R. 978, 981 (Bankr. M.D. Fla. 1997); *In re Moody & Sons, Inc.*, 2010 WL 6982486 (Bkrtcy. M.D. Fla. 2010).

21. Although the Bankruptcy Code does not explicitly define adequate protection, it outlines several acceptable forms of adequate protection, including the provision of periodic payments, additional replacement liens, or other relief which will yield the "indubitable

---

[2] The Debtor has accurately represented that FirstBank, subject to other conditions, would have agreed to accept $40 million in satisfaction of its claims prepetition. Despite prepetition efforts to raise that amount, the Debtors failed, and that deal is no longer available.

equivalent" of the creditor's interest in the collateral. 11 U.S.C. § 361. Where a debtor is unable to provide adequate protection for further diminution of the value of an undersecured creditor's collateral, the Bankruptcy Code mandates that the automatic stay be lifted to prevent further harm to the creditor. 11 U.S.C. § 362(d).

22. The value of FirstBank's claim inclusive of interest as of the Petition Date was in excess of $120 million. As acknowledged by the Debtors, the Debtors have been unable to secure bids of even $40 million for FirstBank's collateral. FirstBank is vastly under-collateralized by at least $80 million, and is therefore entitled to adequate protection of its interests in order to prevent diminution to its collateral value while the Debtors attempt what, as will be discussed below, is nothing more than a futile effort at a reorganization that can never and will never be consummated.

23. The Debtors' prepetition operations offer unassailable evidence of their inability to prevent a diminution in FirstBank's collateral value. Between the execution of the Workout Agreement on June 10, 2011 when the FirstBank principal balance totaled $100,519,966 and the Petition Date when the principal balance was $108,025,428.45, FirstBank's already under-collateralized position deteriorated by over $7 million.

24. While post-petition diminution will not be funded by FirstBank, the losses that the Debtors will continue to experience, whether in the form of unpaid post-petition trade, deferred maintenance or any funding other than either unsecured subordinated loans or equity infusions, will, by definition, diminish the value of FirstBank's collateral position.

25. Indeed, early indications are that the post-petition diminution in store for FirstBank as a result of the Debtors' inability to fund operating expenses and capital expenditures is far more draconian than just incurrence of unpaid administrative debt. The Receiver's cash

flow analysis dated December 7, 2013 showed a projected net cash deficit for the Scrub Island Resort of $297,277.98 as of December 15, 2013. [*See Receiver's Cash Flow Analysis Email Dated as of December 7, 2013, attached as Exhibit B*].  The Receiver initially expressed concern as to whether the Scrub Island Resort would be able to meet its payroll obligations of approximately $120,000, due and owing as of December 19, 2013, but the Receiver's recent efforts in managing payables and FirstBank's prepetition infusions will allow payroll to be met for now.

26.     The Receiver has further indicated that the already experienced cash deficits have rendered certain foreign creditors not subject to the jurisdiction of this Court to be unwilling to continue to provide services, and in several instances such creditors have previously threatened termination of services such as gas, electric and telephone, unless the Debtors submit payments that the Debtors are not only unable to pay due to their cash flow deficit, but also are prohibited from making under the Bankruptcy Code.  [*See Email Dated as of December 3, 2013 from BVI Electricity, attached as Exhibit C* (stating that if its demand for outstanding payment in the amount of $150,000 was not met, electrical supply to the Scrub Island Resort would be terminated); *Receiver's Email Dated as of December 9, 2013, attached as Exhibit D* (discussing Delta Petroleum's demand of $13,000 to avoid termination of service)].  As the Receiver noted, satisfying the gas company's demand would place the cash account in overdraft,  and, further, "[t]he Delta matter is only the beginning.  As warned, I see this scenario playing out across the spectrum of suppliers of goods and services to the Resort…I suspect that when the Court's decision is reported in the news it would accelerate service provider's demands."

27.     The Debtors are unable to make payments of prepetition debt both because they are prohibited by the Bankruptcy Code and because they have insufficient cash on hand to do so.

9

The BVI creditors who are impacted by these two realities are beyond the jurisdiction this Court and have little understanding of, much less regard for, the U.S. Bankruptcy Code. As a result of what the BVI vendors and utility providers view as non-payment, the Debtors are facing the potential imminent loss of employees as well as basic telephone, electrical and gas services at the Scrub Island Resort shortly before the holiday season. An unstaffed or even understaffed luxury resort with no power during the one season when a Caribbean vacation site should be able to generate positive cash flow would result in a marked diminution in the value FirstBank's collateral.

28. Accordingly, as the Debtors are unable to provide adequate protection of FirstBank's interests as a secured creditor, FirstBank is entitled to relief from the stay for cause under Section 362(d)(1).

II. **FirstBank is entitled to Relief from the Automatic Stay Pursuant to § 362(d)(2) because the Debtors have no Equity in the Property and the Property is not Necessary to an Effective Reorganization**

29. Relief from the automatic stay under Section 362(d)(2) must be granted where the creditor establishes that the debtor has no equity in the property, and the debtor is unable to establish that the property is necessary to an effective reorganization. 11 U.S.C. §§ 362(d)(2), 362(g); *In re Annicott Excellence, LLC*, 258 B.R. 278, 283 (Bankr. M.D. Fla. 2001).

30. As stated above, the conclusion that the Debtors lack any equity whatsoever in their property, which is fully encumbered by FirstBank's liens, is inescapable. Furthermore, as the property is not necessary to an effective reorganization, which, on the facts is wholly illusory, FirstBank is entitled to relief from the stay under Section 362(d)(2).

### A. There is no Equity in the Property

31. The principal of FirstBank's claim as of the Petition Date was in excess of $108 million, and with interest, the debt owed exceeds $120 million. That debt is secured by collateral worth less than half of that amount.

32. The Debtors concede that the value of their property is far less than the balance owed FirstBank, and have stated their view that their property's value is approximately $40 million.

33. Once the movant has shown that the debtor lacks equity in the property, the debtor bears the burden of establishing whether the property is necessary to an effective reorganization. *See United Savings Ass'n v. Timbers of Inwood Forest Associates Ltd.*, 484 U.S. 365, 375 (U.S. 1988)[3]; *In re Annicott Excellence, LLC*, 258 B.R. 278, 283 (Bankr. M.D. Fla. 2001); 11 U.S.C. § 362(g).

### B. The Property is Not Necessary to an Effective Reorganization

34. Although the continuation of the Debtors' operations would entail the use of FirstBank's collateral, the inquiry does not end there. In order for property to be deemed "necessary" under Section 362(d)(2)(B), "it must be demonstrated that an effective reorganization is realistically possible; the mere fact that the property is indispensible to the debtor's survival is insufficient." *In re Albany Partners, Ltd.*, 749 F.2d 670, 673 n.7 (11th Cir. 1984).

---

[3] Although the *Timbers* Court noted that "while the bankruptcy courts demand less detailed showings during the four months in which the debtor is given the exclusive right to put together a plan" it went on to conclude that "even within that period lack of any realistic prospect of effective reorganization will require § 362(d)(2) relief." 484 U.S. at 376. The Court cited to various cases making such finding within the first four months post-petition, including *In re Bellina's Restaurants II, Inc.*, 52 B.R. 509, 512 (Bankr. S.D.Fla. 1985) (granting Section 362(d)(2) relief one month post-petition).

35. In order to quash an undersecured creditor's motion for relief from the stay to foreclose upon property in which the debtor has no equity, the Bankruptcy Code imposes a burden on the debtor that "requires…not merely a showing that if there is conceivably to be an effective reorganization, this property will be needed for it; but that the property is essential for an effective reorganization *that is in prospect*. This means…that there must be a reasonable possibility of a successful reorganization within a reasonable time." *United Sav. Ass'n of Texas v. Timbers of Inwood Forest Assocs., Ltd.*, 484 U.S. 365, 375-76 (1988) (emphasis original) (internal quotation omitted). *See also In re Bellina's Restaurants II, Inc.*, 52 B.R. 509, 512 (Bankr. S.D.Fla. 1985) (granting relief under Section 362(d)(2) one month post-petition where although the property would be necessary to any reorganization of the debtor, it was clear that no reasonable likelihood of rehabilitation existed, as the debtors were unable to meet their basic obligations such as rent, taxes and utilities, had no unencumbered assets to offer as refinancing collateral and no evident source of additional capital).

> **i.   *The Debtors Cannot Obtain Acceptance from any Impaired Class of Creditors, and Therefore are Unable to Propose a Confirmable Plan***

36. The Debtors are unable to show the collateral is necessary to an effective reorganization, because the Debtors are unable to propose a confirmable plan, and therefore no reorganization is reasonably possible.

37. As a preliminary matter, the Debtors are unable to get even the minimum requirement of one consenting class of impaired creditors necessary for any hypothetical plan to be confirmed. *See* 11 U.S.C. § 1129(a)(10). For a class to be accepting, the debtors must obtain the vote of more than one half in number and at least two thirds in dollar amount of the allowed claims within the impaired class. 11 U.S.C. § 1126(c). The Case Management Summary indicates that the only voting classes of creditors under any plan that properly classifies the

Debtors' creditors will be the secured classes of FirstBank as to both Debtors and the general unsecured creditor classes of both Debtors. [*See Debtors' Joint Chapter 11 Case Management Summary*, p. 17 (Docket No. 5)].[4] That same Case Management Summary indicates that the only impaired creditor in the cases, and, therefore, the only member of any class entitled to vote, will be FirstBank.

38.     Where a moving creditor controls the impaired class or classes under a prospective plan and is therefore able to block confirmation, courts have recognized that "for this reason alone, an effective reorganization is not realistically possible." *In re Annicott Excellence, LLC*, 258 B.R. 278, 284 (Bankr. M.D. Fla. 2001)[5] (quoting *Resolution Trust Corp. v. Swedeland Development Group Inc.*, 16 F.3d 552, 568 (3d Cir. 1994)).

39.     FirstBank is the Debtors' only secured creditor, and therefore controls 100% of the vote of the secured class. Additionally, FirstBank's claim of more than $120 million is secured by collateral worth not more than $40 million, and as such, FirstBank is left with an unsecured deficiency claim for the remaining $80 million. The Debtors have acknowledged that their only other unsecured claims amount to $10.4 million, and that those creditors will be unimpaired. [*See Debtors' Joint Chapter 11 Case Management Summary*, p. 17 (Docket No. 5)]. Even if the Debtors change course on their statement of leaving other unsecured creditors unimpaired, FirstBank's $80 million unsecured claim represents upwards of 88% of debt in the class of unsecured creditors. As FirstBank controls the Debtors' only two apparent voting classes

---

[4] Although the Debtors also disclosed the British Virgin Islands government holds a secured tax claim for $36,000 of property taxes, such claims are entitled to priority and therefore not entitled to vote on a plan of reorganization. *See* 11 U.S.C. §§ 507(a)(8)(B); 1126(f).

[5] The *Annicott Excellence* Court ultimately denied the motion for relief on the basis that it was not certain that the movants in fact controlled the voting impaired class, as the class also potentially included disputed claims of up to $13 million. 258 B.R. at 285.

of creditors, any plan of reorganization will not be confirmed without FirstBank's consent, which it will not give.

> ii. *Even if the Debtors Create a Consent Class of Impaired Creditors, any Plan of Reorganization Cannot be Crammed Down Over Rejection by the Secured Class*

40. To the extent the Debtors have an as yet unknown class of impaired creditors that is willing to vote to accept a plan, the Debtors will still be unable to obtain confirmation because they are unable to cram down any plan over the objection of FirstBank as the sole secured creditor. A plan may be confirmed without the consent of a secured class, or "crammed down" if either: (1) the secured creditors (i) retain their liens over the collateral to the extent of the allowed secured claim, and (ii) receive deferred cash payments equal to the present value of the collateral; or (2) the secured creditors must receive the "indubitable equivalent" of allowed secured claims. 11 U.S.C. § 1129 (b)(2)(A).

41. The Debtors are unable to provide a payment stream with a present value equal to FirstBank's claim. To calculate the applicable interest rate, courts are directed to begin with the national prime rate and make adjustments to adjust for the risks as indicated by factors including "the circumstances of the estate, the nature of the security, and the duration and feasibility of the reorganization plan." *Till v. SCS Credit Corp.*, 541 U.S. 465, 479 (2004). The risk adjustment operates to "compensate for present value and ensure the safety of the principal," and while the Supreme Court has not set specific parameters for acceptable risk adjustment, adjustments between one and three percent have been approved in the past. *SPCP Group LLC v. Cypress Creek Assisted Living Residence, Inc.*, 424 B.R. 650, 660 (M.D. Fla. 2010) (holding that the interest rate for a chapter 11 secured creditor was to be determined by the *Till* formula where the court has determined that no efficient market exists, regardless of whether or not the debtor has attempted to secure exit financing).

42. Assuming that FirstBank does not make a Section 1111(b) election, the value of its secured claim is conservatively estimated to be $40 million, and the national prime rate is currently 3.25%. Therefore, in order to service FirstBank's debt such that cram down would be permissible, the Debtors would have to pay annual interest, before any upward adjustment for risk, in the amount of $1,300,000. When amortized principal over a term even as long as 20 years is figured in, the Debtors would have to make payments of $226,878.30 per month, or $2,722,539,69.[6]

43. The Debtors have been unable to break even and satisfy obligations ordinary to their business operations, and have never been able to service their secured debt. In fact, since the execution of the Workout Agreement in June 2011, not only had the Debtors failed to make any payments on their outstanding principal as of the Petition Date, but FirstBank had also been forced to extend additional advances in excess $7 million to ensure the Debtors' continued operations. The Debtors are unable to satisfy even the bare minimum interest payments required to demonstrate feasibility of a plan that seeks to cram down FirstBank.[7]

> iii. *Even if the Debtors Create a Consenting Class of Impaired Creditors, and Could Somehow Demonstrate Feasibility, any Plan of Reorganization Cannot be Crammed Down Over Rejection by the Unsecured Class*

44. The Debtors are likewise unable to cram down on its class of unsecured creditors, which is the Debtors' sole hope for confirmation since FirstBank constitutes upwards of 88% of the unsecured class. Cram down of a class of unsecured creditors requires receipt by that class of

---

[6] In actuality, the Debtors' payment obligations would likely be higher because when risk factors such as the Debtors' operating history, the 100% loan to value ratio and the seasonality of the Debtors' business are factored in the interest rate would likely be higher than prime and a 20 year amortization period on a commercial loan is longer than would likely be found to be appropriate.

[7] In addition to rendering any potential plan unconfirmable, a plan cannot be feasible if interest payments alone would result in a debtor's negative cash flow. *See SPCP Group, LLC v. Cypress Creek Assisted Living Residence, Inc.*, 434 B.R. 650, 657 (Bankr. M.D. Fla. 2010) (citing *In re Immenhausen Corp.*, 172 B.R. 343, 348 (Bankr. M.D. Fla. 1994)).

property equivalent in value as of the effective date to the allowed claims in the class, or no junior classes may receive any property. 11 U.S.C. § 1129(b)(2)(B).

45. The Debtors have no assets from which they may satisfy all unsecured claims, including FirstBank's unsecured deficiency claim of roughly $80 million, and therefore may not confirm any plan under which its existing equity holders retain any value.

46. To the extent that there is a "new value" exception to the absolute priority rule that no junior class may receive property before satisfaction in full of any senior classes, the Debtors are unable to qualify for such exception. *See Bank of America Nat'l Trust and Savings Assn. v. 203 North LaSalle Street P'ship*, 526 U.S. 434 (1999); *In re Lett*, 632 F.3d 1216, 1220 n.6 (11th Cir. 2011) (acknowledging the new value exception "which contemplates the receipt of property by equity holders before full payment of creditors in a debtor's reorganization, provided that those equity holders make a 'fresh contribution' to the insolvent enterprise"). The Debtors' equity holders have indicated no ability to contribute sufficient new value to the Debtors commensurate with any such retained value.

47. Where, as here, no reorganization is realistically possible, "then no property of the debtor can be necessary for that end." *In re Annicott Excellence, LLC*, 258 B.R. 278, 284 (Bankr. M.D. Fla. 2001) (quoting *Resolution Trust Corp. v. Swedeland Development Group Inc.*, 16 F.3d 552, 567 (3d Cir. 1994)).

WHEREFORE, for the foregoing reasons, FirstBank respectfully requests that this Court grant this Motion, and enter an order providing that the stay be vacated so as to permit FirstBank to fully pursue its remedies against its collateral under BVI law, and direct such other and further relief as is just and proper.

Dated: December 14, 2013.

/s/  W. Keith Fendrick
W. Keith Fendrick, Esq.
Florida Bar No. 0612154
keith.fendrick@hklaw.com
HOLLAND & KNIGHT LLP
100 N. Tampa St., Suite 4100
Tampa, FL 33602
Phone: 813-227-8500
Fax: 813-229-0134
*Attorneys for FirstBank Puerto Rico*

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on December 14, 2013 a true and correct copy of the foregoing instrument was electronically filed with the Clerk of the Court by using the CM/ECF system, which will send electronic notification to the following:

Charles A. Postler, Esq. and Harley E. Riedel, Esq., Attorneys for the Debtors
Stichter, Riedel, Blain & Prosser, P.A.
110 Madison Street – Suite 200
Tampa, FL 33602

United States Trustee
Timberlake Annex, Suite 1200
501 E. Polk Street
Tampa, FL 33602

and all other CM/ECF participants. I further certify that on December 16, 2013, a true and correct copy of the foregoing instrument will be furnished via electronic mail or U.S. Mail to all parties listed on the attached Local Rule 1007-2 Parties In Interest Matrix.

/s/ W. Keith Fendrick
Attorney