UNITED STATES BANKRUPTCY COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

In re:                                          Chapter 11

SCRUB ISLAND DEVELOPMENT
GROUP LIMITED,                                  Case No. 8:13-bk-15285-MGW

                                                Jointly Administered with

SCRUB ISLAND CONSTRUCTION
LIMITED,                                        Case No. 8:13-bk-15286-MGW

         Debtors.
_____/


FIRST AMENDED JOINT PLAN OF REORGANIZATION OF
SCRUB ISLAND DEVELOPMENT GROUP LIMITED AND
SCRUB ISLAND CONSTRUCTION LIMITED
<u>UNDER CHAPTER 11 OF TITLE 11, UNITED STATES CODE</u>


STICHTER, RIEDEL, BLAIN & PROSSER, P.A.
Harley E. Riedel (Florida Bar No. 183628)
Charles A. Postler (Florida Bar No. 455318)
110 East Madison Street, Suite 200
Tampa, Florida 33602
Telephone:    (813) 229-0144
Facsimile:    (813) 229-1811
Email:        hriedel@srbp.com
              cpostler@srbp.com
Counsel for Debtors and Debtors in Possession


Tampa, Florida
Dated as of July 11, 2014

PURSUANT TO SECTION 1125 OF TITLE 11 OF THE UNITED STATES CODE, NOTHING CONTAINED IN THIS FIRST AMENDED JOINT PLAN OF REORGANIZATION OF SCRUB ISLAND DEVELOPMENT GROUP LIMITED AND SCRUB ISLAND CONSTRUCTION LIMITED UNDER CHAPTER 11 OF TITLE 11, UNITED STATES CODE (THE "PLAN") SHOULD BE CONSTRUED AS CONSTITUTING A SOLICITATION OF ACCEPTANCES OF THE PLAN UNTIL SUCH TIME AS THE DEBTORS' DISCLOSURE STATEMENT (AS HEREINAFTER DEFINED) HAS BEEN APPROVED BY AN ORDER OF THE UNITED STATES BANKRUPTCY COURT FOR THE MIDDLE DISTRICT OF FLORIDA, TAMPA DIVISION, AND DISTRIBUTED, WITH BALLOTS, TO ALL HOLDERS OF CLAIMS AGAINST AND EQUITY INTERESTS IN THE DEBTORS ENTITLED TO VOTE ON THE PLAN. THE DEBTORS RESERVE THE RIGHT TO FILE A FURTHER AMENDED (OR AN AMENDED AND RESTATED) PLAN AND A FURTHER AMENDED (OR AN AMENDED AND RESTATED) DISCLOSURE STATEMENT FROM TIME TO TIME HEREAFTER.   REFERENCE IS MADE TO THE DISCLOSURE STATEMENT FOR (A) A DISCUSSION OF THE DEBTORS' HISTORY, BUSINESSES, PROPERTIES, AND OPERATIONS, (B) THE PROJECTIONS FOR THE DEBTORS' FUTURE OPERATIONS, (C) A SUMMARY OF SIGNIFICANT EVENTS WHICH HAVE OCCURRED TO DATE IN THE BANKRUPTCY CASES, (D) A SUMMARY OF THE MEANS OF IMPLEMENTING AND FUNDING THE PLAN, AND (E) THE PROCEDURES FOR VOTING ON THE PLAN.  ALL HOLDERS OF CLAIMS AGAINST AND EQUITY INTERESTS IN THE DEBTORS ENTITLED TO VOTE ON THE PLAN ARE HEREBY ADVISED AND ENCOURAGED TO READ THE DISCLOSURE STATEMENT AND THE PLAN IN THEIR ENTIRETY BEFORE VOTING TO ACCEPT OR REJECT THE PLAN.

AS TO CONTESTED MATTERS, ADVERSARY PROCEEDINGS AND OTHER ACTIONS OR THREATENED ACTIONS, THE PLAN AND THE DISCLOSURE STATEMENT SHALL NOT BE CONSTRUED AS AN ADMISSION OR STIPULATION, BUT RATHER AS A STATEMENT MADE IN SETTLEMENT NEGOTIATIONS.

# TABLE OF CONTENTS

ARTICLE 1     INTRODUCTION ........................................................................................ 1

ARTICLE 2     DEFINED TERMS; RULES OF CONSTRUCTION ...................................... 2
   2.1     Defined Terms. .................................................................................... 2
   2.2     Rules of Construction. ........................................................................ 26

ARTICLE 3     TREATMENT OF ADMINISTRATIVE EXPENSE CLAIMS, PRIORITY TAX
                         CLAIMS, AND DIP LOAN CLAIMS .......................................................... 26
   3.1     Administrative Expense Claims. .......................................................... 27
   3.2     Priority Tax Claims. ............................................................................ 27
   3.3     DIP Loan Claims. ............................................................................... 28

ARTICLE 4     DESIGNATION OF CLASSES OF CLAIMS AND EQUITY INTERESTS ................. 28
   4.1     Class 1:  Priority Claims. .................................................................... 28
   4.2     Class 2:  Secured Claims and Other Claims of FirstBank. ..................... 28
   4.3     Class 3:  Secured Tax Claims of Governmental Units. .......................... 28
   4.4     Class 4:  Other Secured Claims. ......................................................... 28
   4.5     Class 5:  Unsecured Claims of Blue Water Traders Ltd. ........................ 29
   4.6     Class 6:  Unsecured Claims of Pablo L. Dardet. .................................. 29
   4.7     Class 7:  Unsecured Claims of Thomas Frederick. ............................... 29
   4.8     Class 8:  Unsecured Claims of Arturo Linares, David Foster, and Scrub Island, LLC. ... 29
   4.9     Class 9:  Unsecured Claims of Oscar Rivera and Anabel Rivera. .................... 29
   4.10    Class 10:  Unsecured Claims (Unsecured Claims Not Otherwise Classified)................. 29
   4.11    Class 11:  Unsecured Claims of the SIU Entities. ................................. 29
   4.12    Class 12:  Unsecured Claims of Alf Nolan Davis d/b/a A. N. Davis Plumbing and
          Electrical Services. ............................................................................. 29
   4.13    Class 13:  Subordinated Unsecured Claims of FirstBank. ..................... 29
   4.14    Class 14:  Intercompany Claims. ......................................................... 29
   4.15    Class 15:  SIDG Equity Interests. ........................................................ 30
   4.16    Class 16:  SICL Equity Interests. ......................................................... 30

ARTICLE 5     TREATMENT OF CLASSIFIED CLAIMS AND EQUITY INTERESTS ................... 30
   5.1     Unclassified Claims. ........................................................................... 30
   5.2     Class 1:  Priority Claims. .................................................................... 30
   5.3     Class 2:  Secured Claims and Other Claims of FirstBank. ..................... 30
          5.3.4     FirstBank Option A ..................................................... 31
          5.3.5     FirstBank Option B ..................................................... 35
   5.4     Class 3:  Secured Tax Claims of Governmental Units. .......................... 38
   5.5     Class 4:  Other Secured Claims. ......................................................... 39
   5.6     Class 5:  Unsecured Claims of Blue Water Traders Ltd. ........................ 39
   5.7     Class 6:  Unsecured Claims of Pablo L. Dardet. .................................. 41
   5.8     Class 7:  Unsecured Claims of Thomas Frederick. ............................... 42
   5.9     Class 8:  Unsecured Claims of Arturo Linares, David Foster, and Scrub Island, LLC. ... 44
   5.10    Class 9:  Unsecured Claims of Oscar Rivera and Anabel Rivera. ................... 46
   5.11    Class 10:  Unsecured Claims (Unsecured Claims Not Otherwise Classified)................. 47
   5.12    Class 11:  Unsecured Claims of the SIU Entities. ................................. 48
   5.13    Class 12:  Unsecured Claims of Alf Nolan Davis d/b/a A. N. Davis Plumbing and
          Electrical Services. ............................................................................. 49
   5.14    Class 13:  Subordinated Unsecured Claims of FirstBank. ..................... 50

| | | |
|---|---|---|
| 5.15 | Class 14: Intercompany Claims. | 51 |
| 5.16 | Class 15: SIDG Equity Interests. | 51 |
| 5.17 | Class 16: SICL Equity Interests. | 51 |
| **ARTICLE 6** | **ACCEPTANCE OR REJECTION OF THE PLAN** | **52** |
| 6.1 | Each Impaired Class Entitled to Vote Separately. | 52 |
| 6.2 | Acceptance by Impaired Classes. | 52 |
| 6.3 | Presumed Acceptance of Plan by Unimpaired Classes. | 52 |
| 6.4 | Deemed Non-Acceptance of Plan. | 52 |
| 6.5 | Impairment Controversies. | 53 |
| **ARTICLE 7** | **TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES** | **53** |
| 7.1 | Assumption or Rejection of Executory Contracts and Unexpired Leases. | 53 |
| 7.2 | Approval of Assumption or Rejection of Executory Contracts and Unexpired Leases. | 53 |
| 7.3 | Inclusiveness. | 54 |
| 7.4 | Cure of Defaults. | 54 |
| 7.5 | Claims under Rejected Executory Contracts and Unexpired Leases. | 54 |
| 7.6 | Insurance Policies. | 55 |
| **ARTICLE 8** | **MEANS OF IMPLEMENTATION OF THE PLAN** | **55** |
| 8.1 | General Overview of the Plan. | 55 |
| 8.2 | Effective Date Actions. | 56 |
| 8.3 | Vesting of Property of the Estates in the Reorganized Debtors. | 57 |
| 8.4 | Continued Corporate Existence; Issuance of Reorganized SICL Shares. | 57 |
| 8.5 | Corporate Action. | 57 |
| 8.6 | Boards of Directors and Executive Officers of the Reorganized Debtors. | 57 |
| 8.7 | Section 1146 Exemption. | 58 |
| 8.8 | Pursuit of Causes of Action. | 58 |
| 8.9 | Prosecution and Settlement of Claims and Causes of Action. | 60 |
| 8.10 | Effectuating Documents; Further Transactions. | 60 |
| 8.11 | Cancellation of Existing Loan Documents and Agreements. | 61 |
| 8.12 | Exclusivity Period. | 61 |
| 8.13 | Dissolution of the Creditors Committee. | 61 |
| **ARTICLE 9** | **PROVISIONS GOVERNING DISTRIBUTIONS** | **61** |
| 9.1 | Initial Distribution. | 61 |
| 9.2 | Determination of Claims. | 62 |
| 9.3 | Distributions as to Allowed Unsecured Claims in Class 10. | 63 |
| 9.4 | Unclaimed Distributions. | 63 |
| 9.5 | Transfer of Claim. | 64 |
| 9.6 | One Distribution Per Holder. | 64 |
| 9.7 | Effect of Pre-Confirmation Distributions. | 64 |
| 9.8 | No Interest on Claims. | 64 |
| 9.9 | Compliance with Tax Requirements. | 64 |
| **ARTICLE 10** | **CONDITIONS PRECEDENT TO CONFIRMATION OF THE PLAN AND THE EFFECTIVE DATE** | **65** |
| 10.1 | Conditions Precedent to Confirmation of the Plan. | 65 |
| 10.2 | Conditions Precedent to the Effective Date. | 65 |
| 10.3 | Notice of the Effective Date. | 66 |

iv

ARTICLE 11    DISCHARGE, EXCULPATION FROM LIABILITY, RELEASE, AND GENERAL
                       INJUNCTION...................................................................................... 66
    11.1    Discharge of Claims. ................................................................................... 66
    11.2    Exculpation from Liability. ......................................................................... 67
    11.3    Release. ....................................................................................................... 67
    11.4    General Injunction........................................................................................ 68
    11.5    Term of Certain Injunctions and Automatic Stay. ..................................... 69
    11.6    No Liability for Tax Claims. ....................................................................... 69

ARTICLE 12    RETENTION OF JURISDICTION.................................................................. 69
    12.1    General Retention......................................................................................... 69
    12.2    Specific Purposes. ....................................................................................... 69
    12.3    Closing of the Bankruptcy Cases. ............................................................... 72

ARTICLE 13    MODIFICATION OF PLAN AND CONFIRMATION OVER OBJECTIONS ............. 72
    13.1    Modification of Plan..................................................................................... 72
    13.2    Confirmation Over Objections. ................................................................... 73

ARTICLE 14    MISCELLANEOUS PROVISIONS .................................................................. 73
    14.1    No Admissions. ........................................................................................... 73
    14.2    Revocation or Withdrawal of the Plan......................................................... 73
    14.3    Standard for Approval of the Bankruptcy Court. ........................................ 74
    14.4    Further Assurances. ..................................................................................... 74
    14.5    Headings....................................................................................................... 74
    14.6    Notices.......................................................................................................... 74
    14.7    Governing Law. ........................................................................................... 75
    14.8    Limitation on Allowance. ............................................................................ 75
    14.9    Estimated Claims.......................................................................................... 75
    14.10   Consent to Jurisdiction. ............................................................................... 75
    14.11   Setoffs.......................................................................................................... 75
    14.12   Successors and Assigns. .............................................................................. 76
    14.13   Modification of Payment Terms. ................................................................. 76
    14.14   Entire Agreement.......................................................................................... 76
    14.15   Severability of Plan Provisions. .................................................................. 76
    14.16   Controlling Document................................................................................... 76
    14.17   Plan Supplement........................................................................................... 77
    14.18   Computation of Time.................................................................................... 77
    14.19   Substantial Consummation........................................................................... 77
    14.20   No Liability for Solicitation. ....................................................................... 77

## INDEX TO EXHIBITS TO PLAN

Exhibit A    –    Assumed Contracts

Exhibit B    –    FirstBank February 2014 Term Sheet

Exhibit C    –    Mainsail Claims

Exhibit D    –    Plan Funder Loan Agreement

Exhibit E    –    Rejected Contracts

Exhibit F    –    SIDG Shareholder Claims

## ARTICLE 1
## INTRODUCTION

Scrub Island Development Group Limited ("SIDG") and Scrub Island Construction Limited ("SICL"), as Debtors and Debtors in Possession in the Bankruptcy Cases, hereby propose the following Plan for the reorganization of the Debtors and the resolution of the outstanding Claims against and Equity Interests in the Debtors pursuant to the provisions of Chapter 11 of the Bankruptcy Code, and request Confirmation of the Plan pursuant to Section 1129 of the Bankruptcy Code. This Plan amends, restates and replaces in its entirety the Joint Plan of Reorganization of Scrub Island Development Group Limited and Scrub Island Construction Limited under Chapter 11 of Title 11, United States Code dated as of March 19, 2014 (Doc. No. 176). Capitalized terms used in the Plan shall have the meanings ascribed to such terms in Article 2.1 of the Plan. The Debtors are the proponents of the Plan within the meaning of Section 1129 of the Bankruptcy Code.

Although the Debtors' Estates are presently being jointly administered for procedural purposes, the Debtors and their Estates have not yet been substantively consolidated. Accordingly, the Plan is really two distinct plans, one for each of the Debtors. The Articles of the Plan generally apply to both of the Debtors, except where otherwise indicated.

Under Section 1125(b) of the Bankruptcy Code, a vote to accept or reject the Plan cannot be solicited from the Holder of a Claim or Equity Interest until such time as the Debtors' Disclosure Statement has been approved by the Bankruptcy Court and distributed to Holders of Claims and Equity Interests entitled to vote on the Plan. The Debtors' Disclosure Statement was approved by the Bankruptcy Court in the Disclosure Statement Approval Order, and the Disclosure Statement has been distributed simultaneously with the Plan to all Holders of Claims and Equity Interests whose votes are being solicited. The Disclosure Statement contains, among other things, (a) a discussion of the Debtors' history, businesses, properties, and operations, (b) the Projections for the Debtors' future operations, (c) a summary of significant events which have occurred to date in the Bankruptcy Cases, (d) a summary of the means of implementing and funding the Plan, and (e) the procedures for voting on the Plan. Unless otherwise ordered by the Bankruptcy Court, no materials, other than the Plan and the Disclosure Statement, Disclosure Statement Approval Order, and Ballot, have been approved by the Debtors or the Bankruptcy Court for use in soliciting acceptances or rejections of the Plan. ALL HOLDERS OF CLAIMS AGAINST AND EQUITY INTERESTS IN THE DEBTORS ENTITLED TO VOTE ON THE PLAN ARE ENCOURAGED TO READ THE PLAN AND THE DISCLOSURE STATEMENT, AND ANY EXHIBITS ATTACHED THERETO, IN THEIR ENTIRETY BEFORE VOTING TO ACCEPT OR REJECT THE PLAN.

Subject to certain restrictions and requirements set forth in Section 1127 of the Bankruptcy Code and Bankruptcy Rule 3019 and those restrictions on modifications to the Plan set forth in Article 13 of the Plan, the Debtors expressly reserve the right to alter, amend, modify, supplement, revoke or withdraw the Plan, one or more times, prior to the Plan's substantial consummation.

THE PLAN HAS BEEN APPROVED BY ALL OF THE DIRECTORS OF EACH OF THE DEBTORS.  IN THE OPINION OF THE DEBTORS, THE TREATMENT OF CLAIMS UNDER THE PLAN CONTEMPLATES A GREATER RECOVERY THAN THAT WHICH IS LIKELY TO BE ACHIEVED UNDER OTHER ALTERNATIVES FOR THE REORGANIZATION OR LIQUIDATION OF THE DEBTORS.  ACCORDINGLY, THE DEBTORS BELIEVE THAT CONFIRMATION OF THE PLAN IS IN THE BEST INTERESTS OF CREDITORS, AND THE DEBTORS RECOMMEND THAT CREDITORS VOTE TO ACCEPT THE PLAN.

NOTWITHSTANDING ANYTHING HEREIN TO THE CONTRARY, UNLESS OTHERWISE STATED, ALL STATEMENTS IN THE PLAN AND IN THE DISCLOSURE STATEMENT CONCERNING THE HISTORY OF THE DEBTORS' BUSINESSES, THE PAST OR PRESENT FINANCIAL CONDITION OF THE DEBTORS, THE PROJECTIONS FOR THE FUTURE OPERATIONS OF THE DEBTORS, TRANSACTIONS TO WHICH THE DEBTORS WERE OR ARE PARTY, OR THE EFFECT OF CONFIRMATION OF THE PLAN ON HOLDERS OF CLAIMS AGAINST AND EQUITY INTERESTS IN THE DEBTORS ARE ATTRIBUTABLE EXCLUSIVELY TO THE DEBTORS AND NOT TO ANY OTHER PARTY.

THE PLAN AND THE DISCLOSURE STATEMENT HAVE NOT BEEN REQUIRED TO BE PREPARED IN ACCORDANCE WITH FEDERAL OR STATE SECURITIES LAWS OR OTHER APPLICABLE NON-BANKRUPTCY LAW.  PERSONS OR ENTITIES TRADING IN OR OTHERWISE PURCHASING OR SELLING OR TRANSFERRING SECURITIES OF THE DEBTORS SHOULD EVALUATE THE PLAN AND THE DISCLOSURE STATEMENT IN LIGHT OF THE PURPOSES FOR WHICH THEY WERE PREPARED.

## ARTICLE 2
## DEFINED TERMS; RULES OF CONSTRUCTION

2.1    **Defined Terms**.

2.1.1    As used in the Plan, the following terms (which appear in the Plan as capitalized terms) shall have the meanings set forth below:

"**1 Month Anniversary Date**" means the date that is one (1) month after the Effective Date.

"**12 Month Anniversary Date**" means the date that is twelve (12) months after the Effective Date.

"**24 Month Anniversary Date**" means the date that is twenty-four (24) months after the Effective Date.

"**36 Month Anniversary Date**" means the date that is thirty-six (36) months after the Effective Date.

2

"**Administrative Expense**" means (a) any cost or expense of administration of the Bankruptcy Cases under Section 503(b) or Section 507(a)(1) of the Bankruptcy Code, to the extent the party claiming any such cost or expense files an application, motion, request or other Bankruptcy Court-approved pleading seeking such expense in the Bankruptcy Cases on or before the applicable Administrative Expense Claim Bar Date, including (i) any actual and necessary costs and expenses of preserving the Estates or operating the businesses of the Debtors (including wages, salaries, or commissions for services rendered) incurred on or after the Petition Date, (ii) any Postpetition cost, indebtedness or contractual obligation duly and validly incurred or assumed by the Debtors in Possession in the ordinary course of their businesses, (iii) any Claim granted administrative priority status by a Final Order of the Bankruptcy Court, (iv) any Claim by a Governmental Unit for taxes (and for interest and/or penalties related to such taxes) due from the Debtors for any Postpetition tax year or period, and (v) compensation or reimbursement of expenses of Professionals awarded or allowed pursuant to an order of the Bankruptcy Court under Section 330(a) or 331 of the Bankruptcy Code (including any amounts held back pursuant to an order of the Bankruptcy Court); (b) any Superpriority Claim; (c) all fees and charges assessed against the Estates under Chapter 123 of title 28, United States Code, 28 U.S.C. §§ 1911-1930; and (d) any and all other costs or expenses of administration of the Bankruptcy Cases that are allowed by a Final Order of the Bankruptcy Court; provided, however, that, when used in the Plan, the term "Administrative Expense" shall not include any Priority Tax Claim, any Cure Claim, any Environmental Claim, any Disallowed Claim, any Claims of the BVI Receiver (including, without limitation, for any fees and costs of any attorneys, accountants, advisors, brokers, investment bankers, or other professionals engaged by the BVI Receiver), or, unless otherwise expressly provided in the Plan, any of the Claims in Classes 1 through 14. In no event shall any Claim set out in a Proof of Claim be deemed to be an Administrative Expense (except for any Claim by a Governmental Unit for taxes (and for interest and/or penalties related to such taxes) due from the Debtors for any Postpetition tax year or period).

"**Administrative Expense Claim**" means any Claim for the payment of an Administrative Expense.

"**Administrative Expense Claim Bar Date**" means the date(s) established by one or more orders of the Bankruptcy Court as the deadline for the filing by any Creditor or other party in interest (including any Professional) of an application, motion, request or other Bankruptcy Court-approved pleading for allowance of any Administrative Expense Claim, including as established in the Disclosure Statement Approval Order. Any Holder of an Administrative Expense Claim (including a Holder of a Claim for Postpetition federal, state or local taxes) that does not file an application, motion, request or other Bankruptcy Court-approved pleading by the applicable Administrative Expense Claim Bar Date shall be forever barred, estopped and enjoined from ever asserting such Administrative Expense Claim against the Debtors, the Reorganized Debtors, or any of their respective Properties or Estates, and such Holder shall not be entitled to participate in any Distribution under the Plan on account of any such Administrative Expense Claim.

"**Affiliate**" means, with respect to any Person (other than the Debtors), (a) any other Person which, directly or indirectly, is in control of, is controlled by, or is under common

3

control with such Person, (b) any other Person that, directly or indirectly, owns or controls, whether beneficially, or as trustee, guardian or other fiduciary, twenty-five percent (25%) or more of the equity interests having ordinary voting power in the election of directors of such Person, or (c) any other Person who is a director, officer, joint venturer or partner (i) of such Person, (ii) of any subsidiary of such Person, or (iii) of any Person described in clause (a) above. For the purposes of this definition, control of a Person shall mean the power (direct or indirect) to direct or cause the direction of the management and policies of such Person whether by contract or otherwise. When used in the Plan as relating to the Debtors, the term "Affiliate" has the meaning ascribed to such term in Section 101(2) of the Bankruptcy Code.

"**Allowed Amount**" means the dollar amount in which a Claim is allowed.

"**Allowed Claim**" means a Claim or that portion of a Claim which is not a Disputed Claim or a Disallowed Claim and (a) as to which a Proof of Claim was filed with the Clerk's Office on or before the Bar Date or the Governmental Unit Bar Date, as applicable, or, by order of the Bankruptcy Court, was not required to be so filed, or (b) as to which no Proof of Claim was filed with the Clerk's Office on or before the Bar Date or the Governmental Unit Bar Date, as applicable, but which has been or hereafter is listed by the Debtors in the Schedules as liquidated in amount and not disputed or contingent, and, in the case of subparagraph (a) and (b) above, as to which either (i) no objection to the allowance of such Claim has been filed within the time allowed for the making of objections as fixed by the Plan, the Bankruptcy Code, the Bankruptcy Rules, or an order of the Bankruptcy Court, or (ii) any objection as to the allowance of such Claim has been settled or withdrawn or has been overruled by a Final Order. "Allowed Claim" shall also include a Claim that is allowed by the Bankruptcy Court in a Final Order. "Allowed", when used as an adjective herein (such as Allowed Administrative Expense Claim, Allowed Cure Claim, Allowed Priority Tax Claim, Allowed Priority Claim, Allowed Secured Claim, and Allowed Unsecured Claim), has a corresponding meaning.

"**Allowed Class ... Claim**" means an Allowed Claim in the particular Class described.

"**Assumed Contracts**" has the meaning ascribed to such term in Article 7.1 of the Plan. A list of the Assumed Contracts is set forth in Exhibit A attached to the Plan.

"**Avoidance Actions**" means any and all actions to avoid or recover a transfer of Property of the Debtors' Estates or an interest of the Debtors in Property, which a trustee, debtor in possession or other appropriate party in interest may assert on behalf of the Debtors' Estates under Chapter 5 of the Bankruptcy Code, including actions under one or more provisions of Section 542, 544, 545, 547, 548, 549, 550, 551 or 553 of the Bankruptcy Code or under any other similar applicable federal, state or common law, regardless of whether or not such action has been commenced prior to the Effective Date.

"**Ballot**" means the Ballot, accompanying the Disclosure Statement and the Plan, on which Holders of Impaired Claims entitled to vote on the Plan may indicate their acceptance or rejection of the Plan in accordance with the Voting Instructions.

"**Bankruptcy Cases**" means, collectively, the jointly administered cases of the Debtors currently pending before the Bankruptcy Court under Chapter 11 of the Bankruptcy Code, which cases were commenced by the Debtors on the Petition Date and presently bear Case No. 8:13-bk-15285-MGW (Scrub Island Development Group Limited) and Case No. 8:13-bk-15286-MGW (Scrub Island Construction Limited).

"**Bankruptcy Code**" means title 11 of the United States Code, 11 U.S.C. §§ 101 et seq., as in effect on the Petition Date, together with all amendments and modifications thereto that were subsequently made applicable to the Bankruptcy Cases.

"**Bankruptcy Counsel**" means Stichter, Riedel, Blain & Prosser, P. A.

"**Bankruptcy Court**" means the United States Bankruptcy Court for the Middle District of Florida, Tampa Division, or, as the context requires, any other court of competent jurisdiction exercising jurisdiction over the Bankruptcy Cases.

"**Bankruptcy Rules**" means the Federal Rules of Bankruptcy Procedure, as promulgated under Section 2075 of title 28 of the United States Code, and the Local Rules, as in effect on the Petition Date, together with all amendments and modifications thereto that were subsequently made applicable to the Bankruptcy Cases.

"**Bar Date**" means February 3, 2014, the date set by the Bankruptcy Court in the Notice of Commencement as the last day for filing a Proof of Claim against the Debtors in the Bankruptcy Cases, excluding (a) a Prepetition Claim of a Governmental Unit, for which a Proof of Claim must be filed with the Bankruptcy Court by the Governmental Unit Bar Date, (b) an Administrative Expense Claim, for which a request for payment of an Administrative Expense must be filed with the Bankruptcy Court by the Administrative Expense Claim Bar Date, (c) a Claim for which a bar date may have been otherwise established by a Final Order of the Bankruptcy Court, for which a Proof of Claim must be filed with the Bankruptcy Court by the date set forth in such Final Order, and (d) a Claim with respect to an executory contract or unexpired lease that is assumed or rejected pursuant to the Plan (as to which the bar date shall be as set forth in Article 7.4 or Article 7.5, respectively, of the Plan) or a Final Order of the Bankruptcy Court (as to which the bar date shall be as set forth in such Final Order).

"**Blue Water Traders**" means Blue Water Traders Ltd., a limited company incorporated under the laws of the British Virgin Islands.

"**Blue Water Traders Allowed Class 5 Claim**" has the meaning ascribed to such term in Article 5.6.2.1 of the Plan.

"**Blue Water Traders Loan**" means a Prepetition loan made by FirstBank to Blue Water Traders, Oscar Juelle, and Maria Cristina Feo Franco in connection with Site LV4.

"**Blue Water Traders Prepetition Claims**" means any and all Claims of Blue Water Traders against the Debtors represented by, relating to, or arising under or in connection

with the Blue Water Traders Loan, the Blue Water Traders Prepetition Contracts, the Blue Water Traders Proofs of Claim, and Site LV4.

"**Blue Water Traders Prepetition Contracts**" means, collectively, (a) that certain Site Purchase and Sale Agreement, effective as of August 12, 2006, by and between Blue Water Traders and SIDG, and (b) that certain Construction Contract – Longview Residences by and between Blue Water Traders and SICL, in each case with respect to Site LV4.

"**Blue Water Traders Proofs of Claim**" means, collectively, Proof of Claim Number 6 filed by Blue Water Traders in Case No. 8:13-bk-15285-MGW (Scrub Island Development Group Limited) and Proof of Claim Number 1 filed by Blue Water Traders in Case No. 8:13-bk-15286-MGW (Scrub Island Construction Limited).

"**Blue Water Traders Settlement**" has the meaning ascribed to such term in Article 5.6.2 of the Plan.

"**Blue Water Traders Settlement Agreement**" has the meaning ascribed to such term in Article 5.6.3 of the Plan.

"**Business Day**" means any day other than (a) a Saturday, (b) a Sunday, (c) a "legal holiday" (as "legal holiday" is defined in Bankruptcy Rule 9006(a)), or (d) a day on which commercial banks in Tampa, Florida are required or authorized to close by law.

"**BVI Receiver**" means Meade Malone and/or MWM Corporate Services Limited.

"**BVI Receivership Proceeding**" means the proceeding pending in The Eastern Caribbean Supreme Court In the High Court of Justice Virgin Islands, Claim No. BVIHC (Com) 2013/0139, styled: *In the Matter of a Mortgagee's Claim by FirstBank Puerto Rico (the "Bank") pursuant the CPR Part 66(1)(c)(d) and (g) for the Payment of Monies Secured by Mortgage, for Possession and the Sale of Mortgaged Property by FirstBank Puerto Rico, Claimant, and Scrub Island Construction Limited, Scrub Island Development Group Limited, Joe Collier, CIH Loft LLC, Defendants/Respondents.*

"**Cash**" means cash, cash equivalents and other readily marketable direct obligations of the United States, as determined in accordance with generally accepted accounting principles, including bank deposits, certificates of deposit, checks and similar items. When used in the Plan with respect to a Distribution under the Plan, the term "Cash" means lawful currency of the United States, a certified check, a cashier's check, a wire transfer of immediately available funds from any source, or a check from Reorganized SIDG drawn on a domestic bank.

"**Causes of Action**" means any and all of the Debtors' or the Estates' actions, claims, demands, rights, defenses, counterclaims, suits and causes of action, whether known or unknown, in law, equity or otherwise, against any Creditor or other third party, including (a) the Avoidance Actions, and (b) any and all other claims or rights or proceedings of any value whatsoever, at law or in equity, turnover actions and claims of the type referred to in the

Disclosure Statement or in Article 8.8 of the Plan. The Causes of Action shall vest in the Reorganized Debtors (as applicable) on the Effective Date. When used in the Plan, the term "Causes of Action" shall not include any claims, obligations, suits, judgments, damages, rights, remedies, causes of action, charges, costs, debts, indebtedness, or liabilities expressly released or waived by the Debtors pursuant to the Plan or a Final Order of the Bankruptcy Court.

**"Causes of Action Recoveries"** means the proceeds, benefits and other recoveries of any Causes of Action received by the Reorganized Debtors.

**"Claim"** has the meaning ascribed to such term in Section 101(5) of the Bankruptcy Code. Notwithstanding anything to the contrary contained herein, when used in the Plan, the term "Claim" shall be given the broadest possible meaning permitted by applicable law and shall include all manner and type of claim, whenever and wherever such claim may arise, including Administrative Expense Claims, Environmental Claims, and claims based upon or arising under the laws of the British Virgin Islands.

**"Claims Objection Deadline"** means the date that is sixty (60) days following the date of the entry of the Confirmation Order on the Docket, unless such date is extended by motion of the Debtors or the Reorganized Debtors.

**"Class"** means a category of Claims or Equity Interests classified together as described in Article 4 of the Plan.

**"Clerk"** means the Clerk of the Bankruptcy Court.

**"Clerk's Office"** means the Office of the Clerk of the Bankruptcy Court located at the Sam M. Gibbons United States Courthouse, 801 N. Florida Avenue, 5th Floor, Tampa, Florida 33602.

**"Closing"** means the closing under (a) the Plan Funder Loan Agreement, (b) the FirstBank New Loan A Documents (or, if applicable, the FirstBank New Loan B Documents), and (c) the Longview Villa Owner Settlement Agreements, and the other transactions contemplated in the Plan in connection with the foregoing, all of which shall occur on the Closing Date.

**"Closing Date"** means the date of the Closing.

**"Collateral"** means Property in which any of the Estates has (or had) an interest and that secures (or secured), in whole or part, whether by agreement, statute, or judicial decree, the payment of a Claim.

**"Confirmation"** or **"Confirmation of the Plan"** means the confirmation of the Plan by the Bankruptcy Court.

7

"**Confirmation Date**" means the date on which the Confirmation Order is entered on the Docket by the Clerk pursuant to Bankruptcy Rule 5003(a).

"**Confirmation Hearing**" means the hearing at which the Bankruptcy Court considers Confirmation of the Plan and related matters pursuant to Section 1128(a) of the Bankruptcy Code, as such hearing may be adjourned or continued from time to time.

"**Confirmation Order**" means the order of the Bankruptcy Court in the Bankruptcy Cases confirming the Plan pursuant to Section 1129 and other applicable sections of the Bankruptcy Code, as such order may be amended, modified or supplemented, which order shall be in form and substance acceptable to the Debtors and the Plan Funder.

"**Creditor**" means the Holder of a Claim, within the meaning of Section 101(10) of the Bankruptcy Code, including Secured Creditors, Unsecured Creditors, Creditors with Administrative Expense Claims, Priority Tax Claims, Priority Claims, Cure Claims, and Environmental Claims, and Creditors with Claims based upon or arising under the laws of the British Virgin Islands.

"**Creditors Committee**" means the Committee of the Unsecured Creditors appointed by the United States Trustee in the Bankruptcy Cases pursuant to Section 1102 of the Bankruptcy Code on December 12, 2013 (Doc. No. 64), as such appointment was amended by the United States Trustee on February 27, 2014 (Doc. No. 162), and as the membership of the Creditors Committee may hereafter be further amended or modified by the United States Trustee.

"**Cure Claim**" means any Claim of any nature whatsoever, including any Claim for any cure payment, cost or other amount, if any, due and owing by the Debtors pursuant to Section 365(b) of the Bankruptcy Code or otherwise and any Claim for a default (monetary or non-monetary), arising from, relating to or in connection with the assumption by the Debtors of any Assumed Contract under the Plan (provided such Claim is filed with the Bankruptcy Court by the Cure Claim Submission Deadline). In no event shall any Claim set out in a Proof of Claim be deemed to be a Cure Claim.

"**Cure Claim Submission Deadline**" means, and shall occur on the same day as, the Voting Deadline.

"**Dardet**" means Pablo L. Dardet, an individual residing in the Commonwealth of Puerto Rico.

"**Dardet Allowed Class 6 Claim**" has the meaning ascribed to such term in Article 5.7.2.1 of the Plan.

"**Dardet Prepetition Claims**" means any and all Claims of Dardet against the Debtors represented by, relating to, or arising under or in connection with the Dardet Prepetition Contracts, the Dardet Scheduled Claim, and Site LV9.

"**Dardet Prepetition Contracts**" means, collectively, (a) that certain Site Purchase and Sale Agreement, effective as of May 15, 2006, by and between Dardet and SIDG, and (b) that certain Construction Contract – Longview Residences, effective as of July 5, 2006, by and between Dardet and SICL, in each case with respect to Site LV9.

"**Dardet Scheduled Claim**" means a Claim in the amount of $1,414,355.00 scheduled for Dardet in Case No. 8:13-bk-15286-MGW (Scrub Island Construction Limited).

"**Dardet Settlement**" has the meaning ascribed to such term in Article 5.7.2 of the Plan.

"**Dardet Settlement Agreement**" has the meaning ascribed to such term in Article 5.7.3 of the Plan.

"**Davis**" means Alf Nolan Davis d/b/a A. N. Davis Plumbing and Electrical Services.

"**Davis Allowed Class 12 Claim**" has the meaning ascribed to such term in Article 5.13.3.1 of the Plan.

"**Davis BVI Proceeding**" means the proceeding pending in The Eastern Caribbean Supreme Court In the High Court of Justice Commercial Division The Virgin Islands, Claim No. BVIHCV2014/0032, styled: *Alf Nolan Davis d/b/a A.N. Davis Plumbing and Electrical Services, Claimant, and Scrub Island Development Group Limited, Defendant.*

"**Davis Prepetition Claims**" means any and all Claims of Davis against the Debtors represented by, relating to, or arising under or in connection with the Davis BVI Proceeding and the Davis Proofs of Claim.

"**Davis Proofs of Claim**" means, collectively, Proof of Claim Number 11, Proof of Claim Number 12, and Proof of Claim Number 13 filed by, or on behalf of, Davis in Case No. 8:13-bk-15285-MGW (Scrub Island Development Group Limited).

"**Davis Settlement**" has the meaning ascribed to such term in Article 5.13.3 of the Plan.

"**Davis Settlement Agreement**" has the meaning ascribed to such term in Article 5.13.4 of the Plan.

"**Debt**" has the meaning ascribed to such term in Section 101(12) of the Bankruptcy Code.

"**Debtors**" means, collectively, SIDG and SICL.

"**Debtors in Possession**" means, collectively, SIDG and SICL, as debtors in possession in the Bankruptcy Cases.

"**Determination Date**" means the later of (a) the Effective Date and (b) the date the order of the Bankruptcy Court allowing a Claim becomes a Final Order (if applicable).

"**DIP Advances**" means the aggregate outstanding Postpetition advances extended to SIDG by the DIP Lender pursuant to the DIP Loan Documents and in accordance with and subject to the terms and conditions of the DIP Financing Order.

"**DIP Facility**" has the meaning ascribed to such term in Article 3.3.1 of the Plan.

"**DIP Financing Order**" means, collectively, any interim order and/or Final Order entered by the Bankruptcy Court in the Bankruptcy Cases after the date of the Plan authorizing any DIP Advances.

"**DIP Lender**" means RCB Equities #1, LLC, a California limited liability company, in its capacity as lender under the DIP Loan Documents.

"**DIP Lender Allowed Claim**" means the Allowed Claim of the DIP Lender in an amount equal to the outstanding balance of the DIP Loan Claims as of the Effective Date as determined by the terms and provisions of the DIP Loan Documents and the DIP Financing Order.

"**DIP Loan Claims**" means any and all Claims of the DIP Lender represented by, relating to, or arising under or in connection with the DIP Loan Documents and the DIP Financing Order, whether Administrative Expense Claims or Secured Claims, including the DIP Advances and accrued and unpaid interest.

"**DIP Loan Documents**" means all of the documents evidencing the DIP Loan Claims, and all other documents executed in connection therewith, as any such document has been amended, modified or supplemented thereafter in accordance with its terms.

"**Disallowed Claim**" means any Claim which has been disallowed by an order of the Bankruptcy Court, which order has not been stayed pending appeal.

"**Disclosure Statement**" means the First Amended Joint Disclosure Statement for First Amended Joint Plan of Reorganization of Scrub Island Development Group Limited and Scrub Island Construction Limited under Chapter 11 of Title 11, United States Code dated as of July 11, 2014, including all Exhibits attached thereto, as submitted and filed by the Debtors pursuant to Section 1125 of the Bankruptcy Code in respect of the Bankruptcy Cases and approved by the Bankruptcy Court in the Disclosure Statement Approval Order, and as such Disclosure Statement may be amended, supplemented, modified or amended and restated from time to time.

"**Disclosure Statement Approval Order**" means the Order Approving First Amended Disclosure Statement, Fixing Time to File Applications for Administrative Expenses, Setting Hearing on Confirmation of First Amended Plan, and Setting Deadlines with Respect to

Confirmation Hearing dated August _____, 2014 and entered in the Bankruptcy Cases (Doc. No. ___).

**"Disputed Claim"** means any Claim or portion thereof (other than a Disallowed Claim) that is not an Allowed Claim and (a) as to which a Proof of Claim has been filed with the Clerk's Office or is deemed filed under applicable law or order of the Bankruptcy Court, or (b) which has been scheduled in the Schedules, and, in the case of subparagraph (a) and (b) above, as to which an objection has been or may be timely filed or deemed filed under the Plan, the Bankruptcy Code, the Bankruptcy Rules, or an order of the Bankruptcy Court and any such objection has not been (i) withdrawn, (ii) overruled by an order of the Bankruptcy Court, or (iii) sustained by an order of the Bankruptcy Court.  In addition to the foregoing, a Disputed Claim shall mean a Claim that is not an Allowed Claim, whether or not an objection has been or may be timely filed, if (a) the amount of the Claim specified in the Proof of Claim exceeds the amount of any corresponding Claim scheduled in the Schedules, (b) the classification of the Claim specified in the Proof of Claim differs from the classification of any corresponding Claim scheduled in the Schedules, (c) any corresponding Claim has been scheduled in the Schedules as disputed, contingent or unliquidated, (d) no corresponding Claim has been scheduled in the Schedules, or (e) such Claim is reflected as unliquidated or contingent in the Proof of Claim filed in respect thereof.  To the extent an objection relates to the allowance of only a part of a Claim, such Claim shall be a Disputed Claim only to the extent of the amount subject to objection.  "Disputed", when used as an adjective herein (such as Disputed Administrative Expense Claim, Disputed Cure Claim, Disputed Priority Tax Claim, Disputed Priority Claim, Disputed Secured Claim, and Disputed Unsecured Claim), has a corresponding meaning.

**"Distribution"** means a distribution of Cash to a Creditor on account of an Allowed Claim pursuant to the terms of the Plan.

**"Distribution Date"** means, when used with respect to an Allowed Administrative Expense Claim (including Allowed Administrative Expense Claims of Professionals), an Allowed Claim in Class 1, or an Allowed Secured Tax Claim in Class 3, the date which is as soon as reasonably practicable (as determined by Reorganized SIDG) after the Determination Date, but in no event more than ten (10) days after the Determination Date. "Distribution Date," when used with respect to an Allowed Priority Tax Claim or Allowed Claims in Classes 4 through 13, means the date or dates for any Distribution to Holders of Allowed Priority Tax Claims or Allowed Claims in Classes 4 through 13 as provided in the Plan or any Plan Document, unless such date or dates have been otherwise established by a Final Order of the Bankruptcy Court.

**"Doc. No."** means the number of a pleading as entered in the Docket.

**"Docket"** means the docket in the Bankruptcy Cases maintained by the Clerk.

**"Effective Date"** means, and shall occur on, the first Business Day on which all of the conditions precedent to the occurrence of the Effective Date contained in Article 10.2 of the Plan have been satisfied or waived as provided therein.

11

"**Effective Date Notice**" has the meaning ascribed to such term in <u>Article 10.3</u> of the Plan.

"**Entity**" has the meaning ascribed to such term in Section 101(15) of the Bankruptcy Code.

"**Environmental Claim**" means any Claim or demand now existing or hereafter arising (including all thereof in the nature of or sounding in tort, contract, warranty or under any other theory of law or equity) against the Debtors, their predecessors, successors or assigns, or Affiliates, or their present or former officers, directors or employees, arising out of, or related to, any Environmental Laws, including any Claim or demand: (a) to restrict or enjoin, or recover damages, costs or expenses to remedy, any release, environmental pollution, contamination or nuisance or to require the Debtors to remedy or to reimburse, pay or incur costs to remedy any release, environmental pollution, contamination or nuisance, (b) to remedy, reimburse, compensate or pay any damage, penalty, fine or forfeiture for, or to restrict or enjoin, any violation of or alleged violation of any Environmental Laws, (c) to pay any contractual claim with respect to any Environmental Laws, or (d) to pay or reimburse any Person or Entity for personal injury (including worker's compensation, sickness, disease or death), tangible or intangible property damage or natural resource damage arising out of, or relating to, any release, environmental pollution, contamination or nuisance, whether or not contemplated in subparagraphs (a) through (c) above, or whether or not such Claim or demand is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, secured or unsecured, or whether or not the facts of or legal basis for such Claim or demand are known or unknown, or whether or not the injury or damage giving rise to such Claim or demand was diagnosable, undiagnosable, detectable or undetectable before the Confirmation of the Plan or before the Final Decree Date.   Notwithstanding anything to the contrary contained herein, when used in the Plan, the term "Environmental Claim" shall be broadly construed and shall include (a) claims that may or may not presently constitute "claims" within the meaning of Section 101(5) of the Bankruptcy Code and (b) demands that may or may not presently constitute "demands" within the meaning of Section 524(g)(5) of the Bankruptcy Code.

"**Environmental Laws**" means all federal, state, local and foreign laws, statutes, ordinances, codes, rules, standards and regulations, now or hereafter in effect, and any judicial or administrative interpretation thereof, including any judicial or administrative order, consent decree, or judgment, imposing liability or standards of conduct for or relating to the regulation and protection of human health, safety, the environment and natural resources (including ambient air, surface water, groundwater, wetlands, land surface or subsurface strata, wildlife, aquatic species and vegetation). As used in the Plan, the term "Environmental Laws" shall  include (a) the Comprehensive Environmental Response, Compensation and Liability Act of 1980, as amended by the Superfund Amendments and Reauthorization Act of 1986, 42 U.S.C. §§ 9601, <u>et</u> <u>seq.</u>, (b) the Resource Conservation and Recovery Act, as amended by the Hazardous and Solid Waste Amendment of 1984, 42 U.S.C. §§ 6901, <u>et seq.</u>, (c) the Clean Air Act, 42 U.S.C. §§ 7401, <u>et seq.</u>, (d) the Clean Water Act of 1977, 33 U.S.C. §§ 1251, <u>et seq.</u>, (e) the Toxic Substances Control Act, 15 U.S.C. §§ 2601, <u>et seq.</u>, (f) the Oil Pollution Act of 1990 (OPA 90), (g) the Hazardous Materials Transportation Authorization Act of 1994, 49 U.S.C. §§ 5101, <u>et seq.</u>, (h) the Federal Insecticide, Fungicide, and Rodenticide Act, 7 U.S.C. §§ 136, <u>et seq.</u>, (i) the Solid

Waste Disposal Act, 42 U.S.C. §§ 6901, et seq., (j) the Federal Water Pollution Control Act, 33 U.S.C. §§ 1251, et seq., (k) the Occupational Safety and Health Act, 29 U.S.C. §§ 651, et seq., (l) the Safe Drinking Water Act, 42 U.S.C. §§ 300(f), et seq., (m) all other statutes or laws issued or promulgated by any Governmental Unit, as they may be amended from time to time, relating to environmental contamination or pollution, air pollution, water pollution, noise control and/or the handling, transportation, discharge, existence, release, disposal or recovery of on-site or off-site hazardous, toxic or dangerous wastes, substances, chemicals or materials (including petroleum), including any transfer of ownership notification or approval statutes, and (n) the ordinances, rules, regulations, orders, notices of violation, requests, demands and requirements issued or promulgated by any Governmental Unit in connection with such statutes or laws.

"**Equity Interests**" means, collectively, the SICL Equity Interests and the SIDG Equity Interests.

"**Estates**" means, collectively, the estates created for the Debtors by Section 541 of the Bankruptcy Code upon the commencement of the Bankruptcy Cases.

"**Estimation Hearing**" means a hearing for the estimation of Claims under Section 502(c) of the Bankruptcy Code.

"**Exculpated Parties**" has the meaning ascribed to such term in Article 11.2 of the Plan.

"**Exhibit**" means an exhibit annexed to the Plan or to the Disclosure Statement, as the context requires.

"**Final Decree**" means the final decree for the Bankruptcy Cases entered by the Bankruptcy Court after the Effective Date pursuant to Bankruptcy Rule 3022.

"**Final Decree Date**" means the date on which the Final Decree, obtained after a hearing on notice to the Notice Parties and to such other Persons and Entities as the Bankruptcy Court may direct, is entered on the Docket.

"**Final Order**" means (a) an order, judgment, ruling or other decree (or any revision, modification or amendment thereto) issued and entered by the Bankruptcy Court or by any state or other federal court as may have jurisdiction over any proceeding in connection with the Bankruptcy Cases for the purpose of such proceeding, which order, judgment, ruling or other decree has not been reversed, vacated, stayed, modified or amended and as to which (i) no appeal, petition for review, reargument, rehearing, reconsideration or certiorari has been taken and is pending and the time for the filing of any such appeal, petition for review, reargument, rehearing, reconsideration or certiorari has expired, or (ii) such appeal or petition has been heard and dismissed or resolved and the time to further appeal or petition has expired with no further appeal or petition pending; or (b) a stipulation or other agreement entered into which has the effect of any such aforesaid order, judgment, ruling or other decree with like finality.

13

"**FirstBank**" means FirstBank Puerto Rico, a commercial banking institution incorporated under the laws of the Commonwealth of Puerto Rico, and its Affiliates and their respective successors or assigns.

"**FirstBank Additional Interest Reserve Account**" has the meaning ascribed to such term in Article 5.3.4.4 of the Plan.

"**FirstBank Allowed Class 2A Secured Claim**" has the meaning ascribed to such term in Article 5.3.4.1 of the Plan.

"**FirstBank Allowed Class 2B Secured Claim**" has the meaning ascribed to such term in Article 5.3.5.1 of the Plan.

"**FirstBank Construction Escrow Agreement**" has the meaning ascribed to such term in Article 5.3.4.6 of the Plan.

"**FirstBank Deficiency Claim**" has the meaning ascribed to such term in Article 5.3.4.10 of the Plan.

"**FirstBank Down Payment**" has the meaning ascribed to such term in Article 5.3.4.2 of the Plan.

"**FirstBank February 2014 Term Sheet**" means the Term Sheet for the treatment of the FirstBank Prepetition Claims under a plan of reorganization of the Debtors, which was accepted and executed by FirstBank on February 7, 2014.  A copy of the FirstBank February 2014 Term Sheet is attached to the Plan as Exhibit B.

"**FirstBank Guaranty**" means any and all guarantees executed from time to time by the Guarantor in favor of FirstBank with respect to the FirstBank Prepetition Claims.

"**FirstBank Initial Interest Reserve Account**" has the meaning ascribed to such term in Article 5.3.4.4 of the Plan.

"**FirstBank Injunction Adversary Proceeding**" means the adversary proceeding filed in the Bankruptcy Cases styled as *Scrub Island Development Group Limited and Scrub Island Construction Limited, Plaintiffs, v. FirstBank Puerto Rico, Defendant*, Adv. Pro. No. 8:13-ap-01071-MGW.

"**FirstBank Lender Liability Adversary Proceeding**" means the adversary proceeding filed in the Bankruptcy Cases styled as *Scrub Island Development Group Limited and Scrub Island Construction Limited, Plaintiffs, v. FirstBank Puerto Rico, Defendant*, Adv. Pro. No. 8:14-ap-00534-MGW.

14

"**FirstBank New Guaranty**" has the meaning ascribed to such term in <u>Article 5.3.5.10</u> of the Plan.

"**FirstBank New Loan A Documents**" means all of the documents evidencing the FirstBank Reduced Class 2A Secured Claim, including the FirstBank New Term A Note, the FirstBank New Loan A Security Documents, and all other documents executed in connection therewith, as any such documents may be amended, modified or supplemented thereafter in accordance with their terms.

"**FirstBank New Loan B Documents**" means all of the documents evidencing the FirstBank Reduced Class 2B Secured Claim, including the FirstBank New Term B Note, the FirstBank New Loan B Security Documents, the FirstBank New Guaranty, and all other documents executed in connection therewith, as any such documents may be amended, modified or supplemented thereafter in accordance with their terms.

"**FirstBank New Loan A Security Documents**" has the meaning ascribed to such term in <u>Article 5.3.4.5</u> of the Plan.

"**FirstBank New Loan B Security Documents**" has the meaning ascribed to such term in <u>Article 5.3.5.5</u> of the Plan.

"**FirstBank New Term A Note**" has the meaning ascribed to such term in <u>Article 5.3.4.3</u> of the Plan.

"**FirstBank New Term B Note**" has the meaning ascribed to such term in <u>Article 5.3.5.3</u> of the Plan.

"**FirstBank Option A**" has the meaning ascribed to such term in <u>Article 5.3.3.1</u> of the Plan.

"**FirstBank Option B**" has the meaning ascribed to such term in <u>Article 5.3.3.2</u> of the Plan.

"**FirstBank Prepetition Claims**" means any and all Secured Claims and other Claims of FirstBank represented by, relating to, or arising under or in connection with the FirstBank Prepetition Loan Documents; provided, however, that, when used in the Plan, the term "FirstBank Prepetition Claims" shall not include the Class 13 Claims of FirstBank.

"**FirstBank Prepetition Loan Documents**" means all of the Prepetition documents evidencing the FirstBank Prepetition Claims and any and all other documents executed by the Debtors, the Guarantor or FirstBank in any way relating to the FirstBank Prepetition Claims, as any such documents have been amended, modified or supplemented thereafter in accordance with their terms.

"**FirstBank Proofs of Claim**" means, collectively, (a) Proof of Claim Number 10 filed by FirstBank in Case No. 8:13-bk-15285-MGW (Scrub Island Development Group Limited) and (b) Proof of Claim Number 3 filed by FirstBank in Case No. 8:13-bk-15286-MGW (Scrub Island Construction Limited).

"**FirstBank Reduced Class 2A Secured Claim**" has the meaning ascribed to such term in Article 5.3.4.2 of the Plan.

"**FirstBank Reduced Class 2B Secured Claim**" has the meaning ascribed to such term in Article 5.3.5.2 of the Plan.

"**Frederick**" means Thomas Frederick, an individual residing in the United States.

"**Frederick Allowed Class 7 Claim**" has the meaning ascribed to such term in Article 5.8.2 of the Plan.

"**Frederick Prepetition Claims**" means any and all Claims of Frederick against the Debtors represented by, relating to, or arising under or in connection with the Frederick Prepetition Contracts, the Frederick Proof of Claim, and Site LV2.

"**Frederick Prepetition Contracts**" means, collectively, (a) that certain Site Purchase and Sale Agreement, effective as of March 20, 2007, by and between Frederick and SIDG, and (b) that certain Construction Contract – Long View Residences, effective as of February 2, 2007, by and between Frederick and SICL, in each case with respect to Site LV2.

"**Frederick Proof of Claim**" means Proof of Claim Number 4 filed by Frederick in Case No. 8:13-bk-15285-MGW (Scrub Island Development Group Limited).

"**Frederick Settlement Agreement**" has the meaning ascribed to such term in Article 5.8.4 of the Plan.

"**Governmental Unit**" has the meaning ascribed to such term in Section 101(27) of the Bankruptcy Code.

"**Governmental Unit Bar Date**" means one hundred eighty (180) days from the Petition Date (i.e., May 19, 2014), the last day for a Governmental Unit to file a Proof of Claim against the Debtors in the Bankruptcy Cases.

"**Guarantor**" means Joe C. Collier III.

"**Holder**" means (a) as to any Claim, (i) the owner or holder of such Claim as such is reflected on the Proof of Claim filed with respect to such Claim, or (ii) if no Proof of Claim has been filed with respect to such Claim, the owner or holder of such Claim as such is reflected on the Schedules or the books and records of the Debtors or as otherwise determined by order of the Bankruptcy Court, or (iii) if the owner or holder of such Claim has assigned or

16

transferred the Claim to a third party and the Debtors or Reorganized SIDG, as the case may be, have received sufficient written evidence of such assignment or transfer, the assignee or transferee; and (b) as to any Equity Interest, the record owner or holder of such Equity Interest as shown on the stock register that is maintained by the Debtors or their agent in the British Virgin Islands or as otherwise determined by order of the Bankruptcy Court.

**"Impaired"** refers to any Claim or Equity Interest that is impaired within the meaning of Section 1124 of the Bankruptcy Code.

**"Initial Distribution"** has the meaning ascribed to such term in <u>Article 9.1</u> of the Plan.

**"Intercompany Claim"** means any Claim which one Debtor holds against another Debtor.

**"Liabilities"** means any and all liabilities, obligations, judgments, damages, charges, costs, Debts, and indebtedness of any and every kind and nature whatsoever, whether heretofore, now or hereafter owing, arising, due or payable, direct or indirect, absolute or contingent, liquidated or unliquidated, known or unknown, foreseen or unforeseen, in law, equity or otherwise, of or relating to the Debtors or any predecessor, successor or assign thereof, or otherwise based in whole or in part upon any act or omission, transaction, event or other occurrence taking place prior to the Effective Date in any way relating to the Debtors or any predecessor, successor or assign thereof, any Property of the Debtors, the businesses or operations of the Debtors, the Bankruptcy Cases, or the Plan, including any and all liabilities, obligations, judgments, damages, charges, costs, Debts, and indebtedness based in whole or in part upon any Claim of or relating to successor liability, transferee liability, or other similar theory; provided, however, that, when used in the Plan, the term "Liabilities" shall not include any obligations of the Reorganized Debtors expressly set forth in the Plan.

**"LIBOR Rate"** means the London Interbank Offered Rate as published in <u>The Wall Street Journal</u>.

**"Lien"** means, with respect to any Property, any mortgage, pledge, security interest, lien, right of first refusal, option or other right to acquire, assignment, charge, claim, easement, conditional sale agreement, title retention agreement, defect in title, or other encumbrance or hypothecation or restriction of any nature pertaining to or affecting such Property, whether voluntary or involuntary and whether arising by law, contract or otherwise.

**"Linares/Foster"** means, collectively, Luis Arturo Linares, David G. Foster, and Scrub Island, LLC.

**"Linares/Foster Allowed Class 8 Claim"** has the meaning ascribed to such term in <u>Article 5.9.2.1</u> of the Plan.

**"Linares/Foster Loan"** means a Prepetition loan in the original principal amount of $1,610,000.00 made by FirstBank Virgin Islands, a division of FirstBank, to Linares/Foster in

17

connection with Site LV5.

**"Linares/Foster Prepetition Claims"** means any and all Claims of Linares/Foster against the Debtors represented by, relating to, or arising under or in connection with the Linares/Foster Loan, the Linares/Foster Prepetition Contracts, the Linares/Foster Proofs of Claim, and Site LV5.

**"Linares/Foster Prepetition Contracts"** means, collectively, (a) that certain Site Purchase and Sale Agreement, effective as of February 2, 2007, by and between Luis Arturo Linares and David Foster and SIDG, and (b) that certain Construction Contract – Long View Residences, effective as of February 2, 2007, by and between Luis Arturo Linares and David Foster and SICL, in each case with respect to Site LV5.

**"Linares/Foster Proofs of Claim"** means, collectively, Proof of Claim Number 7 filed by Linares/Foster in Case No. 8:13-bk-15285-MGW (Scrub Island Development Group Limited) and Proof of Claim Number 2 filed by Linares/Foster in Case No. 8:13-bk-15286-MGW (Scrub Island Construction Limited).

**"Linares/Foster Settlement"** has the meaning ascribed to such term in Article 5.9.2 of the Plan.

**"Linares/Foster Settlement Agreement"** has the meaning ascribed to such term in Article 5.9.3 of the Plan.

**"Local Rules"** means the Local Rules of the United States Bankruptcy Court for the Middle District of Florida, as in effect on the Petition Date, together with all amendments and modifications thereto that were subsequently made applicable to the Bankruptcy Cases.

**"Local Rules Service Lists"** means the "Local Rule 1007-2 Parties in Interest List" for each of the Bankruptcy Cases, as that term is defined in Local Rule 1007-2(b).

**"Longview Villa Owner"** means any of the following: (a) Blue Water Traders, (b) Dardet, (c) Linares/Foster, (d) Frederick, or (e) Rivera.

**"Longview Villa Owner Settlement Agreement"** means any of the following: (a) the Blue Water Traders Settlement Agreement, (b) the Dardet Settlement Agreement, (c) the Linares/Foster Settlement Agreement, (d) the Frederick Settlement Agreement, or (e) the Rivera Settlement Agreement.

**"Mainsail Claims"** means any and all Claims of the Mainsail Related Entities against the Debtors. A list of the Mainsail Claims is set forth on Exhibit C attached to the Plan.

**"Mainsail Related Entities"** means, collectively, Mainsail B.V.I. Limited, Mainsail BVI Property Management, LLC, Mainsail Central, LLC, Mainsail Development International, Mainsail Management Group, Mainsail Suites Hotel, and Marriott Execustay.

18

"**Marriott**" means Marriott International, Inc.

"**Marriott Allowed Cure Claim**" means the Allowed Cure Claim of Marriott in the amount of $221,274.23.

"**Marriott Motion**" means the Debtor's Emergency Motion for Order Approving Postpetition Agreement with Marriott International, Inc. filed on February 3, 2014 in the Bankruptcy Cases (Doc. No. 130).

"**Marriott Order**" means the Order Granting Debtor's Emergency Motion for Order Approving Postpetition Agreement with Marriott International, Inc. dated February 5, 2014 and entered in the Bankruptcy Cases (Doc. No. 137).

"**Net Real Estate Sale Proceeds**" means the gross proceeds received by Reorganized SIDG from the sale of any Scrub Island Real Estate less any customary and applicable transfer taxes and closing costs (with such closing costs not to exceed ten percent (10%) of the gross sales price).

"**Notice of Commencement**" means the Notice of Chapter 11 Bankruptcy Case, Meeting of Creditors, & Deadlines (Doc. No. 8).

"**Notice Parties**" means (a) the Reorganized Debtors, (b) Bankruptcy Counsel, (c) counsel to FirstBank, (d) counsel to the Creditors Committee (to the extent the Creditors Committee is then in existence), (e) the United States Trustee, (f) counsel to the Plan Funder, (g) the SIDG Shareholders, and (h) all parties then set forth on the Local Rules Service Lists.

"**Permitted Liens**" has the meaning ascribed to such term in the FirstBank New Loan A Documents (or, if applicable, the FirstBank New Loan B Documents), and shall include any Lien provided to a Longview Villa Owner under the Plan or under a Longview Villa Owner Settlement Agreement.

"**Person**" means any person, individual, corporation, association, partnership, limited liability company, joint venture, trust, organization, business, government, governmental agency or political subdivision thereof, or any other entity or institution of any type whatsoever, including any "person" as such term is defined in Section 101(41) of the Bankruptcy Code.

"**Petition Date**" means November 19, 2013, the date on which the Debtors commenced the Bankruptcy Cases by filing their voluntary petitions under Chapter 11 of the Bankruptcy Code.

"**Plan**" means this First Amended Joint Plan of Reorganization of Scrub Island Development Group Limited and Scrub Island Construction Limited under Chapter 11 of Title 11, United States Code dated as of July 11, 2014, and all Exhibits attached hereto, as the same may be amended, supplemented, modified or amended and restated from time to time in accordance with the provisions of the Plan and the Bankruptcy Code.

19

"**Plan Documents**" means all documents that aid in effectuating the Plan, including the FirstBank New Loan A Documents, the FirstBank Construction Escrow Agreement, the Longview Villa Owner Settlement Agreements, and the Plan Funder Loan Agreement.

"**Plan Funder**" means RCB Equities #1, LLC, a California limited liability company, and its successors or assigns.

"**Plan Funder Loan Agreement**" means the Loan Agreement by and between the Reorganized Debtors, as borrowers, and the Plan Funder, as lender, to be executed on the Closing Date, as it may be amended, modified or supplemented thereafter in accordance with its terms. A copy of the Plan Funder Loan Agreement is attached to the Plan as Exhibit D.  The Debtors and the Plan Funder reserve the right to modify the form of the Plan Funder Loan Agreement attached hereto at any time prior to the Confirmation Hearing.

"**Plan Funder Loan Amount**" means the amount of $12,500,000.00 to be loaned to the Reorganized Debtors on the Closing Date by the Plan Funder.

"**Plan Supplement**" means the pleading containing the Plan Documents (to the extent not already on file with the Bankruptcy Court or delivered to the applicable Creditor), which shall be filed with the Bankruptcy Court in accordance with Article 14.17 of the Plan.

"**Postpetition**" means arising or accruing on or after the Petition Date and before the Effective Date.

"**Prepetition**" means arising or accruing prior to the Petition Date.

"**Priority Claim**" means a Claim that is entitled to a priority in payment pursuant to Sections 507(a)(4) and (5) of the Bankruptcy Code and that is not an Administrative Expense Claim, a Priority Tax Claim, a Secured Claim, a Secured Tax Claim or an Unsecured Claim.

"**Priority Tax Claim**" means a Claim of a Governmental Unit that is entitled to a priority in payment pursuant to Section 507(a)(8) of the Bankruptcy Code and that is not an Administrative Expense Claim, a Priority Claim, a Secured Claim, a Secured Tax Claim or an Unsecured Claim.

"**Professional**" means any professional employed in the Bankruptcy Cases pursuant to an order of the Bankruptcy Court, pursuant to Section 327 or Section 1103 of the Bankruptcy Code.

"**Projections**" means the cash flow forecast for Reorganized SIDG for the period from November 30, 2014 through December 31, 2019, a copy of which is attached as Exhibit 1 to the Disclosure Statement.

"**Proof of Claim**" means a proof of claim filed with the Bankruptcy Court with respect to a Claim against the Debtors pursuant to Bankruptcy Rule 3001, 3002 or 3003.

"**Property**" means any property or asset of any kind, whether real, personal or mixed, tangible or intangible, whether now existing or hereafter acquired or arising, and wherever located, and any interest of any kind therein.

"**Rejected Contracts**" has the meaning ascribed to such term in Article 7.1 of the Plan. A list of specific Rejected Contracts is set forth in Exhibit E attached to the Plan.

"**Released Parties**" has the meaning ascribed to such term in Article 11.3 of the Plan.

"**Reorganized Debtors**" means, collectively, Reorganized SIDG and Reorganized SICL.

"**Reorganized SICL**" means SICL on and after the Effective Date as reorganized pursuant to the Plan, including any successor thereto by merger, consolidation or otherwise.

"**Reorganized SICL Shares**" means the shares of Reorganized SICL to be issued and distributed on the Closing Date to Reorganized SIDG pursuant to the provisions of the Plan.

"**Reorganized SIDG**" means SIDG on and after the Effective Date as reorganized pursuant to the Plan, including any successor thereto by merger, consolidation or otherwise.

"**Reorganized SIDG Shares**" means the shares of Reorganized SIDG to be issued and distributed on the Closing Date to the Plan Funder pursuant to the provisions of the Plan.

"**Rivera**" means, collectively, Oscar Rivera and Anabel Rivera, individuals residing in the Commonwealth of Puerto Rico.

"**Rivera Allowed Class 9 Claim**" has the meaning ascribed to such term in Article 5.10.2.1 of the Plan.

"**Rivera Prepetition Claims**" means any and all Claims of Rivera against the Debtors represented by, relating to, or arising under or in connection with the Rivera Prepetition Contracts, the Rivera Proof of Claim, and Site LVII-4.

"**Rivera Prepetition Contracts**" means, collectively, (a) that certain Site Purchase and Sale Agreement, effective as of July 5, 2006, by and between Oscar Rivera and SIDG, and (b) that certain Construction Contract – Long View Residences II by and between Oscar Rivera and SICL, in each case with respect to Site LVII-4.

"**Rivera Proof of Claim**" means Proof of Claim Number 14 filed by Rivera in Case No. 8:13-bk-15285-MGW (Scrub Island Development Group Limited).

"**Rivera Settlement**" has the meaning ascribed to such term in Article 5.10.2 of the Plan.

"**Rivera Settlement Agreement**" has the meaning ascribed to such term in Article 5.10.3 of the Plan.

"**ROFO**" has the meaning ascribed to such term in Article 5.3.4.13 of the Plan.

"**ROFO Exercise Period**" has the meaning ascribed to such term in Article 5.3.4.13 of the Plan.

"**ROFO Interest Notice**" has the meaning ascribed to such term in Article 5.3.4.13 of the Plan.

"**ROFO Material Sale Terms**" has the meaning ascribed to such term in Article 5.3.4.13 of the Plan.

"**ROFO Negotiation Period**" has the meaning ascribed to such term in Article 5.3.4.13 of the Plan.

"**ROFO Notice**" has the meaning ascribed to such term in Article 5.3.4.13 of the Plan.

"**ROFO Period**" has the meaning ascribed to such term in Article 5.3.4.13 of the Plan.

"**Schedules**" means, collectively, Schedules D, E, F, G, and H filed by the Debtors in the Bankruptcy Cases pursuant to Bankruptcy Rule 1007, as any of such Schedules has been or may hereafter be amended or supplemented from time to time.

"**Scrub Island**" means a 230-acre island located in the British Virgin Islands consisting of Little Scrub Island and Big Scrub Island.

"**Scrub Island Construction Escrow**" has the meaning ascribed to such term in Article 5.3.4.6 of the Plan.

"**Scrub Island Real Estate**" means, collectively, all unsold real estate parcels located on Scrub Island.

"**Scrub Island Resort**" means the Scrub Island Resort, Spa & Marina.

"**Secured Claim**" means any Claim of a Creditor that is (a) secured in whole or in part, as of the Petition Date, by a Lien (i) on Collateral and (ii) which is valid, perfected and enforceable under applicable law and is not subject to avoidance under the Bankruptcy Code or

applicable non-bankruptcy law, or (b) subject to setoff under Section 553 of the Bankruptcy Code, but, with respect to both (a) and (b) above, only to the extent of the value of such Creditor's interest in the Estates' interest in such Collateral or the amount subject to setoff, as the case may be. Except as otherwise provided in the Plan, if the value of a Creditor's interest in the Estates' interest in such Collateral or the amount subject to setoff is less than the amount of the Allowed Claim, then such deficiency shall constitute an Unsecured Claim.

"**Secured Creditor**" means any Creditor holding a Secured Claim.

"**Secured Tax Claim**" means a Secured Claim of a Governmental Unit for Prepetition taxes.

"**Security**" has the meaning ascribed to such term in Section 101(49) of the Bankruptcy Code.

"**SICL**" means Scrub Island Construction Limited, a limited company incorporated under the laws of the British Virgin Islands.

"**SICL Equity Interests**" means the 440 shares of stock of SICL issued and outstanding on the Petition Date and held by the SICL Shareholders.

"**SICL Shareholders**" means, collectively, CIH Loft LLC and Pamela McManus.

"**SIDG**" means Scrub Island Development Group Limited, a limited company incorporated under the laws of the British Virgin Islands.

"**SIDG Contributing Shareholders**" means those SIDG Shareholders who contribute any portion of the SIDG Shareholders Plan Contribution Amount.

"**SIDG Equity Interests**" means the 250 shares of stock of SIDG issued and outstanding on the Petition Date and held by the SIDG Shareholders.

"**SIDG Shareholder Claims**" means any and all Claims of the SIDG Shareholders and Collier Investment Holdings against the Debtors. A list of the SIDG Shareholder Claims is set forth on Exhibit F attached to the Plan.

"**SIDG Shareholders**" means, collectively, CIH Loft LLC, Gary Eng, James B. Rabold, Pamela McManus, and VK Investments Limited.

"**SIDG Shareholders Plan Contribution Amount**" has the meaning ascribed to such term in Article 5.3.4.6 of the Plan.

"**Site LV2**" means Site LV2 in the Long View Residence Neighborhood on Scrub Island, British Virgin Islands, including the real estate lot for Site LV2 and the partially constructed villa residence thereon.

"**Site LV4**" means Site LV4 in the Long View Residence Neighborhood on Scrub Island, British Virgin Islands, including the real estate lot for Site LV4 and the partially constructed villa residence thereon.

"**Site LV5**" means Site LV5 in the Long View Residence Neighborhood on Scrub Island, British Virgin Islands, including the real estate lot for Site LV5 and the partially constructed villa residence thereon.

"**Site LV9**" means Site LV9 in the Long View Residence Neighborhood on Scrub Island, British Virgin Islands, including the real estate lot for Site LV9 and the partially constructed villa residence thereon.

"**Site LVII-4**" means Site LVII-4 in the Long View Residence II Neighborhood on Scrub Island, British Virgin Islands, including the real estate lot for Site LVII-4 and the partially constructed villa residence thereon.

"**SIU**" means Scrub Island Utility (BVI) Ltd., a limited company under the laws of the British Virgin Islands.

"**SIU Entities**" means, collectively, SIU and TSG Water Resources, Inc.

"**SIU Entities Claims**" means any and all Claims of the SIU Entities represented by, relating to, or arising under or in connection with the SIU Entities Prepetition Contracts, the SIU Entities Proof of Claim, and the SIU Systems Purchase Agreement, including any and all Claims of the SIU Entities against, or obligations of, Joe C. Collier III under any of the foregoing.

"**SIU Entities Prepetition Arrearages**" means the sum of $440,540.93 alleged by SIU in the SIU Entities Proof of Claim to be due and owing from SIDG to SIU as of the Petition Date under the SIU Entities Prepetition Contracts.

"**SIU Entities Prepetition Contracts**" means, collectively, (a) that certain Water Supply and Wastewater Treatment Agreement, dated December 20, 2006, by and between SIDG and TSG Water Resources, Inc., and (b) that certain First Amendment to Water Supply and Wastewater Treatment Agreement, dated July 11, 2007, by and between SIDG, TSG Water Resources, Inc., and SIU.

"**SIU Entities Proof of Claim**" means Proof of Claim Number 8 filed by SIU in Case No. 8:13-bk-15285-MGW (Scrub Island Development Group Limited).

"**SIU Entities Unsecured Claim Balance**" has the meaning ascribed to such term in Article 5.12.3.5 of the Plan.

"**SIU Systems**" means, collectively, the seawater reverse osmosis desalination system and the wastewater treatment system as more particularly described in Exhibit B and

24

Exhibit C, respectively, attached to that certain Water Supply and Wastewater Treatment Agreement, dated December 20, 2006, by and between SIDG and TSG Water Resources, Inc.

"**SIU Systems Capital Fee**" has the meaning ascribed to the term "Capital Fee" in that certain Water Supply and Wastewater Treatment Agreement, dated December 20, 2006, by and between SIDG and TSG Water Resources, Inc.

"**SIU Systems Purchase Agreement**" means that certain Agreement of Purchase and Sale, dated as of December 24, 2012, by and between SIU, FirstBank and SIDG.

"**SIU Systems Purchase Option**" means the option to purchase the SIU Systems granted to SIDG pursuant to Article 6.1 of that certain Water Supply and Wastewater Treatment Agreement, dated December 20, 2006, by and between SIDG and TSG Water Resources, Inc.

"**SIU Systems Purchase Option Closing**" means the closing of the purchase of the SIU Systems by SIDG or its affiliate.

"**SIU Systems Purchase Option Price**" has the meaning ascribed to the term "Option Price" in that certain Water Supply and Wastewater Treatment Agreement, dated December 20, 2006, by and between SIDG and TSG Water Resources, Inc.

"**Superpriority Claim**" means any Claim Allowed by a Final Order of the Bankruptcy Court providing for a priority senior to that provided in Section 507(a)(1) of the Bankruptcy Code, including any such Claims granted under Section 364(c)(1) of the Bankruptcy Code.

"**Unimpaired**" refers to a Claim that is not Impaired.

"**Unit OV11**" means Ocean Villa 11 located on Scrub Island.

"**United States**" means the United States of America.

"**United States Trustee**" means the Office of the United States Trustee for the Middle District of Florida.

"**Unsecured Claim**" means any Claim which is not an Administrative Expense Claim, Priority Tax Claim, Priority Claim, Secured Tax Claim, Secured Claim, or Cure Claim, including (a) any Claim arising from the rejection of an executory contract or unexpired lease under Section 365 of the Bankruptcy Code, (b) except as otherwise provided in the Plan, any portion of a Claim to the extent the value of the Creditor's interest in the Estates' interest in the Collateral securing such Claim is less than the amount of the Allowed Claim, or to the extent that the amount of the Claim subject to setoff is less than the amount of the Allowed Claim, as determined pursuant to Section 506(a) of the Bankruptcy Code, (c) any Claim arising from the provision of goods or services to the Debtors prior to the Petition Date, and (d) any Claim designated as an Unsecured Claim elsewhere in the Plan, including the FirstBank Deficiency Claim and the Class 13 Claims of FirstBank.

"**Unsecured Creditor**" means any Creditor holding an Unsecured Claim.

"**Voting Deadline**" means the last day to file, with the Bankruptcy Court, a Ballot accepting or rejecting the Plan as fixed by the Disclosure Statement Approval Order.

"**Voting Instructions**" means the instructions for voting on the Plan contained in the section of the Disclosure Statement entitled "Voting Instructions" and in the Ballot.

2.1.2   Any capitalized term used in the Plan that is not defined in the Plan but that is defined in the Bankruptcy Code or in the Bankruptcy Rules shall have the meaning ascribed to that term in the Bankruptcy Code or in the Bankruptcy Rules, as the case may be (with the Bankruptcy Code or the Bankruptcy Rules, as the case may be, controlling in the case of a conflict or ambiguity).

## 2.2    **Rules of Construction.**

For purposes of the Plan: (a) whenever from the context it is appropriate, each term, whether stated in the singular or the plural, shall include both the singular and the plural; (b) any reference in the Plan to a contract, instrument, release, indenture or other agreement or document being in a particular form or on particular terms and conditions means that such contract, instrument, release, indenture or other agreement or document shall be substantially in such form or substantially on such terms and conditions; (c) any reference in the Plan to an existing document or Exhibit means such document or Exhibit as it may have been or may be amended, modified or supplemented; (d) if the Plan's description of the terms of an Exhibit is inconsistent with the terms of the Exhibit, the terms of the Exhibit shall control; (e) unless otherwise specified, all references in the Plan to Articles and Exhibits are references to Articles and Exhibits of or to the Plan; (f) unless the context requires otherwise, the words "herein," "hereunder" and "hereto" refer to the Plan in its entirety rather than to a particular Article or section or subsection of the Plan; (g) any phrase containing the term "include" or "including" shall mean including without limitation; (h) all of the Exhibits referred to in the Plan shall be deemed incorporated herein by any such reference and made a part hereof for all purposes; (i) any reference to an Entity as a Holder of a Claim or Equity Interest includes that Entity's successors and assigns; and (j) the rules of construction set forth in Section 102 of the Bankruptcy Code shall apply in the construction of the Plan, to the extent such rules are not inconsistent with any other provision in this Article 2.2.

## ARTICLE 3
### TREATMENT OF ADMINISTRATIVE EXPENSE
### CLAIMS, PRIORITY TAX CLAIMS, AND DIP LOAN CLAIMS

In accordance with Section 1123(a)(1) of the Bankruptcy Code, Administrative Expense Claims, Priority Tax Claims, and the DIP Loan Claims have not been classified in the Plan. The treatment accorded to Administrative Expense Claims, Priority Tax Claims, and the DIP Loan Claims is set forth below in this Article 3.

3.1    **Administrative Expense Claims.**

3.1.1    Except as otherwise provided in Article 3.1.2 and Article 3.1.3 below, each Holder of an Allowed Administrative Expense Claim (including Allowed Administrative Expense Claims of Professionals) shall be paid (a) on the Distribution Date, an amount, in Cash, by Reorganized SIDG equal to the Allowed Amount of its Administrative Expense Claim, in accordance with Section 1129(a)(9)(A) of the Bankruptcy Code, or (b) under such other terms as may be mutually agreed upon by both the Holder of such Allowed Administrative Expense Claim and the Debtors or Reorganized SIDG, as the case may be, or (c) as otherwise ordered by a Final Order of the Bankruptcy Court.

3.1.2    All unpaid fees and charges assessed against the Estates under Chapter 123 of title 28, United States Code, 28 U.S.C. §§ 1911-1930, for any calendar quarter (or portion thereof) ending prior to the Effective Date shall be paid to the United States Trustee by Reorganized SIDG by no later than thirty (30) days following the Effective Date. Following the Effective Date, any fees required to be paid to the United States Trustee, pursuant to 28 U.S.C. §1930(a)(6), with respect to the Bankruptcy Cases shall be paid by Reorganized SIDG, until the earlier of (i) the closing of the Bankruptcy Cases by the issuance of a Final Decree by the Bankruptcy Court, or (ii) the entry of an order by the Bankruptcy Court dismissing the Bankruptcy Cases or converting the Bankruptcy Cases to another chapter under the Bankruptcy Code. Any such payment to the United States Trustee shall be in the appropriate sum required pursuant to 28 U.S.C. §1930(a)(6) based upon the applicable disbursements for the relevant period and shall be made within the time period set forth in 28 U.S.C. §1930(a)(6).

3.1.3    All Allowed Administrative Expense Claims with respect to liabilities incurred by the Debtors in the ordinary course of business during the Bankruptcy Cases shall be paid by Reorganized SIDG (a) in the ordinary course of business in accordance with contract terms, or (b) under such other terms as may be mutually agreed upon by both the Holder of such Allowed Administrative Expense Claim and the Debtors or Reorganized SIDG, as the case may be, or (c) as otherwise ordered by a Final Order of the Bankruptcy Court.

3.2    **Priority Tax Claims.**

Each Holder of an Allowed Priority Tax Claim shall receive from Reorganized SIDG, on account of such Allowed Priority Tax Claim, regular installment payments in Cash on the Distribution Date in accordance with Section 1129(a)(9)(C) of the Bankruptcy Code. Holders of Allowed Priority Tax Claims shall receive interest on account of their Allowed Priority Tax Claims at the rate established for delinquent tax obligations pursuant to 26 U.S.C. § 6621; provided, however, that if the Holder of such Allowed Priority Tax Claim is a city, county or state, such Holder shall receive interest on account of its Allowed Priority Tax Claim at the applicable statutory rate under state law. Notwithstanding the above, each Holder of an Allowed Priority Tax Claim may be paid (i) under such other terms as may be mutually agreed upon by both the Holder of such Allowed Priority Tax Claim and the Debtors or Reorganized SIDG, as the case may be, or (b) as otherwise ordered by a Final Order of the Bankruptcy Court.

3.3    **DIP Loan Claims.**

3.3.1    Promptly after the filing of the Plan, SIDG will file an emergency motion with the Bankruptcy Court seeking approval of a $1,000,000.00 Postpetition line of credit facility (the "DIP Facility") from the DIP Lender, secured by a first Lien in favor of the DIP Lender on all of the Property of SIDG located in the United States and providing a Superpriority Claim in favor of the DIP Lender.  Any request for additional advances above the $1,000,000.00 will be pursuant to a motion filed by SIDG with the Bankruptcy Court, with notice to all of the Notice Parties.

3.3.2    Pursuant to Section 1129(a)(9)(A) of the Bankruptcy Code, the DIP Lender is entitled to receive on the Effective Date, in full and final satisfaction, settlement, release, extinguishment, and discharge of the DIP Lender Allowed Claim, Cash equal to the amount of the DIP Lender Allowed Claim.  In addition, pursuant to the terms of the DIP Loan Documents, the DIP Lender Allowed Claim is due and payable in full on the Effective Date.  Subject to and pursuant to the terms of the Plan, including Confirmation of the Plan, the DIP Lender has agreed that (a) the DIP Lender Allowed Claim shall not constitute an Administrative Expense Claim under the Plan and (b) the amount of the DIP Lender Allowed Claim shall be added to the principal balance of the Plan Funder Loan Amount.

## ARTICLE 4
## DESIGNATION OF CLASSES OF CLAIMS AND EQUITY INTERESTS

Pursuant to Section 1122 of the Bankruptcy Code, set forth below is a designation of Classes of Claims and Equity Interests.  A Claim or Equity Interest (a) is classified in a particular Class only to the extent the Claim or Equity Interest qualifies within the description of that Class and (b) is classified in a different Class to the extent the Claim or Equity Interest qualifies within the description of that different Class.  Unless otherwise expressly stated, the Classes of Claims set forth below include Claims against each of the Debtors that qualify within the description of that Class.  For purposes of the Plan, the Claims and Equity Interests are classified as follows:

4.1    **Class 1:  Priority Claims.**

Class 1 consists of all Priority Claims.

4.2    **Class 2:  Secured Claims and Other Claims of FirstBank.**

Class 2 consists of all of the FirstBank Prepetition Claims.

4.3    **Class 3:  Secured Tax Claims of Governmental Units.**

Class 3 consists of all Secured Tax Claims of Governmental Units.

4.4    **Class 4:  Other Secured Claims.**

Class 4 consists of all Secured Claims not otherwise specifically classified in the Plan. In the event there is more than one Secured Claim in this Class, such Secured Claims shall be separated into subclasses in Class 4.

4.5 **Class 5: Unsecured Claims of Blue Water Traders Ltd.**

Class 5 consists of all of the Blue Water Traders Prepetition Claims.

4.6 **Class 6: Unsecured Claims of Pablo L. Dardet.**

Class 6 consists of all of the Dardet Prepetition Claims.

4.7 **Class 7: Unsecured Claims of Thomas Frederick.**

Class 7 consists of all of the Frederick Prepetition Claims.

4.8 **Class 8: Unsecured Claims of Arturo Linares, David Foster, and Scrub Island, LLC.**

Class 8 consists of all of the Linares/Foster Prepetition Claims.

4.9 **Class 9: Unsecured Claims of Oscar Rivera and Anabel Rivera.**

Class 9 consists of all of the Rivera Prepetition Claims.

4.10 **Class 10: Unsecured Claims (Unsecured Claims Not Otherwise Classified).**

Class 10 consists of all Unsecured Claims not otherwise classified in the Plan.

4.11 **Class 11: Unsecured Claims of the SIU Entities.**

Class 11 consists of all of the SIU Entities Claims.

4.12 **Class 12: Unsecured Claims of Alf Nolan Davis d/b/a A. N. Davis Plumbing and Electrical Services.**

Class 12 consists of all of the Davis Prepetition Claims.

4.13 **Class 13: Subordinated Unsecured Claims of FirstBank.**

Class 13 consists of any Allowed Unsecured Claim of FirstBank under FirstBank Option B.

4.14 **Class 14: Intercompany Claims.**

Class 14 consists of all Intercompany Claims.

4.15    **Class 15:  SIDG Equity Interests.**

Class 15 consists of all of the SIDG Equity Interests.

4.16    **Class 16:  SICL Equity Interests.**

Class 16 consists of all of the SICL Equity Interests.

**ARTICLE 5**
**TREATMENT OF CLASSIFIED CLAIMS AND EQUITY INTERESTS**

Claims and Equity Interests shall be treated under the Plan in the manner set forth in this Article 5.  Except as otherwise specifically provided in the Plan, the treatment of, and the consideration to be received by, Holders of Allowed Claims and Holders of Equity Interests pursuant to the Plan shall be in full and final satisfaction, settlement, release, extinguishment and discharge of their respective Allowed Claims (of any nature whatsoever) and Equity Interests.

5.1    **Unclassified Claims.**

Holders of Allowed Administrative Expense Claims and Allowed Priority Tax Claims and the DIP Lender (with respect to the DIP Lender Allowed Claim) shall receive the treatment set forth in Article 3 of the Plan.

5.2    **Class 1:  Priority Claims.**

Class 1 consists of all Priority Claims.  Each Holder of an Allowed Priority Claim shall be paid (a) on the Distribution Date, an amount, in Cash, by Reorganized SIDG equal to the Allowed Amount of its Priority Claim in accordance with Section 1129(a)(9)(B) of the Bankruptcy Code, or (b) as otherwise ordered by a Final Order of the Bankruptcy Court. Class 1 is Unimpaired by the Plan. Each Holder of a Priority Claim in Class 1 conclusively is presumed to have accepted the Plan and is not entitled to vote to accept or reject the Plan.

5.3    **Class 2:  Secured Claims and Other Claims of FirstBank.**

5.3.1    Class 2 consists of all of the FirstBank Prepetition Claims.

5.3.2    In the FirstBank Proofs of Claim, FirstBank has asserted that, as of the Petition Date, (a) SIDG was indebted to FirstBank in an aggregate amount, including principal, interest, fees, charges and attorneys' fees, of $119,275,858.73 with respect to the FirstBank Prepetition Claims, consisting of a Secured Claim in the amount of $60,640,000.00 and an Unsecured Claim in the amount of $58,635,858.73, (b) SICL was indebted to FirstBank in an aggregate amount, including principal, interest, fees, charges and attorneys' fees, of $3,199,861.18 with respect to the FirstBank Prepetition Claims, all of which is a Secured Claim, and (c) the FirstBank Prepetition Claims were secured by properly perfected Liens on certain real property and personal property of the Debtors located in the British Virgin Islands.

5.3.3    The Plan proposes two (2) alternative treatments of the FirstBank Prepetition Claims:

5.3.3.1    The first option ("FirstBank Option A") proposes the treatment of the FirstBank Prepetition Claims as described in the FirstBank February 2014 Term Sheet, which treatment shall be in full and final satisfaction, settlement, release, extinguishment and discharge of the FirstBank Prepetition Claims. The principal terms and conditions of FirstBank Option A are more specifically set forth in Article 5.3.4 of the Plan. FirstBank Option A assumes that (a) FirstBank voluntarily accepts the treatment in Article 5.3.4 or (b) absent such acceptance, in connection with the FirstBank Lender Liability Adversary Proceeding or other contested matters that may be filed (including a motion to strike any Ballot filed by FirstBank rejecting the Plan as being in bad faith pursuant to Section 1126(e) of the Bankruptcy Code), the Bankruptcy Court enters orders compelling FirstBank to accept FirstBank Option A or otherwise deeming FirstBank Option A to have been accepted by FirstBank or to otherwise be an appropriate treatment of the FirstBank Prepetition Claims.

5.3.3.2    The second option ("FirstBank Option B") assumes that FirstBank does not accept the treatment in Article 5.3.4 and that the Bankruptcy Court does not enter the orders described in the last sentence of Article 5.3.3.1. As further set forth in Article 5.3.5 of the Plan, FirstBank Option B proposes that the Collateral of FirstBank be valued and that FirstBank's Allowed Secured Claim be determined by the Bankruptcy Court. FirstBank Option B further proposes that FirstBank will retain its Lien on its Collateral in the amount of the FirstBank Reduced Class 2B Secured Claim and that Reorganized SIDG shall make deferred Cash payments to FirstBank having a value equal to the FirstBank Reduced Class 2B Secured Claim. Any amount that is Allowed to FirstBank in excess of the FirstBank Reduced Class 2B Secured Claim shall be treated as an Unsecured Claim, shall be subordinated to all other Allowed Unsecured Claims, and shall receive the treatment set forth in Article 5.14 of the Plan.

5.3.4    FirstBank Option A. This Article 5.3.4 implements the FirstBank February 2014 Term Sheet. The principal terms and conditions of FirstBank Option A are as follows:

5.3.4.1    FirstBank shall have an Allowed Secured Claim against Reorganized SIDG in the amount of $37,500,000.00 (the "FirstBank Allowed Class 2A Secured Claim").

5.3.4.2    On the Closing Date, Reorganized SIDG shall make a Cash payment to FirstBank, by wire transfer of immediately available funds, in the amount of $7,500,000.00 (the "FirstBank Down Payment") from the Plan Funder Loan Amount, thereby reducing the FirstBank Allowed Class 2A Secured Claim to the amount of $30,000,000.00 (the "FirstBank Reduced Class 2A Secured Claim").

5.3.4.3    The FirstBank Reduced Class 2A Secured Claim shall be evidenced by a term note (the "FirstBank New Term A Note") in the original principal amount of $30,000,000.00, which shall be made payable to FirstBank and be executed and delivered by Reorganized SIDG on the Closing Date. The FirstBank New Term A Note shall

contain the following terms: (a) a maturity date of five (5) years from the Closing Date, (b) interest shall (i) accrue and be payable on the outstanding principal at a rate of 350 basis points over the 1-month LIBOR Rate (but shall never be less than 4.25% per annum), (ii) be calculated based on a 365 day year, and (iii) be payable monthly in arrears, with the first payment being due one (1) month from the Closing Date, (c) for the first twenty-four (24) months following the Closing Date, Reorganized SIDG shall be required to make monthly payments of interest only and, for the next thirty-six (36) months, Reorganized SIDG shall be required to make monthly payments of principal and interest based on an amortization period of twenty-five (25) years, (d) Reorganized SIDG may prepay the FirstBank New Term A Note, without penalty or premium, at any time, (e) the outstanding principal together with all accrued and unpaid interest shall be due and payable in full on the maturity date, (f) Reorganized SIDG shall be required to make mandatory prepayments under the FirstBank New Term A Note in an amount equal to fifty percent (50%) of any Net Real Estate Sale Proceeds, and (g) from and after an event of defaut under the FirstBank New Term A Note and for so long as such event of default is continuing, the FirstBank New Term A Note shall bear interest at a rate of ten percent (10%) per annum.

     5.3.4.4    On the Closing Date, Reorganized SIDG shall make a Cash payment to FirstBank, by wire transfer of immediately available funds, in the amount of $1,275,000.00 from the Plan Funder Loan Amount, which funds shall be used as an interest reserve for the FirstBank New Term A Note (the "FirstBank Initial Interest Reserve Account"). For the first twelve (12) months of the FirstBank New Term A Note, FirstBank shall apply funds from the FirstBank Initial Interest Reserve Account to the monthly interest payments due from Reorganized SIDG under the FirstBank New Term A Note. On the twelve (12) month anniversary of the FirstBank New Term A Note, Reorganized SIDG shall make an additional Cash payment to FirstBank, by wire transfer of immediately available funds, in an amount equal to the monthly interest payments due from Reorganized SIDG during the second twelve (12) months of the FirstBank New Term A Note (the "FirstBank Additional Interest Reserve Account"), and FirstBank shall apply funds from the FirstBank Additional Interest Reserve Account to the monthly interest payments due from Reorganized SIDG during the second twelve (12) months of the FirstBank New Term A Note. No interest reserve shall be required for the remaining thirty-six (36) months of the FirstBank New Term A Note.

     5.3.4.5    The FirstBank New Term A Note shall be secured by a first Lien on all of the Scrub Island Real Estate (subject to the Permitted Liens), all personal property of Reorganized SIDG located in the British Virgin Islands, and all income generated by the operation of the Scrub Island Resort. Reorganized SIDG shall execute any charges, security agreements and other security documents necessary to secure the obligations under the FirstBank New Term A Note (collectively, the "FirstBank New Loan A Security Documents").

     5.3.4.6    On the Closing Date, the SIDG Contributing Shareholders shall contribute the Cash sum of $6,000,000.00 (the "SIDG Shareholders Plan Contribution Amount") to Reorganized SIDG, and Reorganized SIDG shall deliver such amount into

escrow with FirstBank, by wire transfer of immediately available funds (the "Scrub Island Construction Escrow"). The Scrub Island Construction Escrow shall be used for capital expenditure improvements on Scrub Island (including as necessary to consummate any settlements with the Longview Villa Owners under the Plan or under the Longview Villa Owner Settlement Agreements), and the funds therein shall be advanced to Reorganized SIDG by FirstBank in accordance with a proposed capital expenditures budget prepared by SIDG and approved by FirstBank prior to the Closing. The Scrub Island Construction Escrow shall be governed by the terms of an escrow agreement to be executed by FirstBank and Reorganized SIDG at the Closing (the "FirstBank Construction Escrow Agreement").

5.3.4.7    At the Closing, Reorganized SIDG shall pay FirstBank a closing fee of $300,000.00 from the Plan Funder Loan Amount, by wire transfer of immediately available funds.

5.3.4.8    The price for the sale of any Scrub Island Real Estate must be approved in advance by FirstBank. FirstBank shall release any Liens on any Scrub Island Real Estate at the time of the closing on the sale of such Scrub Island Real Estate.

5.3.4.9    Except as to any obligations under the FirstBank New Loan A Documents, the FirstBank Construction Escrow Agreement, or the Plan, the Debtors and FirstBank and their respective officers, directors, shareholders, employees, agents and attorneys shall be deemed to have released each other, as of the Closing Date, from any and all claims of any nature whatsoever that they have or may have against each other, known or unknown, contingent or otherwise, asserted or unasserted, at law or in equity, as well as any other kind or character of action held, owned or possessed, directly or indirectly.    Specifically, the Guarantor shall be deemed to have been released by FirstBank, as of the Closing Date, from any and all claims and obligations under the FirstBank Guaranty.

5.3.4.10.    FirstBank shall have an Allowed Class 10 Unsecured Claim in the amount of $84,895,719.91 (the "FirstBank Deficiency Claim"). FirstBank shall vote a Ballot accepting the Plan with respect to the FirstBank Deficiency Claim; provided, however, that FirstBank shall not be entitled to any Distribution under the Plan with respect to the FirstBank Deficiency Claim and shall be deemed to have released and waived the FirstBank Deficiency Claim on the Closing Date.

5.3.4.11    All of the FirstBank New Loan A Documents and the FirstBank Construction Escrow Agreement shall be governed by the laws of the British Virgin Islands.

5.3.4.12    At the Closing, FirstBank shall assign and transfer to Reorganized SIDG any and all documents evidencing the Blue Water Traders Loan and the Linares/ Foster Loan. No additional consideration shall be paid to FirstBank by Reorganized SIDG in connection with such assignment and transfer.

5.3.4.13    FirstBank shall grant to Reorganized SIDG the right of first offer with respect to Unit OV11 (the "ROFO") in the event FirstBank desires or intends to sell Unit OV11 within the consecutive twenty-four (24) month period immediately following the Closing Date (the "ROFO Period"). In such event, FirstBank will provide written notice (the "ROFO Notice") to Reorganized SIDG of FirstBank's desire and intention to sell Unit OV11 and will provide a summary of the material terms upon which FirstBank desires to sell Unit OV11 (the "ROFO Material Sale Terms"). Reorganized SIDG will have thirty (30) days from the date on which the ROFO Notice is delivered to Reorganized SIDG (the "ROFO Exercise Period") to provide written notice to FirstBank of Reorganized SIDG's interest in purchasing Unit OV11 on the terms and conditions described in the ROFO Notice (the "ROFO Interest Notice"). In the event FirstBank does not receive the ROFO Interest Notice prior to the expiration of the ROFO Exercise Period, Reorganized SIDG will be deemed to have waived Reorganized SIDG's right of first offer with respect to the sale of Unit OV11 by FirstBank as provided in this Article 5.3.4.13, even if the ROFO Period has not yet expired; provided, however, that if FirstBank desires to thereafter sell Unit OV11 during the ROFO Period for a purchase price less than that set forth in the last ROFO Material Sale Terms delivered to Reorganized SIDG or on other terms materially different from those sent in the last ROFO Material Sale Terms, then FirstBank shall provide Reorganized SIDG with another ROFO Notice setting forth the new material terms upon which FirstBank desires to sell Unit OV11 and Reorganized SIDG shall have a ROFO Exercise Period in which to provide a ROFO Interest Notice. If FirstBank receives a ROFO Interest Notice prior to the expiration of the ROFO Exercise Period, FirstBank agrees to negotiate with Reorganized SIDG in good faith the sale of Unit OV11 to Reorganized SIDG for a period of thirty (30) days following FirstBank's receipt of the ROFO Interest Notice (the "ROFO Negotiation Period"). Upon the expiration of the ROFO Negotiation Period, assuming no written agreement has been entered into by Reorganized SIDG and FirstBank with respect to the sale of Unit OV11 to Reorganized SIDG, FirstBank may proceed to sell Unit OV11 to any other Person, with no further obligation or duty to Reorganized SIDG with respect to the sale of Unit OV11, even if the ROFO Period has not yet expired; provided, however, that if FirstBank desires to thereafter sell Unit OV11 during the ROFO Period for a purchase price less than that set forth in the last ROFO Material Sale Terms delivered to Reorganized SIDG or on other terms materially different from those sent in the last ROFO Material Sale Terms, then FirstBank shall provide Reorganized SIDG with another ROFO Notice setting forth the new material terms upon which FirstBank desires to sell Unit OV11 and  Reorganized SIDG shall have a ROFO Exercise Period in which to provide a ROFO Interest Notice. For the avoidance of doubt, nothing contained in the Plan shall be construed to obligate or require FirstBank to sell Unit OV11. The provisions of this Article 5.3.4.13 will survive Closing until the rights of Reorganized SIDG expire in accordance with the terms of this Article 5.3.4.13.

5.3.4.14    On the Closing Date, FirstBank shall withdraw the FirstBank Proofs of Claim with prejudice.

34

5.3.4.15    On or prior to the Closing Date, FirstBank shall dismiss the BVI Receivership Proceeding with prejudice, and shall cause the BVI Receiver to turn over to Reorganized SIDG any Property in the BVI Receiver's possession, custody, or control related to the Debtors or Scrub Island.

5.3.4.16    Effective as of and subject to the occurrence of the Closing Date, any and all of the FirstBank Prepetition Loan Documents shall be deemed cancelled and void and of no further force and effect.

5.3.4.17    On or prior to the Closing Date, the Debtors shall dismiss the FirstBank Injunction Adversary Proceeding and the FirstBank Lender Liability Adversary Proceeding with prejudice.

5.3.4.18    The Closing Date shall occur by no later than ten (10) Business Days following the Effective Date.

5.3.4.19    Upon payment in full pursuant to the terms of the Plan and the FirstBank New Loan A Documents, FirstBank shall release and satisfy its Liens against any and all of Reorganized SIDG's Property and shall return the FirstBank New Loan A Documents to Reorganized SIDG marked "satisfied."

5.3.4.20    To the extent of any inconsistencies between this Article 5.3.4 and the FirstBank New Loan A Documents or the FirstBank Construction Escrow Agreement, the FirstBank New Loan A Documents or the FirstBank Construction Escrow Agreement, as the case may be, shall control.

5.3.5    FirstBank Option B. This Article 5.3.5 shall apply if the Bankruptcy Court does not confirm the Plan treatment for FirstBank proposed in Article 5.3.4 above. The principal terms and conditions of FirstBank Option B are as follows:

5.3.5.1    The Bankruptcy Court shall value FirstBank's Collateral in order to determine FirstBank's Allowed Secured Claim for purposes of Confirmation of the Plan (the "FirstBank Allowed Class 2B Secured Claim"). Any amount adjudicated by the Bankruptcy Court to be owed to FirstBank in excess of the value of its Collateral, after consideration of all defenses thereto, shall be treated as an Unsecured Claim, shall be subordinated to all other Allowed Unsecured Claims, and shall receive the treatment set forth in Article 5.14 of the Plan.

5.3.5.2    On the Closing Date, Reorganized SIDG shall make a Cash payment to FirstBank, by wire transfer of immediately available funds, in an amount equal to twenty percent (20%) of the FirstBank Allowed Class 2B Secured Claim, from the Plan Funder Loan Amount. The reduced FirstBank Allowed Class 2B Secured Claim shall be referred to as the "FirstBank Reduced Class 2B Secured Claim".

5.3.5.3    The FirstBank Reduced Class 2B Secured Claim shall be evidenced by a term note (the "FirstBank New Term B Note") in the original principal amount of the

FirstBank Reduced Class 2B Secured Claim, which shall be made payable to FirstBank and be executed and delivered by Reorganized SIDG on the Closing Date. The FirstBank New Term B Note shall contain the following terms: (a) a maturity date of five (5) years from the Closing Date (or such other maturity date as the Bankruptcy Court deems to be fair and equitable), (b) monthly payments of principal and interest shall be made beginning thirty (30) days after the Closing Date, based on an amortization period of thirty (30) years (or such other term as the Bankruptcy Court deems fair and equitable), (c) interest shall accrue and be payable on the outstanding principal at a rate of four and three-quarters percent (4.75%) per annum (or such other rate as the Bankruptcy Court deems to be fair and equitable), (d) Reorganized SIDG may prepay the FirstBank New Term B Note, without penalty or premium, at any time, (e) the outstanding principal together with all accrued and unpaid interest shall be due and payable in full on the maturity date, and (f) Reorganized SIDG shall be required to make mandatory prepayments under the FirstBank New Term B Note in an amount equal to a percentage of any Net Real Estate Sale Proceeds that the Bankruptcy Court deems to be fair and equitable (and FirstBank shall release any Liens on any Scrub Island Real Estate at the time of the closing on the sale of such Scrub Island Real Estate).

5.3.5.4    On the Closing Date, Reorganized SIDG shall make a Cash payment to FirstBank, by wire transfer of immediately available funds, from the Plan Funder Loan Amount, in an amount equal to the total interest payments required to be made for the first twelve (12) months of the FirstBank New Term B Note. FirstBank shall apply funds from such interest reserve account to the monthly interest payments due from Reorganized SIDG during the first twelve (12) months of the FirstBank New Term B Note. On the twelve (12) month anniversary of the FirstBank New Term B Note, Reorganized SIDG shall make an additional Cash payment to FirstBank, by wire transfer of immediately available funds, in an amount equal to the total interest payments required to be made for the second twelve (12) months of the FirstBank New Term B Note. FirstBank shall apply funds from such interest reserve account to the monthly interest payments due from Reorganized SIDG during the second twelve (12) months of the FirstBank New Term B Note. No interest reserve shall be required for the remaining term of the FirstBank New Term B Note.

5.3.5.5    The FirstBank New Term B Note shall be secured by a first Lien on all of the Scrub Island Real Estate (subject to the Permitted Liens), all personal property of Reorganized SIDG located in the British Virgin Islands, and all income generated by the operation of the Scrub Island Resort. Reorganized SIDG shall execute any charges, security agreements and other security documents necessary to secure the obligations under the FirstBank New Term B Note (collectively, the "FirstBank New Loan B Security Documents").

5.3.5.6    Except as to any obligations under the FirstBank New Loan B Documents or the Plan, the Debtors and FirstBank and their respective officers, directors, shareholders, employees, agents and attorneys shall be deemed to have released each other, as of the Closing Date, from any and all claims of any nature whatsoever that they have or may have against each other, known or unknown, contingent or otherwise,

asserted or unasserted, at law or in equity, as well as any other kind or character of action held, owned or possessed, directly or indirectly. Specifically, the Guarantor shall be deemed to have been released by FirstBank, as of the Closing Date, from any and all claims and obligations under the FirstBank Guaranty.

5.3.5.7    Reorganized SIDG shall be in default in its obligations to FirstBank under this Article 5.3.5 upon the occurrence of the following:

5.3.5.7.1    a failure to make payments to FirstBank as required by the Plan,

5.3.5.7.2    a failure to maintain property and casualty insurance in the current amounts or, if such amounts are unavailable, in the highest insurable amount commercially available,

5.3.5.7.3    a failure to pay real estate taxes when due,

5.3.5.7.4    a failure to provide the following financial reporting: on a quarterly basis, statements of operations within forty-five (45) days of the end of each fiscal quarter, and on an annual basis, statements of operations within sixty (60) days of the end of each calendar year, and

5.3.5.7.5    a failure to allow reasonable inspections by FirstBank of the Scrub Island Resort upon reasonable advance notice.

5.3.5.8    Reorganized SIDG shall have sixty (60) days from written notice of default to cure any default. The Bankruptcy Court shall retain jurisdiction to reopen the Bankruptcy Cases and shall have the exclusive jurisdiction to determine any disputes as to whether a default has occurred and, if so, whether the default was timely cured. All other covenants and default provisions in the FirstBank Prepetition Loan Documents shall be eliminated from the FirstBank New Loan B Documents. The FirstBank New Loan B Documents shall contain only those provisions necessary to grant and perfect the Lien of FirstBank and to evidence the loan obligations under this Article 5.3.5.

5.3.5.9    Reorganized SIDG agrees to not file a subsequent bankruptcy case in the event of a monetary default that is not timely cured and, if a subsequent bankruptcy case is filed by Reorganized SIDG, FirstBank shall be entitled to relief from stay in connection with that new bankruptcy case.

5.3.5.10    Joe C. Collier III shall guaranty Reorganized SIDG's obligations under the FirstBank New Term B Note (the "FirstBank New Guaranty").

5.3.5.11    On or before the Effective Date, the Debtors shall deliver to FirstBank the FirstBank New Loan B Documents containing the modified terms as set forth herein or as have been determined by the Bankruptcy Court to be fair and equitable. The Bankruptcy Court shall have jurisdiction to determine any disputes regarding the terms of

the FirstBank New Loan B Documents. FirstBank and the Debtors shall execute the FirstBank New Loan B Documents as agreed by them or as approved by the Bankruptcy Court.

5.3.5.12    On or prior to the Closing Date, FirstBank shall dismiss the BVI Receivership Proceeding with prejudice, and shall cause the BVI Receiver to turn over to Reorganized SIDG any Property in the BVI Receiver's possession, custody, or control related to the Debtors or Scrub Island.

5.3.5.13    At the Closing, FirstBank shall assign and transfer to Reorganized SIDG any and all documents evidencing the Blue Water Traders Loan and the Linares/ Foster Loan. The Bankruptcy Court shall determine the amount of any additional consideration to be paid to FirstBank by Reorganized SIDG in connection with such assignment and transfer.

5.3.5.14    Effective as of and subject to the occurrence of the Closing Date, any and all of the FirstBank Prepetition Loan Documents shall be deemed cancelled and void and of no further force and effect.

5.3.5.15    On or prior to the Closing Date, the Debtors shall dismiss the FirstBank Injunction Adversary Proceeding and the FirstBank Lender Liability Adversary Proceeding with prejudice.

5.3.5.16    On the Closing Date, the SIDG Contributing Shareholders shall contribute the SIDG Shareholders Plan Contribution Amount to Reorganized SIDG.

5.3.5.17    The Closing Date shall occur by no later than ten (10) Business Days following the Effective Date.

5.3.5.18    Upon payment in full pursuant to the terms of the Plan and the FirstBank New Loan B Documents, FirstBank shall release and satisfy its Liens against any and all of Reorganized SIDG's Property and shall return the FirstBank New Loan B Documents to Reorganized SIDG marked "satisfied."

5.3.6    Notwithstanding the above, FirstBank may be paid under such other terms as may be mutually agreed upon by FirstBank and the Debtors or the Reorganized Debtors, as the case may be.

Class 2 is Impaired by the Plan. It is the Debtors' position that the actions of FirstBank as described in the FirstBank Lender Liability Adversary Proceeding will preclude FirstBank from casting a Ballot in good faith. Subject to the Debtors' rights to contest any Ballot cast by FirstBank, FirstBank, as the Holder of the Class 2 Claims, is entitled to vote to accept or reject the Plan.

5.4    **Class 3:  Secured Tax Claims of Governmental Units.**

Class 3 consists of all Secured Tax Claims of Governmental Units. On the Distribution Date, Reorganized SIDG shall pay to a Governmental Unit, in Cash, the Allowed Amount of its Secured Tax Claim. Class 3 is Unimpaired by the Plan. Each Holder of a Secured Tax Claim in Class 3 conclusively is presumed to have accepted the Plan and is not entitled to vote to accept or reject the Plan.

5.5   **Class 4:  Other Secured Claims.**

5.5.1   Class 4 consists of all Secured Claims not otherwise specifically classified in the Plan. In the event there is more than one Secured Claim in this Class, such Secured Claims shall be separated into subclasses in Class 4. Under the Plan, the following shall occur with respect to the Allowed Class 4 Claims:

5.5.1.1   On the Effective Date, in accordance with Section 1124 of the Bankruptcy Code, Reorganized SIDG shall (a) cure any defaults (other than defaults relating to the insolvency or the financial condition of the Debtor or its status as Debtor in Possession in the Bankruptcy Cases) of the Debtor under the loan and/or security documents evidencing an Allowed Class 4 Claim that occurred before or after the commencement of the Bankruptcy Cases, and (b) reinstate the maturity of such Allowed Class 4 Claim as such maturity existed under the loan and/or security documents evidencing such Allowed Class 4 Claim, thus leaving unaltered the legal, equitable, and contractual rights to which the Holder of such Allowed Class 4 Claim is entitled with respect to such Allowed Class 4 Claim.

5.5.1.2   Following the Effective Date, Reorganized SIDG shall continue to perform its obligations under the loan and/or security documents evidencing an Allowed Class 4 Claim, including making any payments required under such loan and/or security documents.

5.5.1.3   Following the Effective Date, Reorganized SIDG's obligations under the loan and/or security documents evidencing an Allowed Class 4 Claim shall continue to be secured by any security interest in the Debtor's Property granted Prepetition to the Holder of such Allowed Class 4 Claim.

5.5.1.4   Any deficiency owing to a Secured Creditor with respect to a Class 4 Claim shall be classified and treated as a Class 10 Unsecured Claim to the extent Allowed by a Final Order of the Bankruptcy Court.

Class 4 is Unimpaired by the Plan. Each Holder of a Secured Claim in Class 4 conclusively is presumed to have accepted the Plan and is not entitled to vote to accept or reject the Plan.

5.6   **Class 5:  Unsecured Claims of Blue Water Traders Ltd.**

5.6.1   Class 5 consists of all of the Blue Water Traders Prepetition Claims.

5.6.2    Following extensive negotiations, the Debtors and Blue Water Traders have reached a compromise as to all disputes with respect to the Blue Water Traders Prepetition Claims, including the treatment of the Blue Water Traders Prepetition Claims under the Plan (the "Blue Water Traders Settlement").  The principal terms and conditions of the Blue Water Traders Settlement are as follows:

5.6.2.1    The Allowed Amount of the Blue Water Traders Prepetition Claims in the Bankruptcy Cases shall be $500,000.00 (the "Blue Water Traders Allowed Class 5 Claim"), and the Blue Water Traders Allowed Class 5 Claim shall be treated as an Unsecured Claim.

5.6.2.2    On the Effective Date, Reorganized SIDG shall pay Blue Water Traders and/or Mr. and Mrs. Oscar Juelle, in Cash, the sum of $500,000.00 in full and final satisfaction, settlement, release, extinguishment and discharge of the Blue Water Traders Allowed Class 5 Claim.

5.6.2.3    On the Effective Date, the Blue Water Traders Prepetition Contracts shall be deemed terminated in all respects without further action by any party and shall become null and void.  Thus, the Blue Water Traders Prepetition Contracts shall be treated as Rejected Contracts under the Plan.

5.6.2.4    On the Effective Date, upon receipt of payment of the amount of $500,000.00, Blue Water Traders shall withdraw, with prejudice, the Blue Water Traders Proofs of Claim.

5.6.2.5    Except for the Blue Water Traders Allowed Class 5 Claim, Blue Water Traders shall have no other Claim of any nature whatsoever (including any rejection damage Claims) against the Debtors.

5.6.2.6    On the Effective Date, upon receipt of payment of the amount of $500,000.00, Blue Water Traders shall transfer title to Site LV4 to Reorganized SIDG in accordance with the laws of the British Virgin Islands, free and clear of any and all Liens of any other parties, and Blue Water Traders shall cooperate and execute any documents required to effectuate that transfer.

5.6.2.7    Reorganized SIDG shall pay all recording fees, stamp duties, and transfer taxes required to be paid for the transfer of title to Site LV4 from Blue Water Traders to Reorganized SIDG.

5.6.2.8    On the Effective Date, Reorganized SIDG shall (a) acquire the Blue Water Traders Loan from FirstBank, and (b) release Blue Water Traders, Oscar Juelle and Maria Cristina Feo Franco from any obligations under the Blue Water Traders Loan.

5.6.2.9    During the five (5) year period following the Effective Date, Reorganized SIDG will provide two units of 2-bedroom suites in the Marina Village at no cost to Oscar Juelle or Maria Cristina Feo Franco for a period of four (4) weeks each year

(inclusive of a boat slip at the marina), with the weeks to be used in one or two week increments (subject to availability and Scrub Island Resort's normal blackout schedule for holidays) and sixty (60) days prior written notice to be provided by Oscar Juelle. In the event that the four (4) weeks per year are not fully used at the end of any particular year, the residual weeks may be carried over to the following year, provided that all twenty (20) weeks must be used by the end of the five (5) year period.

      5.6.2.10      On the Effective Date, upon receipt of payment of the amount of $500,000.00, the Debtors and Blue Water Traders (including Oscar Juelle and Maria Cristina Feo Franco) shall exchange full mutual releases as to any claims whatsoever relating to the Blue Water Traders Prepetition Contracts, the Blue Water Traders Proofs of Claim, and Site LV4 (with the release by Blue Water Traders (including Oscar Juelle and Maria Cristina Feo Franco) to also be as to all officers, directors, shareholders, employees, agents and attorneys of the Debtors), subject to any remaining obligations under the Plan.

    5.6.3    At or prior to the Confirmation Hearing, the Debtors and Blue Water Traders may enter into a separate settlement agreement incorporating the principal terms of the Blue Water Traders Settlement (the "Blue Water Traders Settlement Agreement").

    Class 5 is Impaired by the Plan. Blue Water Traders, as the Holder of the Class 5 Claims, is entitled to vote to accept or reject the Plan.

5.7    **Class 6: Unsecured Claims of Pablo L. Dardet.**

    5.7.1    Class 6 consists of all of the Dardet Prepetition Claims.

    5.7.2    Following extensive negotiations, the Debtors and Dardet have reached a compromise as to all disputes with respect to the Dardet Prepetition Claims, including the treatment of the Dardet Prepetition Claims under the Plan (the "Dardet Settlement"). The principal terms and conditions of the Dardet Settlement are as follows:

      5.7.2.1      The Allowed Amount of the Dardet Prepetition Claims in the Bankruptcy Cases shall be $1,146,365.27 (the "Dardet Allowed Class 6 Claim"), and the Dardet Allowed Class 6 Claim shall be treated as an Unsecured Claim.

      5.7.2.2      On the Effective Date, Reorganized SIDG shall pay Dardet, in Cash, $400,000.00 of the Dardet Allowed Class 6 Claim.

      5.7.2.3      On the Effective Date, the Dardet Prepetition Contracts shall be deemed terminated in all respects without further action by any party and shall become null and void. Thus, the Dardet Prepetition Contracts shall be treated as Rejected Contracts under the Plan.

      5.7.2.4      Except for the Dardet Allowed Class 6 Claim, Dardet shall have no other Claim of any nature whatsoever (including any rejection damage Claims) against the Debtors.

5.7.2.5     On the Effective Date, Dardet shall transfer title to Site LV9 to Reorganized SIDG in accordance with the laws of the British Virgin Islands, free and clear of any and all Liens of any other parties (except for the charge in favor of Dardet as described in <u>Article 5.7.2.6</u> below), and Dardet shall cooperate and execute any documents required to effectuate that transfer.

5.7.2.6     On the Effective Date, Reorganized SIDG shall grant, and record in favor of, Dardet a charge over Site LV9 as security for the payment of the remaining balance of the Dardet Allowed Class 6 Claim (i.e., $746,365.27). Upon payment in full of the Dardet Allowed Class 6 Claim, Dardet shall execute any documents required to release such charge.

5.7.2.7     Reorganized SIDG shall pay for all costs and expenses (including recording fees, stamp duties, and transfer taxes) required to be paid for (a) the transfer of title to Site LV9 from Dardet to Reorganized SIDG and (b) the charge in favor of Dardet.

5.7.2.8     Upon Reorganized SIDG's receipt of title to Site LV9, Reorganized SICL shall pay for, and complete, the construction of a new villa residence on Site LV9.

5.7.2.9     Reorganized SIDG shall market the sale of the new villa and, upon the earlier to occur of the closing of the sale of the new villa or the 24 Month Anniversary Date, Reorganized SIDG shall pay Dardet, in Cash, the remaining balance of the Dardet Allowed Class 6 Claim (i.e., $746,365.27).

5.7.2.10     On the Effective Date, the Debtors and Dardet shall exchange full mutual releases as to any claims whatsoever relating to the Dardet Prepetition Contracts, the Dardet Scheduled Claim, and Site LV9 (with the release by Dardet to also be as to all officers, directors, shareholders, employees, agents and attorneys of the Debtors), subject to any remaining obligations under the Plan.

5.7.2.11     The Cash payments to be received by Dardet pursuant to this <u>Article 5.7</u> shall be in full and final satisfaction, settlement, release, extinguishment and discharge of the Dardet Allowed Class 6 Claim.

5.7.3     At or prior to the Confirmation Hearing, the Debtors and Dardet may enter into a separate settlement agreement incorporating the principal terms of the Dardet Settlement (the "<u>Dardet Settlement Agreement</u>").

Class 6 is Impaired by the Plan. Dardet, as the Holder of the Class 6 Claims, is entitled to vote to accept or reject the Plan.

## 5.8     **Class 7: Unsecured Claims of Thomas Frederick.**

5.8.1     Class 7 consists of all of the Frederick Prepetition Claims.

5.8.2   In the Frederick Proof of Claim, Frederick has asserted that, as of the Petition Date, SIDG was indebted to Frederick in the aggregate amount of $528,047.00, all of which was asserted as an Unsecured Claim.   Counsel to Frederick has advised counsel to the Debtors that the Frederick Proof of Claim does not include the cost of the real estate lot for Site LV2, and that the actual amount of the Frederick Prepetition Claims is $728,047.00.   The books and records of the Debtors do not support a Claim for Frederick in the amount of $728,047.00.   Thus, the Debtors and Frederick have agreed to exchange information in an attempt to reach an agreement as to the Allowed Amount of the Frederick Prepetition Claims.   To the extent that the Debtors and Frederick cannot agree on the Allowed Amount of the Frederick Prepetition Claims, such Allowed Amount shall be determined by a Final Order of the Bankruptcy Court.   For purposes of this Article 5.8, the Allowed Amount of the Frederick Prepetition Claims as determined as described above shall be defined as the "Frederick Allowed Class 7 Claim".

5.8.3   Under the Plan, Frederick shall receive the following treatment in full and final satisfaction, settlement, release, extinguishment and discharge of the Frederick Allowed Class 7 Claim:

5.8.3.1      The Frederick Allowed Class 7 Claim shall be treated as an Unsecured Claim.

5.8.3.2      On the Effective Date, Reorganized SIDG shall pay Frederick, in Cash, $200,000.00 of the Frederick Allowed Class 7 Claim.

5.8.3.3      On the Effective Date, the Frederick Prepetition Contracts shall be deemed terminated in all respects without further action by any party and shall become null and void.   Thus, the Frederick Prepetition Contracts shall be treated as Rejected Contracts under the Plan.

5.8.3.4      On the Effective Date, Frederick shall withdraw, with prejudice, the Frederick Proof of Claim.

5.8.3.5      Except for the Frederick Allowed Class 7 Claim, Frederick shall have no other Claim of any nature whatsoever (including any rejection damage Claims) against the Debtors.

5.8.3.6      On the Effective Date, Frederick shall transfer title to Site LV2 to Reorganized SIDG in accordance with the laws of the British Virgin Islands, free and clear of any and all Liens of any other parties (except for the charge in favor of Frederick as described in Article 5.8.3.7 below), and Frederick shall cooperate and execute any documents required to effectuate that transfer.

5.8.3.7      On the Effective Date, Reorganized SIDG shall grant, and record in favor of, Frederick a charge over Site LV2 as security for the payment of the remaining balance of the Frederick Allowed Class 7 Claim (after deducting the $200,000.00 payment described in Article 5.8.3.2).   Upon payment in full of the

Frederick Allowed Class 7 Claim, Frederick shall execute any documents required to release such charge.

5.8.3.8     Reorganized SIDG shall pay all recording fees, stamp duties, and transfer taxes required to be paid for (a) the transfer of title to Site LV2 from Frederick to Reorganized SIDG and (b) the charge in favor of Frederick.

5.8.3.9     On the Effective Date, the Debtors and Frederick shall exchange full mutual releases as to any claims whatsoever relating to the Frederick Prepetition Contracts, the Frederick Proof of Claim, and Site LV2 (with the release by Frederick to also be as to all officers, directors, shareholders, employees, agents and attorneys of the Debtors), subject to any remaining obligations under the Plan.

5.8.3.10     On the 12 Month Anniversary Date, Reorganized SIDG shall pay Frederick, in Cash, one-third (1/3) of the remaining balance of the Frederick Allowed Class 7 Claim (after deducting the $200,000.00 payment described in Article 5.8.3.2).

5.8.3.11     On the 24 Month Anniversary Date, Reorganized SIDG shall pay Frederick, in Cash, one-half (1/2) of the remaining balance of the Frederick Allowed Class 7 Claim (after deducting the $200,000.00 payment described in Article 5.8.3.2 and the payment described in Article 5.8.3.10).

5.8.2.12     On the 36 Month Anniversary Date, Reorganized SIDG shall pay Frederick, in Cash, the remaining balance of the Frederick Allowed Class 7 Claim (after deducting the $200,000.00 payment described in Article 5.8.3.2 and the payments described in Article 5.8.3.10 and Article 5.8.3.11).

5.8.4     At or prior to the Confirmation Hearing, the Debtors and Frederick may enter into a separate settlement agreement incorporating the principal terms of the Frederick Settlement (the "Frederick Settlement Agreement").

Class 7 is Impaired by the Plan.  Frederick, as the Holder of the Class 7 Claims, is entitled to vote to accept or reject the Plan.

## 5.9     Class 8: Unsecured Claims of Arturo Linares, David Foster, and Scrub Island, LLC.

5.9.1     Class 8 consists of all of the Linares/Foster Prepetition Claims.

5.9.2     Following extensive negotiations, the Debtors and Linares/Foster have reached a compromise as to all disputes with respect to the Linares/Foster Prepetition Claims, including the treatment of the Linares/Foster Prepetition Claims under the Plan (the "Linares/Foster Settlement"). The principal terms and conditions of the Linares/Foster Settlement are as follows:

5.9.2.1     The Allowed Amount of the Linares/Foster Prepetition Claims in the Bankruptcy Cases shall be $600,000.00 (the "Linares/Foster Allowed Class 8 Claim"), and the Linares/Foster Allowed Class 8 Claim shall be treated as an Unsecured Claim.

44

5.9.2.2        On the Effective Date, Reorganized SIDG shall pay Linares/Foster, in Cash, the sum of $600,000.00 in full and final satisfaction, settlement, release, extinguishment and discharge of the Linares/Foster Allowed Class 8 Claim.

5.9.2.3        On the Effective Date, the Linares/Foster Prepetition Contracts shall be deemed terminated in all respects without further action by any party and shall become null and void. Thus, the Linares/Foster Prepetition Contracts shall be treated as Rejected Contracts under the Plan.

5.9.2.4        On the Effective Date, Linares/Foster shall withdraw, with prejudice, the Linares/Foster Proofs of Claim.

5.9.2.5        Except for the Linares/Foster Allowed Class 8 Claim, Linares/Foster shall have no other Claim of any nature whatsoever (including any rejection damage Claims) against the Debtors.

5.9.2.6        On the Effective Date, Linares/Foster shall transfer title to Site LV5 to Reorganized SIDG in accordance with the laws of the British Virgin Islands, free and clear of any and all Liens of any other parties, and Linares/Foster shall cooperate and execute any documents required to effectuate that transfer.

5.9.2.7        Reorganized SIDG shall pay all recording fees, stamp duties, and transfer taxes required to be paid for the transfer of title to Site LV5 from Linares/Foster to Reorganized SIDG.

5.9.2.8        On the Effective Date, Reorganized SIDG shall (a) acquire the Linares/Foster Loan from FirstBank Virgin Islands, (b) release Linares/Foster from any obligations under the Linares/Foster Loan, and (c) obtain the release of any delinquent credit report by FirstBank Virgin Islands as to Linares/Foster.

5.9.2.9        During the five (5) year period following the Effective Date, Reorganized SIDG shall provide one 3-bedroom villa to Linares/Foster for a period of four (4) weeks each year, with the weeks to be used in one or two week increments (subject to availability and Scrub Island Resort's normal blackout schedule for holidays) and sixty (60) days prior written notice to be provided by Linares/Foster.

5.9.2.10       On the Effective Date, the Debtors and Linares/Foster shall exchange full mutual releases as to any claims whatsoever relating to the Linares/Foster Loan, the Linares/Foster Prepetition Contracts, the Linares/Foster Proofs of Claim, and Site LV5, with the release by Linares/Foster to also be as to all officers, directors, shareholders, employees, agents and attorneys of the Debtors), subject to any remaining obligations under the Plan.

5.9.3    At or prior to the Confirmation Hearing, the Debtors and Linares/Foster may enter into a separate settlement agreement incorporating the principal terms of the Linares/Foster Settlement (the "Linares/Foster Settlement Agreement").

Class 8 is Impaired by the Plan. Linares/Foster, as the Holder of the Class 8 Claims, are entitled to vote to accept or reject the Plan.

5.10    **Class 9: Unsecured Claims of Oscar Rivera and Anabel Rivera.**

5.10.1 Class 9 consists of all of the Rivera Prepetition Claims.

5.10.2 Following extensive negotiations, the Debtors and Rivera have reached a compromise as to all disputes with respect to the Rivera Prepetition Claims, including the treatment of the Rivera Prepetition Claims under the Plan (the "Rivera Settlement"). The principal terms and conditions of the Rivera Settlement are as follows:

5.10.2.1    The Allowed Amount of the Rivera Prepetition Claims in the Bankruptcy Cases shall be $1,846,721.50 (the "Rivera Allowed Class 9 Claim"), and the Rivera Allowed Class 9 Claim shall be treated as an Unsecured Claim.

5.10.2.2    On the Effective Date, Reorganized SIDG shall pay Rivera, in Cash, $450,000.00 of the Rivera Allowed Class 9 Claim.

5.10.2.3    On the Effective Date, the Rivera Prepetition Contracts shall be deemed terminated in all respects without further action by any party and shall become null and void. Thus, the Rivera Prepetition Contracts shall be treated as Rejected Contracts under the Plan.

5.10.2.4    On the Effective Date, Rivera shall withdraw, with prejudice, the Rivera Proof of Claim.

5.10.2.5    Except for the Rivera Allowed Class 9 Claim, Rivera shall have no other Claim of any nature whatsoever (including any rejection damage Claims) against the Debtors.

5.10.2.6    On the Effective Date, Oscar Rivera shall transfer title to Site LVII-4 to Reorganized SIDG in accordance with the laws of the British Virgin Islands, free and clear of any and all Liens of any other parties (except for the charge in favor of Rivera as described in Article 5.10.2.7 below), and Oscar Rivera shall cooperate and execute any documents required to effectuate that transfer.

5.10.2.7    On the Effective Date, Reorganized SIDG shall grant, and record in favor of, Rivera a charge over Site LVII-4 as security for the payment of the remaining balance of the Rivera Allowed Class 9 Claim (i.e., $1,396,721.50). Upon payment in full of the Rivera Allowed Class 9 Claim, Rivera shall execute any documents required to release such charge.

5.10.2.8    Reorganized SIDG shall pay all recording fees, stamp duties, and transfer taxes required to be paid for (a) the transfer of title to Site LVII-4 from Oscar Rivera to Reorganized SIDG and (b) the charge in favor of Rivera.

5.10.2.9    Upon Reorganized SIDG's receipt of title to Site LVII-4, Reorganized SICL shall pay for, and complete, the construction of a new villa residence on Site LVII-4.

5.10.2.10    Reorganized SIDG shall market the sale of the new villa and, upon the earlier to occur of the closing of the sale of the new villa or the 24 Month Anniversary Date, Reorganized SIDG shall pay Rivera, in Cash, the remaining balance of the Rivera Allowed Class 9 Claim (i.e., $1,396,721.50).

5.10.2.11    On the Effective Date, the Debtors and Rivera shall exchange full mutual releases as to any claims whatsoever relating to the Rivera Prepetition Contracts, the Rivera Proof of Claim, and Site LVII-4 (with the release by Rivera to also be as to all officers, directors, shareholders, employees, agents and attorneys of the Debtors), subject to any remaining obligations under the Plan.

5.10.2.12    The Cash payments to be received by Rivera pursuant to this Article 5.10 shall be in full and final satisfaction, settlement, release, extinguishment and discharge of the Rivera Allowed Class 9 Claim.

5.10.3   At or prior to the Confirmation Hearing, the Debtors and Rivera may enter into a separate settlement agreement incorporating the principal terms of the Rivera Settlement (the "Rivera Settlement Agreement").

Class 9 is Impaired by the Plan.  Rivera, as the Holder of the Class 9 Claims, is entitled to vote to accept or reject the Plan.

5.11    **Class 10:  Unsecured Claims (Unsecured Claims Not Otherwise Classified).**

5.11.1   Class 10 consists of all Unsecured Claims not otherwise classified in the Plan.

5.11.2   Under the Plan, each Holder of an Allowed Unsecured Claim in Class 10 will receive Distributions, in Cash, over a five (5) year period from Reorganized SIDG in an amount equal to one hundred percent (100%) of such Holder's Allowed Class 10 Unsecured Claim. The payment to each Holder of an Allowed Class 10 Unsecured Claim shall be made on each anniversary of the Effective Date, with each such annual payment to be in an amount equal to twenty percent (20%) of such Holder's Allowed Class 10 Unsecured Claim.

5.11.3   Notwithstanding anything to the contrary contained in the Plan, no Distributions shall be made under the Plan as to the Mainsail Claims or the SIDG Shareholder Claims until the Plan Funder Loan Amount has been paid in full, at which time Reorganized SIDG shall pay the Mainsail Claims and the SIDG Shareholder Claims in full (or the same percentage thereof that will have then been paid to Holders of Class 10 Allowed Unsecured Claims).

Class 10 is Impaired by the Plan.  Each Holder of an Unsecured Claim in Class 10 is entitled to vote to accept or reject the Plan.

5.12     **Class 11:  Unsecured Claims of the SIU Entities.**

5.12.1  Class 11 consists of all of the SIU Entities Claims.

5.12.2  In the SIU Entities Proof of Claim, SIU has asserted that, as of the Petition Date, SIDG was indebted to SIU in the aggregate amount of $1,553,068.93 with respect to the SIU Entities Prepetition Contracts, all of which was asserted as an Unsecured Claim.  Upon information and belief, the aggregate amount of the Claim asserted by SIU in the SIU Entities Proof of Claim includes (a) future SIU Systems Capital Fees due to SIU under the SIU Entities Prepetition Contracts, and (b) the SIU Entities Prepetition Arrearages.

5.12.3  Under the Plan, the SIU Entities shall receive the following treatment in full and final satisfaction, settlement, release, extinguishment and discharge of the SIU Entities Claims:

5.12.3.1     Prior to the Confirmation Hearing, SIDG or its affiliate shall exercise the SIU Systems Purchase Option.  At the time of the SIU Systems Purchase Option Closing, SIDG or its affiliate shall pay the SIU Systems Purchase Option Price to SIU, by wire transfer of immediately available funds.  At least ten (10) days prior to the SIU Systems Purchase Option Closing, SIU shall deliver to SIDG a detailed written calculation of the SIU Systems Purchase Option Price.  To the extent that SIU and SIDG cannot agree on the amount of the SIU Systems Purchase Option Price, such amount shall be determined by a Final Order of the Bankruptcy Court.  Even though SIDG or its affiliate has the absolute right to purchase the SIU Systems under the terms of Article 6.1 of that certain Water Supply and Wastewater Treatment Agreement, dated December 20, 2006, by and between SIDG and TSG Water Resources, Inc., SIDG, in its sole and absolute discretion, reserves the right to file a motion with the Bankruptcy Court to seek approval of the exercise of the SIU Systems Purchase Option.

5.12.3.2     In accordance with the terms of the SIU Entities Prepetition Contracts, SIU shall, upon receipt of the SIU Systems Purchase Option Price, (a) transfer title to the SIU Systems to SIDG or its affiliate in "as is, where is" condition free and clear of all Liens, and (b) perform the other obligations of SIU set forth in the SIU Entities Prepetition Contracts in connection with such transfer of title.  At the SIU Systems Purchase Option Closing, SIU shall execute and deliver any and all documents as reasonably requested by SIDG or its affiliate to assure that all rights, title and interests in and to the SIU Systems have been sold, assigned and transferred to SIDG or its affiliate.

5.12.3.3     In accordance with the terms of the SIU Entities Prepetition Contracts, the SIU Entities Prepetition Contracts shall terminate at the time of the SIU Systems Purchase Option Closing.  In this regard, SIU shall not be entitled to the payment of any further fees as described in Article 5.2 of that certain Water Supply and Wastewater Treatment Agreement, dated December 20, 2006, by and between SIDG and TSG Water Resources, Inc.

5.12.3.4     Except as to any obligations under the Plan, the Debtors and the SIU Entities and their respective officers, directors, shareholders, employees, agents and

attorneys shall be deemed to have released each other, as of the SIU Systems Purchase Option Closing, from any and all claims of any nature whatsoever that they have or may have against each other, known or unknown, contingent or otherwise, asserted or unasserted, at law or in equity, as well as any other kind or character of action held, owned or possessed, directly or indirectly. Specifically, Joe C. Collier III shall be deemed to have been released by the SIU Entities, as of the SIU Systems Purchase Option Closing, from any and all Claims and obligations under the SIU Entities Prepetition Contracts and the SIU Systems Purchase Agreement, including any guaranties for any obligations thereunder.

5.12.3.5.    SIU shall have an Allowed Class 10 Unsecured Claim in the amount of the SIU Prepetition Arrearages less any portion thereof determined by the Bankruptcy Court to comprise part of the SIU Systems Purchase Option Price (the "SIU Entities Unsecured Claim Balance"). To the extent that SIU and SIDG cannot agree on the amount of the SIU Entities Unsecured Claim Balance, such amount shall be determined by a Final Order of the Bankruptcy Court.

5.12.3.6    The SIU Systems Purchase Agreement shall be treated as a Rejected Contract under the Plan. SIU shall have no Allowed Claims (including any rejection damage Claims) against the Debtors in the Bankruptcy Cases with respect to the SIU Systems Purchase Agreement.

Class 11 is Unimpaired by the Plan, as the provisions of this Article 5.12 leave unaltered all of the legal, equitable and contractual rights of the SIU Entities under the SIU Prepetition Contracts in accordance with Section 1124 of the Bankruptcy Code. The SIU Entities, as the Holders of the Class 11 Claims, conclusively are presumed to have accepted the Plan and are not entitled to vote to accept or reject the Plan.

## 5.13    Class 12:  Unsecured Claims of Alf Nolan Davis d/b/a A. N. Davis Plumbing and Electrical Services.

5.13.1 Class 12 consists of all of the Davis Prepetition Claims.

5.13.2 In the Davis Proofs of Claim, Davis has asserted that, as of the Petition Date, SIDG was indebted to Davis in the aggregate amount of $678,618.18, all of which was asserted as an Unsecured Claim.

5.13.3 Following extensive negotiations, the Debtors and Davis have reached a compromise as to all disputes with respect to the Davis Prepetition Claims, including the treatment of the Davis Prepetition Claims under the Plan (the "Davis Settlement"). The principal terms and conditions of the Davis Settlement are as follows:

5.13.3.1    The Allowed Amount of the Davis Prepetition Claims in the Bankruptcy Cases shall be $550,000.00 (the "Davis Allowed Class 12 Claim"), and the Davis Allowed Class 12 Claim shall be treated as an Unsecured Claim.

49

5.13.3.2    On the 1 Month Anniversary Date, Reorganized SIDG shall pay Davis, in Cash, $150,000.00 of the Davis Allowed Class 12 Claim and the sum of $12,000.00 for Davis' costs to prosecute the Davis Prepetition Claims.

5.13.3.3    On the Effective Date, Davis shall withdraw, with prejudice, the Davis Proofs of Claim and dismiss the Davis BVI Proceeding with prejudice.

5.13.3.4    Except for the Davis Allowed Class 12 Claim, Davis shall have no other Claim of any nature whatsoever against the Debtors.

5.13.3.5.    On the Effective Date, the Debtors and Davis shall exchange full mutual releases as to any claims whatsoever relating to the Davis Prepetition Claims (with the release by Davis to also be as to all officers, directors, shareholders, employees, agents and attorneys of the Debtors), subject to any remaining obligations under the Plan.

5.13.3.6    Reorganized SIDG shall pay Davis, in Cash, the remaining balance of the Davis Allowed Class 12 Claim (i.e., $400,000.00) over a three (3) year period. Such payments shall be made on a quarterly basis, with the first quarterly payment to be made three (3) months after the 1 Month Anniversary Date.

5.13.3.7    The Cash payments to be received by Davis pursuant to this Article 5.13 shall be in full and final satisfaction, settlement, release, extinguishment and discharge of the Davis Allowed Class 12 Claim.

5.13.4 At or prior to the Confirmation Hearing, the Debtors and Davis may enter into a separate settlement agreement incorporating the principal terms of the Davis Settlement (the "Davis Settlement Agreement"). SIDG, in its sole and absolute discretion, reserves the right to file a motion with the Bankruptcy Court to seek approval of the compromise with Davis as provided in this Article 5.13.

Class 12 is Impaired by the Plan. Davis, as the Holders of the Class 12 Claims, is entitled to vote to accept or reject the Plan.

### 5.14    Class 13: Subordinated Unsecured Claims of FirstBank.

5.14.1 Class 13 consists of any Allowed Unsecured Claim of FirstBank under FirstBank Option B.

5.14.2 It is the Debtors' position that FirstBank should not have an Allowed Unsecured Claim for any deficiency under FirstBank Option B. It is also the Debtors' position that any Unsecured Claim of FirstBank must be subordinated to all other Claims. The inclusion of this Article 5.14 is without prejudice to the Debtors' rights to disallow or subordinate FirstBank's asserted Unsecured Claim under FirstBank Option B.

5.14.3 On account of any Allowed Unsecured Claim of FirstBank under FirstBank Option B, FirstBank shall receive a promissory note in the amount of $500,000 payable on the

later of five (5) years from the Effective Date or after payment of all other Allowed Unsecured Claims in accordance with the Plan.

Class 13 is Impaired by the Plan. It is the Debtors' position that the actions of FirstBank as described in the FirstBank Lender Liability Adversary Proceeding will preclude FirstBank from casting a Ballot in good faith. Subject to the Debtors' rights to contest any Ballot cast by FirstBank, FirstBank, as the Holder of the Class 13 Claims, is entitled to vote to accept or reject the Plan.

5.15    **Class 14: Intercompany Claims.**

Class 14 consists of all Intercompany Claims. On the Effective Date, all of the Intercompany Claims shall be deemed cancelled, annulled and extinguished without any further action by any party and shall be of no further force and effect. The Holders of the Class 14 Intercompany Claims will not receive or retain any Property under the Plan on account of such Intercompany Claims. Accordingly, the Reorganized Debtors will not make any Distribution or establish any reserve under the Plan for the Intercompany Claims. Class 14 is Impaired by the Plan. Pursuant to Section 1126(g) of the Bankruptcy Code, Class 14 is deemed not to have accepted the Plan and, thus, Holders of the Class 14 Intercompany Claims are not entitled to vote to accept or reject the Plan.

5.16    **Class 15: SIDG Equity Interests.**

Class 15 consists of all of the SIDG Equity Interests. On the Effective Date, all of the Class 15 Equity Interests shall be deemed cancelled, annulled, extinguished and surrendered without any further action by any party and shall be of no further force and effect. The Holders of the Class 15 Equity Interests will not receive or retain any Property or equity interest under the Plan on account of the Class 15 Equity Interests. Accordingly, Reorganized SIDG will not make any Distribution or establish any reserve under the Plan for the Class 15 Equity Interests. Class 15 is Impaired by the Plan. Pursuant to Section 1126(g) of the Bankruptcy Code, Class 15 is deemed not to have accepted the Plan and, thus, the Holders of the Class 15 Equity Interests are not entitled to vote to accept or reject the Plan.

5.17    **Class 16: SICL Equity Interests.**

Class 16 consists of all of the SICL Equity Interests. On the Effective Date, all of the Class 16 Equity Interests shall be deemed cancelled, annulled, extinguished and surrendered without any further action by any party and shall be of no further force and effect. The Holders of the Class 16 Equity Interests will not receive or retain any Property or equity interest under the Plan on account of the Class 16 Equity Interests. Accordingly, Reorganized SICL will not make any Distribution or establish any reserve under the Plan for the Class 16 Equity Interests. Class 16 is Impaired by the Plan. Pursuant to Section 1126(g) of the Bankruptcy Code, Class 16 is deemed not to have accepted the Plan and, thus, the Holders of the Class 16 Equity Interests are not entitled to vote to accept or reject the Plan.

## ARTICLE 6
## ACCEPTANCE OR REJECTION OF THE PLAN

6.1    **Each Impaired Class Entitled to Vote Separately.**

Except as otherwise provided in Article 6.4, the Holders of Claims or Equity Interests in each Impaired Class of Claims or Impaired Class of Equity Interests shall be entitled to vote separately to accept or reject the Plan.

6.2    **Acceptance by Impaired Classes.**

Classes 2, 5, 6, 7, 8, 9, 10, 12 and 13 are Impaired under the Plan, and, except as otherwise provided in the Plan, Holders of Claims in such Classes are entitled to vote to accept or reject the Plan. Pursuant to Section 1126(c) of the Bankruptcy Code, an Impaired Class of Claims shall have accepted the Plan if (a) the Holders (other than any Holder designated pursuant to Section 1126(e) of the Bankruptcy Code) of at least two-thirds in dollar amount of the Allowed Claims actually voting in such Class have voted to accept the Plan and (b) the Holders (other than any Holder designated pursuant to Section 1126(e) of the Bankruptcy Code) of more than one-half in number of the Allowed Claims actually voting in such Class have voted to accept the Plan. If a Holder of a Claim holds more than one Claim in any one Class, all Claims of such Holder in such Class shall be aggregated and deemed to be one Claim for purposes of determining the number of Claims in such Class voting on the Plan.

6.3    **Presumed Acceptance of Plan by Unimpaired Classes.**

Classes 1, 3, 4, and 11 are Unimpaired under the Plan. Pursuant to Section 1126(f) of the Bankruptcy Code, such Classes and the Holders of Claims or Equity Interests in such Classes are conclusively presumed to have accepted the Plan and, thus, are not entitled to vote on the Plan. Accordingly, votes of Holders of Claims in Classes 1, 3, 4 and 11 are not being solicited by the Debtors. Except as otherwise expressly provided in the Plan, nothing contained herein or otherwise shall affect the rights and legal and equitable claims or defenses of the Debtors or the Reorganized Debtors in respect of any Unimpaired Claims, including all rights in respect of legal and equitable defenses to setoffs or recoupments against Unimpaired Claims.

6.4    **Deemed Non-Acceptance of Plan.**

Holders of Class 14 Intercompany Claims, Class 15 Equity Interests, and Class 16 Equity Interests will not receive or retain any Property under the Plan on account of such Class 14 Intercompany Claims, Class 15 Equity Interests, and Class 16 Equity Interests and, therefore, Classes 14, 15 and 16 are deemed not to have accepted the Plan pursuant to Section 1126(g) of the Bankruptcy Code. Accordingly, votes of Holders of Class 14 Intercompany Claims, Class 15 Equity Interests, and Class 16 Equity Interests are not being solicited by the Debtors.

6.5     **Impairment Controversies.**

If a controversy arises as to whether any Claim or Equity Interest, or any Class of Claims or Class of Equity Interests, is Impaired under the Plan, such Claim, Equity Interest or Class shall be treated as specified in the Plan unless the Bankruptcy Court shall determine such controversy upon motion of the party challenging the characterization of a particular Claim or Equity Interest, or a particular Class of Claims or Class of Equity Interests, under the Plan.

## ARTICLE 7
## TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES

7.1     **Assumption or Rejection of Executory Contracts and Unexpired Leases.**

Pursuant to Sections 365(a) and 1123(b)(2) of the Bankruptcy Code, all executory contracts and unexpired leases that currently exist between the Debtors and another Person or Entity and listed on Exhibit A attached hereto (collectively, the "Assumed Contracts") shall be deemed assumed by the Debtors as of the Closing Date; provided, however, that the Debtors reserve the right, in their sole discretion, on or prior to the Confirmation Date, to amend Exhibit A to add any executory contract or unexpired lease thereto or to delete any executory contract or unexpired lease therefrom, in which event such executory contract(s) or unexpired lease(s) shall be deemed to be assumed (if added) or rejected (if deleted). The Debtors shall provide notice of any amendments to Exhibit A to the parties to the executory contracts and unexpired leases affected thereby. The listing of a document on Exhibit A shall not constitute an admission by the Debtors that such document is an executory contract or an unexpired lease or that the Debtors have any liability thereunder. Any other executory contract or unexpired lease that exists between the Debtors and another Person or Entity and not listed on Exhibit A and that has not been expressly assumed or rejected by the Debtors with the Bankruptcy Court's approval on or prior to the Confirmation Date shall be deemed rejected by the Debtors as of the Confirmation Date, including any executory contract or unexpired lease (i) that has been rejected pursuant to an order of the Bankruptcy Court entered prior to the Effective Date, (ii) as to which a motion for approval of the rejection of such executory contract or unexpired lease has been filed and served prior to the Effective Date, or (iii) that is specifically listed on Exhibit E attached hereto (all of the foregoing, collectively, the "Rejected Contracts"). For purposes of the Plan, (i) all non-compete agreements, confidentiality or non-disclosure agreements and indemnification agreements executed for the benefit of the Debtors shall be deemed to be executory contracts and Assumed Contracts (even if not listed on Exhibit A), and (ii) all non-compete agreements, confidentiality or non-disclosure agreements, indemnification agreements and guaranties executed by the Debtors for the benefit of a third party shall be deemed to be executory contracts and Rejected Contracts (even if not listed on Exhibit E).

7.2     **Approval of Assumption or Rejection of Executory Contracts and Unexpired Leases.**

Entry of the Confirmation Order shall, subject to and upon the occurrence of the Effective Date, constitute (i) the approval, pursuant to Sections 365(a) and 1123(b)(2) of the

Bankruptcy Code, of the assumption of the executory contracts and unexpired leases assumed pursuant to Article 7.1 hereof, (ii) the approval, pursuant to Sections 365(a) and 1123(b)(2) of the Bankruptcy Code, of the rejection of the executory contracts and unexpired leases rejected pursuant to Article 7.1 hereof, and (iii) the extension of time, pursuant to Section 365(d)(4) of the Bankruptcy Code, within which the Debtors may assume, assume and assign, or reject any unexpired lease of nonresidential real property through the date of entry of an order approving the assumption, assumption and assignment, or rejection of such unexpired lease.   The assumption by the Debtors of an Assumed Contract shall be binding upon any and all parties to such Assumed Contract as a matter of law, and each such Assumed Contract shall be fully enforceable by the Reorganized Debtors in accordance with its terms, except as modified by the provisions of the Plan or an order of the Bankruptcy Court.

7.3     **Inclusiveness.**

Unless otherwise specified on Exhibit A, each executory contract and unexpired lease listed or to be listed on Exhibit A shall include all modifications, amendments, supplements, restatements, or other agreements made directly or indirectly by any agreement, instrument, or other document that in any manner affect such executory contract or unexpired lease, without regard to whether such agreement, instrument or other document is listed on Exhibit A.

7.4     **Cure of Defaults.**

Any lessor or other party to an Assumed Contract (except those lessors or other parties whose unexpired leases or executory contracts have been previously assumed by a Final Order of the Bankruptcy Court) asserting a Cure Claim in connection with the assumption of any unexpired lease or executory contract under Article 7.1, as contemplated by Section 365(b) of the Bankruptcy Code, must file such Cure Claim with the Bankruptcy Court on or before the Cure Claim Submission Deadline asserting all alleged amounts accrued or alleged defaults through the Cure Claim Submission Deadline.   Any lessor or other party to an Assumed Contract failing to file a Cure Claim by the Cure Claim Submission Deadline shall be forever barred from asserting, collecting or seeking to collect any amounts or defaults relating thereto against the Debtors or the Reorganized Debtors.   Reorganized SIDG shall have ninety (90) days from the Effective Date to file an objection to any Cure Claim.   Any disputed Cure Claims shall be resolved either consensually or by the Bankruptcy Court. Except as may otherwise be agreed to by the parties, by no later than one hundred twenty (120) days following the Effective Date, Reorganized SIDG shall cure any and all undisputed Cure Claims; provided, however, that, in accordance with the Marriott Motion and the Marriott Order and by agreement of Marriott and the Debtors, Reorganized SIDG shall pay the Marriott Allowed Cure Claim in full by no later than the 1 Month Anniversary Date.   All disputed Cure Claims shall be cured either within one hundred twenty (120) days after the entry of a Final Order determining the amount, if any, of the Debtors' liability with respect thereto or as may otherwise be agreed to by the parties.

7.5     **Claims under Rejected Executory Contracts and Unexpired Leases.**

7.5.1   Unless otherwise ordered by the Bankruptcy Court, any Claim for damages arising by reason of the rejection of any executory contract or unexpired lease must be filed with

the Bankruptcy Court on or before the Bar Date for rejection damage Claims in respect of such rejected executory contract or unexpired lease or such Claim shall be forever barred and unenforceable against the Debtors or the Reorganized Debtors. With respect to the Rejected Contracts, the Bar Date for filing rejection damage and other Claims with the Bankruptcy Court shall be thirty (30) days after the Confirmation Date. The Plan and any other order of the Bankruptcy Court providing for the rejection of an executory contract or unexpired lease shall constitute adequate and sufficient notice to Persons or Entities which may assert a Claim for damages from the rejection of an executory contract or unexpired lease of the Bar Date for filing a Claim in connection therewith.

7.5.2 All Claims for damages from the rejection of an executory contract or unexpired lease, once fixed and liquidated by the Bankruptcy Court and determined to be Allowed Claims, shall be Allowed Unsecured Claims in Class 10.

7.6 **Insurance Policies.**

All of the Debtors' insurance policies and any agreements, documents, or instruments relating thereto are treated as executory contracts under the Plan. Nothing contained in the Plan shall constitute or be deemed a waiver of any Cause of Action that the Debtors or the Reorganized Debtors may hold against any Person or Entity, including the insurers under any of the Debtors' insurance policies.

## ARTICLE 8
## MEANS OF IMPLEMENTATION OF THE PLAN

8.1 **General Overview of the Plan.**

The Plan provides for the reorganization and continued operation of the Debtors as the Reorganized Debtors, the settlement and payment of the FirstBank Prepetition Claims under FirstBank Option A or FirstBank Option B, and the payment in full of all of the other Allowed Claims against the Debtors except as otherwise described in the Plan or any Plan Document. On the Closing Date, (a) $12,500,000.00 will be loaned to Reorganized SIDG by the Plan Funder, and (b) $6,000,000.00 will be contributed to Reorganized SIDG by the SIDG Contributing Shareholders, all of which funds will be used as described elsewhere in the Plan or any Plan Document. The Plan provides for Cash payments to Holders of Allowed Claims, all as more particularly described in Article 3 and Article 5 of the Plan.

The Plan shall be implemented on the Effective Date, and the primary source of the funds necessary to implement the Plan initially will be the Plan Funder Loan Amount and the SIDG Shareholders Plan Contribution Amount. At the present time, the Debtors believe that Reorganized SIDG will have sufficient funds, as of the Effective Date, to pay in full the expected payments required under the Plan to the Holders of Allowed Administrative Expense Claims (including Allowed Administrative Expense Claims of Professionals), Allowed Priority Claims in Class 1, the amounts required to be paid on the Closing Date to FirstBank under Article 5.3.4 or Article 5.3.5 of the Plan, any amounts required to be paid on the Closing Date to the Longview

Villa Owners under the Plan or under the Longview Villa Owner Settlement Agreements, and Allowed Secured Tax Claims in Class 3. Cash payments to be made under the Plan after the Effective Date to the Holders of Allowed Priority Tax Claims and Holders of Allowed Claims will be derived from the operations of Reorganized SIDG, any new capital or financing raised by Reorganized SIDG, or the sale of the Scrub Island Real Estate, in each case as shown in the Projections.

8.2     **Effective Date Actions.**

8.2.1   Subject to the approval of the Bankruptcy Court and the satisfaction or waiver of the conditions precedent to the occurrence of the Effective Date contained in Article 10.2 of the Plan, on, as of, or as soon as practicable after the Effective Date, as the case may be, the Plan shall be implemented and the following shall occur:

8.2.1.1   the Closing shall occur under the Plan Funder Loan Agreement;

8.2.1.2   the Closing shall occur under the FirstBank New Loan A Documents (or, if applicable, the FirstBank New Loan B Documents);

8.2.1.3   the Closing shall occur with the Longview Villa Owners under the Plan or under each of the Longview Villa Owner Settlement Agreements;

8.2.1.4   the Class 15 Equity Interests and the Class 16 Equity Interests shall automatically be deemed cancelled, annulled, waived, and extinguished without any further action by any party and shall be of no further force and effect;

8.2.1.5   Reorganized SIDG shall issue and distribute the Reorganized SIDG Shares to the Plan Funder;

8.2.1.6   Reorganized SIDG shall be issued the Reorganized SICL Shares;

8.2.1.7   Reorganized SIDG shall make the Initial Distribution as provided in Article 9.1 of the Plan;

8.2.1.8   the Class 14 Intercompany Claims shall automatically be deemed cancelled, annulled, waived, and extinguished without any further action by any party and shall be of no further force and effect;

8.2.1.9   the Creditors Committee shall cease to exist;

8.2.1.10  the Reorganized Debtors shall be automatically substituted for the Debtors as a party to all contested matters, adversary proceedings, administrative proceedings and lawsuits, both within and outside of the Bankruptcy Court, involving the Debtor's Properties, Claims against the Debtors, the Causes of Action, and the resolution of Disputed Claims; and

8.2.1.11 the Reorganized Debtors shall carry out their other Effective Date responsibilities under the Plan, including the execution and delivery of all documentation contemplated by the Plan and the Plan Documents.

8.3    **Vesting of Property of the Estates in the Reorganized Debtors.**

On the Effective Date, and except as otherwise expressly provided in the Plan, all Property of the Estates (including the Causes of Action and any net operating losses) shall vest in the Reorganized Debtors free and clear of any and all Liens, Debts, obligations, Claims, Cure Claims, Liabilities, Equity Interests, and all other interests of every kind and nature except the Permitted Liens, and the Confirmation Order shall so provide. The Reorganized Debtors intend to preserve net operating losses to the maximum extent permitted under applicable law. As of the Effective Date, the Reorganized Debtors may operate their businesses and use, acquire, and dispose of their Properties, free of any restrictions of the Bankruptcy Code or the Bankruptcy Rules, other than those restrictions expressly imposed by the Plan and the Confirmation Order. All privileges with respect to the Property of the Debtors' Estates, including the attorney/client privilege, to which the Debtors are entitled shall automatically vest in, and may be asserted by or waived on behalf of, the Reorganized Debtors.

8.4    **Continued Corporate Existence; Issuance of Reorganized SICL Shares.**

Each of the Debtors will continue to exist after the Effective Date as a separate corporate entity, with all of the powers of a corporation under the laws of the British Virgin Islands and pursuant to its applicable corporate governance documents in effect prior to the Effective Date, except to the extent such corporate governance documents are amended or amended and restated as provided in the Plan or the Confirmation Order, without prejudice to any right to terminate such existence (whether by merger, dissolution or otherwise) under applicable law after the Effective Date. On the Closing Date, all of the Reorganized SICL Shares shall be issued to Reorganized SIDG. The Confirmation Order shall contain language authorizing such issuance of the Reorganized SICL Shares.

8.5    **Corporate Action.**

All matters provided for under the Plan involving the corporate structure of the Debtors or the Reorganized Debtors, or any corporate action to be taken by or required of the Debtors or the Reorganized Debtors, including all action taken or required to be taken to approve the Plan Funder Loan Agreement, the FirstBank New Loan A Documents (or, if applicable, the FirstBank New Loan B Documents) and the Longview Villa Owner Settlement Agreements or the issuance of the Reorganized SIDG Shares or the Reorganized SICL Shares, shall, as of the Effective Date, be deemed to have occurred and be effective as provided herein, and shall be authorized and approved in all respects without any requirement for further action by the shareholders or directors of the Debtors or the Reorganized Debtors.

8.6    **Boards of Directors and Executive Officers of the Reorganized Debtors.**

8.6.1    Subject to any requirement of Bankruptcy Court approval pursuant to Section 1129(a)(5) of the Bankruptcy Code, and subject further to any agreement with the Plan Funder, as of the Effective Date, the executive officers and directors of the Debtors immediately prior to the Effective Date shall be deemed to be the executive officers and directors of the Reorganized Debtors without any further action by any party.

8.6.2.    On and after the Effective Date, the operations of each of the Reorganized Debtors shall continue to be the responsibility of its Board of Directors.  Each director of each of the Reorganized Debtors shall serve from and after the Effective Date until his or her successor is duly elected or appointed and qualified or until his or her earlier death, resignation or removal in accordance with the applicable corporate governance documents of such Reorganized Debtor. Each executive officer of each of the Reorganized Debtors shall serve from and after the Effective Date until his or her successor is duly appointed and qualified or until his or her earlier death, resignation or removal in accordance with the applicable corporate governance documents of such Reorganized Debtor.

8.6.3    From and after the Confirmation Date, the directors and executive officers of each of the Debtors and the Reorganized Debtors, as the case may be, shall have all powers accorded by law to put into effect and carry out the Plan and the Confirmation Order.

8.7    **Section 1146 Exemption.**

Pursuant to Section 1146(a) of the Bankruptcy Code, the issuance, distribution, transfer or exchange of any Security (including the Reorganized SIDG Shares and the Reorganized SICL Shares), or the making, delivery or recording (including in the British Virgin Islands) of any instrument of transfer, pursuant to, in implementation of or as contemplated by the Plan or any Plan Document, or the vesting, re-vesting, transfer or sale of any Property of, by or in the Debtors or their Estates or the Reorganized Debtors pursuant to, in implementation of or as contemplated by the Plan or any Plan Document, or any transaction arising out of, contemplated by or in any way related to the foregoing, shall not be subject to any document recording tax, stamp tax, conveyance fee, intangible or similar tax, mortgage tax, stamp act, real estate transfer tax, mortgage recording tax, Uniform Commercial Code filing or recording fee, or other similar tax or governmental assessment, and the appropriate state or local or foreign governmental officials or agents shall be, and hereby are, directed to forego the collection of any such tax or governmental assessment and to accept for filing and recording any of the foregoing instruments or other documents without the payment of any such tax or governmental assessment.

8.8    **Pursuit of Causes of Action.**

8.8.1    On the Effective Date, the Causes of Action shall be vested in the Reorganized Debtors, except to the extent a Creditor or other third party has been specifically released from any Cause of Action by the terms of the Plan or by a Final Order of the Bankruptcy Court.  The Reorganized Debtors will have the right, in their sole and absolute discretion, to pursue, not pursue, settle, release or enforce any Causes of Action without seeking any approval from the Bankruptcy Court except as provided in Article 8.9.  The Debtors are currently not in a position to express an opinion on the merits of any of the Causes of Action or on the recoverability of any

amounts as a result of any such Causes of Action. For purposes of providing notice, the Debtors state that any party in interest that engaged in business or other transactions with the Debtors Prepetition or that received payments from the Debtors Prepetition may be subject to litigation to the extent that applicable bankruptcy or non-bankruptcy law supports such litigation. Reorganized SIDG will fund the costs and expenses (including legal fees) to pursue the Causes of Action.

8.8.2    No Creditor or other party should vote for the Plan or otherwise rely on the Confirmation of the Plan or the entry of the Confirmation Order in order to, or on the belief that it will, obtain any defense to any Cause of Action. No Creditor or other party should act or refrain from acting on the belief that it will obtain any defense to any Cause of Action. ADDITIONALLY, THE PLAN DOES NOT, AND IS NOT INTENDED TO, RELEASE ANY CAUSES OF ACTION OR OBJECTIONS TO CLAIMS, AND ALL SUCH RIGHTS ARE SPECIFICALLY RESERVED IN FAVOR OF THE REORGANIZED DEBTORS. Creditors are advised that legal rights, claims and rights of action the Debtors may have against them, if they exist, are retained under the Plan for prosecution unless a Final Order of the Bankruptcy Court authorizes the Debtors to release such claims. As such, Creditors are cautioned not to rely on (i) the absence of the listing of any legal right, claim or right of action against a particular Creditor in the Disclosure Statement, the Plan, or the Schedules, or (ii) the absence of litigation or demand prior to the Effective Date of the Plan as any indication that the Debtors or the Reorganized Debtors do not possess or do not intend to prosecute a particular claim or Cause of Action if a particular Creditor votes to accept the Plan. It is the expressed intention of the Plan to preserve rights, objections to Claims, and rights of action of the Debtors, whether now known or unknown, for the benefit of the Reorganized Debtors. A Cause of Action shall not, under any circumstances, be waived as a result of the failure of the Debtors to describe such Cause of Action with specificity in the Plan or in the Disclosure Statement; nor shall the Reorganized Debtors, as a result of such failure, be estopped or precluded under any theory from pursuing such Cause of Action. Nothing in the Plan operates as a release of any of the Causes of Action.

8.8.3    The Debtors do not presently know the full extent of the Causes of Action and, for purposes of voting on the Plan, all Creditors are advised that the Reorganized Debtors will have substantially the same rights that a Chapter 7 trustee would have with respect to the Causes of Action. Accordingly, neither a vote to accept the Plan by any Creditor nor the entry of the Confirmation Order will act as a release, waiver, bar or estoppel of any Cause of Action against such Creditor or any other Person or Entity, unless such Creditor, Person or Entity is specifically identified by name as a released party in the Plan, in the Confirmation Order, or in any other Final Order of the Bankruptcy Court. Confirmation of the Plan and entry of the Confirmation Order is not intended to and shall not be deemed to have any res judicata or collateral estoppel or other preclusive effect that would precede, preclude, or inhibit prosecution of such Causes of Action following Confirmation of the Plan.

8.8.4    At this time, the Debtors believe the Causes of Action consist primarily of the Avoidance Actions, the FirstBank Injunction Adversary Proceeding, the FirstBank Lender Liability Adversary Proceeding and other potential contested matters with FirstBank. To the extent the Debtors determine after the date hereof that there are additional Causes of Action, such

Causes of Action will be described in an amendment to the Plan or to the Disclosure Statement approved by the Bankruptcy Court.

8.8.5    The Debtors and the Reorganized Debtors reserve all rights under Section 506(c) of the Bankruptcy Code with respect to any and all Secured Claims.

8.8.6    The Estates shall remain open, even if the Bankruptcy Cases shall have been closed, as to any and all Causes of Action until such time as the Causes of Action have been fully administered and the Causes of Action Recoveries have been received by the Reorganized Debtors; provided, however, that nothing in the Plan or the Disclosure Statement shall prohibit the Reorganized Debtors from pursuing any Causes of Action (excluding the Avoidance Actions) in any courts other than the Bankruptcy Court.

8.9    **Prosecution and Settlement of Claims and Causes of Action.**

The Reorganized Debtors (a) may commence or continue in any appropriate court or tribunal any suit or other proceeding for the enforcement of any Cause of Action which the Debtors had or had power to assert immediately prior to the Effective Date, and (b) may settle or adjust such Cause of Action. From and after the Effective Date, the Reorganized Debtors shall be authorized, pursuant to Bankruptcy Rule 9019 and Section 105(a) of the Bankruptcy Code, to compromise and settle any Cause of Action or objection to a Claim in accordance with the following procedures, which shall constitute sufficient notice in accordance with the Bankruptcy Code and the Bankruptcy Rules for compromises and settlements: (i) if the resulting settlement provides for settlement of a Cause of Action or objection to a Claim originally asserted in an amount equal to or less than $100,000.00, then the Reorganized Debtors may settle the Cause of Action or objection to Claim and execute necessary documents, including a stipulation of settlement or release, subject to notifying the United States Trustee and counsel to FirstBank of the terms of the settlement agreement; provided, however, that if the United States Trustee and counsel to FirstBank indicate their approval or do not provide the Reorganized Debtors with an objection to the proposed settlement within ten (10) days after they receive notice of such settlement in writing, then the Reorganized Debtors shall be authorized to accept and consummate the settlement; and provided further, however, that if a timely written objection is made by the United States Trustee or counsel to FirstBank to the proposed settlement, then the settlement may not be consummated without approval of the Bankruptcy Court in accordance with Bankruptcy Rule 9019; and (ii) if the resulting settlement involves a Cause of Action or objection to a Claim originally asserted in an amount exceeding $100,000.00, then the Reorganized Debtors shall be authorized and empowered to settle such Cause of Action or objection to Claim only upon Bankruptcy Court approval in accordance with Bankruptcy Rule 9019 and after notice to the Notice Parties.

8.10    **Effectuating Documents; Further Transactions.**

Prior to the Effective Date, CIH Loft LLC, a director of each of the Debtors (and, on and after the Effective Date, a director of each of the Reorganized Debtors), shall be authorized to execute, deliver, file, or record such contracts, instruments, releases, mortgages, and other agreements or documents, including the Plan Funder Loan Agreement, the FirstBank New Loan

A Documents (or, if applicable, the FirstBank New Loan B Documents), the FirstBank Construction Escrow Agreement and any Plan Document, and take such actions as may be necessary or appropriate, to effectuate and further evidence the terms and conditions of the Plan or to otherwise comply with applicable law.

8.11    **Cancellation of Existing Loan Documents and Agreements.**

On and subject to the occurrence of the Effective Date, except as otherwise expressly provided in the Plan, (a) all notes, bonds, indentures, debentures or other instruments or documents evidencing or creating any indebtedness or obligations of the Debtors with respect to Claims in Classes 1 through 14 shall be deemed cancelled, and (b) the obligations of the Debtors under any such notes, bonds, indentures, debentures or other instruments or documents evidencing or creating any indebtedness or obligations of the Debtors with respect to Claims in Classes 1 through 14 shall be discharged.

8.12    **Exclusivity Period.**

The Debtors will retain the exclusive right to amend or modify the Plan, and to solicit acceptances of any amendments to or modifications of the Plan, through and until the Effective Date.

8.13    **Dissolution of the Creditors Committee.**

The Creditors Committee shall continue in existence until the Effective Date.  Thereafter, (a) the Creditors Committee shall be deemed dissolved and the members of the Creditors Committee shall be deemed discharged from all rights, duties and liabilities arising from, or related to, the Bankruptcy Cases, and (b) the Professionals for the Creditors Committee shall cease providing any services to the Creditors Committee or otherwise in connection with the Bankruptcy Cases.


**ARTICLE 9**
**PROVISIONS GOVERNING DISTRIBUTIONS**

9.1    **Initial Distribution.**

As soon as reasonably practicable (as determined by Reorganized SIDG) after the Effective Date, and subject to the Closing, Reorganized SIDG shall make the Distributions required under the Plan to Holders of Allowed Administrative Expense Claims (including Allowed Administrative Expense Claims of Professionals) and Allowed Claims in Classes 1 and 3; provided, however, that the Distributions as to Allowed Administrative Expense Claims of Professionals shall be made no more than ten (10) days after the Determination Date (the "Initial Distribution").  Thereafter, Reorganized SIDG shall make additional Distributions to Holders of Allowed Claims as and when required by the terms of the Plan or any Plan Document.

9.2    **Determination of Claims.**

9.2.1    Under the Plan, the Reorganized Debtors shall have the exclusive authority to, and shall, file, settle, compromise, withdraw, or litigate to judgment all objections to Claims. Except as to any late-filed Claims and Claims resulting from the rejection of executory contracts or unexpired leases, if any, all objections to Claims shall be filed with the Bankruptcy Court by no later than the Claims Objection Deadline, and the Confirmation Order shall contain appropriate language to that effect. Holders of Unsecured Claims that have not filed such Claims on or before the Bar Date shall serve the Notice Parties with any request to the Bankruptcy Court for allowance to file late Unsecured Claims. If the Bankruptcy Court grants the request to file a late Unsecured Claim, such Unsecured Claim shall be treated in all respects as a Class 10 Unsecured Claim. Objections to late-filed Claims and Claims resulting from the rejection of executory contracts or unexpired leases shall be filed on the later of (a) thirty (30) days following the Effective Date or (b) the date that is thirty (30) days after Reorganized SIDG receives actual notice of the filing of any such Claim.

9.2.2    Notwithstanding any authority to the contrary, an objection to a Claim shall be deemed properly served on the Holder of the Claim if the Debtors or the Reorganized Debtors, as the case may be, effect service in any of the following manners: (a) in accordance with Federal Rule of Civil Procedure 4, as modified and made applicable by Bankruptcy Rule 7004, (b) to the extent counsel for the Holder of a Claim is unknown, by first class mail, postage prepaid, on the signatory on the Proof of Claim or other representative identified on the Proof of Claim or any attachment thereto, or (c) by first class mail, postage prepaid, on any counsel that has filed a notice of appearance in the Bankruptcy Case on behalf of the Holder of a Claim.

9.2.3    Disputed Claims shall be fixed or liquidated in the Bankruptcy Court as core proceedings within the meaning of 28 U.S.C. § 157(b)(2)(B) unless the Bankruptcy Court orders otherwise. If the fixing or liquidation of a contingent or unliquidated Claim would cause undue delay in the administration of the Bankruptcy Cases, such Claim shall be estimated by the Bankruptcy Court for purposes of allowance and Distribution. The Debtors or the Reorganized Debtors may, at any time, request that the Bankruptcy Court estimate any contingent or unliquidated Claim pursuant to Section 502(c) of the Bankruptcy Code regardless of whether the Debtors or the Reorganized Debtors previously objected to such Claim or whether the Bankruptcy Court has ruled on any such objection. The Bankruptcy Court shall retain jurisdiction to estimate any Claim at any time during litigation concerning any objection to any Claim, including during the pendency of any appeal relating to any such objection. In the event that the Bankruptcy Court estimates any contingent or unliquidated Claim, such estimated amount will constitute either the Allowed Amount of such Claim or a maximum limitation on such Claim, as determined by the Bankruptcy Court. If the estimated amount constitutes a maximum limitation on such Claim, the Debtors or the Reorganized Debtors may elect to pursue any supplemental proceedings to object to any ultimate allowance of such Claim. The determination of Claims in Estimation Hearings shall be binding for purposes of establishing the maximum amount of the Claim for purposes of allowance and Distribution. All of the aforementioned Claims objection, estimation and resolution procedures are cumulative and not exclusive of one another. Procedures for specific Estimation Hearings, including provisions for

discovery, shall be set by the Bankruptcy Court giving due consideration to applicable Bankruptcy Rules and the need for prompt determination of the Disputed Claim.

9.3     **Distributions as to Allowed Unsecured Claims in Class 10.**

9.3.1   Each Holder of an Allowed Unsecured Claim in Class 10 shall receive a Cash Distribution, on the Distribution Date, in the amount provided for in Article 5.11.2 of the Plan.

9.3.2   Notwithstanding any provision herein to the contrary, no Distribution shall be made to the Holder of a Disputed Claim in Class 10 unless and until such Disputed Claim becomes an Allowed Claim.  At such time that such Disputed Claim becomes an Allowed Class 10 Claim, the Holder of such Allowed Class 10 Claim shall receive the Distribution to which such Holder is then entitled under the Plan.

9.3.3   Notwithstanding any provision herein to the contrary, if, on any applicable Distribution Date, the Holder of a Class 10 Claim is subject to a proceeding against it by the Reorganized Debtors under Section 502(d) of the Bankruptcy Code, then Reorganized SIDG (in its sole discretion) may withhold a Distribution to such Holder until the final resolution of such proceeding.

9.3.4   Distributions to a Holder of an Allowed Claim in Class 10 shall be made at the address of such Holder set forth in the Schedules or on the books and records of the Debtors or the Reorganized Debtors at the time of the Distribution, unless Reorganized SIDG has been notified in writing of a change of address, including by the filing of a Proof of Claim or statement pursuant to Bankruptcy Rule 3003 by such Holder that contains an address for such Holder different than the address for such Holder as set forth in the Schedules.  Reorganized SIDG shall not be liable for any Distribution sent to the address of record of a Holder in the absence of the written change thereof as provided herein.

9.4     **Unclaimed Distributions.**

9.4.1   If the Holder of an Allowed Claim fails to negotiate a check for a Distribution issued to such Holder within sixty (60) days of the date such check was issued, then Reorganized SIDG shall provide written notice to such Holder stating that, unless such Holder negotiates such check within thirty (30) days of the date of such notice, the amount of Cash attributable to such check shall be deemed to be unclaimed, such Holder shall be deemed to have no further Claim in respect of such check, such Holder's Allowed Claim shall no longer be deemed to be Allowed, and such Holder shall not be entitled to participate in any further Distributions under the Plan in respect of such Claim.

9.4.2   If a check for a Distribution made pursuant to the Plan to any Holder of an Allowed Claim is returned to Reorganized SIDG due to an incorrect or incomplete address for the Holder of such Allowed Claim, and no claim is made in writing to Reorganized SIDG as to such check within sixty (60) days of the date such Distribution was made, then the amount of Cash attributable to such check shall be deemed to be unclaimed, such Holder shall be deemed to have no further Claim in respect of such check, such Holder's Allowed Claim shall no longer be

deemed to be Allowed, and such Holder shall not be entitled to participate in any further Distributions under the Plan in respect of such Claim.

9.4.3   Any unclaimed Distribution as described above sent by Reorganized SIDG shall become the property of Reorganized SIDG.

9.5   **Transfer of Claim.**

In the event that the Holder of any Claim shall transfer such Claim on and after the Effective Date, such Holder shall immediately advise Reorganized SIDG in writing of such transfer and provide sufficient written evidence of such transfer. Reorganized SIDG shall be entitled to assume that no transfer of any Claim has been made by any Holder unless and until Reorganized SIDG shall have received written notice to the contrary. Each transferee of any Claim shall take such Claim subject to the provisions of the Plan and to any request made, waiver or consent given or other action taken hereunder and, except as otherwise expressly provided in such notice, Reorganized SIDG shall be entitled to assume conclusively that the transferee named in such notice shall thereafter be vested with all rights and powers of the transferor under the Plan.

9.6   **One Distribution Per Holder.**

If the Holder of a Claim holds more than one Claim in any one Class, all Claims of such Holder in such Class shall be aggregated and deemed to be one Claim for purposes of Distribution hereunder, and only one Distribution shall be made with respect to the single aggregated Claim.

9.7   **Effect of Pre-Confirmation Distributions.**

Nothing in the Plan shall be deemed to entitle the Holder of a Claim that received, prior to the Effective Date, full or partial payment of such Holder's Claim, by way of settlement or otherwise, pursuant to an order of the Bankruptcy Court, provision of the Bankruptcy Code, or other means, to receive a duplicate payment in full or in part pursuant to the Plan; and all such full or partial payments shall be deemed to be payments made under the Plan for purposes of satisfying the obligations of the Debtors or the Reorganized Debtors to such Holder under the Plan.

9.8   **No Interest on Claims.**

Except as otherwise Allowed by a Final Order of the Bankruptcy Court, no Holder of an Allowed Claim shall be entitled to the accrual of Postpetition interest or the payment of Postpetition interest, penalties, or late charges on account of such Allowed Claim for any purpose. Additionally, and without limiting the foregoing, interest shall not accrue or be paid on any Disputed Claim in respect of the period from the Effective Date to the date a Disputed Claim becomes an Allowed Claim.

9.9   **Compliance with Tax Requirements.**

In connection with the Plan, Reorganized SIDG shall comply with all tax withholding and reporting requirements imposed by federal, state, local and foreign taxing authorities, and all Distributions hereunder shall be subject to such withholding and reporting requirements. Notwithstanding the above, each Holder of an Allowed Claim that is to receive a Distribution under the Plan shall have the sole and exclusive responsibility for the satisfaction and payment of any tax obligations imposed by any Governmental Unit, including income, withholding, and other tax obligations, on account of such Distribution.

## ARTICLE 10
## CONDITIONS PRECEDENT TO CONFIRMATION
## OF THE PLAN AND THE EFFECTIVE DATE

10.1    **Conditions Precedent to Confirmation of the Plan.**

The following are conditions precedent to Confirmation of the Plan, each of which may be waived by the Debtors:

10.1.1        Each Plan Document shall be in form and substance acceptable to the Debtors.

10.1.2        The Bankruptcy Court shall have made such findings and determinations regarding the Plan as shall enable the entry of the Confirmation Order in a manner consistent with the provisions of the Plan.

10.2    **Conditions Precedent to the Effective Date.**

The Plan shall not be consummated and the Effective Date shall not occur unless each of the following conditions has been satisfied following the Confirmation Date or waived by the Debtors:

10.2.1        The Confirmation Order shall be a Final Order.

10.2.2        All conditions precedent to the Closing under the Plan Funder Loan Agreement shall have been satisfied or waived in accordance with the terms thereof, and the Plan Funder Loan Amount shall have been deposited into escrow with Bankruptcy Counsel.

10.2.3        All conditions precedent to the Closing under the FirstBank New Loan A Documents (or, if applicable, the FirstBank New Loan B Documents) shall have been satisfied or waived in accordance with the terms thereof.

10.2.4        All conditions precedent to the Closing with the Longview Villa Owners under the Plan or under the Longview Villa Owner Settlement Agreements shall have been satisfied or waived in accordance with the terms thereof.

10.2.5        The SIDG Shareholders Plan Contribution Amount shall have been deposited into escrow with Bankruptcy Counsel.

10.3    **Notice of the Effective Date.**

Promptly following the satisfaction, or the waiver by the Debtors, of all of the conditions set forth in Article 10.2, the Debtors shall file a notice (the "Effective Date Notice") with the Bankruptcy Court designating the Effective Date. The Debtors shall serve the Effective Date Notice on all Creditors of, and Holders of Equity Interests in, the Debtors.

**ARTICLE 11**
**DISCHARGE, EXCULPATION FROM LIABILITY, RELEASE,**
**AND GENERAL INJUNCTION**

11.1    **Discharge of Claims.**

Except as otherwise expressly provided in the Plan or in the Confirmation Order, the Confirmation Order shall operate as a discharge, pursuant to Section 1141(d) of the Bankruptcy Code, to the fullest extent permitted by applicable law, as of the Effective Date, of the Debtors and their Estates and the Reorganized Debtors from any and all Debts of and Claims of any nature whatsoever against the Debtors that arose at any time prior to the Effective Date, including any and all Claims for principal and interest, whether accrued before, on or after the Petition Date. Except as otherwise expressly provided in the Plan or in the Confirmation Order, but without limiting the generality of the foregoing, on the Effective Date, the Debtors and their Estates and the Reorganized Debtors, and their respective successors or assigns, shall be discharged, to the fullest extent permitted by applicable law, from any Claim or Debt that arose prior to the Effective Date and from any and all Debts of the kind specified in Section 502(g), 502(h), or 502(i) of the Bankruptcy Code, whether or not (a) a Proof of Claim based on such Debt was filed pursuant to Section 501 of the Bankruptcy Code, (b) a Claim based on such Debt is an Allowed Claim pursuant to Section 502 of the Bankruptcy Code, or (c) the Holder of a Claim based on such Debt has voted to accept the Plan. As of the Effective Date, except as otherwise expressly provided in the Plan or in the Confirmation Order, all Persons and Entities, including all Holders of Claims or Equity Interests, shall be forever precluded and permanently enjoined to the fullest extent permitted by applicable law from asserting directly or indirectly against the Debtors or their Estates or the Reorganized Debtors, or any of their respective successors and assigns, or the assets or Properties of any of them, any other or further Claims, Debts, rights, causes of action, remedies, or Liabilities based upon any act, omission, document, instrument, transaction, event, or other activity of any kind or nature that occurred prior to the Effective Date or that occurs in connection with implementation of the Plan, and the Confirmation Order shall contain appropriate injunctive language to that effect. As of the Effective Date, Holders of Equity Interests shall have no rights arising from or relating to such Equity Interests, except as otherwise expressly provided in the Plan or the Confirmation Order. In accordance with the foregoing, except as otherwise expressly provided in the Plan or in the Confirmation Order, the Confirmation Order shall be a judicial determination of the discharge or termination of all such Claims and other Debts and Liabilities against the Debtors, pursuant to Sections 524 and 1141 of the Bankruptcy Code, to the fullest extent permitted by applicable law, and such discharge shall void any judgment obtained against the Debtors, at any time, to the

extent that such judgment relates to a discharged or terminated Claim, Liability, or Debt. Notwithstanding the foregoing, Reorganized SIDG shall remain obligated to make payments to Holders of Allowed Claims and issue the Reorganized SIDG Shares as required pursuant to the Plan.

11.2    **Exculpation from Liability.**

**The Debtors and their Postpetition directors, shareholders and officers, the Professionals for the Debtors (acting in such capacity), the Creditors Committee and its members, the Professionals for the Creditors Committee (acting in such capacity), the Plan Funder, and their respective officers, directors, employees, Affiliates, attorneys, agents and representatives (collectively, the "Exculpated Parties") shall neither have nor incur any liability whatsoever to any Person or Entity for any act taken or omitted to be taken in good faith in connection with or related to the formulation, preparation, dissemination, or confirmation of the Plan, the Disclosure Statement, any Plan Document, or any contract, instrument, release, or other agreement or document created or entered into, or any other act taken or omitted to be taken, in connection with the Plan or the Bankruptcy Cases, in each case for the period on and after the Petition Date and through the Effective Date; provided, however, that this exculpation from liability provision shall not be applicable to any liability found by a Final Order of a court of competent jurisdiction to have resulted from fraud or the willful misconduct or gross negligence of any such party. With respect to Professionals, the foregoing exculpation from liability provision shall also include claims of professional negligence arising from the services provided by such Professionals during the Bankruptcy Cases. Any such claims shall be governed by the standard of care otherwise applicable to the standard of negligence claims outside of bankruptcy. The rights granted under this Article 11.2 are cumulative with (and not restrictive of) any and all rights, remedies, and benefits that the Exculpated Parties have or obtain pursuant to any provision of the Bankruptcy Code or other applicable law. In furtherance of the foregoing, the Exculpated Parties shall have the fullest protection afforded under Section 1125(e) of the Bankruptcy Code and all applicable law from liability for violation of any applicable law, rule or regulation governing the solicitation of acceptance or rejection of a plan or the offer, issuance, sale or purchase of Securities, including the Reorganized SIDG Shares and the Reorganized SICL Shares. This exculpation from liability provision is an integral part of the Plan and is essential to its implementation. Notwithstanding anything to the contrary contained herein, the provisions of this Article 11.2 shall not release, or be deemed a release of, any of the Causes of Action.**

11.3    **Release.**

**On the Effective Date, the Debtors, the Reorganized Debtors, the Creditors Committee, and any and all Holders of Claims and Equity Interests shall release unconditionally and hereby are deemed to release unconditionally the Debtors' Postpetition directors, shareholders and officers, the members of the Creditors Committee, the Professionals employed by the Debtors and the Creditors Committee, and the Plan Funder (collectively, the "Released Parties") from any and all claims, obligations, suits, judgments, damages, losses, rights, remedies, causes of action, charges, costs, debts, indebtedness, or liabilities whatsoever, whether known or unknown, foreseen or unforeseen, existing or**

hereafter arising, in law, equity or otherwise, based in whole or in part upon any act or omission, transaction, event or other occurrence taking place between the Petition Date and the Effective Date, which is in any way relating to the Debtors, the Bankruptcy Cases, any Property of the Debtors, the business or operations of the Debtors, any Plan Documents, the Plan, or any of the transactions contemplated thereby; provided, however, that this release provision shall not be applicable to any liability found by a Final Order of a court of competent jurisdiction to have resulted from fraud or the willful misconduct or gross negligence of any such party. With respect to Professionals, the foregoing release provision shall also include claims of professional negligence arising from the services provided by such Professionals during the Bankruptcy Cases.  Any such claims shall be governed by the standard of care otherwise applicable to the standard of negligence claims outside of bankruptcy.  The Confirmation Order shall enjoin the prosecution by any Person or Entity, whether directly, derivatively or otherwise, of any such claim, obligation, suit, judgment, damage, loss, right, remedy, cause of action, charge, cost, debt, indebtedness, or liability which arose or accrued during such period or was or could have been asserted against any of the Released Parties, except as otherwise provided in the Plan or in the Confirmation Order. Each of the Released Parties shall have the right to independently seek enforcement of this release provision.  This release provision is an integral part of the Plan and is essential to its implementation.  Notwithstanding anything to the contrary contained herein, the provisions of this Article 11.3 shall not release, or be deemed a release of, any of the Causes of Action.

11.4    **General Injunction.**

Pursuant to Sections 105, 1123, 1129 and 1141 of the Bankruptcy Code, in order to preserve and implement the various transactions contemplated by and provided for in the Plan, as of the Effective Date, except as otherwise expressly provided in the Plan or in the Confirmation Order, all Persons or Entities that have held, currently hold or may hold a Claim, Debt, or Liability that is discharged or terminated pursuant to the terms of the Plan are and shall be permanently enjoined and forever barred to the fullest extent permitted by law from taking any of the following actions on account of any such discharged or terminated Claims, Debts, or Liabilities, other than actions brought to enforce any rights or obligations under the Plan or the Plan Documents: (a) commencing or continuing in any manner any action or other proceeding against the Debtors or the Reorganized Debtors or their respective Properties; (b) enforcing, attaching, collecting or recovering in any manner any judgment, award, decree or order against the Debtors or the Reorganized Debtors or their respective Properties; (c) creating, perfecting or enforcing any Lien or encumbrance against the Debtors or the Reorganized Debtors or their respective Properties; (d) asserting a setoff, right of subrogation or recoupment of any kind against any debt, liability or obligation due to the Debtors or the Reorganized Debtors; (e) commencing or continuing, in any manner or in any place, any action that does not comply with or is inconsistent with the provisions of the Plan or the Confirmation Order; or (f) interfering with or in any manner whatsoever disturbing the rights and remedies of the Debtors or the Reorganized Debtors under the Plan and the Plan Documents and the other documents executed in connection therewith. The Debtors and the Reorganized Debtors shall have the right to independently seek enforcement of this general injunction provision.   This general injunction provision is an integral part of the Plan and is essential to its implementation.

**Notwithstanding anything to the contrary contained herein, the provisions of this Article 11.4 shall not release, or be deemed a release of, any of the Causes of Action.**

11.5    **Term of Certain Injunctions and Automatic Stay.**

11.5.1        All injunctions or automatic stays for the benefit of the Debtors pursuant to Sections 105, 362 or other applicable provisions of the Bankruptcy Code, or otherwise provided for in the Bankruptcy Cases, and in existence on the Confirmation Date, shall remain in full force and effect following the Confirmation Date and until the Final Decree Date, unless otherwise ordered by the Bankruptcy Court.

11.5.2        With respect to all lawsuits pending in courts in any jurisdiction (other than the Bankruptcy Court) that seek to establish the Debtors' liability on Prepetition Claims asserted therein and that are stayed pursuant to Section 362 of the Bankruptcy Code, such lawsuits shall be deemed dismissed as of the Effective Date, unless the Debtors affirmatively elect to have the Debtors' liability established by such other courts, and any pending motions seeking relief from the automatic stay for purposes of continuing any such lawsuits in such other courts shall be deemed denied as of the Effective Date, and the automatic stay shall continue in effect, unless the Debtors affirmatively elect to have the automatic stay lifted and to have the Debtors' liability established by such other courts; and the Prepetition Claims at issue in such lawsuits shall be determined and either Allowed or disallowed in whole or part by the Bankruptcy Court pursuant to the applicable provisions of the Plan, unless otherwise elected by the Debtors as provided herein.

11.6    **No Liability for Tax Claims.**

Unless a taxing Governmental Unit has asserted a Claim against the Debtors before the Governmental Unit Bar Date or Administrative Expense Claim Bar Date established therefor, no Claim of such Governmental Unit shall be Allowed against the Debtors, the Reorganized Debtors or their respective directors, officers, employees or agents for taxes, penalties, interest, additions to tax or other charges arising out of (i) the failure, if any, of the Debtors, any of their Affiliates, or any other Person or Entity to have paid tax or to have filed any tax return (including any income tax return or franchise tax return) in or for any prior year or period, or (ii) an audit of any return for a period before the Petition Date.

**ARTICLE 12**
**RETENTION OF JURISDICTION**

12.1    **General Retention.**

Notwithstanding the entry of the Confirmation Order and the occurrence of the Effective Date, until the Bankruptcy Cases are closed, the Bankruptcy Court shall retain the fullest and most extensive jurisdiction of the Bankruptcy Cases that is permitted by applicable law, including that necessary to ensure that the purposes and intent of the Plan are carried out.

12.2    **Specific Purposes.**

In addition to the general retention of jurisdiction set forth in Article 12.1, after Confirmation of the Plan and until the Bankruptcy Cases are closed, the Bankruptcy Court shall retain jurisdiction of the Bankruptcy Cases for the following specific purposes:

12.2.1    to allow, disallow, determine, liquidate, classify, estimate or establish the priority or secured or unsecured status of any Claim or Equity Interest, including the resolution of any application for an Administrative Expense Claim, and to determine any and all objections to the allowance or priority of Claims or Equity Interests;

12.2.2    to determine any and all cases, controversies, suits or disputes arising under or relating to the Bankruptcy Cases, the Plan or the Confirmation Order (including regarding the effect of any release, exculpation from liability, discharge, limitation of liability, or injunction provisions provided for herein or affected hereby and regarding whether the conditions precedent to the consummation and/or the Effective Date of the Plan have been satisfied);

12.2.3    to determine any and all applications for allowance of compensation of Professionals and reimbursement of expenses under Section 330, 331 or 503(b) of the Bankruptcy Code arising out of or relating to the Bankruptcy Cases; provided, however, that this retention of jurisdiction shall not require prior Bankruptcy Court approval of the payment of fees and reimbursement of expenses of Professionals incurred after the Effective Date unless an objection to such fees and expenses has been made by Reorganized SIDG;

12.2.4    to determine any and all motions pending as of the date of the Confirmation Hearing (including pursuant to the Plan) for the rejection, assumption, or assignment of executory contracts or unexpired leases to which either of the Debtors is a party or with respect to which either of the Debtors may be liable, and to determine the allowance of any Claims resulting from the rejection thereof or any Cure Claims;

12.2.5    to determine any and all motions, applications, adversary proceedings, contested or litigated matters, Causes of Action, and any other matters involving the Debtors or the Reorganized Debtors commenced in connection with, or arising during, the Bankruptcy Cases and pending on the Effective Date, including approval of proposed settlements thereof;

12.2.6    to enforce, interpret and administer the terms and provisions of the Plan and the Plan Documents;

12.2.7    to modify any provisions of the Plan to the fullest extent permitted by the Bankruptcy Code and the Bankruptcy Rules;

12.2.8    to consider and act on the compromise and settlement of any Claim against or Equity Interest in the Debtors or their respective Estates;

12.2.9    to assure the performance by the Reorganized Debtors of their obligations under the Plan;

12.2.10    to correct any defect, cure any omission, reconcile any inconsistency or make any other necessary changes or modifications in or to the Disclosure Statement, the Plan, the Plan Documents, the Confirmation Order, or any exhibits or schedules to the foregoing, as may be necessary or appropriate to carry out the purposes and intent of the Plan, including the adjustment of the date(s) of performance under the Plan in the event the Effective Date does not occur as provided herein so that the intended effect of the Plan may be substantially realized thereby;

12.2.11    to resolve any disputes concerning any release or exculpation of, or limitation of liability as to, a non-debtor (including any Professional) hereunder or the injunction against acts, employment of process or actions against such non-debtor (including any Professional) arising hereunder;

12.2.12    to enforce all orders, judgments, injunctions and rulings entered in connection with the Bankruptcy Cases;

12.2.13    to enter such orders as may be necessary or appropriate to implement or consummate the provisions of the Plan and all contracts, instruments, releases, indentures and other agreements or documents created in connection with the Plan, the Disclosure Statement or the Confirmation Order, including the Plan Documents;

12.2.14    to review and approve any sale or transfer of assets or Property by the Debtors or the Reorganized Debtors, including prior to or after the date of the Plan, and to determine all questions and disputes regarding such sales or transfers;

12.2.15    to determine all questions and disputes regarding title to the assets or Property of the Debtors, the Estates, or the Reorganized Debtors;

12.2.16    to determine any and all matters, disputes and proceedings relating to the Causes of Action, whether arising before or after the Effective Date;

12.2.17    to determine any motions or contested matters involving taxes, tax refunds, tax attributes, tax benefits and similar or related matters with respect to the Debtors arising on or prior to the Effective Date or arising on account of transactions contemplated by the Plan;

12.2.18    to resolve any determinations which may be requested by the Debtors or the Reorganized Debtors of any unpaid or potential tax liability or any matters relating thereto under Sections 505 and 1146 of the Bankruptcy Code, including tax liability or such related matters for any taxable year or portion thereof ending on or before the Effective Date;

12.2.19    to issue injunctions, enter and implement other orders or take such other actions as may be necessary or appropriate to restrain interference by any Person or Entity with consummation, implementation or enforcement of the Plan or the Confirmation Order;

12.2.20     to enter and implement such orders as are necessary or appropriate if the Confirmation Order is for any reason modified, stayed, reversed, revoked or vacated;

12.2.21     to determine any other matters that may arise in connection with or relating to the Plan, the Disclosure Statement, the Confirmation Order, or the Plan Documents;

12.2.22     to enter such orders as are necessary to implement and enforce the injunctions described herein;

12.2.23     to enforce the obligations of any purchaser of any Property of the Debtors;

12.2.24     to adjudicate any and all disputes or issues arising from or relating to the issuance and distribution of the Reorganized SIDG Shares and the Reorganized SICL Shares;

12.2.25     to determine such other matters and for such other purposes as may be provided for in the Confirmation Order or as may from time to time be authorized under the provisions of the Bankruptcy Code or any other applicable law; and

12.2.26     to enter an order concluding and terminating the Bankruptcy Cases.

## 12.3    **Closing of the Bankruptcy Cases.**

In addition to the retention of jurisdiction set forth in Article 12.1 and Article 12.2, the Bankruptcy Court shall retain jurisdiction of the Bankruptcy Cases to enter an order reopening the Bankruptcy Cases after they have been closed.

## ARTICLE 13
## MODIFICATION OF PLAN AND CONFIRMATION OVER OBJECTIONS

### 13.1    **Modification of Plan.**

13.1.1     The Debtors may modify the Plan at any time prior to the entry of the Confirmation Order provided that the Plan, as modified, and the Disclosure Statement meet applicable Bankruptcy Code and Bankruptcy Rules requirements.

13.1.2     After the entry of the Confirmation Order, the Debtors (prior to the Effective Date) or the Reorganized Debtors (on and after the Effective Date) may modify the Plan to remedy any defect or omission herein, or to reconcile any inconsistencies between the Plan and the Confirmation Order, as may be necessary to carry out the purposes and effects of the Plan, provided that (a) the Debtors or the Reorganized Debtors (as the case may be) obtain Bankruptcy Court approval for such modification, after notice to the Notice Parties and a hearing, and (b) such modification does not materially adversely affect the interests, rights, or treatment of any Class of Claims under the Plan.

13.1.3          After the entry of the Confirmation Order and before substantial consumation of the Plan, the Debtors (prior to the Effective Date) or the Reorganized Debtors (on and after the Effective Date) may modify the Plan in a way that materially adversely affects the interests, rights, or treatment of a Class of Claims, provided that (a) the Plan, as modified, meets applicable Bankruptcy Code requirements, (b) the Debtors or the Reorganized Debtors (as the case may be) obtain Bankruptcy Court approval for such modification, after notice to the Notice Parties and the Class of Claims materially adversely affected and a hearing, (c) such modification is accepted by at least two-thirds in dollar amount, and more than one-half in number, of the Allowed Claims actually voting in each Class of Claims adversely affected by such modification, and (d) the Debtors or the Reorganized Debtors (as the case may be) comply with Section 1125 of the Bankruptcy Code with respect to the Plan, as modified.

13.1.4          Notwithstanding anything to the contrary contained in this Article 13.1 or elsewhere in the Plan, the Plan may not be altered, amended or modified without the written consent of the Debtors (prior to the Effective Date) or the Reorganized Debtors (on and after the Effective Date).

## 13.2   **Confirmation Over Objections.**

In the event any Impaired Class of Claims votes against the Plan, and the Plan is not revoked or withdrawn in accordance with Article 14.2, the Debtors hereby request, and shall be allowed, to modify the terms of the Plan to effect a "cramdown" on such dissenting Class by (a) restructuring the treatment of any Class on terms consistent with Section 1129(b)(2)(B) of the Bankruptcy Code, or (b) deleting Distributions to all Classes at or below the level of the objecting Class, or reallocating such Distributions, until such Impaired senior Classes are paid in accordance with the absolute priority rule of Section 1129(b) of the Bankruptcy Code. The Debtors may make such modifications or amendments to the Plan and such modifications or amendments shall be filed with the Bankruptcy Court and served on all parties in interest entitled to receive notice prior to the Confirmation Hearing. No such modifications shall require any resolicitation of acceptances as to the Plan by any Class of Claims unless the Bankruptcy Court shall require otherwise. Notwithstanding any provision of the Plan to the contrary, the Debtors reserve any and all rights they may have to challenge the validity, perfection, priority, scope and extent of any Liens in respect to any Secured Claims and the amount of any Secured Claims, the Holders of which have not accepted the Plan.

## ARTICLE 14
## MISCELLANEOUS PROVISIONS

## 14.1   **No Admissions.**

The Plan provides for the resolution, settlement and compromise of Claims against and Equity Interests in the Debtors. Nothing herein shall be construed to be an admission of any fact or otherwise binding upon the Debtors in any manner prior to the Effective Date.

## 14.2   **Revocation or Withdrawal of the Plan.**

The Debtors reserve the right to revoke or withdraw the Plan prior to the Confirmation Date. If the Debtors revoke or withdraw the Plan, or if Confirmation of the Plan does not occur, then the Plan shall be deemed null and void in all respects and nothing contained in the Plan shall be deemed to (a) constitute a waiver or release of any Claims against, or Equity Interests in, the Debtors or any other Person, or (b) prejudice in any manner the rights of the Debtors or any other Person in any further proceedings involving the Debtors.

## 14.3    Standard for Approval of the Bankruptcy Court.

In the event any of the matters described herein are brought for approval before the Bankruptcy Court, then any such approval shall mean the entry of an order by the Bankruptcy Court approving the matter using the standards for approval of similar matters by a Chapter 11 debtor in possession.

## 14.4    Further Assurances.

Each of the Debtors and the Reorganized Debtors agree, and are hereby authorized, to execute and deliver any and all papers, documents, contracts, agreements and instruments which may be necessary to carry out and implement the terms and conditions of the Plan.

## 14.5    Headings.

The headings and table of contents used in the Plan are for convenience and reference only and shall not constitute a part of the Plan for any other purpose or in any manner affect the construction of the provisions of the Plan.

## 14.6    Notices.

All notices, requests or other communications in connection with, or required to be served by, the Plan shall be in writing and shall be sent by United States first class mail, postage prepaid, or by overnight delivery by a recognized courier service, and addressed as follows: (i) if to the Debtors or the Reorganized Debtors, Scrub Island Development Group Limited, Attn: Joe C. Collier III, 4602 Eisenhower Boulevard, Tampa, Florida 33634, with a copy to Charles A. Postler, Esq., Stichter, Riedel, Blain & Prosser, P.A., 110 East Madison Street, Suite 200, Tampa, Florida 33602, (ii) if to FirstBank, counsel to FirstBank, W. Keith Fendrick, Esq., Holland & Knight LLP, 100 North Tampa Street, Suite 4100, Tampa, Florida 33602, (iii) if to the Creditors Committee, counsel to the Creditors Committee, Robert B. Glenn, Esq., Glenn Rasmussen, P.A., 100 South Ashley Drive, Suite 1300, Tampa, Florida 33602, and (iv) if to the Plan Funder, counsel to the Plan Funder, Richard McIntyre, Esq., McIntyre Thanasides Bringgold Elliott Grimaldi & Guito, P.A., 501 E. Kennedy Boulevard, Suite 1900, Tampa, Florida 33602. Copies of all notices under the Plan to any party shall be given to each of the parties listed above contemporaneously with the giving of such notice. Any of the parties listed above may change the person or address to whom or to which notices are to be given hereunder by filing a written instrument to that effect with the Bankruptcy Court. Notwithstanding anything to the contrary contained in the Plan, no notice shall be required hereunder to the Creditors Committee if it is not (or no longer) in existence.

14.7    **Governing Law.**

Except to the extent that federal law (including the Bankruptcy Code or the Bankruptcy Rules) is applicable, or where the Plan or the provision of any contract, instrument, release, indenture or other agreement or document entered into in connection with the Plan provides otherwise, the rights and obligations arising under the Plan shall be governed by, and construed and enforced in accordance with, the laws of the State of Florida, without giving effect to the principles of conflicts of law thereof. Notwithstanding anything to the contrary contained in the Plan, all of the FirstBank New Loan A Documents and the FirstBank Construction Escrow Agreement shall be governed by the laws of the British Virgin Islands.

14.8    **Limitation on Allowance.**

No attorneys' fees, punitive damages, penalties, exemplary damages, or interest shall be paid with respect to any Claim or Equity Interest except as otherwise expressly provided in the Plan or as Allowed by a Final Order of the Bankruptcy Court.

14.9    **Estimated Claims.**

To the extent any Claim is estimated for any purpose other than for voting on the Plan, then in no event shall such Claim be Allowed in an amount greater than the estimated amount.

14.10   **Consent to Jurisdiction.**

Upon any default under the Plan, the Debtors and the Reorganized Debtors consent to the jurisdiction of the Bankruptcy Court and agree that the Bankruptcy Court shall be the preferred forum for all proceedings relating to any such default.

By accepting any Distribution under or in connection with the Plan, by filing any Proof of Claim, by filing any Administrative Expense Claim or Cure Claim, by voting on the Plan, by reason of being served with notice of the filing of the Bankruptcy Cases or the Confirmation Hearing, or by entering an appearance in the Bankruptcy Cases, Creditors, Holders of Equity Interests and other parties in interest, including foreign Creditors and foreign parties in interest (including Creditors and parties in interest located in the British Virgin Islands), have consented, and shall be deemed to have expressly consented, to the jurisdiction of the Bankruptcy Court for all purposes with respect to any and all matters relating to, arising under or in connection with the Debtors, the Plan or the Bankruptcy Cases, including the matters and purposes set forth in Article 12 of the Plan. The Bankruptcy Court shall maintain jurisdiction to the fullest extent allowed under applicable law over all matters set forth in Article 12 of the Plan.

14.11   **Setoffs.**

Subject to the limitations provided in Section 553 of the Bankruptcy Code, the Reorganized Debtors may, but shall not be required to, set off against any Claim and any Distribution to be made pursuant to the Plan in respect of such Claim, claims of any nature

whatsoever the Debtors or the Reorganized Debtors may have against the Holder of such Claim, but neither the failure to do so nor the allowance of any Claim hereunder shall constitute a waiver or release by the Reorganized Debtors of any such claim that the Debtors or the Reorganized Debtors may have against the Holder of such Claim.

14.12  **Successors and Assigns.**

The rights, benefits, duties and obligations of any Person or Entity named or referred to in the Plan shall be binding upon, and shall inure to the benefit of, any heir, executor, administrator, successor or assign of such Person or Entity.

14.13  **Modification of Payment Terms.**

The Reorganized Debtors reserve the right to modify the treatment of any Allowed Claim, as provided in Section 1123(a)(4) of the Bankruptcy Code, at any time after the Effective Date, upon the consent of the Holder of such Allowed Claim. In addition, Reorganized SIDG reserves the right to modify the timing for the payment of any Allowed Class 10 Unsecured Claim, the Holder of which is located in the British Virgin Islands.

14.14  **Entire Agreement.**

The Plan and the Plan Documents set forth the entire agreement and undertakings relating to the subject matter thereof and supersede all prior discussions and documents. No Person or Entity shall be bound by any terms, conditions, definitions, warranties, understandings, or representations with respect to the subject matter thereof, other than as expressly provided for therein or as may hereafter be agreed to by such Person or Entity in writing.

14.15  **Severability of Plan Provisions.**

If, prior to Confirmation of the Plan, any term or provision of the Plan is held by the Bankruptcy Court to be invalid, void or unenforceable, the Bankruptcy Court, at the request of the Debtors, shall have the power to alter or interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void or unenforceable, and such term or provision shall then be applicable as altered or interpreted. Notwithstanding any such holding, alteration or interpretation, the remainder of the terms and provisions of the Plan will remain in full force and effect and will in no way be affected, impaired or invalidated by such holding, alteration or interpretation. The Confirmation Order shall constitute a judicial determination and shall provide that each term or provision of the Plan, as it may have been altered or interpreted in accordance with the foregoing, is valid and enforceable.

14.16  **Controlling Document.**

To the extent the Confirmation Order or the Plan is inconsistent with the Disclosure Statement or any agreement entered into between the Debtors or the Reorganized Debtors and any third party, unless otherwise expressly provided in the Plan or the Confirmation Order, the

Confirmation Order and the Plan shall control over the Disclosure Statement and any such agreement. The Confirmation Order (and any other Final Orders of the Bankruptcy Court) shall be construed together and consistent with the terms of the Plan; provided, however, to the extent the Confirmation Order is inconsistent with the Plan, the Confirmation Order shall control over the Plan.

14.17  **Plan Supplement.**

The Plan Supplement shall be filed with the Bankruptcy Court and posted at www.srbp.com at least five (5) days prior to the Voting Deadline; provided, however, that (i) the Debtors may amend the Plan Supplement through and including the Confirmation Date, and (ii) in lieu of filing the Plan Supplement with the Bankruptcy Court, the Debtors may provide copies of the Plan Documents to the applicable Creditor on or prior to the Voting Deadline. Upon its filing with the Bankruptcy Court, the Plan Supplement may be inspected at the Clerk's Office during normal business hours, may be obtained from the Bankruptcy Court's copying service upon the payment of the appropriate charges, or may be obtained from Bankruptcy Counsel's website at www.srbp.com.

14.18  **Computation of Time.**

In computing any period of time prescribed or allowed by the Plan, the provisions of Bankruptcy Rule 9006(a) shall apply.

14.19  **Substantial Consummation.**

The Plan shall be deemed to be substantially consummated within the meaning of Section 1101 of the Bankruptcy Code upon commencement by Reorganized SIDG of the Initial Distribution described in Article 9.1 of the Plan.

14.20  **No Liability for Solicitation.**

Pursuant to Section 1125(e) of the Bankruptcy Code, any Person that solicits the acceptance or rejection of the Plan, in good faith and in compliance with the applicable provisions of the Bankruptcy Code, or that participates, in good faith and in compliance with the applicable provisions of the Bankruptcy Code, in the offer, issuance, sale or purchase of a Security, offered or sold under the Plan, of the Debtors, shall not be liable, on account of such solicitation or participation, for violation of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of the Plan or the offer, issuance, sale or purchase of Securities.

Dated as of July 11, 2014          Respectfully submitted,

**Scrub Island Development Group Limited**

By:    CIH Loft LLC,
       Its Director

       By:    _____
              Joe C. Collier III
              Managing Member

**Scrub Island Construction Limited**

By:    CIH Loft LLC,
       Its Director

       By:    _____
              Joe C. Collier III
              Managing Member

/s/ Charles A. Postler
Harley E. Riedel (Florida Bar No. 183628)
Charles A. Postler (Florida Bar No. 455318)
STICHTER, RIEDEL, BLAIN & PROSSER, P.A.
110 East Madison Street, Suite 200
Tampa, Florida 33602
Telephone:    (813) 229-0144
Facsimile:    (813) 229-1811
Email: hriedel@srbp.com
       cpostler@srbp.com
Counsel for Debtors and Debtors in Possession

# EXHIBIT A

## Assumed Contracts

| Third Party to Contract | Description of Contract | Effective Date of Contract |
|---|---|---|
| Dive BVI | Dive Shop Retail Space | 1/1/2012 |
| North Sound Dock | Docking Agreement | 2/1/2013 |
| Marriott International | Franchise Agreement[1] | 7/28/2011 |
| Mainsail BVI Limited | Management Agreement | 7/1/2007 |
| Collier Investment Holdings | Professional Services Agreement | 4/16/2005 |
| Hayworth Creative | Public Relations Agreement | 6/29/2012 |
| Emerge | SEO Agreement | 2/14/2014 |
| Marcam | Shared Services Agreement | 1/1/2014 |
| Buzzfish | Social Media Agreement | 3/31/2012 |
| L'Occitane | Spa Services Agreement | 9/4/2013 |
| Digicel | Internet Connection | |
| Cable and Wireless | Internet Connection | 6/13/2010 |
| Triple K Contract | Contract Labor | 12/1/2011 |
| BVI Pest Control | Pest Control Services | |
| STO Enterprises | Pool Service | 8/12/2010 |
| Caribbean Technology | Generator Maintenance | 7/11/2013 |
| DAKM General Maintenance | Landscape Maintenance | undated |
| BVI Courtesy Services | Airport Greeting Services | 4/2/2012 |
| Mainsail Central | Office Lease | 1/1/2013 |
| WMS Limited | Lease | 8/1/2010 |
| Eduardo Artau-Gomez | Rental Agreement | 3/26/2010 |
| NMFM | Rental Agreement | 4/1/2010 |
| Mavana Corporation | Rental Agreement | 3/31/2010 |
| Marinatime LLC | Rental Agreement | 12/20/2010 |
| Scrub Island Associates | Rental Agreement | 3/29/2010 |
| Gustavo Hermida | Rental Agreement | 3/29/2010 |
| Pablo Guzman | Rental Agreement | 3/26/2010 |
| Scrubtime, LLC | Rental Agreement | 12/20/2010 |
| Eugenio Ortega | Rental Agreement | 12/13/2011 |
| Joe & Lorie Orzel | Rental Agreement | 7/3/2010 |
| NDL Marine Corporation Limited | Rental Agreement | 9/1/2012 |
| Fernando Ortega & Magda Rodriguez | Rental Agreement | 10/1/2012 |
| Robert Bonapace | Rental Agreement | 2/7/2011 |
| Felipe Perez | Rental Agreement | 12/12/2011 |
| John McTaggart/Doug Nanni | Rental Agreement | 12/5/2011 |

| Steve and Katherine James | Rental Agreement | 11/20/2011 |
| Jose and Mila Fullana | Rental Agreement | 6/7/2010 |
| Joseph Frett | Settlement Agreement | 9/6/11 |

---

[1]    Subject to modifications to be mutually agreed upon by the Debtors and Marriott International.

## EXHIBIT B

**FirstBank February 2014 Term Sheet**

**From:** Lance Shaner [mailto:lshaner@shanercorp.com]
**Sent:** Friday, February 07, 2014 2:28 PM
**To:** Joe Collier
**Subject:** FW: Scrub LOI
**Importance:** High



*Lance T. Shaner, CEO*
1965 Waddle Road
State College, Pa 16803
PA Office Phone 814-234-4460
PA Office Fax 814-278-7295
2300 Glades Rd, Suite 360 W
Boca Raton, FL 33431
FL Office Phone 561-826-3863
FL Office Fax 561-826-3865
Cell Phone 814-880-0991
www.shanercorp.com

**From:** Calixto Garcia - Velez [mailto:Calixto.Garcia-Velez@firstbankfla.com]
**Sent:** Friday, February 07, 2014 1:30 PM
**To:** Lance Shaner
**Cc:** SAMUEL PASTRANA; Rolando Rodriguez; alberto.hernandez@hklaw.com; jose.casal@hklaw.com
**Subject:** Scrub LOI
**Importance:** High

Lance,

Congratulations! We have accepted your offer as outlined in the attached executed LOI. The bank's primary concern is the our ability to classify this loan as "performing" under our regulatory guidelines. As such, it is critical that your team provide us with the necessary documentation to achieve this. This may require flexibility on both our parts....

We look forward to working with your team to complete the DD and our underwriting and final approval process.

Have a great weekend.

Cali

*************************************************** This email and any files transmitted with it are confidential and intended solely for the use of the individual or entity to whom they are addressed. If you have received this email in error please notify the system manager. This message contains confidential information and is intended only for the individual named. If you are not the named addressee you should not disseminate, distribute or copy this e-mail. Please notify the sender immediately by e-mail if you have received this e-mail by mistake and delete this e-mail from your system. If you are not the intended recipient you are notified that disclosing, copying, distributing or taking any action in reliance on the contents of this information is strictly prohibited. *************************************************** WARNING: Computer viruses can be transmitted via email. The recipient should check this email and any attachments for the presence of viruses. FirstBank Florida accepts no liability for any damage caused by any virus transmitted by this email. E-mail transmission cannot be guaranteed to be secure or error-free as information could be intercepted, corrupted, lost, destroyed, arrive late or incomplete, or contain viruses. FirstBank Florida therefore does not accept liability for any errors or omissions in the contents of this message, which arise as a result of e-mail transmission. *************************************************** FirstBank Florida, Operations Center, 9795 South Dixie Highway, Miami, FL 33156

**Scrub Island Development**
**Term Sheet**
**Revised as of February 6, 2014**

**Sales price**: $37,500,000

**Down payment**: $7,500,000

**Deferred Purchase Price**: $30,000,000

**Fee over Term Loan**: 1% over Deferred Purchase Price payable at closing

**Total Facility**: $30,000,000

**Interest Rate**: 350 bps over 30 day LIBOR with a floor of 4.25%

**Interest Rate Payment:** Payment of all interest should be prefunded annually during the first 24 months starting at closing date

**Repayment of Deferred Sales Price**: Debt service on $30,000,000 comprising interest only for 24 months. From then on, principal and interest payment for the next 36 months based on an amortization period of 25 years with balloon payment at maturity, accelerated by applications of indicated net proceeds from sales of all real estate components.

**Maturity**: 5 years from closing date

**Collateral**:

1. **Mortgage Note** of $30,000,000 evidenced by a first mortgage over all real estate properties and acceptable lien to the Bank on all personal properties therein and income generated by all operations at the resort.

2. **UCC Filing:** On all assets or its equivalent in BVI

**Underwriting of Loan**: Borrower must comply with Bank's financial underwriting requirements, as reflected by current financial statements to be submitted for evaluation, prior the closing date. Bank will perform credit underwriting and analyze that the proposed Borrower has a standalone repayment ability to liquidate the loan.

**Business Plan**: Borrower to present prior to closing a fully documented business feasibility/CAPEX plan

**Construction Escrow**: Borrower to fund at closing no less than $6,000,000 for CAPEX improvements only. Funds to be controlled by Bank and advanced to Borrower upon satisfactory completion of work, as periodically certified by a bank approved engineer. Borrower must submit proposed CAPEX budget to be approved by Bank prior closing.

**Sales Price List And Related Release Price On Sale Of Real Estate**: Initial sales price list of all real estate components must be approved by the Bank before closing, as well as any related future changes. Release Price will comprise 50% over net sales proceeds of each one of the different real estate components of the resort, including Little Scrub and Big Scrub. Net sales proceeds mean gross sales price less maximum closing costs of

10% of gross sales price. Sales efforts must be evidenced and actual sales must commence by no later than month 13th after the closing date.

**Due diligence period and closing date**: 30 days from the acceptance of these terms. Closing date no later than March 15, 2014

**OV 11**: As agreed under the ROFO mechanism

**LV4 and LV5 units**:  As agreed, included in sales price

**Final Approval**:  These terms must be finally approved by the Board of Directors of the Bank

FirstBank of Puerto Rico

By: _____            2/7/14
     Calixto Garcia-Vélez            Date

Accepted:

By: _____
     Lance T. Shaner            Date

# EXHIBIT C

### Mainsail Claims

| Name of Mainsail Entity | Amount of Mainsail Entity Scheduled Claim |
|---|---|
| Mainsail B.V.I. Limited | $844,703.43 |
| Mainsail BVI Property Management, LLC | $294,421.97 |
| Mainsail Central, LLC | $71,617.29 |
| Mainsail Development International | $275,711.58 |
| Mainsail Management Group | $1,460,935.62 |
| Mainsail Suites Group | $17,114.51 |
| Marriott Execustay | $9,224.78 |

# EXHIBIT D

**Plan Funder Loan Agreement**


[TO BE FILED BY SUPPLEMENT BY NO LATER THAN
SEVEN (7) DAYS PRIOR TO THE DEADLINE TO FILE
OBJECTIONS TO THE DISCLOSURE STATEMENT]

## EXHIBIT E

## Rejected Contracts

| Third Party(ies) to Contract | Description of Contract | Effective Date of Contract |
|---|---|---|
| Enjoy Life Limited | Spa Lease Agreement | 4/30/2010 |
| Blue Water Traders Ltd. | Site Purchase and Sale Agreement | August 12, 2006 |
| Blue Water Traders Ltd. | Construction Contract – Longview Residences | |
| Pablo L. Dardet | Site Purchase and Sale Agreement | May 15, 2006 |
| Pablo L. Dardet | Construction Contract – Longview Residences | July 5, 2006 |
| Thomas Frederick | Site Purchase and Sale Agreement | March 20, 2007 |
| Thomas Frederick | Construction Contract – Long View Residences | February 2, 2007 |
| Luis A. Linares and David Foster | Site Purchase and Sale Agreement | February 2, 2007 |
| Luis A. Linares and David Foster | Construction Contract – Long View Residences | February 2, 2007 |
| Oscar Rivera | Site Purchase and Sale Agreement | July 5, 2006 |
| Oscar Rivera | Construction Contract – Long View Residences II | |
| Scrub Island Utility (BVI) Ltd. and FirstBank Puerto Rico | Agreement of Purchase and Sale | December 24, 2012 |

## EXHIBIT F

### SIDG Shareholder Claims

| Name of SIDG Shareholder | Amount of SIDG Shareholder Scheduled Claim | Amount of SIDG Shareholder Filed Claim |
|---|---|---|
| CIH Loft LLC | $127,921.00 | --- |
| Collier Investment Holdings[1] | $3,035,355.92 | -- |
| Gary Eng | $4,251,618.00 | -- |
| James R. Rabold | $4,381,275.00 | $4,545,044.00 |
| Pamela McManus | $494,422.00 | -- |
| Vance Kershner | $4,254,526.00 | -- |

---

[1]    Collier Investment Holdings is not an SIDG Shareholder.