# UNITED STATES BANKRUPTCY COURT
## MIDDLE DISTRICT OF FLORIDA
## TAMPA DIVISION

In re:                                          Chapter 11

**SCRUB ISLAND DEVELOPMENT
GROUP LIMITED,**                         Case No. 8:13-bk-15285-MGW

                                               **Jointly Administered with**

**SCRUB ISLAND CONSTRUCTION
LIMITED,**                                  Case No. 8:13-bk-15286-MGW

           Debtors.
_____/


## FIRST AMENDED JOINT DISCLOSURE STATEMENT FOR
## FIRST AMENDED JOINT PLAN OF REORGANIZATION OF
## SCRUB ISLAND DEVELOPMENT GROUP LIMITED AND
## SCRUB ISLAND CONSTRUCTION LIMITED
## UNDER CHAPTER 11 OF TITLE 11, UNITED STATES CODE

STICHTER, RIEDEL, BLAIN & PROSSER, P.A.
Harley E. Riedel (Florida Bar No. 183628)
Charles A. Postler (Florida Bar No. 455318)
110 East Madison Street, Suite 200
Tampa, Florida 33602
Telephone:    (813) 229-0144
Facsimile:    (813) 229-1811
Email:        hriedel@srbp.com
              cpostler@srbp.com
Counsel for Debtors and Debtors in Possession

Tampa, Florida
Dated as of July 11, 2014

THIS FIRST AMENDED JOINT DISCLOSURE STATEMENT (THE "<u>DISCLOSURE STATEMENT</u>") MAY NOT BE RELIED ON FOR ANY PURPOSE OTHER THAN TO DETERMINE HOW TO VOTE ON THE FIRST AMENDED JOINT PLAN OF REORGANIZATION OF SCRUB ISLAND DEVELOPMENT GROUP LIMITED AND SCRUB ISLAND CONSTRUCTION LIMITED UNDER CHAPTER 11 OF TITLE 11, UNITED STATES CODE DATED AS OF JULY 11, 2014 (AS AMENDED FROM TIME TO TIME, THE "<u>PLAN</u>"), AND NOTHING CONTAINED HEREIN SHALL CONSTITUTE AN ADMISSION OF ANY FACT OR LIABILITY BY ANY PARTY, OR BE ADMISSIBLE IN ANY PROCEEDING INVOLVING THE DEBTORS OR ANY OTHER PARTY, OR BE DEEMED CONCLUSIVE ADVICE ON THE TAX OR SECURITIES LAWS OR OTHER LEGAL EFFECTS OF THE PLAN ON HOLDERS OF CLAIMS AGAINST OR EQUITY INTERESTS IN THE DEBTORS. ANY CREDITOR OR OTHER PARTY BUYING OR SELLING A CLAIM BASED ON THE INFORMATION CONTAINED HEREIN, INCLUDING ON <u>EXHIBIT 1</u>, DOES SO AT ITS OWN RISK.

ALL CREDITORS AND HOLDERS OF EQUITY INTERESTS THAT ARE ENTITLED TO VOTE ON THE PLAN ARE ENCOURAGED TO READ AND CAREFULLY CONSIDER THE ENTIRE DISCLOSURE STATEMENT FURNISHED TO THEM AND THE MATTERS DESCRIBED IN THIS DISCLOSURE STATEMENT, PRIOR TO SUBMITTING A BALLOT, PURSUANT TO THIS SOLICITATION. THE DESCRIPTION OF THE PLAN CONTAINED IN THIS DISCLOSURE STATEMENT IS INTENDED AS A SUMMARY ONLY AND IS QUALIFIED IN ITS ENTIRETY BY REFERENCE TO THE PLAN ITSELF. EACH CREDITOR AND HOLDER OF AN EQUITY INTEREST THAT IS ENTITLED TO VOTE ON THE PLAN SHOULD READ, CONSIDER AND CAREFULLY ANALYZE THE TERMS AND PROVISIONS OF THE PLAN.

**<u>THE PLAN PROPOSES EXCULPATION FROM LIABILITY AS TO THE DEBTORS AND VARIOUS NON-DEBTOR PARTIES AND RELEASES AS TO VARIOUS NON-DEBTOR PARTIES FOR CERTAIN POSTPETITION ACTIONS IN CONNECTION WITH THE BANKRUPTCY CASES, WHICH PROVISIONS WOULD ENJOIN THE DEBTORS, HOLDERS OF CLAIMS, AND HOLDERS OF EQUITY INTERESTS FROM PURSUING CERTAIN ACTIONS AGAINST SUCH PARTIES EXCEPT AS OTHERWISE PROVIDED IN THE PLAN. ALL CREDITORS, HOLDERS OF EQUITY INTERESTS AND OTHER PARTIES IN INTEREST ARE URGED TO READ CAREFULLY ARTICLE 11.2 OF THE PLAN ON EXCULPATION FROM LIABILITY AND ARTICLE 11.3 OF THE PLAN ON RELEASES.</u>**

THIS DISCLOSURE STATEMENT HAS NOT BEEN APPROVED BY THE SECURITIES AND EXCHANGE COMMISSION OR ANY STATE SECURITIES COMMISSION NOR HAS THE SECURITIES AND EXCHANGE COMMISSION OR ANY STATE SECURITIES COMMISSION PASSED UPON THE ACCURACY OR ADEQUACY OF THE STATEMENTS CONTAINED HEREIN. IN ADDITION, THIS DISCLOSURE STATEMENT AND THE PLAN HAVE NOT BEEN REQUIRED TO BE PREPARED IN ACCORDANCE WITH FEDERAL OR STATE SECURITIES LAWS OR OTHER APPLICABLE NON-BANKRUPTCY LAW. PERSONS OR ENTITIES TRADING IN OR OTHERWISE PURCHASING OR SELLING OR TRANSFERRING SECURITIES OF THE DEBTORS SHOULD EVALUATE THIS DISCLOSURE STATEMENT AND THE PLAN IN LIGHT OF THE PURPOSES FOR WHICH THEY WERE PREPARED.

NO PERSON IS AUTHORIZED BY THE DEBTORS IN CONNECTION WITH THE PLAN OR THE SOLICITATION OF ACCEPTANCES OF THE PLAN TO GIVE ANY INFORMATION OR TO MAKE ANY REPRESENTATION OTHER THAN AS CONTAINED IN THIS DISCLOSURE STATEMENT AND THE EXHIBITS ATTACHED HERETO OR INCORPORATED BY REFERENCE OR REFERRED TO HEREIN AND, IF GIVEN OR MADE, SUCH INFORMATION OR REPRESENTATION MAY NOT BE RELIED UPON AS HAVING BEEN AUTHORIZED BY THE DEBTORS. SUCH ADDITIONAL REPRESENTATIONS SHOULD BE REPORTED TO COUNSEL FOR THE DEBTORS, WHO IN TURN SHALL DELIVER SUCH INFORMATION TO THE BANKRUPTCY COURT FOR ACTION AS MAY BE DEEMED APPROPRIATE. THE DELIVERY OF THIS DISCLOSURE STATEMENT WILL NOT UNDER

ANY CIRCUMSTANCES IMPLY THAT THE INFORMATION HEREIN IS CORRECT AS OF ANY TIME SUBSEQUENT TO THE DATE HEREOF. THIS DISCLOSURE STATEMENT IS DATED AS OF JULY 11, 2014, AND CREDITORS AND HOLDERS OF EQUITY INTERESTS ARE ENCOURAGED TO REVIEW THE DOCKET IN THE BANKRUPTCY CASES IN ORDER TO APPRISE THEMSELVES OF EVENTS WHICH OCCUR IN THE BANKRUPTCY CASES BETWEEN THE DATE OF THIS DISCLOSURE STATEMENT AND THE DATE OF THE CONFIRMATION HEARING.

NOTWITHSTANDING ANYTHING CONTAINED HEREIN TO THE CONTRARY, UNLESS OTHERWISE STATED, ALL STATEMENTS IN THIS DISCLOSURE STATEMENT AND IN THE PLAN CONCERNING THE HISTORY OF THE DEBTORS' BUSINESSES, THE PAST OR PRESENT FINANCIAL CONDITION OF THE DEBTORS, THE PROJECTIONS FOR THE FUTURE OPERATIONS OF THE DEBTORS, TRANSACTIONS TO WHICH THE DEBTORS WERE OR ARE PARTY, OR THE EFFECT OF CONFIRMATION OF THE PLAN ON HOLDERS OF CLAIMS AGAINST AND EQUITY INTERESTS IN THE DEBTORS ARE ATTRIBUTABLE EXCLUSIVELY TO THE DEBTORS AND NOT TO ANY OTHER PARTY. NONE OF THE ATTORNEYS, ACCOUNTANTS, OR OTHER PROFESSIONALS RETAINED BY THE DEBTORS OR THE CREDITORS COMMITTEE IN THE BANKRUPTCY CASES MAKES ANY REPRESENTATIONS CONCERNING SUCH INFORMATION.

THE DEBTORS HAVE ATTEMPTED TO PRESENT THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT ACCURATELY AND FAIRLY. THE ASSUMPTIONS UNDERLYING THE ANTICIPATION OF FUTURE EVENTS CONTAINED IN THIS DISCLOSURE STATEMENT REPRESENT AN ESTIMATE BY THE DEBTORS, BUT BECAUSE THESE ARE ONLY ASSUMPTIONS OR PREDICTIONS OF FUTURE EVENTS (MOST OF WHICH ARE BEYOND THE DEBTORS' CONTROL), THERE CAN BE NO ASSURANCE THAT THE EVENTS WILL OCCUR.

IN THE EVENT THAT ANY IMPAIRED CLASS OF CLAIMS VOTES TO REJECT THE PLAN, (1) THE DEBTORS MAY ALSO SEEK TO SATISFY THE REQUIREMENTS FOR CONFIRMATION OF THE PLAN WITH RESPECT TO THAT CLASS UNDER THE BANKRUPTCY CODE'S "CRAMDOWN" PROVISIONS AND, IF REQUIRED, MAY AMEND THE PLAN TO CONFORM TO SUCH REQUIREMENTS, OR (2) THE PLAN MAY BE OTHERWISE MODIFIED OR WITHDRAWN.

THE REQUIREMENTS FOR CONFIRMATION, INCLUDING THE VOTE OF IMPAIRED CLASSES OF CLAIMS TO ACCEPT THE PLAN AND CERTAIN OF THE STATUTORY FINDINGS THAT MUST BE MADE BY THE BANKRUPTCY COURT, ARE SET FORTH IN THE SECTION OF THIS DISCLOSURE STATEMENT TITLED "VOTING ON AND CONFIRMATION OF THE PLAN."

UNLESS OTHERWISE DEFINED HEREIN, ALL CAPITALIZED TERMS USED IN THIS DISCLOSURE STATEMENT HAVE THE MEANINGS ASCRIBED TO THEM IN THE PLAN. ANY TERM USED IN THE PLAN OR HEREIN THAT IS NOT DEFINED IN THE PLAN OR HEREIN AND THAT IS USED IN THE BANKRUPTCY CODE OR THE BANKRUPTCY RULES HAS THE MEANING ASSIGNED TO THAT TERM IN THE BANKRUPTCY CODE OR THE BANKRUPTCY RULES, AS THE CASE MAY BE. IF THERE IS ANY CONFLICT BETWEEN THE DEFINITIONS CONTAINED IN THIS DISCLOSURE STATEMENT AND THE DEFINITIONS CONTAINED IN THE PLAN, THE DEFINITIONS CONTAINED IN THE PLAN SHALL CONTROL.

TABLE OF CONTENTS

INTRODUCTION ............................................................................................................ 1

PURPOSE OF THIS DISCLOSURE STATEMENT ................................................... 2

VOTING INSTRUCTIONS ......................................................................................... 2
    Who May Vote ......................................................................................................... 2
    How to Vote ............................................................................................................ 3
    Acceptance of Plan and Vote Required for Class Acceptance ............................... 3
    Confirmation Hearing and Objections to Confirmation ......................................... 4

SUMMARY OF THE PLAN ....................................................................................... 4
    Introduction ............................................................................................................. 4
    General Overview of the Plan ................................................................................. 6
    Classification of Claims and Equity Interests ........................................................ 8
    Summary of Plan Distributions .............................................................................. 8
        *Administrative Expense Claims* ........................................................................ 8
        *Priority Tax Claims* .......................................................................................... 9
        *DIP Loan Claims* ............................................................................................ 10
        *Class 1: Priority Claims* .................................................................................. 10
        *Class 2: Secured Claims and Other Claims of FirstBank* .............................. 10
            FirstBank Option A ...................................................................................... 11
            FirstBank Option B ...................................................................................... 15
        *Class 3: Secured Tax Claims of Governmental Units* .................................... 19
        *Class 4: Other Secured Claims* ....................................................................... 19
        *Class 5: Unsecured Claims of Blue Water Traders Ltd.* ................................. 19
        *Class 6: Unsecured Claims of Pablo L. Dardet* ............................................. 21
        *Class 7: Unsecured Claims of Thomas Frederick* .......................................... 22
        *Class 8: Unsecured Claims of Arturo Linares, David Foster, and Scrub Island, LLC* ...... 24
        *Class 9: Unsecured Claims of Oscar Rivera and Anabel Rivera* .................... 25
        *Class 10: Unsecured Claims (Unsecured Claims Not Otherwise Classified)* ...... 27
        *Class 11: Unsecured Claims of the SIU Entities* ............................................ 27
        *Class 12: Unsecured Claims of Alf Nolan Davis d/b/a A. N. Davis Plumbing and Electrical Services* ...... 29
        *Class 13: Subordinated Unsecured Claims of FirstBank.* ............................... 30
        *Class 14: Intercompany Claims.* ..................................................................... 30
        *Class 15: SIDG Equity Interests.* .................................................................... 31
        *Class 16: SICL Equity Interests..* ................................................................... 31
    Conditions Precedent to Confirmation of the Plan and the Effective Date ............ 31
        *Conditions Precedent to Confirmation of the Plan.* ........................................ 31
        *Conditions Precedent to the Effective Date.* ................................................... 31
        *Notice of the Effective Date.* ........................................................................... 32
    Effective Date Actions ............................................................................................ 32
    Treatment of Executory Contracts and Unexpired Leases ..................................... 32
        *Assumption or Rejection of Executory Contracts and Unexpired Leases.* ...... 32
        *Approval of Assumption or Rejection of Executory Contracts and Unexpired Leases* ...... 33
        *Inclusiveness.* ................................................................................................. 33
        *Cure of Defaults.* ............................................................................................ 33

iii

*Claims under Rejected Executory Contracts and Unexpired Leases.* ................................. 34
*Insurance Policies.* ............................................................................................................ 34
Vesting of Property of the Estates in the Reorganized Debtors. ............................................. 34
Continued Corporate Existence; Issuance of Reorganized SICL Shares ................................ 35
Boards of Directors and Executive Officers of the Reorganized Debtors............................... 35
Discharge, Exculpation from Liability, Release and General Injunction Provisions under the
    Plan ..................................................................................................................................... 35
*Discharge of Claims.* ........................................................................................................ 36
*Exculpation from Liability.* .............................................................................................. 36
*Release.* ............................................................................................................................. 37
*General Injunction* ........................................................................................................... 38
*Term of Certain Injunctions and Automatic Stay* ............................................................ 38
*No Liability for Tax Claims.* ............................................................................................ 39
Distributions under the Plan ................................................................................................... 39
*Initial Distribution* .......................................................................................................... 39
*Determination of Claims* .................................................................................................. 39
*Distributions as to Allowed Unsecured Claims in Class 10.* ........................................... 40
*Unclaimed Distributions.* ................................................................................................. 40
Corporate Action .................................................................................................................... 41
Section 1146 Exemption ......................................................................................................... 41
Pursuit of Causes of Action .................................................................................................... 41
Prosecution and Settlement of Claims and Causes of Action ................................................. 43
Dissolution of the Creditors Committee.................................................................................. 44
Modification of Plan ............................................................................................................... 44
Confirmation Over Objections ................................................................................................ 45
Retention of Jurisdiction ......................................................................................................... 45
Exclusivity Period ................................................................................................................... 45
Governing Law........................................................................................................................ 45

BUSINESS OF THE DEBTORS ................................................................................................... 46
Introduction ............................................................................................................................ 46
Scrub Island Development Group Limited .............................................................................. 46
Scrub Island Construction Limited ......................................................................................... 53
Locations of the Debtors' Operations and Whether Leased or Owned .................................... 53
List of Officers, Directors and Insiders and Their Salaries and Benefits at the Time of Filing and
    During the One Year Prior to Filing..................................................................................... 53
Debtors' Annual Gross Revenues ........................................................................................... 53

EVENTS LEADING TO, AND REASONS FOR, THE CHAPTER 11 FILING ........................... 53

SIGNIFICANT EVENTS IN THE CHAPTER 11 BANKRUPTCY CASES ................................. 55
Introduction ............................................................................................................................ 55
Joint Administration ............................................................................................................... 55
Retention of Professionals by the Debtors .............................................................................. 55
Bar Dates ................................................................................................................................ 55
Use of Cash Collateral ............................................................................................................ 56
Payment of Prepetition Employee Obligations ....................................................................... 56
Motion Filed by the United States Trustee to Establish Uniform Procedures for Attorney
    Timekeeping, Billing and Budgeting.................................................................................... 56

Debtor in Possession Financing ............................................................................ 56
Schedules and Statements of Financial Affairs ...................................................... 57
Monthly Financial Reports ..................................................................................... 57
Appointment of Unsecured Creditors Committee.................................................. 57
Retention of Professionals by the Creditors Committee ........................................ 57
Section 341 Meetings of Creditors ......................................................................... 57
FirstBank Injunction Adversary Proceeding .......................................................... 57
Motions to Dismiss Bankruptcy Cases Filed by FirstBank.................................... 58
Motion for Relief from Stay Filed by FirstBank .................................................... 58
Section 543 Motion Filed by FirstBank ................................................................. 59
Motion to Terminate Utility Services Filed by Scrub Island Utility (BVI) Ltd. .......... 59
Debtors' Emergency Motion to Compel Discovery from FirstBank........................ 59
Debtor's Emergency Motion to Approve Postpetition Agreement with Marriott International,
    Inc. ................................................................................................................... 59
Debtor's Motion to Approve Postpetition Agreement with Offshore Sailing School, Ltd., Inc... 60
Joint Emergency Motion to Approve "No Shop" and Exclusivity Agreement with FirstBank ... 60
Initial Joint Plan of Reorganization and Joint Disclosure Statement filed by the Debtors........... 61
Objections to Disclosure Statement for Initial Plan ............................................... 61
Motion to Require Mediation .................................................................................. 62
FirstBank's Efforts to Terminate Exclusivity ........................................................ 62
Joint Motions to Continue Hearings........................................................................ 62
Agreed Extensions of Exclusivity .......................................................................... 62
Impasse of Mediation ............................................................................................. 63
Employment of HVS as Appraiser .......................................................................... 63
Extension of Exclusivity ......................................................................................... 63
FirsBank Lender Liability Adversary Proceeding .................................................. 63
Trial Scheduled in FirstBank Lender Liability Adversary Proceeding and Confirmation of
    Plan .................................................................................................................. 63
DIP Loan – Miller Coors ........................................................................................ 64

CERTAIN FEDERAL INCOME TAX CONSEQUENCES ............................................. 64
General ...................................................................................................................... 64
General Federal Income Tax Consequences to Holders........................................... 64
    In General.. .......................................................................................................... 64
    Tax Consequences to Holders of Claims and Equity Interests ............................ 65
No Federal Income Tax Consequences to the Debtors............................................. 65

VOTING ON AND CONFIRMATION OF THE PLAN ................................................... 66
Confirmation and Acceptance by All Impaired Classes........................................... 66
    Feasibility............................................................................................................ 66
    Best Interests Standard ....................................................................................... 67
Confirmation Without Acceptance by All Impaired Classes ................................... 68
    Discriminate Unfairly.......................................................................................... 68
    Fair and Equitable Standard. ............................................................................. 68
Non-Confirmation of the Plan ................................................................................. 68

ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF THE PLAN ............. 69
Alternative Plans of Reorganization......................................................................... 69
Liquidation under Chapter 7 or Chapter 11............................................................. 69

SUMMARY, RECOMMENDATION AND CONCLUSION......................................................................... 70

## INDEX TO EXHIBITS

Exhibit 1 –    Projections for Reorganized SIDG for the Period from November 30, 2014 through
              December 31, 2019

Exhibit 2 –    Liquidation Summary

## FIRST AMENDED JOINT DISCLOSURE STATEMENT
## PURSUANT TO SECTION 1125 OF THE BANKRUPTCY CODE

### INTRODUCTION

Scrub Island Development Group Limited and Scrub Island Construction Limited, as Debtors and Debtors in Possession in the Bankruptcy Cases (collectively, the "Debtors"), have filed with the United States Bankruptcy Court for the Middle District of Florida, Tampa Division (the "Bankruptcy Court"), their First Amended Joint Plan of Reorganization of Scrub Island Development Group Limited and Scrub Island Construction Limited under Chapter 11 of Title 11, United States Code dated as of July 11, 2014 (as amended from time to time, the "Plan"). This First Amended Joint Disclosure Statement for First Amended Joint Plan of Reorganization of Scrub Island Development Group Limited and Scrub Island Construction Limited under Chapter 11 of Title 11, United States Code dated as of July 11, 2014 (the "Disclosure Statement"), is submitted pursuant to Section 1125 of the Bankruptcy Code, 11 U.S.C. §§ 101, et. seq. (the "Bankruptcy Code"), in connection with the solicitation of votes on the Plan from Holders of Impaired Claims against the Debtors entitled to vote on the Plan. The hearing on Confirmation of the Plan is scheduled for _____, 2014, at _____ __.m.    This Disclosure Statement amends, restates and replaces in its entirety the Joint Disclosure Statement for Joint Plan of Reorganization of Scrub Island Development Group Limited and Scrub Island Construction Limited under Chapter 11 of Title 11, United States Code dated as of March 19, 2014 (Doc. No. 177).

This Disclosure Statement has been approved by the Bankruptcy Court in accordance with Section 1125(b) of the Bankruptcy Code as containing information of a kind and in sufficient detail adequate to enable a hypothetical reasonable investor typical of Holders of Claims in the relevant Voting Classes (as defined below) to make an informed judgment whether to accept or reject the Plan. Such approval of this Disclosure Statement by the Bankruptcy Court and the transmittal of this Disclosure Statement do not, however, constitute a determination by the Bankruptcy Court as to the fairness or merits of the Plan and should not be interpreted as being a recommendation by the Bankruptcy Court either to accept or reject the Plan.

THE PLAN HAS BEEN APPROVED BY ALL OF THE DIRECTORS OF EACH OF THE DEBTORS. IN THE OPINION OF THE DEBTORS, THE TREATMENT OF CLAIMS UNDER THE PLAN CONTEMPLATES A GREATER RECOVERY THAN THAT WHICH IS LIKELY TO BE ACHIEVED UNDER OTHER ALTERNATIVES FOR THE REORGANIZATION OR LIQUIDATION OF THE DEBTORS. ACCORDINGLY, THE DEBTORS BELIEVE THAT CONFIRMATION OF THE PLAN IS IN THE BEST INTERESTS OF CREDITORS, AND THE DEBTORS RECOMMEND THAT CREDITORS VOTE TO ACCEPT THE PLAN.

Accompanying or included as Exhibits to this Disclosure Statement are copies of the following documents:

      (a)      the Plan, including all Exhibits thereto;

(b)     the Projections for Reorganized SIDG for the period commencing November 30, 2014 (the anticipated Closing Date) and ending December 31, 2019, included as Exhibit 1 to this Disclosure Statement;

(c)     a Liquidation Summary, included as Exhibit 2 to this Disclosure Statement;

(d)     the Bankruptcy Court's Order Approving First Amended Disclosure Statement, Fixing Time to File Applications for Administrative Expenses, Setting Hearing on Confirmation of First Amended Plan, and Setting Deadlines with Respect to Confirmation Hearing dated August ___, 2014 and entered in the Bankruptcy Cases (Doc. No. ___) (the "Disclosure Statement Approval Order"); and

(e)     in the case of Impaired Classes of Claims entitled to vote on the Plan (Classes 2, 5, 6, 7, 8, 9, 10, 12 and 13) (each, a "Voting Class"), a Ballot for acceptance or rejection of the Plan.

## PURPOSE OF THIS DISCLOSURE STATEMENT

The purpose of this Disclosure Statement is to provide the Holders of Claims and Equity Interests entitled to vote on the Plan with adequate information to make an informed judgment about the Plan.  This information includes, among other things, (a) the procedures for voting on the Plan, (b) a summary of the Plan and an explanation of how the Plan will function, including the means of implementing and funding the Plan, (c) general information about the businesses, properties, and operations of the Debtors, (d) the events leading to, and the reasons for, the filing of the Bankruptcy Cases, (e) the Projections for the Debtors' future operations, and (f) a summary of significant events which have occurred to date in the Bankruptcy Cases.

This Disclosure Statement contains important information about the Plan and considerations pertinent to a vote for or against the Confirmation of the Plan.  All Holders of Claims and Equity Interests entitled to vote on the Plan are encouraged to review carefully this Disclosure Statement.

## VOTING INSTRUCTIONS

### Who May Vote

Only the Holders of Claims and Equity Interests which are "Impaired" under the terms and provisions of the Plan are permitted to vote to accept or reject the Plan.  Holders of Class 14 Intercompany Claims, Class 15 Equity Interests, and Class 16 Equity Interests will not receive or retain any Property under the Plan on account of such Class 14 Intercompany Claims, Class 15 Equity Interests, and Class 16 Equity Interests and, therefore, Classes 14, 15 and 16 are deemed not to have accepted the Plan pursuant to Section 1126(g) of the Bankruptcy Code and, thus, are

2

not entitled to vote to accept or reject the Plan. For purposes of the Plan, only the Holders of Claims in the Voting Classes (Classes 2, 5, 6, 7, 8, 9, 10, 12 and 13) are Impaired under the Plan and thus may vote to accept or reject the Plan. It is the Debtors' position that the actions of FirstBank as described in the FirstBank Lender Liability Adversary Proceeding will preclude FirstBank from casting a Ballot in good faith in Classes 2 and 13. Subject to the Debtors' rights to contest any Ballot cast by FirstBank in Classes 2 and 13, FirstBank, as the Holder of the Class 2 Claims and the Class 13 Claims, is entitled to vote to accept or reject the Plan. ACCORDINGLY, A BALLOT FOR ACCEPTANCE OR REJECTION OF THE PLAN IS BEING PROVIDED ONLY TO MEMBERS OF THE VOTING CLASSES.

**How to Vote**

Each Holder of a Claim in a Voting Class should read this Disclosure Statement, together with the Plan and any Exhibits thereto, in their entirety. After carefully reviewing the Plan and this Disclosure Statement and any Exhibits thereto, please complete the enclosed Ballot, including marking your vote with respect to the Plan, and return it as provided below. If you have an Impaired Claim in more than one Class, you should receive a separate Ballot for each such Claim. If you receive more than one Ballot, you should assume that each Ballot is for a separate Impaired Claim and you should complete and return all of them.

If you are a member of a Voting Class and did not receive a Ballot, if your Ballot is damaged or lost, or if you have any questions concerning voting procedures, please contact Charles A. Postler, counsel to the Debtors, by telephone at (813) 229-0144 or by electronic mail at cpostler@srbp.com.

**YOU SHOULD COMPLETE AND SIGN EACH ENCLOSED BALLOT AND RETURN IT TO THE ADDRESS FOR THE BANKRUPTCY COURT PROVIDED BELOW. IN ORDER TO BE COUNTED, BALLOTS MUST BE DULY COMPLETED AND EXECUTED AND RECEIVED BY THE CLERK OF THE BANKRUPTCY COURT BY NO LATER THAN _____, 2014 (THE "VOTING DEADLINE").**

All Ballots should be returned either by regular mail, hand delivery or overnight delivery to:

> Clerk, United States Bankruptcy Court
> Sam M. Gibbons United States Courthouse
> 801 N. Florida Avenue, 5th Floor
> Tampa, Florida 33602-3826

**Acceptance of Plan and Vote Required for Class Acceptance**

As the Holder of a Claim in one of the Voting Classes, your vote on the Plan is extremely important. The Debtors are soliciting acceptances of the Plan only from Holders of Claims in Classes 2, 5, 6, 7, 8, 9, 10, 12 and 13, which are the only Classes entitled to vote on the Plan. You may be contacted by the Debtors or their agent with regard to your vote on the Plan.

Pursuant to Section 1126(c) of the Bankruptcy Code, an Impaired Class of Claims shall have accepted the Plan if (a) the Holders (other than any Holder designated pursuant to Section 1126(e) of the Bankruptcy Code) of at least two-thirds in dollar amount of the Allowed Claims actually voting in such Class have voted to accept the Plan and (b) the Holders (other than any Holder designated pursuant to Section 1126(e) of the Bankruptcy Code) of more than one-half in number of the Allowed Claims actually voting in such Class have voted to accept the Plan. If a Holder of a Claim holds more than one Claim in any one Class, all Claims of such Holder in such Class shall be aggregated and deemed to be one Claim for purposes of determining the number of Claims in such Class voting on the Plan.

To meet the requirement for confirmation of the Plan under the "cram-down" provisions of the Bankruptcy Code with respect to any Impaired Class of Claims which votes to reject, or is deemed to have rejected, the Plan (a "Rejecting Class"), the Debtors would have to show that all Classes junior to the Rejecting Class will not receive or retain any Property under the Plan unless all Holders of Claims in the Rejecting Class receive or retain under the Plan Property having a value equal to the full amount of their Allowed Claims. For a more complete description of the implementation of the "cram-down" provisions of the Bankruptcy Code pursuant to the Plan, see "VOTING ON AND CONFIRMATION OF THE PLAN -- Confirmation Without Acceptance by All Impaired Classes."

**Confirmation Hearing and Objections to Confirmation**

The Bankruptcy Court has scheduled a hearing to consider Confirmation of the Plan for _____, 2014, at _____ __.m. of said day (the "Confirmation Hearing"), at the United States Bankruptcy Court, Sam M. Gibbons United States Courthouse, 801 N. Florida Avenue, Courtroom 8A, Tampa, Florida 33602, which may be adjourned from time to time by the Bankruptcy Court without further notice except for an announcement of the adjourned date made at the Confirmation Hearing.

Any objection to Confirmation of the Plan must be filed and served in accordance with the Disclosure Statement Approval Order. Pursuant to the Disclosure Statement Approval Order, any such objection must be filed with the Bankruptcy Court by no later than _____, 2014.

## SUMMARY OF THE PLAN

**Introduction**

Chapter 11 is the principal business reorganization chapter of the Bankruptcy Code. Under Chapter 11, a debtor is authorized to reorganize and/or liquidate its business for the benefit of itself and its creditors and stockholders. The formulation of a plan is the principal objective of a Chapter 11 case. In general, a Chapter 11 plan (i) divides claims and equity interests into separate classes, (ii) specifies the property that each class is to receive under such plan, and (iii) contains other provisions necessary to the reorganization and/or liquidation of the debtor. Chapter 11 does not require each holder of a claim or equity interest to vote in favor of the plan in order for the bankruptcy court to confirm the plan. However, a plan must be accepted by the holders of at least one impaired class of claims (unless there are no impaired classes)

without considering the votes of "insiders" (within the meaning of Section 101(31) of the Bankruptcy Code) in that impaired class.

The summary of the Plan contained herein addresses only certain provisions of the Plan. As a summary, it is qualified in its entirety by reference to the Plan itself (including the Plan Supplement and the Plan Documents). The Plan (including the Plan Supplement and the Plan Documents) shall control and, upon Confirmation and the Effective Date, bind the Debtors, the Reorganized Debtors, all of the Debtors' Creditors, Holders of Equity Interests and other parties in interest except as expressly set forth in the Plan. TO THE EXTENT THAT THE TERMS OF THIS DISCLOSURE STATEMENT VARY OR CONFLICT WITH THE TERMS OF THE PLAN, THE TERMS OF THE PLAN SHALL CONTROL.

The Bankruptcy Cases were commenced on November 19, 2013 (the "Petition Date"). Since the Petition Date, the Debtors have continued to operate their businesses and maintain their Properties as Debtors in Possession.

Prior to the Petition Date, the Debtors and FirstBank Puerto Rico, a commercial banking institution incorporated under the laws of the Commonwealth of Puerto Rico ("FirstBank"), entered into several loan agreements which set forth the terms for several loans from FirstBank to the Debtors with respect to the construction and development of the Scrub Island Resort (the "First Bank Loans"). In the FirstBank Proofs of Claim, FirstBank has asserted that, as of the Petition Date, (a) SIDG was indebted to FirstBank in an aggregate amount, including principal, interest, fees, charges and attorneys' fees, of $119,275,858.73 with respect to the FirstBank Prepetition Claims, consisting of a Secured Claim in the amount of $60,640,000.00 and an Unsecured Claim in the amount of $58,635,858.73, (b) SICL was indebted to FirstBank in an aggregate amount, including principal, interest, fees, charges and attorneys' fees, of $3,199,861.18 with respect to the FirstBank Prepetition Claims, all of which is a Secured Claim, and (c) the FirstBank Prepetition Claims were secured by properly perfected Liens on certain real property and personal property of the Debtors located in the British Virgin Islands. FirstBank is the only Secured Creditor of the Debtors. FirstBank has advised the Debtors, and has represented to the Bankruptcy Court, that it has written the FirstBank Loans down to $40 million on its books and records.

Prior to the filing of the Bankruptcy Cases, FirstBank, in an *ex parte* manner and without prior notice to SIDG or its counsel (despite numerous daily contacts between FirstBank representatives and SIDG representatives and their respective counsel during the time period in question), sought the appointment of a temporary operating receiver (the "BVI Receiver") of the assets of SIDG. The BVI Receiver was appointed pursuant to an Order entered November 1, 2013 in The Eastern Caribbean Supreme Court In the High Court of Justice Virgin Islands, Claim No. BV1HC (Com) 2013/0139 in the proceeding styled: In the Matter of a Mortgagee's Claim by FirstBank Puerto Rico (the "Bank") pursuant the CPR Part 66(1)(c)(d) and (g) for the Payment of Monies Secured by Mortgage, for Possession and the Sale of Mortgaged Property by FirstBank Puerto Rico, Claimant, and Scrub Island Construction Limited, Scrub Island Development Group Limited, Joe Collier, CIH Loft LLC, Defendants/Respondents (the "BVI Receivership Proceeding"). The BVI Receivership Proceeding has remained pending during the Bankruptcy Cases; provided, however, that upon Confirmation of the Plan and the Closing with

FirstBank, FirstBank will be required to dismiss the BVI Receivershp Proceeding with prejudice.

As of the Petition Date, (i) the books and records of SIDG reflected Unsecured Claims of approximately $27.3 million, and (ii) the books and records of SICL reflected Unsecured Claims of approximately $4.8 million owed to the Longview Villa Owners for the construction of Long View Villas on Little Scrub Island.

The Debtors have filed the Plan with the Bankruptcy Court. The Plan represents the culmination of the Debtors' efforts to restructure their business operations and concentrate on their continued efforts to develop Scrub Island and for SIDG to emerge from Chapter 11 as a viable business entity. The Debtors believe that the going concern value of SIDG's business is greater than the liquidation value of its assets, that only through continued operation by SIDG will Creditors receive any return on account of their Claims, that many trade creditors will benefit from SIDG's continued business operations through ongoing transactions with Reorganized SIDG, and that the filing for Chapter 11 has preserved jobs for SIDG's employees. The result of the foregoing is to provide the Holders of Allowed Unsecured Claims against the Debtors with a substantially greater return and value than if FirstBank were to foreclose on its Secured Claims or if the Debtors were liquidated under Chapter 7 of the Bankruptcy Code.

**General Overview of the Plan**

The Plan provides for the reorganization and continued operation of the Debtors as the Reorganized Debtors, the settlement and payment of the FirstBank Prepetition Claims under FirstBank Option A or FirstBank Option B, and the payment in full of all of the other Allowed Claims against the Debtors except as otherwise described in the Plan or any Plan Document. On the Closing Date, (a) $12,500,000.00 will be loaned to Reorganized SIDG by the Plan Funder, and (b) $6,000,000.00 will be contributed to Reorganized SIDG by the SIDG Contributing Shareholders, all of which funds will be used as described elsewhere in the Plan or any Plan Document. The Plan provides for Cash payments to Holders of Allowed Claims, all as more particularly described in Article 3 and Article 5 of the Plan.

The Plan Funder is RCB Equities #1, LLC, a California limited liability company ("RCB"). RCB is an investment partnership managed by Brian Dror. RCB is located at 5967 W. 3rd Street, Los Angeles, California 90036. Upon request, RCB will provide proof of financial capability to fund the Plan Funder Loan Amount.

On the Closing Date, the Debtors and the Plan Funder will enter into the Plan Funder Loan Agreement. The principal business terms of the Plan Funder Loan Agreement include the following: (a) the Plan Funder will loan the Reorganized Debtors the sum of $12,500,000.00 (the "Plan Loan"), (b) the Plan Loan will bear interest at the rate of 12.00% per annum, (c) the maturity date of the Plan Loan will be three (3) years from the Closing Date, but may be extended for a period of one (1) year by a cash payment of one percent (1%) of the outstanding balance of the Plan Loan at the maturity date, (d) the Reorganized Debtors will be required to make monthly interest payments only during the term of the Plan Loan, (e) the Plan Funder will be granted a second lien (junior to FirstBank) on all assets of the Reorganized Debtors, (f) a closing fee of three percent (3%) of the amount of the Plan Loan shall be payable to the Plan

6

Funder on the Closing Date, (g) the Plan Loan shall have a one percent (1%) annual monitoring fee, (h) the SIDG Contributing Shareholders must contribute $6,000,000.00 to the capital of Reorganized SIDG on the Closing Date, (i) the Plan Loan is conditioned on the Bankruptcy Court confirming the Plan, (j) the Plan Funder shall receive one hundred percent (100%) of the Reorganized SIDG Shares on the Closing Date, but will only retain thirty percent (30%) of the Reorganized SIDG Shares upon payment in full of the Plan Loan, and (k) the Debtors will be responsible for all legal costs of the Plan Funder associated with the Plan Loan up to a maximum amount of $250,000.00.

A copy of the Plan Funder Loan Agreement is attached as <u>Exhibit D</u> to the Plan. The Debtors and the Plan Funder reserve the right to modify the form of the Plan Funder Loan Agreement attached to the Plan at any time prior to the Confirmation Hearing.

The Plan shall be implemented on the Effective Date, and the primary source of the funds necessary to implement the Plan initially will be the Plan Funder Loan Amount and the SIDG Shareholders Plan Contribution Amount. At the present time, the Debtors believe that Reorganized SIDG will have sufficient funds, as of the Effective Date, to pay in full the expected payments required under the Plan to the Holders of Allowed Administrative Expense Claims (including Allowed Administrative Expense Claims of Professionals), Allowed Priority Claims in Class 1, the amounts required to be paid on the Closing Date to FirstBank under <u>Article 5.3.4</u> or <u>Article 5.3.5</u> of the Plan, any amounts required to be paid on the Closing Date to the Longview Villa Owners under the Plan or under the Longview Villa Owner Settlement Agreements, and Allowed Secured Tax Claims in Class 3. Cash payments to be made under the Plan after the Effective Date to the Holders of Allowed Priority Tax Claims and Holders of Allowed Claims will be derived from the operations of Reorganized SIDG, any new capital or financing raised by Reorganized SIDG, or the sale of the Scrub Island Real Estate, in each case as shown in the Projections.

The Plan Documents (i.e., all documents that aid in effectuating the Plan, including the Plan Funder Loan Agreement, the FirstBank New Loan A Documents, the FirstBank Construction Escrow Agreement, and the Longview Villa Owner Settlement Agreements) will be contained in the Plan Supplement (unless already on file with the Bankruptcy Court) and will be filed with the Bankruptcy Court and posted at www.srbp.com at least five (5) days prior to the Voting Deadline; provided, however, that (i) the Debtors may amend the Plan Supplement through and including the Confirmation Date, and (ii) in lieu of filing the Plan Supplement with the Bankruptcy Court, the Debtors may provide copies of the Plan Documents to the applicable Creditor on or prior to the Voting Deadline. Upon its filing with the Bankruptcy Court, the Plan Supplement may be inspected in the Clerk's Office during normal business hours, may be obtained from the Bankruptcy Court's copying service upon the payment of the appropriate charges, or may be obtained from the Debtors' Bankruptcy Counsel's website at www.srbp.com.

**Classification of Claims and Equity Interests**

Section 1123 of the Bankruptcy Code provides that a plan of reorganization shall classify the claims of a debtor's creditors and interests of a debtor's equity holders. The Plan divides the Claims and Equity Interests into sixteen (16) Classes.

Section 101(5) of the Bankruptcy Code defines "claim" as a "right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured or unsecured," or a "right to an equitable remedy for breach of performance if such breach gives rise to a right to payment, whether or not such right to an equitable remedy is reduced to judgment, fixed, contingent, matured, disputed, undisputed, secured or unsecured." The Debtors are required under Section 1122 of the Bankruptcy Code to classify the Claims and Equity Interests into separate Classes which contain Claims and Equity Interests that are substantially similar to the other Claims and Equity Interests within such Class.

The Debtors believe that they have classified all Claims and Equity Interests in compliance with the provisions of Section 1122 of the Bankruptcy Code. However, it is possible that a Holder of a Claim or another interested party may challenge the classification of Claims and Equity Interests contained in the Plan and that the Bankruptcy Court may find that a different classification is required for the Plan to be confirmed. In such event, it is the present intent of the Debtors, to the extent permitted by the Bankruptcy Court, to make such reasonable modifications of the classifications under the Plan to provide for whatever classification might be required by the Bankruptcy Court for Confirmation and to use the Plan acceptances received in this solicitation for the purpose of obtaining the approval of the Class or Classes of which the accepting Holder is ultimately deemed to be a member. Any such reclassification could adversely affect the Class in which such Holder was initially a member, or any other Class under the Plan, by changing the composition of such Class and the vote required of that Class for approval of the Plan. A reclassification of Claims after approval of the Disclosure Statement might necessitate a resolicitation of acceptances or rejections of the Plan.

**Summary of Plan Distributions**

Set forth below is a summary of each Class of Claims and Equity Interests and the expected Distributions under the Plan to Holders of Allowed Claims against and Equity Interests in the Debtors. Any estimates of Claims set forth in this Disclosure Statement are approximate and are based on amounts scheduled by the Debtors in their Schedules or set forth in Proofs of Claim filed with the Bankruptcy Court. Except as otherwise specifically provided in the Plan, the treatment of, and the consideration to be received by, Holders of Allowed Claims and Holders of Equity Interests pursuant to the Plan shall be in full and final satisfaction, settlement, release, extinguishment and discharge of their respective Allowed Claims (of any nature whatsoever) and Equity Interests.

*Administrative Expense Claims.* The Holders of Allowed Administrative Expense Claims are entitled to be paid in full under a plan of reorganization pursuant to the Bankruptcy Code. The Debtors believe that the Administrative Expense Claims will consist primarily of Postpetition operating expenses incurred by the Debtors (including unpaid wages and employee

8

benefits), fees and costs of Professionals, fees required to be paid to the United States Trustee, the costs of solicitation of votes on the Plan (including photocopying and postage charges), and any Administrative Expense Claims filed with the Bankruptcy Court by the Administrative Expense Claim Bar Date, in each of the foregoing cases as Allowed by a Final Order of the Bankruptcy Court or as otherwise provided in the Plan. The amount of fees and costs sought by Professionals will not be known until such Professionals file their fee applications with the Bankruptcy Court as required by the Disclosure Statement Approval Order.

The Plan provides that, except as otherwise provided in Article 3.1.2 and Article 3.1.3 of the Plan, each Holder of an Allowed Administrative Expense Claim (including Allowed Administrative Expense Claims of Professionals) shall be paid (a) on the Distribution Date, an amount, in Cash, by Reorganized SIDG equal to the Allowed Amount of its Administrative Expense Claim, in accordance with Section 1129(a)(9)(A) of the Bankruptcy Code, or (b) under such other terms as may be mutually agreed upon by both the Holder of such Allowed Administrative Expense Claim and the Debtors or Reorganized SIDG, as the case may be, or (c) as otherwise ordered by a Final Order of the Bankruptcy Court.

The fees required to be paid to the United States Trustee pursuant to 28 U.S.C. §1930(a)(6) for the periods prior to the Effective Date also constitute Administrative Expense Claims. The Plan provides that all unpaid fees and charges assessed against the Estates under Chapter 123 of title 28, United States Code, 28 U.S.C. §§ 1911-1930, for any calendar quarter (or portion thereof) ending prior to the Effective Date shall be paid to the United States Trustee by Reorganized SIDG by no later than thirty (30) days following the Effective Date. Following the Effective Date, any fees required to be paid to the United States Trustee, pursuant to 28 U.S.C. §1930(a)(6), with respect to the Bankruptcy Cases shall be paid by Reorganized SIDG, until the earlier of (i) the closing of the Bankruptcy Cases by the issuance of a Final Decree by the Bankruptcy Court, or (ii) the entry of an order by the Bankruptcy Court dismissing the Bankruptcy Cases or converting the Bankruptcy Cases to another chapter under the Bankruptcy Code. Any such payment to the United States Trustee shall be in the appropriate sum required pursuant to 28 U.S.C. §1930(a)(6) based upon the applicable disbursements for the relevant period and shall be made within the time period set forth in 28 U.S.C. §1930(a)(6).

All Allowed Administrative Expense Claims with respect to liabilities incurred by the Debtors in the ordinary course of business during the Bankruptcy Cases shall be paid by Reorganized SIDG (a) in the ordinary course of business in accordance with contract terms, or (b) under such other terms as may be mutually agreed upon by both the Holder of such Allowed Administrative Expense Claim and the Debtors or Reorganized SIDG, as the case may be, or (c) as otherwise ordered by a Final Order of the Bankruptcy Court.

*Priority Tax Claims.* The Holders of Allowed Priority Tax Claims are also entitled to be paid in full under a plan of reorganization pursuant to the Bankruptcy Code. As of the date of this Disclosure Statement, the Debtors believe that there will be no Allowed Priority Tax Claims in the Bankruptcy Cases.

The Plan provides that each Holder of an Allowed Priority Tax Claim shall receive from Reorganized SIDG, on account of such Allowed Priority Tax Claim, regular installment payments

in Cash on the Distribution Date in accordance with Section 1129(a)(9)(C) of the Bankruptcy Code. Holders of Allowed Priority Tax Claims shall receive interest on account of their Allowed Priority Tax Claims at the rate established for delinquent tax obligations pursuant to 26 U.S.C. § 6621; provided, however, that if the Holder of such Allowed Priority Tax Claim is a city, county or state, such Holder shall receive interest on account of its Allowed Priority Tax Claim at the applicable statutory rate under state law. Notwithstanding the above, each Holder of an Allowed Priority Tax Claim may be paid (i) under such other terms as may be mutually agreed upon by both the Holder of such Allowed Priority Tax Claim and the Debtors or Reorganized SIDG, as the case may be, or (b) as otherwise ordered by a Final Order of the Bankruptcy Court.

*DIP Loan Claims.* Promptly after the filing of the Plan, SIDG will file an emergency motion with the Bankruptcy Court seeking approval of a $1,000,000.00 Postpetition line of credit facility (the "DIP Facility") from the DIP Lender, secured by a first Lien in favor of the DIP Lender on all of the Property of SIDG located in the United States and providing a Superpriority Claim in favor of the DIP Lender. Any request for additional advances above the $1,000,000.00 will be pursuant to a motion filed by SIDG with the Bankruptcy Court, with notice to all of the Notice Parties.

Pursuant to Section 1129(a)(9)(A) of the Bankruptcy Code, the DIP Lender is entitled to receive on the Effective Date, in full and final satisfaction, settlement, release, extinguishment, and discharge of the DIP Lender Allowed Claim, Cash equal to the amount of the DIP Lender Allowed Claim. In addition, pursuant to the terms of the DIP Loan Documents, the DIP Lender Allowed Claim is due and payable in full on the Effective Date. Subject to and pursuant to the terms of the Plan, including Confirmation of the Plan, the DIP Lender has agreed that (a) the DIP Lender Allowed Claim shall not constitute an Administrative Expense Claim under the Plan and (b) the amount of the DIP Lender Allowed Claim shall be added to the principal balance of the Plan Funder Loan Amount.

*Class 1: Priority Claims.* Class 1 consists of all Priority Claims. The Holders of Allowed Priority Claims are also entitled to be paid in full under a plan of reorganization pursuant to the Bankruptcy Code. As of the date of this Disclosure Statement, the Debtors believe that there will be no Allowed Priority Claims in the Bankruptcy Cases.

The Plan provides that each Holder of an Allowed Priority Claim shall be paid (a) on the Distribution Date, an amount, in Cash, by Reorganized SIDG equal to the Allowed Amount of its Priority Claim in accordance with Section 1129(a)(9)(B) of the Bankruptcy Code, or (b) as otherwise ordered by a Final Order of the Bankruptcy Court. Class 1 is Unimpaired by the Plan. Each Holder of a Priority Claim in Class 1 conclusively is presumed to have accepted the Plan and is not entitled to vote to accept or reject the Plan.

*Class 2: Secured Claims and Other Claims of FirstBank.* Class 2 consists of all of the FirstBank Prepetition Claims. In the FirstBank Proofs of Claim, FirstBank has asserted that, as of the Petition Date, (a) SIDG was indebted to FirstBank in an aggregate amount, including principal, interest, fees, charges and attorneys' fees, of $119,275,858.73 with respect to the FirstBank Prepetition Claims, consisting of a Secured Claim in the amount of $60,640,000.00 and an Unsecured Claim in the amount of $58,635,858.73, (b) SICL was indebted to FirstBank

10

in an aggregate amount, including principal, interest, fees, charges and attorneys' fees, of $3,199,861.18 with respect to the FirstBank Prepetition Claims, all of which is a Secured Claim, and (c) the FirstBank Prepetition Claims were secured by properly perfected Liens on certain real property and personal property of the Debtors located in the British Virgin Islands.

The Plan proposes two (2) alternative treatments of the FirstBank Prepetition Claims:

(i)    The first option ("FirstBank Option A") proposes the treatment of the FirstBank Prepetition Claims as described in the FirstBank February 2014 Term Sheet, which treatment shall be in full and final satisfaction, settlement, release, extinguishment and discharge of the FirstBank Prepetition Claims. The principal terms and conditions of FirstBank Option A are more specifically set forth in Article 5.3.4 of the Plan. FirstBank Option A assumes that (a) FirstBank voluntarily accepts the treatment in Article 5.3.4 or (b) absent such acceptance, in connection with the FirstBank Lender Liability Adversary Proceeding or other contested matters that may be filed (including a motion to strike any Ballot filed by FirstBank rejecting the Plan as being in bad faith pursuant to Section 1126(e) of the Bankruptcy Code), the Bankruptcy Court enters orders compelling FirstBank to accept FirstBank Option A or otherwise deeming FirstBank Option A to have been accepted by FirstBank or to otherwise be an appropriate treatment of the FirstBank Prepetition Claims.

(ii)    The second option ("FirstBank Option B") assumes that FirstBank does not accept the treatment in Article 5.3.4 and that the Bankruptcy Court does not enter the orders described in the last sentence of Article 5.3.3.1. As further set forth in Article 5.3.5 of the Plan, FirstBank Option B proposes that the Collateral of FirstBank be valued and that FirstBank's Allowed Secured Claim be determined by the Bankruptcy Court. FirstBank Option B further proposes that FirstBank will retain its Lien on its Collateral in the amount of the FirstBank Reduced Class 2B Secured Claim and that Reorganized SIDG shall make deferred Cash payments to FirstBank having a value equal to the FirstBank Reduced Class 2B Secured Claim. Any amount that is Allowed to FirstBank in excess of the FirstBank Reduced Class 2B Secured Claim shall be treated as an Unsecured Claim, shall be subordinated to all other Allowed Unsecured Claims, and shall receive the treatment set forth in Article 5.14 of the Plan.

FirstBank Option A. Article 5.3.4 implements the FirstBank February 2014 Term Sheet. The principal terms and conditions of FirstBank Option A are as follows:

(i)    FirstBank shall have an Allowed Secured Claim against Reorganized SIDG in the amount of $37,500,000.00 (the "FirstBank Allowed Class 2A Secured Claim").

(ii)    On the Closing Date, Reorganized SIDG shall make a Cash payment to FirstBank, by wire transfer of immediately available funds, in the amount of $7,500,000.00 (the "FirstBank Down Payment") from the Plan Funder Loan Amount, thereby reducing the FirstBank Allowed Class 2A Secured Claim to the amount of $30,000,000.00 (the "FirstBank Reduced Class 2A Secured Claim").

(iii)    The FirstBank Reduced Class 2A Secured Claim shall be evidenced by a term note (the "<u>FirstBank New Term A Note</u>") in the original principal amount of $30,000,000.00, which shall be made payable to FirstBank and be executed and delivered by Reorganized SIDG on the Closing Date.  The FirstBank New Term A Note shall contain the following terms: (a) a maturity date of five (5) years from the Closing Date, (b) interest shall (i) accrue and be payable on the outstanding principal at a rate of 350 basis points over the 1-month LIBOR Rate (but shall never be less than 4.25% per annum), (ii) be calculated based on a 365 day year, and (iii) be payable monthly in arrears, with the first payment being due one (1) month from the Closing Date, (c) for the first twenty-four (24) months following the Closing Date, Reorganized SIDG shall be required to make monthly payments of interest only and, for the next thirty-six (36) months, Reorganized SIDG shall be required to make monthly payments of principal and interest based on an amortization period of twenty-five (25) years, (d) Reorganized SIDG may prepay the FirstBank New Term A Note, without penalty or premium, at any time, (e) the outstanding principal together with all accrued and unpaid interest shall be due and payable in full on the maturity date, (f) Reorganized SIDG shall be required to make mandatory prepayments under the FirstBank New Term A Note in an amount equal to fifty percent (50%) of any Net Real Estate Sale Proceeds, and (g) from and after an event of defaut under the FirstBank New Term A Note and for so long as such event of default is continuing, the FirstBank New Term A Note shall bear interest at a rate of ten percent (10%) per annum.

(iv)    On the Closing Date, Reorganized SIDG shall make a Cash payment to FirstBank, by wire transfer of immediately available funds, in the amount of $1,275,000.00 from the Plan Funder Loan Amount, which funds shall be used as an interest reserve for the FirstBank New Term A Note (the "<u>FirstBank Initial Interest Reserve Account</u>").  For the first twelve (12) months of the FirstBank New Term A Note, FirstBank shall apply funds from the FirstBank Initial Interest Reserve Account to the monthly interest payments due from Reorganized SIDG under the FirstBank New Term A Note.  On the twelve (12) month anniversary of the FirstBank New Term A Note, Reorganized SIDG shall make an additional Cash payment to FirstBank, by wire transfer of immediately available funds, in an amount equal to the monthly interest payments due from Reorganized SIDG during the second twelve (12) months of the FirstBank New Term A Note (the "<u>FirstBank Additional Interest Reserve Account</u>"), and FirstBank shall apply funds from the FirstBank Additional Interest Reserve Account to the monthly interest payments due from Reorganized SIDG during the second twelve (12) months of the FirstBank New Term A Note.  No interest reserve shall be required for the remaining thirty-six (36) months of the FirstBank New Term A Note.

(v)    The FirstBank New Term A Note shall be secured by a first Lien on all of the Scrub Island Real Estate (subject to the Permitted Liens), all personal property of Reorganized SIDG located in the British Virgin Islands, and all income generated by the operation of the Scrub Island Resort. Reorganized SIDG shall execute any charges, security agreements and other security documents necessary to secure the obligations under the FirstBank New Term A Note (collectively, the "<u>FirstBank New Loan A Security Documents</u>").

(vi)    On the Closing Date, the SIDG Contributing Shareholders shall contribute the Cash sum of $6,000,000.00 (the "SIDG Shareholders Plan Contribution Amount") to Reorganized SIDG, and Reorganized SIDG shall deliver such amount into escrow with FirstBank, by wire transfer of immediately available funds (the "Scrub Island Construction Escrow"). The Scrub Island Construction Escrow shall be used for capital expenditure improvements on Scrub Island (including as necessary to consummate any settlements with the Longview Villa Owners under the Plan or under the Longview Villa Owner Settlement Agreements), and the funds therein shall be advanced to Reorganized SIDG by FirstBank in accordance with a proposed capital expenditures budget prepared by SIDG and approved by FirstBank prior to the Closing. The Scrub Island Construction Escrow shall be governed by the terms of an escrow agreement to be executed by FirstBank and Reorganized SIDG at the Closing (the "FirstBank Construction Escrow Agreement").

(vii)    At the Closing, Reorganized SIDG shall pay FirstBank a closing fee of $300,000.00 from the Plan Funder Loan Amount, by wire transfer of immediately available funds.

(viii)    The price for the sale of any Scrub Island Real Estate must be approved in advance by FirstBank. FirstBank shall release any Liens on any Scrub Island Real Estate at the time of the closing on the sale of such Scrub Island Real Estate.

(ix)    Except as to any obligations under the FirstBank New Loan A Documents, the FirstBank Construction Escrow Agreement, or the Plan, the Debtors and FirstBank and their respective officers, directors, shareholders, employees, agents and attorneys shall be deemed to have released each other, as of the Closing Date, from any and all claims of any nature whatsoever that they have or may have against each other, known or unknown, contingent or otherwise, asserted or unasserted, at law or in equity, as well as any other kind or character of action held, owned or possessed, directly or indirectly. Specifically, the Guarantor shall be deemed to have been released by FirstBank, as of the Closing Date, from any and all claims and obligations under the FirstBank Guaranty.

(x)    FirstBank shall have an Allowed Class 10 Unsecured Claim in the amount of $84,895,719.91 (the "FirstBank Deficiency Claim"). FirstBank shall vote a Ballot accepting the Plan with respect to the FirstBank Deficiency Claim; provided, however, that FirstBank shall not be entitled to any Distribution under the Plan with respect to the FirstBank Deficiency Claim and shall be deemed to have released and waived the FirstBank Deficiency Claim on the Closing Date.

(xi)    All of the FirstBank New Loan A Documents and the FirstBank Construction Escrow Agreement shall be governed by the laws of the British Virgin Islands.

(xii)    At the Closing, FirstBank shall assign and transfer to Reorganized SIDG any and all documents evidencing the Blue Water Traders Loan and the Linares/ Foster

13

Loan. No additional consideration shall be paid to FirstBank by Reorganized SIDG in connection with such assignment and transfer.

(xiii)   FirstBank shall grant to Reorganized SIDG the right of first offer with respect to Unit OV11 (the "ROFO") in the event FirstBank desires or intends to sell Unit OV11 within the consecutive twenty-four (24) month period immediately following the Closing Date (the "ROFO Period"). In such event, FirstBank will provide written notice (the "ROFO Notice") to Reorganized SIDG of FirstBank's desire and intention to sell Unit OV11 and will provide a summary of the material terms upon which FirstBank desires to sell Unit OV11 (the "ROFO Material Sale Terms"). Reorganized SIDG will have thirty (30) days from the date on which the ROFO Notice is delivered to Reorganized SIDG (the "ROFO Exercise Period") to provide written notice to FirstBank of Reorganized SIDG's interest in purchasing Unit OV11 on the terms and conditions described in the ROFO Notice (the "ROFO Interest Notice"). In the event FirstBank does not receive the ROFO Interest Notice prior to the expiration of the ROFO Exercise Period, Reorganized SIDG will be deemed to have waived Reorganized SIDG's right of first offer with respect to the sale of Unit OV11 by FirstBank as provided in Article 5.3.4.13 of the Plan, even if the ROFO Period has not yet expired; provided, however, that if FirstBank desires to thereafter sell Unit OV11 during the ROFO Period for a purchase price less than that set forth in the last ROFO Material Sale Terms delivered to Reorganized SIDG or on other terms materially different from those sent in the last ROFO Material Sale Terms, then FirstBank shall provide Reorganized SIDG with another ROFO Notice setting forth the new material terms upon which FirstBank desires to sell Unit OV11 and Reorganized SIDG shall have a ROFO Exercise Period in which to provide a ROFO Interest Notice. If FirstBank receives a ROFO Interest Notice prior to the expiration of the ROFO Exercise Period, FirstBank agrees to negotiate with Reorganized SIDG in good faith the sale of Unit OV11 to Reorganized SIDG for a period of thirty (30) days following FirstBank's receipt of the ROFO Interest Notice (the "ROFO Negotiation Period"). Upon the expiration of the ROFO Negotiation Period, assuming no written agreement has been entered into by Reorganized SIDG and FirstBank with respect to the sale of Unit OV11 to Reorganized SIDG, FirstBank may proceed to sell Unit OV11 to any other Person, with no further obligation or duty to Reorganized SIDG with respect to the sale of Unit OV11, even if the ROFO Period has not yet expired; provided, however, that if FirstBank desires to thereafter sell Unit OV11 during the ROFO Period for a purchase price less than that set forth in the last ROFO Material Sale Terms delivered to Reorganized SIDG or on other terms materially different from those sent in the last ROFO Material Sale Terms, then FirstBank shall provide Reorganized SIDG with another ROFO Notice setting forth the new material terms upon which FirstBank desires to sell Unit OV11 and  Reorganized SIDG shall have a ROFO Exercise Period in which to provide a ROFO Interest Notice. For the avoidance of doubt, nothing contained in the Plan shall be construed to obligate or require FirstBank to sell Unit OV11. The provisions of Article 5.3.4.13 of the Plan will survive Closing until the rights of Reorganized SIDG expire in accordance with the terms of Article 5.3.4.13 of the Plan.

(xiv)    On the Closing Date, FirstBank shall withdraw the FirstBank Proofs of Claim with prejudice.

(xv)    On or prior to the Closing Date, FirstBank shall dismiss the BVI Receivership Proceeding with prejudice, and shall cause the BVI Receiver to turn over to Reorganized SIDG any Property in the BVI Receiver's possession, custody, or control related to the Debtors or Scrub Island.

(xvi)    Effective as of and subject to the occurrence of the Closing Date, any and all of the FirstBank Prepetition Loan Documents shall be deemed cancelled and void and of no further force and effect.

(xvii)    On or prior to the Closing Date, the Debtors shall dismiss the FirstBank Injunction Adversary Proceeding and the FirstBank Lender Liability Adversary Proceeding with prejudice.

(xviii)    The Closing Date shall occur by no later than ten (10) Business Days following the Effective Date.

(xix)    Upon payment in full pursuant to the terms of the Plan and the FirstBank New Loan A Documents, FirstBank shall release and satisfy its Liens against any and all of Reorganized SIDG's Property and shall return the FirstBank New Loan A Documents to Reorganized SIDG marked "satisfied."

(xx)    To the extent of any inconsistencies between Article 5.3.4 of the Plan and the FirstBank New Loan A Documents or the FirstBank Construction Escrow Agreement, the FirstBank New Loan A Documents or the FirstBank Construction Escrow Agreement, as the case may be, shall control.

FirstBank Option B.    Article 5.3.5 shall apply if the Bankruptcy Court does not confirm the Plan treatment for FirstBank proposed in Article 5.3.4 of the Plan.  The principal terms and conditions of FirstBank Option B are as follows:

(i)    The Bankruptcy Court shall value FirstBank's Collateral in order to determine FirstBank's Allowed Secured Claim for purposes of Confirmation of the Plan (the "FirstBank Allowed Class 2B Secured Claim").  Any amount adjudicated by the Bankruptcy Court to be owed to FirstBank in excess of the value of its Collateral, after consideration of all defenses thereto, shall be treated as an Unsecured Claim, shall be subordinated to all other Allowed Unsecured Claims, and shall receive the treatment set forth in Article 5.14 of the Plan.

(ii)    On the Closing Date, Reorganized SIDG shall make a Cash payment to FirstBank, by wire transfer of immediately available funds, in an amount equal to twenty percent (20%) of the FirstBank Allowed Class 2B Secured Claim, from the Plan Funder Loan Amount.  The reduced FirstBank Allowed Class 2B Secured Claim shall be referred to as the "FirstBank Reduced Class 2B Secured Claim".

15

(iii)    The FirstBank Reduced Class 2B Secured Claim shall be evidenced by a term note (the "FirstBank New Term B Note") in the original principal amount of the FirstBank Reduced Class 2B Secured Claim, which shall be made payable to FirstBank and be executed and delivered by Reorganized SIDG on the Closing Date.  The FirstBank New Term B Note shall contain the following terms: (a) a maturity date of five (5) years from the Closing Date (or such other maturity date as the Bankruptcy Court deems to be fair and equitable), (b) monthly payments of principal and interest shall be made beginning thirty (30) days after the Closing Date, based on an amortization period of thirty (30) years (or such other term as the Bankruptcy Court deems fair and equitable), (c) interest shall accrue and be payable on the outstanding principal at a rate of four and three-quarters percent (4.75%) per annum (or such other rate as the Bankruptcy Court deems to be fair and equitable), (d) Reorganized SIDG may prepay the FirstBank New Term B Note, without penalty or premium, at any time, (e) the outstanding principal together with all accrued and unpaid interest shall be due and payable in full on the maturity date, and (f) Reorganized SIDG shall be required to make mandatory prepayments under the FirstBank New Term B Note in an amount equal to a percentage of any Net Real Estate Sale Proceeds that the Bankruptcy Court deems to be fair and equitable (and FirstBank shall release any Liens on any Scrub Island Real Estate at the time of the closing on the sale of such Scrub Island Real Estate).

(iv)    On the Closing Date, Reorganized SIDG shall make a Cash payment to FirstBank, by wire transfer of immediately available funds, from the Plan Funder Loan Amount, in an amount equal to the total interest payments required to be made for the first twelve (12) months of the FirstBank New Term B Note.  FirstBank shall apply funds from such interest reserve account to the monthly interest payments due from Reorganized SIDG during the first twelve (12) months of the FirstBank New Term B Note.  On the twelve (12) month anniversary of the FirstBank New Term B Note, Reorganized SIDG shall make an additional Cash payment to FirstBank, by wire transfer of immediately available funds, in an amount equal to the total interest payments required to be made for the second twelve (12) months of the FirstBank New Term B Note.  FirstBank shall apply funds from such interest reserve account to the monthly interest payments due from Reorganized SIDG during the second twelve (12) months of the FirstBank New Term B Note.  No interest reserve shall be required for the remaining term of the FirstBank New Term B Note.

(v)    The FirstBank New Term B Note shall be secured by a first Lien on all of the Scrub Island Real Estate (subject to the Permitted Liens), all personal property of Reorganized SIDG located in the British Virgin Islands, and all income generated by the operation of the Scrub Island Resort.  Reorganized SIDG shall execute any charges, security agreements and other security documents necessary to secure the obligations under the FirstBank New Term B Note (collectively, the "FirstBank New Loan B Security Documents").

(vi)    Except as to any obligations under the FirstBank New Loan B Documents or the Plan, the Debtors and FirstBank and their respective officers, directors,

shareholders, employees, agents and attorneys shall be deemed to have released each other, as of the Closing Date, from any and all claims of any nature whatsoever that they have or may have against each other, known or unknown, contingent or otherwise, asserted or unasserted, at law or in equity, as well as any other kind or character of action held, owned or possessed, directly or indirectly.  Specifically, the Guarantor shall be deemed to have been released by FirstBank, as of the Closing Date, from any and all claims and obligations under the FirstBank Guaranty.

(vii)    Reorganized SIDG shall be in default in its obligations to FirstBank under Article 5.3.5 of the Plan upon the occurrence of the following:

a.    a failure to make payments to FirstBank as required by the Plan,

b    a failure to maintain property and casualty insurance in the current amounts or, if such amounts are unavailable, in the highest insurable amount commercially available,

c.    a failure to pay real estate taxes when due,

d.    a failure to provide the following financial reporting: on a quarterly basis, statements of operations within forty-five (45) days of the end of each fiscal quarter, and on an annual basis, statements of operations within sixty (60) days of the end of each calendar year, and

e.    a failure to allow reasonable inspections by FirstBank of the Scrub Island Resort upon reasonable advance notice.

(viii)    Reorganized SIDG shall have sixty (60) days from written notice of default to cure any default.  The Bankruptcy Court shall retain jurisdiction to reopen the Bankruptcy Cases and shall have the exclusive jurisdiction to determine any disputes as to whether a default has occurred and, if so, whether the default was timely cured.  All other covenants and default provisions in the FirstBank Prepetition Loan Documents shall be eliminated from the FirstBank New Loan B Documents.  The FirstBank New Loan B Documents shall contain only those provisions necessary to grant and perfect the Lien of FirstBank and to evidence the loan obligations under Article 5.3.5 of the Plan.

(ix)    Reorganized SIDG agrees to not file a subsequent bankruptcy case in the event of a monetary default that is not timely cured and, if a subsequent bankruptcy case is filed by Reorganized SIDG, FirstBank shall be entitled to relief from stay in connection with that new bankruptcy case.

(x)    Joe C. Collier III shall guaranty Reorganized SIDG's obligations under the FirstBank New Term B Note (the "FirstBank New Guaranty").

(xi)    On or before the Effective Date, the Debtors shall deliver to FirstBank the FirstBank New Loan B Documents containing the modified terms as set forth herein or as

have been determined by the Bankruptcy Court to be fair and equitable. The Bankruptcy Court shall have jurisdiction to determine any disputes regarding the terms of the FirstBank New Loan B Documents. FirstBank and the Debtors shall execute the FirstBank New Loan B Documents as agreed by them or as approved by the Bankruptcy Court.

(xii)    On or prior to the Closing Date, FirstBank shall dismiss the BVI Receivership Proceeding with prejudice, and shall cause the BVI Receiver to turn over to Reorganized SIDG any Property in the BVI Receiver's possession, custody, or control related to the Debtors or Scrub Island.

(xiii)    At the Closing, FirstBank shall assign and transfer to Reorganized SIDG any and all documents evidencing the Blue Water Traders Loan and the Linares/ Foster Loan. The Bankruptcy Court shall determine the amount of any additional consideration to be paid to FirstBank by Reorganized SIDG in connection with such assignment and transfer.

(xiv)    Effective as of and subject to the occurrence of the Closing Date, any and all of the FirstBank Prepetition Loan Documents shall be deemed cancelled and void and of no further force and effect.

(xv)    On or prior to the Closing Date, the Debtors shall dismiss the FirstBank Injunction Adversary Proceeding and the FirstBank Lender Liability Adversary Proceeding with prejudice.

(xvi)    On the Closing Date, the SIDG Contributing Shareholders shall contribute the SIDG Shareholders Plan Contribution Amount to Reorganized SIDG.

(xvii)    The Closing Date shall occur by no later than ten (10) Business Days following the Effective Date.

(xviii)    Upon payment in full pursuant to the terms of the Plan and the FirstBank New Loan B Documents, FirstBank shall release and satisfy its Liens against any and all of Reorganized SIDG's Property and shall return the FirstBank New Loan B Documents to Reorganized SIDG marked "satisfied."

Notwithstanding the above, FirstBank may be paid under such other terms as may be mutually agreed upon by FirstBank and the Debtors or the Reorganized Debtors, as the case may be.

Class 2 is Impaired by the Plan. It is the Debtors' position that the actions of FirstBank as described in the FirstBank Lender Liability Adversary Proceeding will preclude FirstBank from casting a Ballot in good faith. Subject to the Debtors' rights to contest any Ballot cast by FirstBank, FirstBank, as the Holder of the Class 2 Claims, is entitled to vote to accept or reject the Plan.

*Class 3: Secured Tax Claims of Governmental Units.*  Class 3 consists of all Secured Tax Claims of Governmental Units.  As of the date of this Disclosure Statement, the Debtors believe that the only outstanding taxes are those owed to the British Virgin Islands Government in the amount of $36,000.00.    On the Distribution Date, Reorganized SIDG shall pay to a Governmental Unit, in Cash, the Allowed Amount of its Secured Tax Claim.    Class 3 is Unimpaired by the Plan.  Each Holder of a Secured Tax Claim in Class 3 conclusively is presumed to have accepted the Plan and is not entitled to vote to accept or reject the Plan.

*Class 4: Other Secured Claims.*  Class 4 consists of all Secured Claims not otherwise specifically classified in the Plan.  In the event there is more than one Secured Claim in this Class, such Secured Claims shall be separated into subclasses in Class 4.  As of the date of this Disclosure Statement, the Debtors believe that there will be no Secured Claims in Class 4.

Under the Plan, the following shall occur with respect to the Allowed Class 4 Claims:

(i)    On the Effective Date, in accordance with Section 1124 of the Bankruptcy Code, Reorganized SIDG shall (a) cure any defaults (other than defaults relating to the insolvency or the financial condition of the Debtor or its status as Debtor in Possession in the Bankruptcy Cases) of the Debtor under the loan and/or security documents evidencing an Allowed Class 4 Claim that occurred before or after the commencement of the Bankruptcy Cases, and (b) reinstate the maturity of such Allowed Class 4 Claim as such maturity existed under the loan and/or security documents evidencing such Allowed Class 4 Claim, thus leaving unaltered the legal, equitable, and contractual rights to which the Holder of such Allowed Class 4 Claim is entitled to with respect to such Allowed Class 4 Claim.

(ii)    Following the Effective Date, Reorganized SIDG shall continue to perform its obligations under the loan and/or security documents evidencing an Allowed Class 4 Claim, including making any payments required under such loan and/or security documents.

(iii)    Following the Effective Date, Reorganized SIDG's obligations under the loan and/or security documents evidencing an Allowed Class 4 Claim shall continue to be secured by any security interest in the Debtor's Property granted Prepetition to the Holder of such Allowed Class 4 Claim.

(iv)    Any deficiency owing to a Secured Creditor with respect to a Class 4 Claim shall be classified and treated as a Class 10 Unsecured Claim to the extent Allowed by a Final Order of the Bankruptcy Court.

Class 4 is Unimpaired by the Plan.  Each Holder of a Secured Claim in Class 4 conclusively is presumed to have accepted the Plan and is not entitled to vote to accept or reject the Plan.

*Class 5: Unsecured Claims of Blue Water Traders Ltd.*  Class 5 consists of all of the Blue Water Traders Prepetition Claims.

Following extensive negotiations, the Debtors and Blue Water Traders have reached a compromise as to all disputes with respect to the Blue Water Traders Prepetition Claims, including the treatment of the Blue Water Traders Prepetition Claims under the Plan (the "Blue Water Traders Settlement"). The principal terms and conditions of the Blue Water Traders Settlement are as follows:

(i) The Allowed Amount of the Blue Water Traders Prepetition Claims in the Bankruptcy Cases shall be $500,000.00 (the "Blue Water Traders Allowed Class 5 Claim"), and the Blue Water Traders Allowed Class 5 Claim shall be treated as an Unsecured Claim.

(ii) On the Effective Date, Reorganized SIDG shall pay Blue Water Traders and/or Mr. and Mrs. Oscar Juelle, in Cash, the sum of $500,000.00 in full and final satisfaction, settlement, release, extinguishment and discharge of the Blue Water Traders Allowed Class 5 Claim.

(iii) On the Effective Date, the Blue Water Traders Prepetition Contracts shall be deemed terminated in all respects without further action by any party and shall become null and void. Thus, the Blue Water Traders Prepetition Contracts shall be treated as Rejected Contracts under the Plan.

(iv) On the Effective Date, upon receipt of payment of the amount of $500,000.00, Blue Water Traders shall withdraw, with prejudice, the Blue Water Traders Proofs of Claim.

(v) Except for the Blue Water Traders Allowed Class 5 Claim, Blue Water Traders shall have no other Claim of any nature whatsoever (including any rejection damage Claims) against the Debtors.

(vi) On the Effective Date, upon receipt of payment of the amount of $500,000.00, Blue Water Traders shall transfer title to Site LV4 to Reorganized SIDG in accordance with the laws of the British Virgin Islands, free and clear of any and all Liens of any other parties, and Blue Water Traders shall cooperate and execute any documents required to effectuate that transfer.

(vii) Reorganized SIDG shall pay all recording fees, stamp duties, and transfer taxes required to be paid for the transfer of title to Site LV4 from Blue Water Traders to Reorganized SIDG.

(viii) On the Effective Date, Reorganized SIDG shall (a) acquire the Blue Water Traders Loan from FirstBank, and (b) release Blue Water Traders, Oscar Juelle and Maria Cristina Feo Franco from any obligations under the Blue Water Traders Loan.

(ix) During the five (5) year period following the Effective Date, Reorganized SIDG will provide two units of 2-bedroom suites in the Marina Village at no cost to Oscar Juelle or Maria Cristina Feo Franco for a period of four (4) weeks each year

20

(inclusive of a boat slip at the marina), with the weeks to be used in one or two week increments (subject to availability and Scrub Island Resort's normal blackout schedule for holidays) and sixty (60) days prior written notice to be provided by Oscar Juelle. In the event that the four (4) weeks per year are not fully used at the end of any particular year, the residual weeks may be carried over to the following year, provided that all twenty (20) weeks must be used by the end of the five (5) year period.

(x)     On the Effective Date, upon receipt of payment of the amount of $500,000.00, the Debtors and Blue Water Traders (including Oscar Juelle and Maria Cristina Feo Franco) shall exchange full mutual releases as to any claims whatsoever relating to the Blue Water Traders Prepetition Contracts, the Blue Water Traders Proofs of Claim, and Site LV4 (with the release by Blue Water Traders (including Oscar Juelle and Maria Cristina Feo Franco) to also be as to all officers, directors, shareholders, employees, agents and attorneys of the Debtors), subject to any remaining obligations under the Plan.

At or prior to the Confirmation Hearing, the Debtors and Blue Water Traders may enter into a separate settlement agreement incorporating the principal terms of the Blue Water Traders Settlement (the "Blue Water Traders Settlement Agreement").

Class 5 is Impaired by the Plan. Blue Water Traders, as the Holder of the Class 5 Claims, is entitled to vote to accept or reject the Plan.

*Class 6: Unsecured Claims of Pablo L. Dardet.*   Class 6 consists of all of the Dardet Prepetition Claims.

Following extensive negotiations, the Debtors and Dardet have reached a compromise as to all disputes with respect to the Dardet Prepetition Claims, including the treatment of the Dardet Prepetition Claims under the Plan (the "Dardet Settlement"). The principal terms and conditions of the Dardet Settlement are as follows:

(i)     The Allowed Amount of the Dardet Prepetition Claims in the Bankruptcy Cases shall be $1,146,365.27 (the "Dardet Allowed Class 6 Claim"), and the Dardet Allowed Class 6 Claim shall be treated as an Unsecured Claim.

(ii)     On the Effective Date, Reorganized SIDG shall pay Dardet, in Cash, $400,000.00 of the Dardet Allowed Class 6 Claim.

(iii)     On the Effective Date, the Dardet Prepetition Contracts shall be deemed terminated in all respects without further action by any party and shall become null and void. Thus, the Dardet Prepetition Contracts shall be treated as Rejected Contracts under the Plan.

(iv)     Except for the Dardet Allowed Class 6 Claim, Dardet shall have no other Claim of any nature whatsoever (including any rejection damage Claims) against the Debtors.

(v)    On the Effective Date, Dardet shall transfer title to Site LV9 to Reorganized SIDG in accordance with the laws of the British Virgin Islands, free and clear of any and all Liens of any other parties (except for the charge in favor of Dardet as described in Article 5.7.2.6 of the Plan), and Dardet shall cooperate and execute any documents required to effectuate that transfer.

(vi)    On the Effective Date, Reorganized SIDG shall grant, and record in favor of, Dardet a charge over Site LV9 as security for the payment of the remaining balance of the Dardet Allowed Class 6 Claim (i.e., $746,365.27).  Upon payment in full of the Dardet Allowed Class 6 Claim, Dardet shall execute any documents required to release such charge.

(vii)    Reorganized SIDG shall pay for all costs and expenses (including recording fees, stamp duties, and transfer taxes) required to be paid for (a) the transfer of title to Site LV9 from Dardet to Reorganized SIDG and (b) the charge in favor of Dardet.

(viii)    Upon Reorganized SIDG's receipt of title to Site LV9, Reorganized SICL shall pay for, and complete, the construction of a new villa residence on Site LV9.

(ix)    Reorganized SIDG shall market the sale of the new villa and, upon the earlier to occur of the closing of the sale of the new villa or the 24 Month Anniversary Date, Reorganized SIDG shall pay Dardet, in Cash, the remaining balance of the Dardet Allowed Class 6 Claim (i.e., $746,365.27).

(x)    On the Effective Date, the Debtors and Dardet shall exchange full mutual releases as to any claims whatsoever relating to the Dardet Prepetition Contracts, the Dardet Scheduled Claim, and Site LV9 (with the release by Dardet to also be as to all officers, directors, shareholders, employees, agents and attorneys of the Debtors), subject to any remaining obligations under the Plan.

(xi)    The Cash payments to be received by Dardet pursuant to Article 5.7 of the Plan shall be in full and final satisfaction, settlement, release, extinguishment and discharge of the Dardet Allowed Class 6 Claim.

At or prior to the Confirmation Hearing, the Debtors and Dardet may enter into a separate settlement agreement incorporating the principal terms of the Dardet Settlement (the "Dardet Settlement Agreement").

Class 6 is Impaired by the Plan.  Dardet, as the Holder of the Class 6 Claims, is entitled to vote to accept or reject the Plan.

*Class 7: Unsecured Claims of Thomas Frederick.*  Class 7 consists of all of the Frederick Prepetition Claims.  In the Frederick Proof of Claim, Frederick has asserted that, as of the Petition Date, SIDG was indebted to Frederick in the aggregate amount of $528,047.00, all of which was asserted as an Unsecured Claim.  Counsel to Frederick has advised counsel to the Debtors that the Frederick Proof of Claim does not include the cost of the real estate lot for Site LV2, and that the actual amount of the Frederick Prepetition Claims is $728,047.00.  The books

22

and records of the Debtors do not support a Claim for Frederick in the amount of $728,047.00. Thus, the Debtors and Frederick have agreed to exchange information in an attempt to reach an agreement as to the Allowed Amount of the Frederick Prepetition Claims. To the extent that the Debtors and Frederick cannot agree on the Allowed Amount of the Frederick Prepetition Claims, such Allowed Amount shall be determined by a Final Order of the Bankruptcy Court. For purposes of Article 5.8 of the Plan, the Allowed Amount of the Frederick Prepetition Claims as determined as described above shall be defined as the "Frederick Allowed Class 7 Claim".

Under the Plan, Frederick shall receive the following treatment in full and final satisfaction, settlement, release, extinguishment and discharge of the Frederick Allowed Class 7 Claim:

(i)    The Frederick Allowed Class 7 Claim shall be treated as an Unsecured Claim.

(ii)    On the Effective Date, Reorganized SIDG shall pay Frederick, in Cash, $200,000.00 of the Frederick Allowed Class 7 Claim.

(iii)    On the Effective Date, the Frederick Prepetition Contracts shall be deemed terminated in all respects without further action by any party and shall become null and void. Thus, the Frederick Prepetition Contracts shall be treated as Rejected Contracts under the Plan.

(iv)    On the Effective Date, Frederick shall withdraw, with prejudice, the Frederick Proof of Claim.

(v)    Except for the Frederick Allowed Class 7 Claim, Frederick shall have no other Claim of any nature whatsoever (including any rejection damage Claims) against the Debtors.

(vi)    On the Effective Date, Frederick shall transfer title to Site LV2 to Reorganized SIDG in accordance with the laws of the British Virgin Islands, free and clear of any and all Liens of any other parties (except for the charge in favor of Frederick as described in Article 5.8.3.7 of the Plan), and Frederick shall cooperate and execute any documents required to effectuate that transfer.

(vii)    On the Effective Date, Reorganized SIDG shall grant, and record in favor of, Frederick a charge over Site LV2 as security for the payment of the remaining balance of the Frederick Allowed Class 7 Claim (after deducting the $200,000.00 payment described in Article 5.8.3.2 of the Plan). Upon payment in full of the Frederick Allowed Class 7 Claim, Frederick shall execute any documents required to release such charge.

(viii)    Reorganized SIDG shall pay all recording fees, stamp duties, and transfer taxes required to be paid for (a) the transfer of title to Site LV2 from Frederick to Reorganized SIDG and (b) the charge in favor of Frederick.

(ix)    On the Effective Date, the Debtors and Frederick shall exchange full mutual releases as to any claims whatsoever relating to the Frederick Prepetition Contracts, the Frederick Proof of Claim, and Site LV2 (with the release by Frederick to also be as to all officers, directors, shareholders, employees, agents and attorneys of the Debtors), subject to any remaining obligations under the Plan.

(x)    On the 12 Month Anniversary Date, Reorganized SIDG shall pay Frederick, in Cash, one-third (1/3) of the remaining balance of the Frederick Allowed Class 7 Claim (after deducting the $200,000.00 payment described in Article 5.8.3.2 of the Plan).

(xi)    On the 24 Month Anniversary Date, Reorganized SIDG shall pay Frederick, in Cash, one-half (1/2) of the remaining balance of the Frederick Allowed Class 7 Claim (after deducting the $200,000.00 payment described in Article 5.8.3.2 of the Plan and the payment described in Article 5.8.3.10 of the Plan).

(xii)    On the 36 Month Anniversary Date, Reorganized SIDG shall pay Frederick, in Cash, the remaining balance of the Frederick Allowed Class 7 Claim (after deducting the $200,000.00 payment described in Article 5.8.3.2 of the Plan and the payments described in Article 5.8.3.10 of the Plan and Article 5.8.3.11 of the Plan).

At or prior to the Confirmation Hearing, the Debtors and Frederick may enter into a separate settlement agreement incorporating the principal terms of the Frederick Settlement (the "Frederick Settlement Agreement").

Class 7 is Impaired by the Plan. Frederick, as the Holder of the Class 7 Claims, is entitled to vote to accept or reject the Plan.

*Class 8: Unsecured Claims of Arturo Linares, David Foster, and Scrub Island, LLC.* Class 8 consists of all of the Linares/Foster Prepetition Claims.

Following extensive negotiations, the Debtors and Linares/Foster have reached a compromise as to all disputes with respect to the Linares/Foster Prepetition Claims, including the treatment of the Linares/Foster Prepetition Claims under the Plan (the "Linares/Foster Settlement"). The principal terms and conditions of the Linares/Foster Settlement are as follows:

(i)    The Allowed Amount of the Linares/Foster Prepetition Claims in the Bankruptcy Cases shall be $600,000.00 (the "Linares/Foster Allowed Class 8 Claim"), and the Linares/Foster Allowed Class 8 Claim shall be treated as an Unsecured Claim.

(ii)    On the Effective Date, Reorganized SIDG shall pay Linares/Foster, in Cash, the sum of $600,000.00 in full and final satisfaction, settlement, release, extinguishment and discharge of the Linares/Foster Allowed Class 8 Claim.

(iii)    On the Effective Date, the Linares/Foster Prepetition Contracts shall be deemed terminated in all respects without further action by any party and shall become

null and void. Thus, the Linares/Foster Prepetition Contracts shall be treated as Rejected Contracts under the Plan.

(iv)     On the Effective Date, Linares/Foster shall withdraw, with prejudice, the Linares/Foster Proofs of Claim.

(v)     Except for the Linares/Foster Allowed Class 8 Claim, Linares/Foster shall have no other Claim of any nature whatsoever (including any rejection damage Claims) against the Debtors.

(vi)     On the Effective Date, Linares/Foster shall transfer title to Site LV5 to Reorganized SIDG in accordance with the laws of the British Virgin Islands, free and clear of any and all Liens of any other parties, and Linares/Foster shall cooperate and execute any documents required to effectuate that transfer.

(vii)     Reorganized SIDG shall pay all recording fees, stamp duties, and transfer taxes required to be paid for the transfer of title to Site LV5 from Linares/Foster to Reorganized SIDG.

(viii)     On the Effective Date, Reorganized SIDG shall (a) acquire the Linares/Foster Loan from FirstBank Virgin Islands, (b) release Linares/Foster from any obligations under the Linares/Foster Loan, and (c) obtain the release of any delinquent credit report by FirstBank Virgin Islands as to Linares/Foster.

(ix)     During the five (5) year period following the Effective Date, Reorganized SIDG shall provide one 3-bedroom villa to Linares/Foster for a period of four (4) weeks each year, with the weeks to be used in one or two week increments (subject to availability and Scrub Island Resort's normal blackout schedule for holidays) and sixty (60) days prior written notice to be provided by Linares/Foster.

(x)     On the Effective Date, the Debtors and Linares/Foster shall exchange full mutual releases as to any claims whatsoever relating to the Linares/Foster Loan, the Linares/Foster Prepetition Contracts, the Linares/Foster Proofs of Claim, and Site LV5, with the release by Linares/Foster to also be as to all officers, directors, shareholders, employees, agents and attorneys of the Debtors), subject to any remaining obligations under the Plan.

At or prior to the Confirmation Hearing, the Debtors and Linares/Foster may enter into a separate settlement agreement incorporating the principal terms of the Linares/Foster Settlement (the "Linares/Foster Settlement Agreement").

Class 8 is Impaired by the Plan. Linares/Foster, as the Holder of the Class 8 Claims, are entitled to vote to accept or reject the Plan.

*Class 9: Unsecured Claims of Oscar Rivera and Anabel Rivera.* Class 9 consists of all of the Rivera Prepetition Claims.

Following extensive negotiations, the Debtors and Rivera have reached a compromise as to all disputes with respect to the Rivera Prepetition Claims, including the treatment of the Rivera Prepetition Claims under the Plan (the "Rivera Settlement").  The principal terms and conditions of the Rivera Settlement are as follows:

(i)    The Allowed Amount of the Rivera Prepetition Claims in the Bankruptcy Cases shall be $1,846,721.50 (the "Rivera Allowed Class 9 Claim"), and the Rivera Allowed Class 9 Claim shall be treated as an Unsecured Claim.

(ii)    On the Effective Date, Reorganized SIDG shall pay Rivera, in Cash, $450,000.00 of the Rivera Allowed Class 9 Claim.

(iii)    On the Effective Date, the Rivera Prepetition Contracts shall be deemed terminated in all respects without further action by any party and shall become null and void.  Thus, the Rivera Prepetition Contracts shall be treated as Rejected Contracts under the Plan.

(iv)    On the Effective Date, Rivera shall withdraw, with prejudice, the Rivera Proof of Claim.

(v)    Except for the Rivera Allowed Class 9 Claim, Rivera shall have no other Claim of any nature whatsoever (including any rejection damage Claims) against the Debtors.

(vi)    On the Effective Date, Oscar Rivera shall transfer title to Site LVII-4 to Reorganized SIDG in accordance with the laws of the British Virgin Islands, free and clear of any and all Liens of any other parties (except for the charge in favor of Rivera as described in Article 5.10.2.7 of the Plan), and Oscar Rivera shall cooperate and execute any documents required to effectuate that transfer.

(vii)    On the Effective Date, Reorganized SIDG shall grant, and record in favor of, Rivera a charge over Site LVII-4 as security for the payment of the remaining balance of the Rivera Allowed Class 9 Claim (i.e., $1,396,721.50).  Upon payment in full of the Rivera Allowed Class 9 Claim, Rivera shall execute any documents required to release such charge.

(viii)    Reorganized SIDG shall pay all recording fees, stamp duties, and transfer taxes required to be paid for (a) the transfer of title to Site LVII-4 from Oscar Rivera to Reorganized SIDG and (b) the charge in favor of Rivera.

(ix)    Upon Reorganized SIDG's receipt of title to Site LVII-4, Reorganized SICL shall pay for, and complete, the construction of a new villa residence on Site LVII-4.

(x)    Reorganized SIDG shall market the sale of the new villa and, upon the earlier to occur of the closing of the sale of the new villa or the 24 Month Anniversary

Date, Reorganized SIDG shall pay Rivera, in Cash, the remaining balance of the Rivera Allowed Class 9 Claim (i.e., $1,396,721.50).

(xi)     On the Effective Date, the Debtors and Rivera shall exchange full mutual releases as to any claims whatsoever relating to the Rivera Prepetition Contracts, the Rivera Proof of Claim, and Site LVII-4 (with the release by Rivera to also be as to all officers, directors, shareholders, employees, agents and attorneys of the Debtors), subject to any remaining obligations under the Plan.

(xii)    The Cash payments to be received by Rivera pursuant to Article 5.10 of the Plan shall be in full and final satisfaction, settlement, release, extinguishment and discharge of the Rivera Allowed Class 9 Claim.

At or prior to the Confirmation Hearing, the Debtors and Rivera may enter into a separate settlement agreement incorporating the principal terms of the Rivera Settlement (the "Rivera Settlement Agreement").

Class 9 is Impaired by the Plan. Rivera, as the Holder of the Class 9 Claims, is entitled to vote to accept or reject the Plan.

*Class 10: Unsecured Claims (Unsecured Claims Not Otherwise Classified).* Class 11 consists of all Unsecured Claims not otherwise classified in the Plan. As of the date of this Disclosure Statement, the Debtors estimate that the total amount of Allowed Unsecured Claims in Class 10 will be approximately $800,000.00 (excluding (a) any Unsecured Claims of Marriott, (b) any Unsecured Claims separately classified in the Plan, (c) the Mainsail Claims, (d) the SIDG Shareholder Claims, and (e) any Unsecured Claim of the SIU Entities for future capital fees due from SIDG).

Under the Plan, each Holder of an Allowed Unsecured Claim in Class 10 will receive Distributions, in Cash, over a five (5) year period from Reorganized SIDG in an amount equal to one hundred percent (100%) of such Holder's Allowed Class 10 Unsecured Claim. The payment to each Holder of an Allowed Class 10 Unsecured Claim shall be made on each anniversary of the Effective Date, with each such annual payment to be in an amount equal to twenty percent (20%) of such Holder's Allowed Class 10 Unsecured Claim.

Notwithstanding anything to the contrary contained in the Plan, no Distributions shall be made under the Plan as to the Mainsail Claims or the SIDG Shareholder Claims until the Plan Funder Loan Amount has been paid in full, at which time Reorganized SIDG shall pay the Mainsail Claims and the SIDG Shareholder Claims in full (or the same percentage thereof that will have then been paid to Holders of Class 10 Allowed Unsecured Claims).

Class 10 is Impaired by the Plan. Each Holder of an Unsecured Claim in Class 10 is entitled to vote to accept or reject the Plan.

*Class 11: Unsecured Claims of the SIU Entities.* Class 11 consists of all of the SIU Entities Claims. In the SIU Entities Proof of Claim, SIU has asserted that, as of the Petition

Date, SIDG was indebted to SIU in the aggregate amount of $1,553,068.93 with respect to the SIU Entities Prepetition Contracts, all of which was asserted as an Unsecured Claim. Upon information and belief, the aggregate amount of the Claim asserted by SIU in the SIU Entities Proof of Claim includes (a) future SIU Systems Capital Fees due to SIU under the SIU Entities Prepetition Contracts, and (b) the SIU Entities Prepetition Arrearages.

Under the Plan, the SIU Entities shall receive the following treatment in full and final satisfaction, settlement, release, extinguishment and discharge of the SIU Entities Claims:

(i)     Prior to the Confirmation Hearing, SIDG or its affiliate shall exercise the SIU Systems Purchase Option. At the time of the SIU Systems Purchase Option Closing, SIDG or its affiliate shall pay the SIU Systems Purchase Option Price to SIU, by wire transfer of immediately available funds. At least ten (10) days prior to the SIU Systems Purchase Option Closing, SIU shall deliver to SIDG a detailed written calculation of the SIU Systems Purchase Option Price. To the extent that SIU and SIDG cannot agree on the amount of the SIU Systems Purchase Option Price, such amount shall be determined by a Final Order of the Bankruptcy Court. Even though SIDG or its affiliate has the absolute right to purchase the SIU Systems under the terms of Article 6.1 of that certain Water Supply and Wastewater Treatment Agreement, dated December 20, 2006, by and between SIDG and TSG Water Resources, Inc., SIDG, in its sole and absolute discretion, reserves the right to file a motion with the Bankruptcy Court to seek approval of the exercise of the SIU Systems Purchase Option.

(ii)    In accordance with the terms of the SIU Entities Prepetition Contracts, SIU shall, upon receipt of the SIU Systems Purchase Option Price, (a) transfer title to the SIU Systems to SIDG or its affiliate in "as is, where is" condition free and clear of all Liens, and (b) perform the other obligations of SIU set forth in the SIU Entities Prepetition Contracts in connection with such transfer of title. At the SIU Systems Purchase Option Closing, SIU shall execute and deliver any and all documents as reasonably requested by SIDG or its affiliate to assure that all rights, title and interests in and to the SIU Systems have been sold, assigned and transferred to SIDG or its affiliate.

(iii)   In accordance with the terms of the SIU Entities Prepetition Contracts, the SIU Entities Prepetition Contracts shall terminate at the time of the SIU Systems Purchase Option Closing. In this regard, SIU shall not be entitled to the payment of any further fees as described in Article 5.2 of that certain Water Supply and Wastewater Treatment Agreement, dated December 20, 2006, by and between SIDG and TSG Water Resources, Inc.

(iv)    Except as to any obligations under the Plan, the Debtors and the SIU Entities and their respective officers, directors, shareholders, employees, agents and attorneys shall be deemed to have released each other, as of the SIU Systems Purchase Option Closing, from any and all claims of any nature whatsoever that they have or may have against each other, known or unknown, contingent or otherwise, asserted or unasserted, at law or in equity, as well as any other kind or character of action held, owned or possessed, directly or indirectly. Specifically, Joe C. Collier III shall be

deemed to have been released by the SIU Entities, as of the SIU Systems Purchase Option Closing, from any and all Claims and obligations under the SIU Entities Prepetition Contracts and the SIU Systems Purchase Agreement, including any guaranties for any obligations thereunder.

(v)     SIU shall have an Allowed Class 10 Unsecured Claim in the amount of the SIU Prepetition Arrearages less any portion thereof determined by the Bankruptcy Court to comprise part of the SIU Systems Purchase Option Price (the "SIU Entities Unsecured Claim Balance").  To the extent that SIU and SIDG cannot agree on the amount of the SIU Entities Unsecured Claim Balance, such amount shall be determined by a Final Order of the Bankruptcy Court.

(vi)    The SIU Systems Purchase Agreement shall be treated as a Rejected Contract under the Plan.  SIU shall have no Allowed Claims (including any rejection damage Claims) against the Debtors in the Bankruptcy Cases with respect to the SIU Systems Purchase Agreement.

Class 11 is Unimpaired by the Plan, as the provisions of Article 5.12 of the Plan leave unaltered all of the legal, equitable and contractual rights of the SIU Entities under the SIU Prepetition Contracts in accordance with Section 1124 of the Bankruptcy Code.  The SIU Entities, as the Holders of the Class 11 Claims, conclusively are presumed to have accepted the Plan and are not entitled to vote to accept or reject the Plan.

*Class 12: Unsecured Claims of Alf Nolan Davis d/b/a A. N. Davis Plumbing and Electrical Services.*  Class 12 consists consists of all of the Davis Prepetition Claims.  In the Davis Proofs of Claim, Davis has asserted that, as of the Petition Date, SIDG was indebted to Davis in the aggregate amount of $678,618.18, all of which was asserted as an Unsecured Claim.

Following extensive negotiations, the Debtors and Davis have reached a compromise as to all disputes with respect to the Davis Prepetition Claims, including the treatment of the Davis Prepetition Claims under the Plan (the "Davis Settlement").  The principal terms and conditions of the Davis Settlement are as follows:

(i)     The Allowed Amount of the Davis Prepetition Claims in the Bankruptcy Cases shall be $550,000.00 (the "Davis Allowed Class 12 Claim"), and the Davis Allowed Class 12 Claim shall be treated as an Unsecured Claim.

(ii)    On the 1 Month Anniversary Date, Reorganized SIDG shall pay Davis, in Cash, $150,000.00 of the Davis Allowed Class 12 Claim and the sum of $12,000.00 for Davis' costs to prosecute the Davis Prepetition Claims.

(iii)   On the Effective Date, Davis shall withdraw, with prejudice, the Davis Proofs of Claim and dismiss the Davis BVI Proceeding with prejudice.

(iv)    Except for the Davis Allowed Class 12 Claim, Davis shall have no other Claim of any nature whatsoever against the Debtors.

(v)    On the Effective Date, the Debtors and Davis shall exchange full mutual releases as to any claims whatsoever relating to the Davis Prepetition Claims (with the release by Davis to also be as to all officers, directors, shareholders, employees, agents and attorneys of the Debtors), subject to any remaining obligations under the Plan.

(vi)    Reorganized SIDG shall pay Davis, in Cash, the remaining balance of the Davis Allowed Class 12 Claim (i.e., $400,000.00) over a three (3) year period.  Such payments shall be made on a quarterly basis, with the first quarterly payment to be made three (3) months after the 1 Month Anniversary Date.

(vii)    The Cash payments to be received by Davis pursuant to Article 5.13 of the Plan shall be in full and final satisfaction, settlement, release, extinguishment and discharge of the Davis Allowed Class 12 Claim.

At or prior to the Confirmation Hearing, the Debtors and Davis may enter into a separate settlement agreement incorporating the principal terms of the Davis Settlement (the "Davis Settlement Agreement").  SIDG, in its sole and absolute discretion, reserves the right to file a motion with the Bankruptcy Court to seek approval of the compromise with Davis as provided in Article 5.13 of the Plan.

Class 12 is Impaired by the Plan.  Davis, as the Holders of the Class 12 Claims, is entitled to vote to accept or reject the Plan.

*Class 13: Subordinated Unsecured Claims of FirstBank.*  Class 13 consists consists of any Allowed Unsecured Claim of FirstBank under FirstBank Option B.

It is the Debtors' position that FirstBank should not have an Allowed Unsecured Claim for any deficiency under FirstBank Option B.  It is also the Debtors' position that any Unsecured Claim of FirstBank must be subordinated to all other Claims.  The inclusion of Article 5.14 of the Plan is without prejudice to the Debtors' rights to disallow or subordinate FirstBank's asserted Unsecured Claim under FirstBank Option B.

On account of any Allowed Unsecured Claim of FirstBank under FirstBank Option B, FirstBank shall receive a promissory note in the amount of $500,000 payable on the later of five (5) years from the Effective Date or after payment of all other Allowed Unsecured Claims in accordance with the Plan.

Class 13 is Impaired by the Plan.  It is the Debtors' position that the actions of FirstBank as described in the FirstBank Lender Liability Adversary Proceeding will preclude FirstBank from casting a Ballot in good faith.  Subject to the Debtors' rights to contest any Ballot cast by FirstBank, FirstBank, as the Holder of the Class 13 Claims, is entitled to vote to accept or reject the Plan.

*Class 14: Intercompany Claims.*  Class 14 consists of all Intercompany Claims..  On the Effective Date, all of the Intercompany Claims shall be deemed cancelled, annulled and

extinguished without any further action by any party and shall be of no further force and effect. The Holders of the Class 14 Intercompany Claims will not receive or retain any Property under the Plan on account of such Intercompany Claims. Accordingly, the Reorganized Debtors will not make any Distribution or establish any reserve under the Plan for the Intercompany Claims. Class 14 is Impaired by the Plan. Pursuant to Section 1126(g) of the Bankruptcy Code, Class 14 is deemed not to have accepted the Plan and, thus, Holders of the Class 14 Intercompany Claims are not entitled to vote to accept or reject the Plan.

*Class 15: SIDG Equity Interests.*  Class 15 consists of all of the SIDG Equity Interests. On the Effective Date, all of the Class 15 Equity Interests shall be deemed cancelled, annulled, extinguished and surrendered without any further action by any party and shall be of no further force and effect. The Holders of the Class 15 Equity Interests will not receive or retain any Property or equity interest under the Plan on account of the Class 15 Equity Interests. Accordingly, Reorganized SIDG will not make any Distribution or establish any reserve under the Plan for the Class 15 Equity Interests. Class 15 is Impaired by the Plan. Pursuant to Section 1126(g) of the Bankruptcy Code, Class 15 is deemed not to have accepted the Plan and, thus, the Holders of the Class 15 Equity Interests are not entitled to vote to accept or reject the Plan.

*Class 16: SICL Equity Interests.*  Class 16 consists of all of the SICL Equity Interests. On the Effective Date, all of the Class 16 Equity Interests shall be deemed cancelled, annulled, extinguished and surrendered without any further action by any party and shall be of no further force and effect. The Holders of the Class 16 Equity Interests will not receive or retain any Property or equity interest under the Plan on account of the Class 16 Equity Interests. Accordingly, Reorganized SICL will not make any Distribution or establish any reserve under the Plan for the Class 16 Equity Interests. Class 16 is Impaired by the Plan. Pursuant to Section 1126(g) of the Bankruptcy Code, Class 16 is deemed not to have accepted the Plan and, thus, the Holders of the Class 16 Equity Interests are not entitled to vote to accept or reject the Plan.

**Conditions Precedent to Confirmation of the Plan and the Effective Date**

*Conditions Precedent to Confirmation of the Plan.*  The following are conditions precedent to Confirmation of the Plan, each of which may be waived by the Debtors:  (i) each Plan Document shall be in form and substance acceptable to the Debtors; and (ii) the Bankruptcy Court shall have made such findings and determinations regarding the Plan as shall enable the entry of the Confirmation Order in a manner consistent with the provisions of the Plan.

*Conditions Precedent to the Effective Date.*  The Plan shall not be consummated and the Effective Date shall not occur unless each of the following conditions has been satisfied following the Confirmation Date or waived by the Debtors: (i) the Confirmation Order shall be a Final Order; (ii) all conditions precedent to the Closing under the Plan Funder Loan Agreement shall have been satisfied or waived in accordance with the terms thereof, and the Plan Funder Loan Amount shall have been deposited into escrow with Bankruptcy Counsel; (iii) all conditions precedent to the Closing under the FirstBank New Loan A Documents (or, if applicable, the FirstBank New Loan B Documents) shall have been satisfied or waived in accordance with the terms thereof; (iv) all conditions precedent to the Closing with the Longview Villa Owners under the Plan or under the Longview Villa Owner Settlement Agreements shall

31

have been satisfied or waived in accordance with the terms thereof; and (v) the SIDG Shareholders Plan Contribution Amount shall have been deposited into escrow with Bankruptcy Counsel.

*Notice of the Effective Date.* Promptly following the satisfaction, or the waiver by the Debtors, of all of the conditions set forth in <u>Article 10.2</u> of the Plan, the Debtors shall file a notice (the "<u>Effective Date Notice</u>") with the Bankruptcy Court designating the Effective Date. The Debtors shall serve the Effective Date Notice on all Creditors of, and Holders of Equity Interests in, the Debtors.

**Effective Date Actions**

Subject to the approval of the Bankruptcy Court and the satisfaction or waiver of the conditions precedent to the occurrence of the Effective Date contained in <u>Article 10.2</u> of the Plan, on, as of, or as soon as practicable after the Effective Date, as the case may be, the Plan shall be implemented and the following shall occur: (i) the Closing shall occur under the Plan Funder Loan Agreement; (ii) the Closing shall occur under the FirstBank New Loan A Documents (or, if applicable, the FirstBank New Loan B Documents); (iii) the Closing shall occur with the Longview Villa Owners under the Plan or under each of the Longview Villa Owner Settlement Agreements; (iv) the Class 15 Equity Interests and the Class 16 Equity Interests shall automatically be deemed cancelled, annulled, waived, and extinguished without any further action by any party and shall be of no further force and effect; (v) Reorganized SIDG shall issue and distribute the Reorganized SIDG Shares to the Plan Funder; (vi) Reorganized SIDG shall be issued the Reorganized SICL Shares; (vii) Reorganized SIDG shall make the Initial Distribution as provided in <u>Article 9.1</u> of the Plan; (viii) the Class 14 Intercompany Claims shall automatically be deemed cancelled, annulled, waived, and extinguished without any further action by any party and shall be of no further force and effect; (ix) the Creditors Committee shall cease to exist; (x) the Reorganized Debtors shall be automatically substituted for the Debtors as a party to all contested matters, adversary proceedings, administrative proceedings and lawsuits, both within and outside of the Bankruptcy Court, involving the Debtor's Properties, Claims against the Debtors, the Causes of Action, and the resolution of Disputed Claims; and (xi) the Reorganized Debtors shall carry out their other Effective Date responsibilities under the Plan, including the execution and delivery of all documentation contemplated by the Plan and the Plan Documents.

**Treatment of Executory Contracts and Unexpired Leases**

*Assumption or Rejection of Executory Contracts and Unexpired Leases.* Pursuant to Sections 365(a) and 1123(b)(2) of the Bankruptcy Code, all executory contracts and unexpired leases that currently exist between the Debtors and another Person or Entity and listed on <u>Exhibit A</u> attached to the Plan (collectively, the "<u>Assumed Contracts</u>") shall be deemed assumed by the Debtors as of the Closing Date; provided, however, that the Debtors reserve the right, in their sole discretion, on or prior to the Confirmation Date, to amend <u>Exhibit A</u> to add any executory contract or unexpired lease thereto or to delete any executory contract or unexpired lease therefrom, in which event such executory contract(s) or unexpired lease(s) shall be deemed to be assumed (if added) or rejected (if deleted). The Debtors shall provide notice of any amendments

to <u>Exhibit A</u> to the parties to the executory contracts and unexpired leases affected thereby. The listing of a document on <u>Exhibit A</u> shall not constitute an admission by the Debtors that such document is an executory contract or an unexpired lease or that the Debtors have any liability thereunder. Any other executory contract or unexpired lease that exists between the Debtors and another Person or Entity and not listed on <u>Exhibit A</u> and that has not been expressly assumed or rejected by the Debtors with the Bankruptcy Court's approval on or prior to the Confirmation Date shall be deemed rejected by the Debtors as of the Confirmation Date, including any executory contract or unexpired lease (i) that has been rejected pursuant to an order of the Bankruptcy Court entered prior to the Effective Date, (ii) as to which a motion for approval of the rejection of such executory contract or unexpired lease has been filed and served prior to the Effective Date, or (iii) that is specifically listed on <u>Exhibit E</u> attached to the Plan (all of the foregoing, collectively, the "<u>Rejected Contracts</u>"). For purposes of the Plan, (i) all non-compete agreements, confidentiality or non-disclosure agreements and indemnification agreements executed for the benefit of the Debtors shall be deemed to be executory contracts and Assumed Contracts (even if not listed on <u>Exhibit A</u> to the Plan), and (ii) all non-compete agreements, confidentiality or non-disclosure agreements, indemnification agreements and guaranties executed by the Debtors for the benefit of a third party shall be deemed to be executory contracts and Rejected Contracts (even if not listed on <u>Exhibit E</u> to the Plan).

*Approval of Assumption or Rejection of Executory Contracts and Unexpired Leases.* Entry of the Confirmation Order shall, subject to and upon the occurrence of the Effective Date, constitute (i) the approval, pursuant to Sections 365(a) and 1123(b)(2) of the Bankruptcy Code, of the assumption of the executory contracts and unexpired leases assumed pursuant to <u>Article 7.1</u> of the Plan, (ii) the approval, pursuant to Sections 365(a) and 1123(b)(2) of the Bankruptcy Code, of the rejection of the executory contracts and unexpired leases rejected pursuant to <u>Article 7.1</u> of the Plan, and (iii) the extension of time, pursuant to Section 365(d)(4) of the Bankruptcy Code, within which the Debtors may assume, assume and assign, or reject any unexpired lease of nonresidential real property through the date of entry of an order approving the assumption, assumption and assignment, or rejection of such unexpired lease. The assumption by the Debtors of an Assumed Contract shall be binding upon any and all parties to such Assumed Contract as a matter of law, and each such Assumed Contract shall be fully enforceable by the Reorganized Debtors in accordance with its terms, except as modified by the provisions of the Plan or an order of the Bankruptcy Court.

*Inclusiveness.* Unless otherwise specified on <u>Exhibit A</u> to the Plan, each executory contract and unexpired lease listed or to be listed on <u>Exhibit A</u> to the Plan shall include all modifications, amendments, supplements, restatements, or other agreements made directly or indirectly by any agreement, instrument, or other document that in any manner affect such executory contract or unexpired lease, without regard to whether such agreement, instrument or other document is listed on <u>Exhibit A</u> to the Plan.

*Cure of Defaults.* Any lessor or other party to an Assumed Contract (except those lessors or other parties whose unexpired leases or executory contracts have been previously assumed by a Final Order of the Bankruptcy Court) asserting a Cure Claim in connection with the assumption of any unexpired lease or executory contract under <u>Article 7.1</u> of the Plan, as contemplated by Section 365(b) of the Bankruptcy Code, must file such Cure Claim with the

Bankruptcy Court on or before the Cure Claim Submission Deadline asserting all alleged amounts accrued or alleged defaults through the Cure Claim Submission Deadline. Any lessor or other party to an Assumed Contract failing to file a Cure Claim by the Cure Claim Submission Deadline shall be forever barred from asserting, collecting or seeking to collect any amounts or defaults relating thereto against the Debtors or the Reorganized Debtors. Reorganized SIDG shall have ninety (90) days from the Effective Date to file an objection to any Cure Claim. Any disputed Cure Claims shall be resolved either consensually or by the Bankruptcy Court. Except as may otherwise be agreed to by the parties, by no later than one hundred twenty (120) days following the Effective Date, Reorganized SIDG shall cure any and all undisputed Cure Claims; provided, however, that, in accordance with the Marriott Motion and the Marriott Order and by agreement of Marriott and the Debtors, Reorganized SIDG shall pay the Marriott Allowed Cure Claim in full by no later than the 1 Month Anniversary Date. All disputed Cure Claims shall be cured either within one hundred twenty (120) days after the entry of a Final Order determining the amount, if any, of the Debtors' liability with respect thereto or as may otherwise be agreed to by the parties. As of the date of this Disclosure Statement, the Debtors believe that the only Cure Claim that will be filed with the Bankruptcy Court will be a Cure Claim of Marriott in the amount of $221,274.23.

*Claims under Rejected Executory Contracts and Unexpired Leases.* Unless otherwise ordered by the Bankruptcy Court, any Claim for damages arising by reason of the rejection of any executory contract or unexpired lease must be filed with the Bankruptcy Court on or before the Bar Date for rejection damage Claims in respect of such rejected executory contract or unexpired lease or such Claim shall be forever barred and unenforceable against the Debtors or the Reorganized Debtors. With respect to the Rejected Contracts, the Bar Date for filing rejection damage and other Claims with the Bankruptcy Court shall be thirty (30) days after the Confirmation Date. The Plan and any other order of the Bankruptcy Court providing for the rejection of an executory contract or unexpired lease shall constitute adequate and sufficient notice to Persons or Entities which may assert a Claim for damages from the rejection of an executory contract or unexpired lease of the Bar Date for filing a Claim in connection therewith. All Claims for damages from the rejection of an executory contract or unexpired lease, once fixed and liquidated by the Bankruptcy Court and determined to be Allowed Claims, shall be Allowed Unsecured Claims in Class 10.

*Insurance Policies.* All of the Debtors' insurance policies and any agreements, documents, or instruments relating thereto are treated as executory contracts under the Plan. Nothing contained in the Plan shall constitute or be deemed a waiver of any Cause of Action that the Debtors or the Reorganized Debtors may hold against any Person or Entity, including the insurers under any of the Debtors' insurance policies.

**Vesting of Property of the Estates in the Reorganized Debtors**

On the Effective Date, and except as otherwise expressly provided in the Plan, all Property of the Estates (including the Causes of Action and any net operating losses) shall vest in the Reorganized Debtors free and clear of any and all Liens, Debts, obligations, Claims, Cure Claims, Liabilities, Equity Interests, and all other interests of every kind and nature except the Permitted Liens, and the Confirmation Order shall so provide. The Reorganized Debtors intend

to preserve net operating losses to the maximum extent permitted under applicable law. As of the Effective Date, the Reorganized Debtors may operate their businesses and use, acquire, and dispose of their Properties, free of any restrictions of the Bankruptcy Code or the Bankruptcy Rules, other than those restrictions expressly imposed by the Plan and the Confirmation Order. All privileges with respect to the Property of the Debtors' Estates, including the attorney/client privilege, to which the Debtors are entitled shall automatically vest in, and may be asserted by or waived on behalf of, the Reorganized Debtors.

**Continued Corporate Existence; Issuance of Reorganized SICL Shares**

Each of the Debtors will continue to exist after the Effective Date as a separate corporate entity, with all of the powers of a corporation under the laws of the British Virgin Islands and pursuant to its applicable corporate governance documents in effect prior to the Effective Date, except to the extent such corporate governance documents are amended or amended and restated as provided in the Plan or the Confirmation Order, without prejudice to any right to terminate such existence (whether by merger, dissolution or otherwise) under applicable law after the Effective Date. On the Closing Date, all of the Reorganized SICL Shares shall be issued to Reorganized SIDG. The Confirmation Order shall contain language authorizing such issuance of the Reorganized SICL Shares.

**Boards of Directors and Executive Officers of the Reorganized Debtors**

Subject to any requirement of Bankruptcy Court approval pursuant to Section 1129(a)(5) of the Bankruptcy Code, and subject further to any agreement with the Plan Funder, as of the Effective Date, the executive officers and directors of the Debtors immediately prior to the Effective Date shall be deemed to be the executive officers and directors of the Reorganized Debtors without any further action by any party. On and after the Effective Date, the operations of each of the Reorganized Debtors shall continue to be the responsibility of its Board of Directors. Each director of each of the Reorganized Debtors shall serve from and after the Effective Date until his or her successor is duly elected or appointed and qualified or until his or her earlier death, resignation or removal in accordance with the applicable corporate governance documents of such Reorganized Debtor. Each executive officer of each of the Reorganized Debtors shall serve from and after the Effective Date until his or her successor is duly appointed and qualified or until his or her earlier death, resignation or removal in accordance with the applicable corporate governance documents of such Reorganized Debtor. From and after the Confirmation Date, the directors and executive officers of each of the Debtors and the Reorganized Debtors, as the case may be, shall have all powers accorded by law to put into effect and carry out the Plan and the Confirmation Order.

**Discharge, Exculpation from Liability, Release and General Injunction Provisions under the Plan**

Article 11 of the Plan contains detailed discharge, exculpation from liability, release and injunction provisions for the benefit of the Debtors, the Reorganized Debtors and other parties. In addition, the Plan provides for the complete and unconditional discharge, to the fullest extent permitted by law, of any and all Debts and Claims of any nature whatsoever against the Debtors

or the Reorganized Debtors that arose on or before the Effective Date. Each holder of a Claim against or Equity Interest in the Debtors is encouraged to read Article 11 of the Plan in its entirety. Set forth below is a summary of these provisions.

*Discharge of Claims.* Except as otherwise expressly provided in the Plan or in the Confirmation Order, the Confirmation Order shall operate as a discharge, pursuant to Section 1141(d) of the Bankruptcy Code, to the fullest extent permitted by applicable law, as of the Effective Date, of the Debtors and their Estates and the Reorganized Debtors from any and all Debts of and Claims of any nature whatsoever against the Debtors that arose at any time prior to the Effective Date, including any and all Claims for principal and interest, whether accrued before, on or after the Petition Date. Except as otherwise expressly provided in the Plan or in the Confirmation Order, but without limiting the generality of the foregoing, on the Effective Date, the Debtors and their Estates and the Reorganized Debtors, and their respective successors or assigns, shall be discharged, to the fullest extent permitted by applicable law, from any Claim or Debt that arose prior to the Effective Date and from any and all Debts of the kind specified in Section 502(g), 502(h), or 502(i) of the Bankruptcy Code, whether or not (a) a Proof of Claim based on such Debt was filed pursuant to Section 501 of the Bankruptcy Code, (b) a Claim based on such Debt is an Allowed Claim pursuant to Section 502 of the Bankruptcy Code, or (c) the Holder of a Claim based on such Debt has voted to accept the Plan. As of the Effective Date, except as otherwise expressly provided in the Plan or in the Confirmation Order, all Persons and Entities, including all Holders of Claims or Equity Interests, shall be forever precluded and permanently enjoined to the fullest extent permitted by applicable law from asserting directly or indirectly against the Debtors or their Estates or the Reorganized Debtors, or any of their respective successors and assigns, or the assets or Properties of any of them, any other or further Claims, Debts, rights, causes of action, remedies, or Liabilities based upon any act, omission, document, instrument, transaction, event, or other activity of any kind or nature that occurred prior to the Effective Date or that occurs in connection with implementation of the Plan, and the Confirmation Order shall contain appropriate injunctive language to that effect. As of the Effective Date, Holders of Equity Interests shall have no rights arising from or relating to such Equity Interests, except as otherwise expressly provided in the Plan or the Confirmation Order. In accordance with the foregoing, except as otherwise expressly provided in the Plan or in the Confirmation Order, the Confirmation Order shall be a judicial determination of the discharge or termination of all such Claims and other Debts and Liabilities against the Debtors, pursuant to Sections 524 and 1141 of the Bankruptcy Code, to the fullest extent permitted by applicable law, and such discharge shall void any judgment obtained against the Debtors, at any time, to the extent that such judgment relates to a discharged or terminated Claim, Liability, or Debt. Notwithstanding the foregoing, Reorganized SIDG shall remain obligated to make payments to Holders of Allowed Claims and issue the Reorganized SIDG Shares as required pursuant to the Plan.

**<u>*Exculpation from Liability.*</u> The Debtors and their Postpetition directors, shareholders and officers, the Professionals for the Debtors (acting in such capacity), the Creditors Committee and its members, the Professionals for the Creditors Committee (acting in such capacity), the Plan Funder, and their respective officers, directors, employees, Affiliates, attorneys, agents and representatives (collectively, the "Exculpated Parties") shall neither have nor incur any liability whatsoever to any Person or Entity for any act taken or omitted to**

36

be taken in good faith in connection with or related to the formulation, preparation, dissemination, or confirmation of the Plan, the Disclosure Statement, any Plan Document, or any contract, instrument, release, or other agreement or document created or entered into, or any other act taken or omitted to be taken, in connection with the Plan or the Bankruptcy Cases, in each case for the period on and after the Petition Date and through the Effective Date; provided, however, that this exculpation from liability provision shall not be applicable to any liability found by a Final Order of a court of competent jurisdiction to have resulted from fraud or the willful misconduct or gross negligence of any such party. With respect to Professionals, the foregoing exculpation from liability provision shall also include claims of professional negligence arising from the services provided by such Professionals during the Bankruptcy Cases. Any such claims shall be governed by the standard of care otherwise applicable to the standard of negligence claims outside of bankruptcy. The rights granted under Article 11.2 of the Plan are cumulative with (and not restrictive of) any and all rights, remedies, and benefits that the Exculpated Parties have or obtain pursuant to any provision of the Bankruptcy Code or other applicable law. In furtherance of the foregoing, the Exculpated Parties shall have the fullest protection afforded under Section 1125(e) of the Bankruptcy Code and all applicable law from liability for violation of any applicable law, rule or regulation governing the solicitation of acceptance or rejection of a plan or the offer, issuance, sale or purchase of Securities, including the Reorganized SIDG Shares and the Reorganized SICL Shares. This exculpation from liability provision is an integral part of the Plan and is essential to its implementation. Notwithstanding anything to the contrary contained herein, the provisions of Article 11.2 of the Plan shall not release, or be deemed a release of, any of the Causes of Action.

*Release.* On the Effective Date, the Debtors, the Reorganized Debtors, the Creditors Committee, and any and all Holders of Claims and Equity Interests shall release unconditionally and hereby are deemed to release unconditionally the Debtors' Postpetition directors, shareholders and officers, the members of the Creditors Committee, the Professionals employed by the Debtors and the Creditors Committee, and the Plan Funder (collectively, the "Released Parties") from any and all claims, obligations, suits, judgments, damages, losses, rights, remedies, causes of action, charges, costs, debts, indebtedness, or liabilities whatsoever, whether known or unknown, foreseen or unforeseen, existing or hereafter arising, in law, equity or otherwise, based in whole or in part upon any act or omission, transaction, event or other occurrence taking place between the Petition Date and the Effective Date, which is in any way relating to the Debtors, the Bankruptcy Cases, any Property of the Debtors, the business or operations of the Debtors, any Plan Documents, the Plan, or any of the transactions contemplated thereby; provided, however, that this release provision shall not be applicable to any liability found by a Final Order of a court of competent jurisdiction to have resulted from fraud or the willful misconduct or gross negligence of any such party. With respect to Professionals, the foregoing release provision shall also include claims of professional negligence arising from the services provided by such Professionals during the Bankruptcy Cases. Any such claims shall be governed by the standard of care otherwise applicable to the standard of negligence claims outside of bankruptcy. The Confirmation Order shall enjoin the prosecution by any Person or Entity, whether directly, derivatively or otherwise, of any such claim, obligation, suit, judgment, damage, loss, right, remedy, cause of action, charge, cost, debt, indebtedness, or liability which

**arose or accrued during such period or was or could have been asserted against any of the Released Parties, except as otherwise provided in the Plan or in the Confirmation Order. Each of the Released Parties shall have the right to independently seek enforcement of this release provision. This release provision is an integral part of the Plan and is essential to its implementation. Notwithstanding anything to the contrary contained herein, the provisions of Article 11.3 of the Plan shall not release, or be deemed a release of, any of the Causes of Action.**

*General Injunction.* Pursuant to Sections 105, 1123, 1129 and 1141 of the Bankruptcy Code, in order to preserve and implement the various transactions contemplated by and provided for in the Plan, as of the Effective Date, except as otherwise expressly provided in the Plan or in the Confirmation Order, all Persons or Entities that have held, currently hold or may hold a Claim, Debt, or Liability that is discharged or terminated pursuant to the terms of the Plan are and shall be permanently enjoined and forever barred to the fullest extent permitted by law from taking any of the following actions on account of any such discharged or terminated Claims, Debts, or Liabilities, other than actions brought to enforce any rights or obligations under the Plan or the Plan Documents: (a) commencing or continuing in any manner any action or other proceeding against the Debtors or the Reorganized Debtors or their respective Properties; (b) enforcing, attaching, collecting or recovering in any manner any judgment, award, decree or order against the Debtors or the Reorganized Debtors or their respective Properties; (c) creating, perfecting or enforcing any Lien or encumbrance against the Debtors or the Reorganized Debtors or their respective Properties; (d) asserting a setoff, right of subrogation or recoupment of any kind against any debt, liability or obligation due to the Debtors or the Reorganized Debtors; (e) commencing or continuing, in any manner or in any place, any action that does not comply with or is inconsistent with the provisions of the Plan or the Confirmation Order; or (f) interfering with or in any manner whatsoever disturbing the rights and remedies of the Debtors or the Reorganized Debtors under the Plan and the Plan Documents and the other documents executed in connection therewith. The Debtors and the Reorganized Debtors shall have the right to independently seek enforcement of this general injunction provision. This general injunction provision is an integral part of the Plan and is essential to its implementation. Notwithstanding anything to the contrary contained herein, the provisions of Article 11.4 of the Plan shall not release, or be deemed a release of, any of the Causes of Action.

*Term of Certain Injunctions and Automatic Stay.* All injunctions or automatic stays for the benefit of the Debtors pursuant to Sections 105, 362 or other applicable provisions of the Bankruptcy Code, or otherwise provided for in the Bankruptcy Cases, and in existence on the Confirmation Date, shall remain in full force and effect following the Confirmation Date and until the Final Decree Date, unless otherwise ordered by the Bankruptcy Court. With respect to all lawsuits pending in courts in any jurisdiction (other than the Bankruptcy Court) that seek to establish the Debtors' liability on Prepetition Claims asserted therein and that are stayed pursuant to Section 362 of the Bankruptcy Code, such lawsuits shall be deemed dismissed as of the Effective Date, unless the Debtors affirmatively elect to have the Debtors' liability established by such other courts, and any pending motions seeking relief from the automatic stay for purposes of continuing any such lawsuits in such other courts shall be deemed denied as of the Effective Date, and the automatic stay shall continue in effect, unless the Debtors affirmatively elect to have the automatic stay lifted and to have the Debtors' liability established by such other courts;

38

and the Prepetition Claims at issue in such lawsuits shall be determined and either Allowed or disallowed in whole or part by the Bankruptcy Court pursuant to the applicable provisions of the Plan, unless otherwise elected by the Debtors as provided in the Plan.

*No Liability for Tax Claims.*  Unless a taxing Governmental Unit has asserted a Claim against the Debtors before the Governmental Unit Bar Date or Administrative Expense Claim Bar Date established therefor, no Claim of such Governmental Unit shall be Allowed against the Debtors, the Reorganized Debtors or their respective directors, officers, employees or agents for taxes, penalties, interest, additions to tax or other charges arising out of (i) the failure, if any, of the Debtors, any of their Affiliates, or any other Person or Entity to have paid tax or to have filed any tax return (including any income tax return or franchise tax return) in or for any prior year or period, or (ii) an audit of any return for a period before the Petition Date.

## Distributions under the Plan

*Initial Distribution.*  As soon as reasonably practicable (as determined by Reorganized SIDG) after the Effective Date, and subject to the Closing, Reorganized SIDG shall make the Distributions required under the Plan to Holders of Allowed Administrative Expense Claims (including Allowed Administrative Expense Claims of Professionals) and Allowed Claims in Classes 1 and 3; provided, however, that the Distributions as to Allowed Administrative Expense Claims of Professionals shall be made no more than ten (10) days after the Determination Date (the "Initial Distribution").  Thereafter, Reorganized SIDG shall make additional Distributions to Holders of Allowed Claims as and when required by the terms of the Plan or any Plan Document.

*Determination of Claims.*  Under the Plan, the Reorganized Debtors shall have the exclusive authority to, and shall, file, settle, compromise, withdraw, or litigate to judgment all objections to Claims.  Except as to any late-filed Claims and Claims resulting from the rejection of executory contracts or unexpired leases, if any, all objections to Claims shall be filed with the Bankruptcy Court by no later than the Claims Objection Deadline, and the Confirmation Order shall contain appropriate language to that effect.  Holders of Unsecured Claims that have not filed such Claims on or before the Bar Date shall serve the Notice Parties with any request to the Bankruptcy Court for allowance to file late Unsecured Claims.  If the Bankruptcy Court grants the request to file a late Unsecured Claim, such Unsecured Claim shall be treated in all respects as a Class 10 Unsecured Claim.  Objections to late-filed Claims and Claims resulting from the rejection of executory contracts or unexpired leases shall be filed on the later of (a) thirty (30) days following the Effective Date or (b) the date that is thirty (30) days after Reorganized SIDG receives actual notice of the filing of any such Claim.

Notwithstanding any authority to the contrary, an objection to a Claim shall be deemed properly served on the Holder of the Claim if the Debtors or the Reorganized Debtors, as the case may be, effect service in any of the following manners: (a) in accordance with Federal Rule of Civil Procedure 4, as modified and made applicable by Bankruptcy Rule 7004, (b) to the extent counsel for the Holder of a Claim is unknown, by first class mail, postage prepaid, on the signatory on the Proof of Claim or other representative identified on the Proof of Claim or any attachment thereto, or (c) by first class mail, postage prepaid, on any counsel that has filed a notice of appearance in the Bankruptcy Case on behalf of the Holder of a Claim.

Disputed Claims shall be fixed or liquidated in the Bankruptcy Court as core proceedings within the meaning of 28 U.S.C. § 157(b)(2)(B) unless the Bankruptcy Court orders otherwise. If the fixing or liquidation of a contingent or unliquidated Claim would cause undue delay in the administration of the Bankruptcy Cases, such Claim shall be estimated by the Bankruptcy Court for purposes of allowance and Distribution. The Debtors or the Reorganized Debtors may, at any time, request that the Bankruptcy Court estimate any contingent or unliquidated Claim pursuant to Section 502(c) of the Bankruptcy Code regardless of whether the Debtors or the Reorganized Debtors previously objected to such Claim or whether the Bankruptcy Court has ruled on any such objection. The Bankruptcy Court shall retain jurisdiction to estimate any Claim at any time during litigation concerning any objection to any Claim, including during the pendency of any appeal relating to any such objection. In the event that the Bankruptcy Court estimates any contingent or unliquidated Claim, such estimated amount will constitute either the Allowed Amount of such Claim or a maximum limitation on such Claim, as determined by the Bankruptcy Court. If the estimated amount constitutes a maximum limitation on such Claim, the Debtors or the Reorganized Debtors may elect to pursue any supplemental proceedings to object to any ultimate allowance of such Claim. The determination of Claims in Estimation Hearings shall be binding for purposes of establishing the maximum amount of the Claim for purposes of allowance and Distribution. All of the aforementioned Claims objection, estimation and resolution procedures are cumulative and not exclusive of one another. Procedures for specific Estimation Hearings, including provisions for discovery, shall be set by the Bankruptcy Court giving due consideration to applicable Bankruptcy Rules and the need for prompt determination of the Disputed Claim.

*Distributions as to Allowed Unsecured Claims in Class 10.* Each Holder of an Allowed Unsecured Claim in Class 10 shall receive a Cash Distribution, on the Distribution Date, in the amount provided for in Article 5.11.2 of the Plan. Notwithstanding any provision in the Plan to the contrary, no Distribution shall be made to the Holder of a Disputed Claim in Class 10 unless and until such Disputed Claim becomes an Allowed Claim. At such time that such Disputed Claim becomes an Allowed Class 10 Claim, the Holder of such Allowed Class 10 Claim shall receive the Distribution to which such Holder is then entitled under the Plan. Notwithstanding any provision in the Plan to the contrary, if, on any applicable Distribution Date, the Holder of a Class 10 Claim is subject to a proceeding against it by the Reorganized Debtors under Section 502(d) of the Bankruptcy Code, then Reorganized SIDG (in its sole discretion) may withhold a Distribution to such Holder until the final resolution of such proceeding. Distributions to a Holder of an Allowed Claim in Class 10 shall be made at the address of such Holder set forth in the Schedules or on the books and records of the Debtors or the Reorganized Debtors at the time of the Distribution, unless Reorganized SIDG has been notified in writing of a change of address, including by the filing of a Proof of Claim or statement pursuant to Bankruptcy Rule 3003 by such Holder that contains an address for such Holder different than the address for such Holder as set forth in the Schedules. Reorganized SIDG shall not be liable for any Distribution sent to the address of record of a Holder in the absence of the written change thereof as provided in the Plan.

*Unclaimed Distributions.* If the Holder of an Allowed Claim fails to negotiate a check for a Distribution issued to such Holder within sixty (60) days of the date such check was issued,

then Reorganized SIDG shall provide written notice to such Holder stating that, unless such Holder negotiates such check within thirty (30) days of the date of such notice, the amount of Cash attributable to such check shall be deemed to be unclaimed, such Holder shall be deemed to have no further Claim in respect of such check, such Holder's Allowed Claim shall no longer be deemed to be Allowed, and such Holder shall not be entitled to participate in any further Distributions under the Plan in respect of such Claim.   If a check for a Distribution made pursuant to the Plan to any Holder of an Allowed Claim is returned to Reorganized SIDG due to an incorrect or incomplete address for the Holder of such Allowed Claim, and no claim is made in writing to Reorganized SIDG as to such check within sixty (60) days of the date such Distribution was made, then the amount of Cash attributable to such check shall be deemed to be unclaimed, such Holder shall be deemed to have no further Claim in respect of such check, such Holder's Allowed Claim shall no longer be deemed to be Allowed, and such Holder shall not be entitled to participate in any further Distributions under the Plan in respect of such Claim.   Any unclaimed Distribution as described above sent by Reorganized SIDG shall become the property of Reorganized SIDG.

**Corporate Action**

All matters provided for under the Plan involving the corporate structure of the Debtors or the Reorganized Debtors, or any corporate action to be taken by or required of the Debtors or the Reorganized Debtors, including all action taken or required to be taken to approve the Plan Funder Loan Agreement, the FirstBank New Loan A Documents (or, if applicable, the FirstBank New Loan B Documents) and the Longview Villa Owner Settlement Agreements or the issuance of the Reorganized SIDG Shares or the Reorganized SICL Shares, shall, as of the Effective Date, be deemed to have occurred and be effective as provided herein, and shall be authorized and approved in all respects without any requirement for further action by the shareholders or directors of the Debtors or the Reorganized Debtors.

**Section 1146 Exemption**

Pursuant to Section 1146(a) of the Bankruptcy Code, the issuance, distribution, transfer or exchange of any Security (including the Reorganized SIDG Shares or the Reorganized SICL Shares), or the making, delivery or recording (including in the British Virgin Islands) of any instrument of transfer, pursuant to, in implementation of or as contemplated by the Plan or any Plan Document, or the vesting, re-vesting, transfer or sale of any Property of, by or in the Debtors or their Estates or the Reorganized Debtors pursuant to, in implementation of or as contemplated by the Plan or any Plan Document, or any transaction arising out of, contemplated by or in any way related to the foregoing, shall not be subject to any document recording tax, stamp tax, conveyance fee, intangible or similar tax, mortgage tax, stamp act, real estate transfer tax, mortgage recording tax, Uniform Commercial Code filing or recording fee, or other similar tax or governmental assessment, and the appropriate state or local or foreign governmental officials or agents shall be, and hereby are, directed to forego the collection of any such tax or governmental assessment and to accept for filing and recording any of the foregoing instruments or other documents without the payment of any such tax or governmental assessment.

**Pursuit of Causes of Action**

41

On the Effective Date, the Causes of Action shall be vested in the Reorganized Debtors, except to the extent a Creditor or other third party has been specifically released from any Cause of Action by the terms of the Plan or by a Final Order of the Bankruptcy Court. The Reorganized Debtors will have the right, in their sole and absolute discretion, to pursue, not pursue, settle, release or enforce any Causes of Action without seeking any approval from the Bankruptcy Court except as provided in Article 8.9 of the Plan. The Debtors are currently not in a position to express an opinion on the merits of any of the Causes of Action or on the recoverability of any amounts as a result of any such Causes of Action. For purposes of providing notice, the Debtors state that any party in interest that engaged in business or other transactions with the Debtors Prepetition or that received payments from the Debtors Prepetition may be subject to litigation to the extent that applicable bankruptcy or non-bankruptcy law supports such litigation. Reorganized SIDG will fund the costs and expenses (including legal fees) to pursue the Causes of Action.

No Creditor or other party should vote for the Plan or otherwise rely on the Confirmation of the Plan or the entry of the Confirmation Order in order to, or on the belief that it will, obtain any defense to any Cause of Action. No Creditor or other party should act or refrain from acting on the belief that it will obtain any defense to any Cause of Action. ADDITIONALLY, THE PLAN DOES NOT, AND IS NOT INTENDED TO, RELEASE ANY CAUSES OF ACTION OR OBJECTIONS TO CLAIMS, AND ALL SUCH RIGHTS ARE SPECIFICALLY RESERVED IN FAVOR OF THE REORGANIZED DEBTORS. Creditors are advised that legal rights, claims and rights of action the Debtors may have against them, if they exist, are retained under the Plan for prosecution unless a Final Order of the Bankruptcy Court authorizes the Debtors to release such claims. As such, Creditors are cautioned not to rely on (i) the absence of the listing of any legal right, claim or right of action against a particular Creditor in the Disclosure Statement, the Plan, or the Schedules, or (ii) the absence of litigation or demand prior to the Effective Date of the Plan as any indication that the Debtors or the Reorganized Debtors do not possess or do not intend to prosecute a particular claim or Cause of Action if a particular Creditor votes to accept the Plan. It is the expressed intention of the Plan to preserve rights, objections to Claims, and rights of action of the Debtors, whether now known or unknown, for the benefit of the Reorganized Debtors. A Cause of Action shall not, under any circumstances, be waived as a result of the failure of the Debtors to describe such Cause of Action with specificity in the Plan or in the Disclosure Statement; nor shall the Reorganized Debtors, as a result of such failure, be estopped or precluded under any theory from pursuing such Cause of Action. Nothing in the Plan operates as a release of any of the Causes of Action.

The Debtors do not presently know the full extent of the Causes of Action and, for purposes of voting on the Plan, all Creditors are advised that the Reorganized Debtors will have substantially the same rights that a Chapter 7 trustee would have with respect to the Causes of Action. Accordingly, neither a vote to accept the Plan by any Creditor nor the entry of the Confirmation Order will act as a release, waiver, bar or estoppel of any Cause of Action against such Creditor or any other Person or Entity, unless such Creditor, Person or Entity is specifically identified by name as a released party in the Plan, in the Confirmation Order, or in any other Final Order of the Bankruptcy Court. Confirmation of the Plan and entry of the Confirmation Order is not intended to and shall not be deemed to have any res judicata or collateral estoppel or

other preclusive effect that would precede, preclude, or inhibit prosecution of such Causes of Action following Confirmation of the Plan.

At this time, the Debtors believe the Causes of Action consist primarily of the Avoidance Actions, the FirstBank Injunction Adversary Proceeding, the FirstBank Lender Liability Adversary Proceeding and other potential contested matters with FirstBank. To facilitate the preservation of Avoidance Actions and the reservation of rights provided herein, the Debtors incorporate the response to question 3.b of SIDG's Statement of Financial Affairs filed with the Bankruptcy Court (Doc. No. 66). The claims against FirstBank in the FirstBank Lender Liability Adversary Proceeding are described in more detail below in this Disclosure Statement. All claims against FirstBank will be released by the Debtors, on the Closing Date, pursuant to Article 5.3 of the Plan. To the extent the Debtors determine after the date hereof that there are additional Causes of Action or that further detail is required as to a particular Course of Action, such Causes of Action will be described in an amendment to the Plan or to the Disclosure Statement approved by the Bankruptcy Court.

The Debtors and the Reorganized Debtors reserve all rights under Section 506(c) of the Bankruptcy Code with respect to any and all Secured Claims.

The Estates shall remain open, even if the Bankruptcy Cases shall have been closed, as to any and all Causes of Action until such time as the Causes of Action have been fully administered and the Causes of Action Recoveries have been received by the Reorganized Debtors; provided, however, that nothing in the Plan or the Disclosure Statement shall prohibit the Reorganized Debtors from pursuing any Causes of Action (excluding the Avoidance Actions) in any courts other than the Bankruptcy Court.

**Prosecution and Settlement of Claims and Causes of Action**

The Reorganized Debtors (a) may commence or continue in any appropriate court or tribunal any suit or other proceeding for the enforcement of any Cause of Action which the Debtors had or had power to assert immediately prior to the Effective Date, and (b) may settle or adjust such Cause of Action. From and after the Effective Date, the Reorganized Debtors shall be authorized, pursuant to Bankruptcy Rule 9019 and Section 105(a) of the Bankruptcy Code, to compromise and settle any Cause of Action or objection to a Claim in accordance with the following procedures, which shall constitute sufficient notice in accordance with the Bankruptcy Code and the Bankruptcy Rules for compromises and settlements: (i) if the resulting settlement provides for settlement of a Cause of Action or objection to a Claim originally asserted in an amount equal to or less than $100,000.00, then the Reorganized Debtors may settle the Cause of Action or objection to Claim and execute necessary documents, including a stipulation of settlement or release, subject to notifying the United States Trustee and counsel to FirstBank of the terms of the settlement agreement; provided, however, that if the United States Trustee and counsel to FirstBank indicate their approval or do not provide the Reorganized Debtors with an objection to the proposed settlement within ten (10) days after they receive notice of such settlement in writing, then the Reorganized Debtors shall be authorized to accept and consummate the settlement; and provided further, however, that if a timely written objection is made by the United States Trustee or counsel to FirstBank to the proposed settlement, then the

43

settlement may not be consummated without approval of the Bankruptcy Court in accordance with Bankruptcy Rule 9019; and (ii) if the resulting settlement involves a Cause of Action or objection to a Claim originally asserted in an amount exceeding $100,000.00, then the Reorganized Debtors shall be authorized and empowered to settle such Cause of Action or objection to Claim only upon Bankruptcy Court approval in accordance with Bankruptcy Rule 9019 and after notice to the Notice Parties.

**Dissolution of the Creditors Committee**

The Creditors Committee shall continue in existence until the Effective Date. Thereafter, (a) the Creditors Committee shall be deemed dissolved and the members of the Creditors Committee shall be deemed discharged from all rights, duties and liabilities arising from, or related to, the Bankruptcy Cases, and (b) the Professionals for the Creditors Committee shall cease providing any services to the Creditors Committee or otherwise in connection with the Bankruptcy Cases.

**Modification of Plan**

The Debtors may modify the Plan at any time prior to the entry of the Confirmation Order provided that the Plan, as modified, and the Disclosure Statement meet applicable Bankruptcy Code and Bankruptcy Rules requirements. After the entry of the Confirmation Order, the Debtors (prior to the Effective Date) or the Reorganized Debtors (on and after the Effective Date) may modify the Plan to remedy any defect or omission herein, or to reconcile any inconsistencies between the Plan and the Confirmation Order, as may be necessary to carry out the purposes and effects of the Plan, provided that (a) the Debtors or the Reorganized Debtors (as the case may be) obtain Bankruptcy Court approval for such modification, after notice to the Notice Parties and a hearing, and (b) such modification does not materially adversely affect the interests, rights, or treatment of any Class of Claims under the Plan. After the entry of the Confirmation Order and before substantial consummation of the Plan, the Debtors (prior to the Effective Date) or the Reorganized Debtors (on and after the Effective Date) may modify the Plan in a way that materially adversely affects the interests, rights, or treatment of a Class of Claims, provided that (a) the Plan, as modified, meets applicable Bankruptcy Code requirements, (b) the Debtors or the Reorganized Debtors (as the case may be) obtain Bankruptcy Court approval for such modification, after notice to the Notice Parties and the Class of Claims materially adversely affected and a hearing, (c) such modification is accepted by at least two-thirds in dollar amount, and more than one-half in number, of the Allowed Claims actually voting in each Class of Claims adversely affected by such modification, and (d) the Debtors or the Reorganized Debtors (as the case may be) comply with Section 1125 of the Bankruptcy Code with respect to the Plan, as modified. Notwithstanding anything to the contrary contained in Article 13.1 of the Plan or elsewhere in the Plan, the Plan may not be altered, amended or modified without the written consent of the Debtors (prior to the Effective Date) or the Reorganized Debtors (on and after the Effective Date).

**Confirmation Over Objections**

In the event any Impaired Class of Claims votes against the Plan, and the Plan is not revoked or withdrawn in accordance with <u>Article 14.2</u> of the Plan, the Debtors hereby request, and shall be allowed, to modify the terms of the Plan to effect a "cramdown" on such dissenting Class by (a) restructuring the treatment of any Class on terms consistent with Section 1129(b)(2)(B) of the Bankruptcy Code, or (b) deleting Distributions to all Classes at or below the level of the objecting Class, or reallocating such Distributions, until such Impaired senior Classes are paid in accordance with the absolute priority rule of Section 1129(b) of the Bankruptcy Code. The Debtors may make such modifications or amendments to the Plan and such modifications or amendments shall be filed with the Bankruptcy Court and served on all parties in interest entitled to receive notice prior to the Confirmation Hearing. No such modifications shall require any resolicitation of acceptances as to the Plan by any Class of Claims unless the Bankruptcy Court shall require otherwise. Notwithstanding any provision of the Plan to the contrary, the Debtors reserve any and all rights they may have to challenge the validity, perfection, priority, scope and extent of any Liens in respect to any Secured Claims and the amount of any Secured Claims, the Holders of which have not accepted the Plan.

**Retention of Jurisdiction**

The Plan provides for the retention of jurisdiction by the Bankruptcy Court following the Effective Date to, among other things, determine all disputes and other issues presented by or arising under the Plan. The Bankruptcy Court will also retain jurisdiction under the Plan for any actions brought in connection with the implementation and consummation of the Plan and the transactions contemplated thereby. See <u>Article 12</u> of the Plan for a more detailed description.

**Exclusivity Period**

The Debtors will retain the exclusive right to amend or modify the Plan, and to solicit acceptances of any amendments to or modifications of the Plan, through and until the Effective Date.

**Governing Law**

Except to the extent that federal law (including the Bankruptcy Code or the Bankruptcy Rules) is applicable, or where the Plan or the provision of any contract, instrument, release, indenture or other agreement or document entered into in connection with the Plan provides otherwise, the rights and obligations arising under the Plan shall be governed by, and construed and enforced in accordance with, the laws of the State of Florida, without giving effect to the principles of conflicts of law thereof. Notwithstanding anything to the contrary contained in the Plan, all of the FirstBank New Loan A Documents and the FirstBank Construction Escrow Agreement shall be governed by the laws of the British Virgin Islands.

## BUSINESS OF THE DEBTORS

### Introduction

The information contained in this section of the Disclosure Statement is intended as a summary of the Debtors' history and business operations prior to the Petition Date. In addition, Holders of Claims and Equity Interests are encouraged to review information contained on SIDG's website (www.scrubisland.com) for current business and other developments.

### Scrub Island Development Group Limited

SIDG, a company incorporated by two United States citizens under the laws of the British Virgin Islands on January 16, 1992, has its principal place of business and corporate headquarters in Tampa, Florida. SIDG owns Scrub Island, which is a 230-acre island located in the British Virgin Islands consisting of Little Scrub Island and Big Scrub Island, which are connected by an isthmus between the islands. The following photograph depicts a recent aerial view of Scrub Island (with Little Scrub Island in the foreground):



The Scrub Island project began in 2003 with pre-development activities, environmental studies, and applications for numerous government approvals. Beginning in 2005, Joe C. Collier III, a resident of Tampa, Florida, became involved with SIDG and the design, development and construction of Scrub Island. Mr. Collier is the President of Mainsail Lodging & Development ("Mainsail"), a Florida corporation with its corporate offices and headquarters located in Tampa, Florida. Mainsail has been contracted as the sole and exclusive developer of Scrub Island and the sole and exclusive operator of the Scrub Island Resort (as defined below) and residential community. As of the Petition Date, Mainsail and its related entities, all of which are United States entities, were five of the ten largest unsecured creditors of SIDG, having aggregate claims of approximately $3.3 million.

From its inception through 2005, all of SIDG's funding (approximately $2.9 million) was obtained from the former and current shareholders of SIDG. All of the shareholders of SIDG are citizens of the United States. Commencing in 2005 and through the Petition Date, the funding of

SIDG's construction, development and operation activities has been obtained from the current shareholders of SIDG (approximately $12 million) and FirstBank.

In February 2010, SIDG opened the Scrub Island Resort, Spa & Marina (the "Scrub Island Resort"), which is an award-winning boutique luxury resort located on Little Scrub Island. See www.scrubisland.com.  The Scrub Island Resort includes, among other things:

(i)      26 ocean view guest rooms in the Marina Village residential community, which are available for rental in the Marriott International, Inc. ("Marriott") rental program to guests for overnight and longer stays,

(ii)     26 ocean view one bedroom suites in the Marina Village residential community, which are available for rental in the Marriott rental program to guests for overnight and longer stays,

(iii)    two, three, four and five bedroom hillside and ocean view villas (defined below as the Ocean Villas and the Long View Villas), which are available for rental in the Marriott rental program to guests for overnight and longer stays,

(iv)    a 55-slip deep water marina (the "Marina") available for short or long term docking, including five slips specifically designed to handle larger yachts up to 160 feet in length,

(v)     a multi-level lagoon-style swimming pool with a waterfall and pool bars,

(vi)    three restaurants,

(vii)   the Ixora Spa,

(viii)  a 25,000 square foot pavilion building which includes a lobby, administrative offices, a business center, restaurants, meeting rooms, and a private dining room,

(ix)    commercial space, including a retail boutique gift shop, a 3,000 square foot gourmet market, and a real estate sales office, and

(x)     a fitness center.

The following photographs depict the lower and upper swimming pools (with the Marina in the background) at the Scrub Island Resort:



The Marina Village residential component of the Scrub Island Resort consists of 26 two-bedroom, 2.5 bath lock-off condominium hotel suite units (the "Marina Village Suites"), which are constructed in an architectural style described as Anglo-Caribbean. The Marina Village Suites can be divided and rented through the Marriott rental program as a guest room or as a one bedroom suite, which thus provides a 52-key hotel inventory for the Scrub Island Resort. The Marina Village Suites include a combined living/dining room, a full, gourmet kitchen, a master suite and guest bedroom, two and a half baths, and an owner's closet for those who wish to rent their units. As of the Petition Date, 10 of the 26 Marina Village Suites had been sold by SIDG to United States citizens and one of the 26 Marina Village Suites had been sold by SIDG to a Canadian citizen. Thus, as of the Petition Date, 15 of the Marina Village Suites remain unsold and are property of SIDG's estate.

The following photographs depict an aerial view of the Marina Village Suites (top photograph), the Marina Village Suites with the Marina in the foreground (middle photograph), and the Marina (bottom photograph):







On December 15, 2011, the Scrub Island Resort became part of the prestigious Marriott Autograph Collection Hotel system pursuant to a Franchise Agreement by and between Marriott and SIDG, dated as of July 28, 2011 (the "Marriott Franchise Agreement").    See www.autographcollection.com.  Pursuant to the terms of the Marriott Franchise Agreement, an affiliate of Mainsail is the only approved operator and manager of the Scrub Island Resort.  The entire Marriott reservation and rental program for the Scrub Island Resort, as well as the daily operations of the Scrub Island Resort, are handled by Mainsail at its Tampa, Florida offices.  As of the Petition Date, Marriott, a United States corporation, was one of the largest unsecured creditors of SIDG.

The Scrub Island Resort is one of two Marriott Autograph Collection Hotel properties in the Caribbean. The Scrub Island Resort ranks at the top of Marriott's hotels in terms of quality and customer satisfaction.[1]

In addition to the Marina Village Suites, the Scrub Island Resort currently has an inventory of six constructed two-bedroom Ocean View Villas on Little Scrub Island available for rental in the Marriott rental program to guests for overnight and longer stays. All of these six Ocean View Villas have been sold to United States citizens. There are five remaining Ocean View Villa lots (the "OV Lots") for sale, two of which are steep waterfront lots and three of which are hillside lots. The OV Lots enjoy close proximity to the core amenities of the Scrub Island Resort and the Marina. The following photograph depicts several of the Ocean View Villas:



There are twenty-two Long View Villa lots for sale on Little Scrub Island, nine of which are designated as Long View Villa 1 Lots (the "LV1 Lots") and thirteen of which are designated as Long View Villa II lots (the "LV2 Lots"). The Long View Villas are luxury three, four or five-bedroom residences. As of the Petition Date, there were three constructed Long View Villas on LV1 Lots and four partially constructed Long View Villas (three of which are on LV1 Lots and one of which is on an LV2 Lot), all of which have been sold to United States citizens. The owners of the four partially constructed Long View Villas are the largest unsecured creditors of SICL. In addition, one LV1 Lot has been sold to a United States citizen.

Of the nine LV1 Lots, three are steep waterfront lots on the southeast side of Little Scrub Island, and six are hillside, ocean view lots that are located on the north end of Little Scrub Island. The waterfront lots range in size from .709 acres to 1.007 acres and the hillside lots

---

[1]    Industry benchmark reports by Smith Analytics ("STR") show that the Scrub Island Resort has achieved 137.1% of its share in occupancy, 100.6% of its share in average daily rate, and 137.9% of its share in revenue per available room for the month of September 2013. Preliminary results for October 2013 indicate 175%, 108%, and 177% for each of those categories, respectively. For the running 12 month data, the Scrub Island Resort improved (over same time prior year) occupancy by 20.4%, average daily rate by 23.3%, and revenue per available room by 41.2%, as reported by STR. Marriott hires an independent company to manage its guest satisfaction surveys and provides this data to the hotels under its portfolio. The Scrub Island Resort has performed at high levels, amongst the highest in the Marriott Autograph Collection Hotel brand. The year to date score for the Scrub Island Resort is 88.5% compared to a brand average of 86.8%. Marriott also has a third party perform a surprise quality assurance audit semi-annually. The Scrub Island Resort has passed the inspections on each of the audits performed on behalf of Marriott since the conversion of the Scrub Island Resort to the Marriott Autograph Collection Hotel system in December 2011.

range in size from .430 acres to .571 acres. In addition to these nine LV1 Lots, the Governors Point parcel can also be considered as an LV1 Lot. When completed, all of the Long View Villas on the LV1 Lots will be available to participate in the Marriott rental program. The following photographs depict (i) an example of two Long View Villas participating in the Marriott rental program, and (ii) Governors Point (with Long View Villas and Ocean View Villas in the foreground):





The LV2 Lots represent some of the superior lots on Little Scrub Island. No Long View Villas have yet been completely built on the LV2 Lots, and the area for future development includes most of the peak elevations on Little Scrub Island. Four of the LV2 Lots overlook the existing North Beach, five of the LV2 Lots are planned around the summit of Little Scrub Island, and the remaining four LV2 Lots are situated below the summit. The LV2 Lots on the southeastern slope will overlook the Marina Suites village. When completed, all of the Long View Villas on the LV2 Lots will be available to participate in the Marriott rental program.

Big Scrub Island consists of 170 acres and is designated for large estate homes and is fully entitled for the sale of 54 lots, seven of which have been sold or reserved. Big Scrub Island represents only one of two residential resort developments in the British Virgin Islands where a virtual island (a large land mass connected to another by a narrow corridor of land) has land access to facilities and services of another body of land. Owners of residences on Big Scrub Island will have access to the Scrub Island Resort and other amenities on Little Scrub Island. The following photograph depicts an aerial view of Big Scrub Island:



Little Scrub Island and Big Scrub Island are connected by an isthmus, which contains a desalinization and wastewater treatment plant, a laundry processing and housekeeping building, a delivery dock for barges, and a receiving, storage and maintenance facility. The following photograph depicts the isthmus (as viewed from Big Scrub Island):



As of the Petition Date, SIDG employed a total of 127 full-time employees and 13 part-time employees in its business operations. Three of the full-time employees and thirteen of the part-time employees work out of SIDG's Tampa, Florida corporate headquarters. The Tampa-based Director of Sales, Travel and Leisure Sales Manager, and Destination Weddings/Sales Coordinator all are fully dedicated to the Scrub Island Resort and sales efforts. Their focus is to sell the Scrub Island Resort to groups, incentive houses, high end travel and leisure travel agencies, and wholesale agencies.

The following Tampa-based individuals are part-time employees of SIDG: (i) the director of procurement, who negotiates with vendors and coordinates logistics for shipments to Scrub Island; (ii) revenue management and central reservations office with six staff members handling all marina reservations, villa reservations, owner reservations, follow up to all bookings made through Marriott's reservations system, and yield management and strategy for revenue pricing and execution in all systems; (iii) marketing - one person handling the marketing efforts, designing and implementing marketing campaigns with website providers, public relations firms, and social media teams; (iv) the regional engineer, who provides site visits to Scrub Island and ongoing support; and (v) accounting support from four staff members to assist in managing cash flow, review financial statements, owner billing and communications, and back office accounting functions.

**Scrub Island Construction Limited**

SICL, a company incorporated under the laws of the British Virgin Islands on May 18, 2006, has its principal place of business and corporate headquarters in Tampa, Florida. SICL is party to construction contracts with various United States citizens providing for the construction by SICL of Long View Villas on Little Scrub Island. SICL owns the construction contracts for the Long View Villas. As of the Petition Date, Pamela McManus and CIH Loft LLC (a company controlled by Joe C. Collier III) were the sole shareholders and sole directors of SICL. Ms. McManus and Mr. Collier are United States citizens. All of the unsecured creditors of SICL are United States citizens.

**Locations of the Debtors' Operations and Whether Leased or Owned**

The Debtors' principal place of business and corporate headquarters is located at 4602 Eisenhower Boulevard, Tampa, Florida 33634. The Debtors lease space at that location from Mainsail Central, LLC. As of the Petition Date, SIDG also owned Scrub Island, which is located in the British Virgin Islands.

**List of Officers, Directors and Insiders and Their Salaries and Benefits at the Time of Filing and During the One Year Prior to Filing**

CIH Loft LLC, Pamela McManus, James B. Rabold and Vance Kershner are the directors of SIDG and Pamela McManus also serves as the Secretary of SIDG. CIH Loft LLC and Pamela McManus are the directors of SICL. None of the directors or officers of either of the Debtors has received a salary during the one year prior to the filing of the Bankruptcy Cases. Furthermore, none of the directors or officers of either of the Debtors has received, or will receive, a salary or any other compensation during the course of the Bankruptcy Cases.

**Debtors' Annual Gross Revenues**

For the ten months ended October 31, 2013, SIDG's statement of operations reflected total revenues of approximately $8,355,763 (with total revenues for 2013 projected to be approximately $10.5 million), not including any lot or villa sales. Revenues for 2014 are forecasted at $12 million, with SIDG forecasted to have positive net operating income. For the ten months ended October 31, 2013, SICL's statement of operations reflected no revenue as there has been no construction on the Long View Villas during 2013.

## EVENTS LEADING TO, AND REASONS FOR, THE CHAPTER 11 FILING

The immediate precipitating cause for the filing of the Bankruptcy Cases was the *ex parte* and highly secretive appointment, at the direct request of FirstBank, of the BVI Receiver over the assets and undertakings of SIDG. FirstBank sought the appointment of a receiver without prior notice to SIDG or its counsel, despite numerous daily contacts between FirstBank representatives and SIDG representatives and their respective counsel during the time period in question. The BVI Receiver was appointed pursuant to an Order entered November 1, 2013 in the BVI Receivership Proceeding.

By way of background, the loans from FirstBank to the Debtors had been substantially restructured in June 2011 pursuant to the terms of a Workout Agreement executed by the parties. Under the terms of the Workout Agreement, the Debtors and Mainsail undertook a number of obligations, the most significant of which were obtaining an affiliation with Marriott, and specifically with Marriott, for inclusion of the Scrub Island Resort as a Marriott Autograph Collection Hotel and substantial improvements necessary to bring the Scrub Island Resort into compliance with Marriott's requirements. SIDG was successful in this endeavor, and the Scrub Island Resort became a Marriott property in December 2011. The success of SIDG was due in large part to the significant relationships between Marriott and Mainsail.

As the Marriott conversion was taking place, SIDG, Mainsail and Mr. Collier were actively engaged in efforts to replace FirstBank (at its request) as the lender on the Scrub Island project. Incredibly, however, as these efforts were ongoing, SIDG and Mainsail began to suspect that certain officers of FirstBank were engaged in unauthorized and clandestine contacts with one of the senior executives of Mainsail who was intimately involved with the SIDG operations in his position as project manager for the Scrub Island project. This executive enjoyed access to confidential and proprietary materials of SIDG, was privy to communications among the shareholders and directors of SIDG and to communications with prospective investors, and was regularly in communication with counsel for SIDG. He owed fiduciary and contractual duties to SIDG and its shareholders. In breach of those fiduciary and contractual duties, the executive disclosed confidential information to FirstBank.

Following the termination of this executive, the Debtors and FirstBank engaged in discussions to reach agreement on the transfer of the FirstBank loans to a note purchaser. Less than one week prior to the filing of the BVI Receivership Proceeding, FirstBank agreed to accept a total payment of $40 million to either (a) release and satisfy its loans with the Debtors or (b) transfer its liens, claims, charges, and loans to a third party purchaser procured by SIDG. FirstBank also agreed to give the Debtors the exclusive right until June 30, 2014 to raise these funds. FirstBank also agreed to provide 50% loan-to-value financing to a qualified third party note purchaser, payable over five years. The Debtors were in turn required to invest $1.2 million of new money for the further build-out and improvement of certain infrastructure items on Little Scrub Island. The Debtors accepted the offer, only to be met with radio silence on the part of FirstBank and its counsel despite numerous email and telephone contacts. Following the Debtors' acceptance of FirstBank's offer, however, FirstBank apparently decided to instead secretly pursue the receivership through the BVI Receivership Proceeding.

Following the filing of the BVI Receivership Proceeding, the Debtors and their counsel repeatedly reached out to FirstBank and its counsel regarding the agreement reached between the parties and FirstBank's secretive actions in filing the BVI Receivership Proceeding. Despite repeated attempts, FirstBank and its counsel ignored the Debtors and their counsel. It has also become apparent to the Debtors that FirstBank's secretive actions in obtaining the appointment of the BVI Receiver were done with the goal of wiping out all claims of creditors of the Debtors, including claims of significant United States creditors of the Debtors, as well as the substantial equity invested in SIDG by its shareholders. Faced with these prospects, the Debtors were forced to seek relief under Chapter 11 of the Bankruptcy Code in order to terminate the

receivership and to reorganize, either on the terms previously agreed to with FirstBank or based on alternative treatment for FirstBank that will provide for valuation of FirstBank's Collateral and for the payment of the secured and unsecured components of FirstBank's Claim as provided by law.

## SIGNIFICANT EVENTS IN THE
## CHAPTER 11 BANKRUPTCY CASES

### Introduction

On November 19, 2013, (i) SIDG filed a voluntary petition under Chapter 11 of the Bankruptcy Code, which case is designated as Case Number 8:13-bk-15285-MGW, and (ii) SICL filed a voluntary petition under Chapter 11 of the Bankruptcy Code, which case is designated as Case Number 8:13-bk-15286-MGW. The Debtors remain in possession of their properties and continue to manage their assets as debtors in possession pursuant to Sections 1107 and 1108 of the Bankruptcy Code. Set forth below is a brief summary of significant matters or events which have occurred to date in the Bankruptcy Cases. The description of such matters or events is qualified in its entirety by the actual pleadings filed in the Bankruptcy Cases and, to the extent of any inconsistencies between the descriptions in this Disclosure Statement and such pleadings, such pleadings shall control. All of such pleadings are on file with, and may be obtained from, the Bankruptcy Court or electronically from counsel for the Debtors upon written request.

### Joint Administration

On November 20, 2013, the Bankruptcy Court entered orders directing the joint administration of the Debtors' Chapter 11 cases for procedural purposes only. Pursuant to the terms of those orders, the Chapter 11 case of Scrub Island Development Group Limited, Case No. 8:13-bk-15285-MGW, is the lead case.

### Retention of Professionals by the Debtors

The Debtors have retained the law firm of Stichter, Riedel, Blain & Prosser, P.A. ("Stichter, Riedel") as their general bankruptcy counsel in the Bankruptcy Cases. On January 2, 2014, the Bankruptcy Court entered a final order approving the application by the Debtors to employ Stichter, Riedel as their general bankruptcy counsel in the Bankruptcy Cases. On January 2, 2014, the Bankruptcy Court also entered an order approving the retention by the Debtors of the law firm of Rocke McLean & Sbar, P.A. as special litigation counsel in connection with filing a lender liability complaint against FirstBank.

### Bar Dates

On November 20, 2013, the Bankruptcy Court entered its Notice of Chapter 11 Bankruptcy Case, Meeting of Creditors, & Deadlines in the Bankruptcy Cases which, among other things, established February 3, 2014 as the deadline for filing Claims against the Debtors by all Creditors (not including Governmental Units), and the date that is 180 days from the

Petition Date (i.e., May 19, 2014) as the deadline for filing Claims against the Debtors by all Governmental Units. The Bankruptcy Court will also establish a bar date for the filing of Administrative Expense Claims, which will be set forth in the Disclosure Statement Approval Order.

**Use of Cash Collateral**

On December 6, 2013, the Bankruptcy Court entered an interim order authorizing SIDG's use of up to $16,554.89 of "cash collateral" (as defined in 11 U.S.C. §363(a)) from its Tampa, Florida bank accounts for the period from the Petition Date through and including December 6, 2013, only for the purpose of paying the Prepetition compensation owing to its employees located in the United States. At a hearing held on December 6, 2013, the Bankruptcy Court authorized, on a final basis, SIDG's continued use of cash collateral in its Tampa, Florida bank accounts in the ordinary course of business.

**Payment of Prepetition Employee Obligations**

On December 9, 2013, the Bankruptcy Court entered an order granting SIDG's motion for authority to pay to its United States employees (i) Prepetition accrued, unpaid employee wages and related taxes, benefits and business expenses, (ii) all Prepetition premiums and contributions on policies and plans of insurance for the benefit of its employees, and (iii) all payments for employee 401(k) and health savings account plans. Pursuant to the terms of that ruling, SIDG has made all such payments, none of which exceeded the allowed statutory priority claims under Sections 507(a)(4) and (5) of the Bankruptcy Code.

**Motion Filed by the United States Trustee to Establish Uniform Procedures for Attorney Timekeeping, Billing and Budgeting**

On December 11, 2013, the United States Trustee filed a motion with the Bankruptcy Court for an order establishing uniform procedures for the preparation and submission of billing records, staffing plans, and budgets by all attorneys retained in the Bankruptcy Cases. The motion was filed in connection with the new guidelines for attorneys in larger chapter 11 cases issued by the United States Trustee ("Appendix B – Guidelines for Reviewing Applications for Compensation and Reimbursement of Expenses Filed Under 11 U.S.C. § 330 by Attorneys in Larger Chapter 11 Cases" (See 78 Federal Register No. 116, 36248 – 36276)) (the "New Guidelines"). On February 7, 2014, the Bankruptcy Court entered an order granting, in part, the motion, which provided that the New Guidelines would be applicable to the United States Trustee's review of compensation sought by any attorneys in the Bankruptcy Cases.

**Debtor in Possession Financing**

On December 13, 2013, SIDG filed an emergency motion with the Bankruptcy Court for entry of an order approving a $250,000.00 debtor in possession credit facility from CIH Loft LLC, Gary Eng and VK Investments Limited (three shareholders of SIDG) or an entity to be formed by them. The motion was filed to provide additional financing to manage the operation of the Scrub Island Resort due to certain actions taken by FirstBank following the Bankruptcy Court's denial on December 6, 2013 of the motions to dismiss the Bankruptcy Cases filed by

FirstBank (see below).  The hearing on this motion has been continued to July 28, 2014, at 1:30 p.m.

**Schedules and Statements of Financial Affairs**

On December 13, 2013, each of SIDG and SICL filed its Schedules and Statement of Financial Affairs with the Bankruptcy Court.

**Monthly Financial Reports**

The Debtors have filed all monthly financial reports as required by, and in accordance with, Bankruptcy Rule 2015.

**Appointment of Unsecured Creditors Committee**

On December 12, 2013, the United States Trustee appointed a committee of Creditors holding Unsecured Claims in the Bankruptcy Cases (the "Creditors Committee").  On February 27, 2014, the Untied States Trustee filed a notice with the Bankruptcy Court amending the membership of the Creditors Committee to add two (2) additional members.  The current members of the Creditors Committee are Pablo L. Dardet, Art Linares, Anabel A. Rivera, Chip Withers, and Oscar Juelle.

**Retention of Professionals by the Creditors Committee**

On February 13, 2014, the Bankruptcy Court entered an order approving the application by the Creditors Committee to employ Glenn Rasmussen, P.A. as counsel to the Creditors Committee in the Bankruptcy Cases, *nunc pro tunc* to December 13, 2013.

**Section 341 Meetings of Creditors**

On December 19, 2013, the United States Trustee convened meetings of Creditors in the Bankruptcy Cases pursuant to Section 341 of the Bankruptcy Code.  The meetings of Creditors were concluded on that same date.

**FirstBank Injunction Adversary Proceeding**

On November 22, 2013, the Debtors commenced Adversary Proceeding Number 8:13-ap-01071-MGW (the "FirstBank Injunction Adversary Proceeding") in the Bankruptcy Cases by filing a complaint for injunctive relief (the "Injunction Complaint") against FirstBank, seeking the entry of preliminary and permanent injunctions (i) staying the BVI Receivership Proceeding, (ii) directing FirstBank to take no further action in prosecuting the BVI Receivership Proceeding unless and until the automatic stay under Section 362 of the Bankruptcy Code is terminated by order of the Bankruptcy Court or by operation of law, and (iii) not allowing any transfer of title to any of the Debtors' Property in  the BVI Receivership Proceeding.  Because FirstBank is an FDIC-insured institution and has offices in the State of Florida, as well as elsewhere, and has filed claims and otherwise submitted to the jurisdiction of the Bankruptcy Court, any orders entered in the FirstBank Injunction Adversary Proceeding requiring FirstBank to take or refrain

from taking actions are binding and enforceable on FirstBank, eliminating any jurisdictional issues with the BVI Receivership Proceeding. On November 22, 2013, the Debtors also filed their motion for preliminary injunction in the FirstBank Injunction Adversary Proceeding and subsequently filed a memorandum and affidavits in support thereof. On December 9, 2013, the Bankruptcy Court entered its order granting the Debtors' motion for a preliminary injunction, which, among other things, (i) prohibited FirstBank from continuing to prosecute the BVI Receivership Proceeding or taking any action to acquire title to the Debtors' Property in the BVI Receivership Proceeding, and (ii) required FirstBank to take certain actions in the BVI Receivership Proceeding to maintain the status quo. On December 23, 2013, FirstBank filed its answer to the Injunction Complaint. Pretrial conferences on the Injunction Complaint have been set and continued in connection with other continued hearings. A pretrial conference on the Injunction Complaitn is currently set for July 28, 2014, at 1:30 p.m.

On December 13, 2013, the Debtors filed, in the FirstBank Injunction Adversary Proceeding, a motion to modify the preliminary injunction entered by the Bankruptcy Court on December 9, 2013 to (i) require FirstBank to immediately terminate the BVI Receivership Proceeding and (ii) require the BVI Receiver to turn over funds in his possession to the Debtors, based on concerns by the Debtors regarding the BVI Receiver's ability to properly manage the Scrub Island Resort. As a result of ongoing settlement discussions between the Debtors and FirstBank, the hearing on this motion has been continued a number of times, and is currently set for preliminary hearing on July 28, 2014, at 1:30 p.m.

**Motions to Dismiss Bankruptcy Cases Filed by FirstBank**

On November 29, 2013, FirstBank filed two (2) separate motions to dismiss the Bankruptcy Cases. The first motion sought dismissal of the Bankruptcy Cases for cause under Section 1112(b) of the Bankruptcy Code and alleged, among other things, that (i) the Debtors manufactured jurisdiction in the Bankruptcy Court notwithstanding the Bankruptcy Court's lack of jurisdiction over the Bankruptcy Cases, (ii) the Debtors filed their bankruptcy petitions in bad faith in an effort to derail the BVI Receivership Proceeding despite having no realistic hope of confirming a plan of reorganization, and (iii) dismissal of the Bankruptcy Cases was in the best interests of both the Creditors and the Estates of the Debtors. The second motion sought dismissal of the Bankruptcy Cases under Section 305(a) of the Bankruptcy Code, requesting that the Bankruptcy Court abstain from proceeding with the Bankruptcy Cases and allow the BVI Receivership Proceeding to proceed forward. The Debtors filed responses to each of FirstBank's motions to dismiss. The Bankruptcy Court held an evidentiary hearing on December 5, 2013 on FirstBank's motions to dismiss and the Debtors' responses thereto. On December 6, 2013, the Bankruptcy Court announced its ruling in open court and denied FirstBank's motions to dismiss. On December 17, 2013, the Bankruptcy Court entered orders denying FirstBank's motons to dismiss.

**Motion for Relief from Stay Filed by FirstBank**

On December 14, 2013, FirstBank filed a motion for relief from stay pursuant to Section 362(d) of the Bankruptcy Code (the "Stay Relief Motion") in order to continue to prosecute the BVI Receivership Proceeding and seek to sell or dispose of the Debtors' Property subject to FirstBank's Liens. In connection therewith, FirstBank also filed a motion with the Bankruptcy

Court to file the reports of the BVI Receiver under seal, presumably to be utilized by FirstBank in support of the Stay Relief Motion. On January 2, 2014, the Bankruptcy Court entered an order (i) denying on a preliminary basis the Stay Relief Motion and setting the Stay Relief Motion for a final evidentiary hearing on January 15, 2014 and (ii) establishing discovery requirements with respect thereto. This matter is still pending before the Bankruptcy Court.

**Section 543 Motion Filed by FirstBank**

On December 17, 2013, FirstBank filed a motion with the Bankruptcy Court to excuse the BVI Receiver from compliance with the custodial turnover obligations of Section 543 of the Bankruptcy Code so as to allow the BVI Receiver to continue to operate and maintain the Debtors' Property. This matter is still pending before the Bankruptcy Court.

**Motion to Terminate Utility Services Filed by Scrub Island Utility (BVI) Ltd.**

On January 2, 2014, Scrub Island Utility (BVI) Ltd. ("SIU") filed a motion with the Bankruptcy Court to terminate providing water utility services to SIDG as a result of SIDG's failure to provide SIU with adequate assurance of Postpetition payment in the form of a deposit in the amount of $96,400.00. SIU and the Debtors have resolved the relief sought by SIU in the motion through (i) SIDG providing a Postpetition deposit in the amount of $24,000.00 to SIU, and (ii) SIDG agreeing to prepay each monthly invoice for utility services from SIU within seven (7) days of receipt of the invoice.

**Debtors' Emergency Motion to Compel Discovery from FirstBank**

On January 22, 2014, the Debtors filed an emergency motion with the Bankruptcy Court to compel FirstBank to respond to discovery requests served by the Debtors in connection with the final evidentiary hearing on the Stay Relief Motion. The Bankruptcy Court has held several hearings on this motion and entered orders with respect to the production of discovery by FirstBank.

**Debtor's Emergency Motion to Approve Postpetition Agreement with Marriott International, Inc.**

On February 3, 2014, SIDG filed an emergency motion with the Bankruptcy Court to approve a Postpetition agreement (the "Marriott Agreement") with Marriott containing the following terms (the "Marriott Motion"):[2]  (a) as an accommodation by Marriott during SIDG's Chapter 11 case, Marriott will make cash payments to SIDG, effective as of the Petition Date and for each postpetition month (or portion thereof), for all Marriott Rewards Redemption Amounts for postpetition guest stays at the Scrub Island Resort less (i) any and all Franchisor Fees/Expenses incurred by Marriott Postpetition, and (ii) an estimated holdback in an amount equivalent to two months of Franchisor Fees/Expenses (because Franchisor Fees/Expenses are based upon revenue, such calculations may not be made by month end; therefore, for purposes of estimating the holdback, Marriott will withhold $55,000 each month or a total of $110,000 for

---

[2]    Unless otherwise defined herein, all capitalized terms used in this paragraph shall have the meaning ascribed thereto in the Marriott Motion.

two months) (the "Holdback"), with the Holdback to be deducted in two installments: first, from the cash payment to be made from Marriott to SIDG for the postpetition period from the Petition Date through and including December 31, 2013 (Exhibit B attached to the Marriott Agreement sets forth the calculation of the cash payment to be made to SIDG for that period), and second, from the cash payment to be made from Marriott to SIDG for the Postpetition period from January 1, 2014 through and including January 31, 2014; (b) SIDG shall pay the Marriott Prepetition Claim to Marriott in full (less the amount of the Holdback, as long as SIDG is then current on all postpetition amounts due under the Franchise Agreement) pursuant to a plan of reorganization to be filed by SIDG in these cases as agreed by Marriott and SIDG; (c) SIDG agrees to include in the plan that, upon the effective date of the plan, the Franchise Agreement will be assumed pursuant to Section 365 of the Bankruptcy Code and the Marriott Prepetition Claim shall then be promptly paid in full (less the amount of the Holdback, as long as SIDG is then current on all Postpetition amounts due under the Franchise Agreement) as agreed by Marriott and SIDG; (d) upon the execution of the Marriott Agreement by Marriott and SIDG, Marriott shall pay SIDG, by wire transfer of immediately available funds, $76,398.43 (which is $131,398.43 (the amount set forth on Exhibit B attached to the Marriott Agreement for the Postpetition period from the Petition Date through and including December 31, 2013) less the first Holdback of $55,000). Upon entry of an order of the Court granting the Marriott Motion, Marriott shall pay SIDG, by wire transfer of immediately available funds, the calculated amount for the Postpetition period from January 1, 2014 through and including January 31, 2014 (less the second Holdback of $55,000); and (e) Marriott may immediately cease making any cash payments provided for under the Marriott Agreement without further notice to SIDG in the event any of the following occurs: (i) SIDG fails to file a plan that provides for the assumption of the Franchise Agreement; (ii) the plan does not provide for the prompt payment in full of the Marriott Prepetition Claim as provided in the Marriott Agreement; (iii) any creditor (including but not limited to the BVI Receiver) obtains relief from the automatic stay authorizing such creditor to foreclose on the Scrub Island Resort or any accounts of SIDG; and/or (iv) outstanding postpetition Franchisor Fees/Expenses exceed the Marriott Rewards Redemption Amounts (i.e., the Holdback was insufficient to ensure that Marriott has received its postpetition Franchisor Fees/Expenses). On February 5, 2014, the Bankruptcy Court entered an order granting the Marriott Motion and authorizing SIDG's execution and performance of the Marriott Agreement.

**Debtor's Motion to Approve Postpetition Agreement with Offshore Sailing School, Ltd., Inc.**

On February 10, 2014, SIDG filed a motion with the Bankruptcy Court seeking approval of a Postpetition agreement with Offshore Sailing School, Ltd., Inc. ("Offshore Sailing School"), pursuant to which Offshore Sailing School would operate its sailing and power boat instruction and related programs from the Scrub Island Resort. On February 13, 2014, the Bankruptcy Court entered an order granting that motion and authorizing SIDG's execution and performance of the agreement with Offshore Sailing School attached to the motion.

**Joint Emergency Motion to Approve "No Shop" and Exclusivity Agreement with FirstBank**

On February 28, 2014, the Debtors and FirstBank filed a joint motion for approval of an agreement between the Debtors and FirstBank pursuant to which FirstBank agreed that, provided that the Debtors filed a plan of reorganization on or before March 19, 2014, then through and

including April 1, 2014 (i) FirstBank would not sell or transfer its claims or loan documents to, and would engage in no negotiations to sell or transfer its claims or loan documents with, any third parties without the Debtors' prior written consent, (ii) FirstBank would not invite or accompany (or direct the BVI Receiver to invite or accompany) any third parties to Scrub Island who have an interest in purchasing FirstBank's claims or the Scrub Island Resort, (iii) FirstBank would not negotiate with any party other than the Debtors as to the terms of a Chapter 11 plan that would compete with a plan to be filed by the Debtors that would incorporate the economic terms of settlement term sheets exchanged by the parties, and (iv) upon final documentation of the terms of the consensual plan that is the subject of those settlement term sheets, FirstBank would enter into an appropriate plan support agreement with the Debtors. The Debtors and FirstBank likewise agreed to a standstill in their ongoing litigation against each other, and the Debtors agreed not to file an adversary proceeding or take depositions through April 1, 2014. On March 3, 2014, the Bankruptcy Court entered an order granting the motion.

**Initial Joint Plan of Reorganization and Joint Disclosure Statement filed by the Debtors**

On March 19, 2014, the Debtors filed their Joint Plan of Reorganization of Scrub Island Development Group Limited and Scrub Island Construction Limited under Chapter 11 of Title 11, United States Code dated as of March 19, 2014 (Doc. No. 176) (the "Initial Plan") and their Joint Disclosure Statement for Joint Plan of Reorganization of Scrub Island Development Group Limited and Scrub Island Construction Limited under Chapter 11 of Title 11, United States Code dated as of March 19, 2014 (Doc. No. 177) (the "Disclosure Statement for Initial Plan"). The Initial Plan matched the treatment of FirstBank's Claims as contained in a settlement plan term sheet agreed to by FirstBank, and was filed as a consensual plan on that basis. The Initial Plan provided for the reorganization of the Debtors, the settlement and payment of the Allowed Secured Claims of FirstBank, and the payment in full of all of the other Allowed Claims against the Debtors except as otherwise described in the Initial Plan. The Initial Plan provided for new investment of $15,075,000.00 into Reorganized SIDG by new equity interest holders, including a portion to be invested by existing SIDG shareholders for a minority interest.

The Disclosure Statement for Initial Plan contained a detailed discussion of the events occurring in the Bankruptcy Cases as of March 19, 2014, as well as summaries of the Initial Plan and other information which the Debtors believed to be adequate to enable Creditors to decide to vote on the Initial Plan. A hearing on approval of the Disclosure Statement for Initial Plan was set for April 14, 2014, with deadlines to object and for filing amendments to the Disclosure Statement for Initial Plan set in conjunction with the hearing.

**Objections to Disclosure Statement for Initial Plan**

FirstBank filed an initial and a supplemental objection to the Disclosure Statement for Initial Plan, asserting that it had not agreed to the Initial Plan, and that the Disclosure Statement for Initial Plan failed to contain certain other information which FirstBank contended was necessary in order for Creditors to have adequate information to consider whether to vote on the Initial Plan. Objections to the Disclosure Statement for Initial Plan were also filed by SIU, the United States Trustee, Marriott, and Linares/Foster.

Following the initial objection filed by FirstBank, the Debtors filed a Notice of Intent to Amend Joint Disclosure Statement, indicating that, in addition to other amendments which might be made to address other objections, the Disclosure Statement for Initial Plan would be amended to indicate that there was no agreement with FirstBank at that stage regarding the identity of the plan funding parties.

**Motion to Require Mediation**

On March 31, 2014, the Bankruptcy Court conducted a status conference on the Debtors' motion to compel production by FirstBank, and subsequently entered an order continuing the hearings on various contested matters from April 14, 2014 to April 30, 2014. Following the hearing, and based on the objections raised by FirstBank to the Disclosure Statement for Initial Plan and in other discussions between the parties that mediation might prove fruitful, on April 1, 2014 the Creditors Committee filed a motion to require mediation. The Bankrupcy Court entered its Order Granting Motion to Require Mediation, directing the Debtors, FirstBank, and the Creditors Committee to mediation (the "Mediation") to occur on or before April 29, 2014. A mediation was conducted on April 29, 2014, April 30, 2014, and June 24, 2014.

**FirstBank's Efforts to Terminate Exclusivity**

Prior to the Mediation, FirstBank filed a Reservation of Rights (Doc. No. 199), and a motion to terminate the Debtors' exclusivity period under Section 1121 of the Bankruptcy Code. The motion to terminate exclusivity was initially set for hearing on April 30, 2014, and as discussed below, was ultimately heard on June 25, 2014.

**Joint Motions to Continue Hearings**

The Mediation was scheduled for April 29, 2014 and the morning of April 30, 2014. In order to allow the parties to focus on the mediation efforts, the Debtors and FirstBank filed a Joint Motion to Schedule Status Conference on April 30, 2014 in Lieu of Presently Scheduled Matters, jointly requesting that the Bankruptcy Court conduct a status conference and consider scheduling matters at the hearing on April 30, 2014. Based on the progress of the Mediation, at the hearing on April 30, 2014, the Debtors and FirstBank again jointly requested that the Bankruptcy Court continue the hearings to June 25, 2014, to be held following a continued mediation session. The Bankruptcy Court entered its Order (A) on April 30, 2014 Status Conference and (B) Rescheduling Hearings Scheduled for May 13, 2014 to June 25, 2014.

**Agreed Extensions of Exclusivity**

In connection with the Mediation, and in conjunction with the agreed requests to continue hearings, the Bankruptcy Court also entered an Order Granting Debtors' Unopposed Motion for Extension of Period of, extending the Debtors' exclusive right to solicit acceptances of a plan through and including June 27, 2014, and providing that the Bankruptcy Court would consider a further extension of exclusivity at the hearing to be conducted on June 25, 2014.

**Impasse of Mediation**

A continued mediation session between the Debtors, FirstBank, and the Creditors Committee conducted on June 24, 2014 was unsuccessful, and the mediator declared an impasse, reflected in the Mediator's Report and Notice of Completion of Mediation and Impasse.

**Employment of HVS as Appraiser**

On June 24, 2014, SIDG filed an application to employ HVS Shared Ownership Services ("HVS") as Appraiser, to appraise SIDG's real property and related personal property consisting of the Scrub Island Resort, including the various villas and lots owned by SIDG. The proposed employment is in accordance with the Proposal for a Restricted Appraisal Report, attached as an exhibit to the application, and is for purposes of valuing the assets of the Debtors for purposes of confirmation of the Plan. On June 30, 2014, FirstBank filed a limited objection to the application regarding the source of funds to pay the retainer to HVS. The Debtors believe the basis for the objection has been resolved, and expect that the employment of HVS will be approved.

**Extension of Exclusivity**

At a hearing held on June 25, 2014, the Bankruptcy Court denied FirstBank's motion to terminate exclusivity, and granted the Debtors' motion to extend exclusivity in connection with an amended plan and an amended disclosure statement to be filed by the Debtors by no later than July 11, 2014. The Plan, as may be further amended, is the plan contemplated by the exclusivity extension order.

**FirsBank Lender Liability Adversary Proceeding**

In the Debtors' Joint Case Management Summary, the Debtors identified certain prepetition activity by FirstBank and a former executive of the Debtors giving rise to claims which the Debtors would pursue in an adversary proceeding in the absence of consensual resolution. On June 24, 2014, the Debtors filed their Complaint and Objection to Claims (the "Lender Liability Complaint"), initiating the FirstBank Lender Liability Adversary Proceeding against FirstBank, Adv. Proc. No. 8:14-ap-00534-MGW. The Lender Liability Complaint contains counts for breach of contract, negligent misrepresentation, tortious interference, civil conspiracy, aiding and abetting breach of fiduciary duty, and equitable subordination, among others. The Lender Liability Complaint seeks compensatory and punitive damages not subject to setoff, and the disallowance in full or subordination under Section 510(c) of claims filed by FirstBank. On July 8, 2014, the Creditors Committee filed a Motion for Leave to Intervene as Party Plaintiffs in the FirstBank Lender Liability Adversary Proceeding, seeking relief including a judgment subordinating FirstBank's Claims to all other Allowed Claims and ordering that any Liens securing the FirstBank Claims be transferred to the Estate.

**Trial Scheduled in FirstBank Lender Liability Adversary Proceeding and Confirmation of Plan**

At the June 25, 2014 hearing, the Bankruptcy Court set trial dates in September, October, and November in the the FirstBank Lender Liability Adversary Proceeding, the FirstBank

Injunction Adversary Proceeding, and the various contested matters in the Bankruptcy Cases, and to consider Confirmation of the Plan.

**DIP Loan – Miller Coors**

On June 24, 2014, SIDG filed a motion on an emergency basis seeking authority to borrow up to $185,000.00 from Mainsail Property Management, LLC secured by a first lien interest in a receivable due from Miller-Coors in the approximate amount of $191,000. Miller-Coors booked the entire Scrub Island Resort for the period from June 17–21, 2014, and owed SIDG approximately $191,000. Under separate agreement with Marriott, Miller-Coors has thirty (30) days to make such payment to SIDG. Under the proposed financing, Mainsail agreed to make the loan to fund SIDG's cash flow until receipt of the receivable, at which time the loan will be repaid. The motion was heard on June 25, 2014, and granted.

## CERTAIN FEDERAL INCOME TAX CONSEQUENCES

**General**

The tax consequences of the Plan to the Debtors and to Holders of Claims and Equity Interests (collectively, "Holders") are discussed below. This discussion of the federal income tax consequences of the Plan to the Debtors and Holders under U.S. federal income tax law, including the Internal Revenue Code of 1986, as amended (the "Tax Code"), is provided for informational purposes only. While this discussion addresses certain of the material tax consequences of the Plan, it is not a complete discussion of all such consequences and is subject to substantial uncertainties. Moreover, the consequences to a Holder may be affected by matters not discussed below (including, without limitation, special rules applicable to certain types of persons, such as persons holding non-vested stock or otherwise subject to special rules, nonresident aliens, life insurance companies, and tax-exempt organizations) and by such Holder's particular tax situation. In addition, this discussion does not address any state, local, or foreign tax considerations that may be applicable to particular Holders.

**HOLDERS ARE URGED TO CONSULT THEIR OWN TAX ADVISORS REGARDING THE TAX CONSEQUENCES TO THEM OF THE TRANSACTIONS CONTEMPLATED BY THE PLAN, INCLUDING STATE, LOCAL AND FOREIGN TAX CONSEQUENCES.**

**THE DEBTORS' GENERAL BANKRUPTCY COUNSEL HAS NO TAX EXPERTISE AND HAS NOT RESEARCHED OR ANALYZED TAX CONSEQUENCES RESULTING FROM THE PLAN.**

**SOME OF THE ISSUES DISCUSSED BELOW ARE COMPLEX, AND THERE CAN BE NO ASSURANCE OF THE ACCURACY OF THIS INFORMATION.**

**General Federal Income Tax Consequences to Holders**

***In General.*** The following discussion addresses certain of the material consequences of the Plan to Holders. Under the Plan, the tax consequences of the Plan to a Holder will depend, in part, on the type of consideration received in exchange for the Claim or Equity Interest and the

tax status of the Holder, such as whether the Holder is an individual, corporation or other entity, whether the Holder is a resident of the United States, the accounting method of the Holder, and the tax classification of the Holder's particular Claim or Equity Interest. **HOLDERS ARE STRONGLY ADVISED TO CONSULT THEIR OWN TAX ADVISORS WITH RESPECT TO THE TAX TREATMENT UNDER THE PLAN OF THEIR PARTICULAR CLAIM OR EQUITY INTEREST.**

*Tax Consequences to Holders of Claims and Equity Interests.* The Holders of Claims against and Equity Interests in the Debtors are urged to consult with their tax advisors as to the consequences of the Plan to them. Among the issues the Holders of Claims and/or Equity Interests and their advisors may wish to consider are:

(1)   The extent to which the Holder of a Claim and/or Equity Interest is entitled to a bad debt deduction or a worthless securities loss.

(2)   The extent to which the Holder of a Claim or Equity Interest recognizes gain or loss on the exchange of its Claim or Equity Interest for property, debt, and stock of the Debtors and the character of that gain or loss.

(3)   The basis and the holding period for any property, debt, and stock received by the Holder of a Claim or Equity Interest.

(4)   Whether the original issue discount rules, market discount rule, and amortizable bond premium rules apply to any debt received by the Holder of a Claim or Equity Interest.

(5)   The treatment of property, stock, or debt, if any, received by the Holder of a Claim or Equity Interest in satisfaction of accrued interest.

(6)   The effect of a Holder of a Claim or Equity Interest receiving deferred distributions or distributions that are contingent in amount.

PERSONS CONCERNED WITH THE TAX CONSEQUENCES OF THE PLAN SHOULD CONSULT THEIR OWN ACCOUNTANTS, ATTORNEYS AND/OR ADVISORS. THE DEBTORS MAKE THE ABOVE-NOTED DISCLOSURE OF POSSIBLE TAX CONSEQUENCES FOR THE SOLE PURPOSE OF ALERTING READERS TO TAX ISSUES THEY MAY WISH TO CONSIDER. THE DEBTORS CANNOT AND DO NOT REPRESENT THAT THE TAX CONSEQUENCES MENTIONED ABOVE ARE COMPLETELY ACCURATE BECAUSE, AMONG OTHER THINGS, THE TAX LAW EMBODIES MANY COMPLICATED RULES THAT MAKE IT DIFFICULT TO STATE ACCURATELY WHAT THE TAX IMPLICATIONS OF ANY ACTION MIGHT BE.

### No Federal Income Tax Consequences to the Debtors

The Plan will have no federal income tax effect on the Debtors since they are not required to file federal income tax returns.

## VOTING ON AND CONFIRMATION OF THE PLAN

**Confirmation and Acceptance by All Impaired Classes**

At the Confirmation Hearing, the Bankruptcy Court will confirm the Plan if all of the requirements of Bankruptcy Code Section 1129 are met. Among the requirements for confirmation of a plan are that the plan be accepted by all impaired classes of claims and equity interests, and satisfaction of the matters described below.

*Feasibility*. A plan may be confirmed only if it is not likely to be followed by the liquidation or the need for further financial reorganization of a debtor. The Debtors believe that they will be able to perform their obligations under the Plan without further financial reorganization.

As noted elsewhere, the Debtors' Plan contemplates the infusion of approximately $18.5 million of cash into the Reorganized Debtors on the Effective Date of the Plan (in addition to the DIP Facility of approximately $1.0 million). The primary sources of this funding are (a) RBC Equities #1, LLC to the extent of $12.5 million and (b) three of the current shareholders of SIDG to the extent of approximately $6 million. Inasmuch as the DIP Facility will not be repaid on the Effective Date, its unpaid balance will be added to the $12.5 exit financing component of the Plan Loan from RBC Equities #1, LLC. The Debtors believe that these funds and other funds from operations and sales will be sufficient to fund all required Creditor payments under the Plan, to provide adequate funds for ongoing improvements to the Scrub Island Resort, including additional construction of partially-finished villas that Reorganized SIDG will acquire on the Effective Date, and to supplement the Reorganized Debtors' revenues to maintain their business operations.

The Debtors are preparing a projection of cash flow from the Reorganized Debtors' operations and from the sale of real estate, which shall be filed with the Bankruptcy Court no later than one week prior to the deadline for the filing of objections to the Disclosure Statement. Some uncertainties, however, presently exist that might vary the Debtors' cash needs at Confirmation and might require additional funds. For example, (a) the exact amount of Allowed Administrative Expense Claims will not be known until applications for those Claims are filed and orders allowing those Claims are entered; (b) the allowed amount of FirstBank's Secured Claim, under FirstBank Option B of the Plan, will depend upon a valuation by the Bankruptcy Court;[3] and (c) the outcome of the FirstBank Lender Liability Adversary Proceeding may impact cash requirements, which may actually be favorable to the Debtors and reduce cash requirements, thus enhancing feasibility. The Debtors will establish the existence of commitments for such additional funding at the Confirmation Hearing, if necessary.

---

[3] The cash flow projection will be based on Confirmation using the FirstBank Option A treatment of the FirstBank Prepetition Claims, but, as further discussed below, Confirmation using FirstBank Option B would not materially change the cash flow analysis. Should the Bankruptcy Court, for example, allow FirstBank a Secured Claim in the range of $40 million, it would not significantly affect the Reorganized Debtors' post-confirmation cash requirements.

As currently provided, the exit financing under the Plan Loan would be used to pay on the Effective Date of the Plan costs of administration (estimated at $1 million in excess of amounts of funds that may be paid through the DIP Facility), a cash payment of $7.5 million to FirstBank,[4] total payments to Unsecured Creditors of approximately $2.5 million, and an interest reserve for FirstBank Option A of approximately $1.275 million. The remaining amount of approximately $6 million will be deposited in the Debtors' operating or reserve accounts.

Deferred cash payments required under the Plan will be funded from the cash on hand at the time of confirmation, future revenues from the operation of the Scrub Island Resort, and sales of the Scrub Island Real Estate. The cash flow projection will address the Debtors' operations and will reflect that the Debtors will have sufficient funds to make all Plan payments through the five year term of the Plan.[5]

The Plan also provides for payment in cash of the unpaid portion of FirstBank's Allowed Secured Claim five years after the Effective Date of the Plan. By that time, FirstBank will have received substantial payments of principal, derived primarily from its fifty percent share of net proceeds from the sale of the Scrub Island Real Estate, reducing its remaining principal balance (depending upon the result of the Bankruptcy Court's valuation and the results of the FirstBank Lender Liability Adversary Proceeding). Under the Plan, FirstBank will retain its Prepetition Liens on the Debtors' assets. FirstBank's collateral at the end of five years will consist of the Scrub Island Resort operations, projected to be operating profitably and generating significant annual net operating income. In addition, the Reorganized Debtors will still own significant unsold real estate subject to FirstBank's Liens and will have accumulated some cash through operations and asset disposition. The positive cash flow and the unsold real estate will support a new loan facility sufficient to refinance the unpaid balance owed to FirstBank or could, alternatively, be sold to pay off the remaining unpaid balance of the FirstBank Allowed Secured Claim.

*Best Interests Standard*. The Bankruptcy Code requires that the Plan meet the "best interest" test, which requires that members of a Class must receive or retain under the Plan, property having a value not less than the amount which the Class members would have received or retained if the Debtors were liquidated under Chapter 7 on the same date. The Debtors believe that Distributions to all Impaired Classes of Claims in accordance with the terms of the Plan would exceed the net distribution that would otherwise take place in Chapter 7. See

---

4    FirstBank Option B would require FirstBank to be paid Cash on the Effective Date of twenty percent (20%) of its Allowed Secured Claim, which may change the $7.5 million down payment. Based upon statements made by FirstBank in papers filed with the Bankruptcy Court and admissions of its representatives, the Debtors believe it unlikely that the Allowed Secured Claim will exceed $40 million. It is also possible that FirstBank's Claims will be reduced or eliminated as part of the FirstBank Lender Liability Adversary Proceeding. In any event, the Debtors will establish at the Confirmation Hearing the feasibility of the Plan, including any required payments to FirstBank.

5    Subject to Bankruptcy Court approval, SIDG has retained HVS Shared Ownership Services ("HVS"), an appraiser of hotel and resort property. HVS has a worldwide reputation for its expertise in this area and will be forming conclusions as to the operating revenues and the revenues from asset sales. The Debtors will consider HVS' analysis when received and may incorporate additional information into or revise certain aspects of their cash flow projections prior to Confirmation.

"ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF THE PLAN—Liquidation under Chapter 7 or Chapter 11."

**Confirmation Without Acceptance by All Impaired Classes**

If one or more of the Impaired Classes of Claims does not accept the Plan, the Plan may nevertheless be confirmed and be binding upon the non-accepting Impaired Class under the "cram-down" provisions of the Bankruptcy Code, if the Plan does not "discriminate unfairly" and is "fair and equitable" to the non-accepting Impaired Classes under the Plan.

***Discriminate Unfairly***.  The Bankruptcy Code requirement that a plan not "discriminate unfairly" means that a dissenting class must be treated equally with respect to other classes of equal rank.  The Debtors believe that the Plan does not "discriminate unfairly" with respect to any Class of Claims because no class is afforded treatment which is disproportionate to the treatment afforded other Classes of equal rank.

***Fair and Equitable Standard***.  With respect to the Impaired Classes of Unsecured Claims, Bankruptcy Code Section 1129(b)(2)(B) provides that a plan is "fair and equitable" if it provides that (i) each holder of a claim of such a class receives or retains on account of such claim, property of a value as of the effective date of the plan equal to the allowed amount of such claim; or (ii) the holder of any claim or interest that is junior to the claims of such class will not receive or retain any property under the plan on account of such junior claim or interest.  The Debtors believe that the Plan meets these standards.  Accordingly, if necessary, the Debtors will seek Confirmation of the Plan under the "cram-down" provisions of the Bankruptcy Code and believe it meets the requirements for Confirmation by the Bankruptcy Court notwithstanding the non-acceptance by an Impaired Class of Claims.

The outcome of the FirstBank Lender Liability Adversary Proceeding brought by the Debtors and joined by the Creditors Committee may impact the treatment of FirstBank's Claims and other events in the Bankruptcy Cases.  The Debtors believe, however, that the Plan is confirmable and is fair and equitable, particularly FirstBank Option B, even if the FirstBank Lender Liability Adversary Proceeding is decided adversely to the Debtors and the Creditors Committee.  Based on the rulings of the Bankruptcy Court in the FirstBank Lender Liability Adversary Proceeding, the Debtors may modify the Plan to adjust treatment of various Claims.  Additionally, the Debtors intend to evaluate the results of the balloting and determine whether to seek Confirmation of the Plan in the event that less than all the Impaired Classes of Claims do not vote to accept the Plan.  The determination as to whether to seek Confirmation under such circumstances will be announced before or at the Confirmation Hearing.

**Non-Confirmation of the Plan**

If the Plan is not confirmed by the Bankruptcy Court, the Court may permit the filing of an amended plan, dismiss the case, or convert the case to Chapter 7.  In a Chapter 7 case, the Debtors' assets would be sold and distributed to the Unsecured Creditors after the payment of all Secured Claims, costs of administration and the payment of priority claims.  Due to the amount of the Secured Claims asserted by FirstBank, there would be no such distribution for Unsecured Creditors in a Chapter 7 proceeding.

68

The cost of distributing the Plan and this Disclosure Statement, as well as the costs, if any, of soliciting acceptances, will be borne by the Debtors.

## ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF THE PLAN

If the Plan is not confirmed, the potential alternatives include (a) alternative plans under Chapter 11 (including a liquidation plan), (b) dismissal of the Bankruptcy Cases, or (c) conversion of the Bankruptcy Cases to cases under Chapter 7 of the Bankruptcy Code.

**Alternative Plans of Reorganization**

If the Plan is not confirmed, the Debtors or, subject to further determination by the Bankruptcy Court as to extensions of exclusivity under the Bankruptcy Code, any other party in interest in the Bankruptcy Cases could attempt to formulate and propose a different plan or plans. Such plans might involve the reorganization of the Debtors, an orderly liquidation of the Debtors' assets, or a combination thereof. The Debtors believe that the Plan will enable Creditors to be paid the maximum amount possible for their Allowed Claims.

**Liquidation under Chapter 7 or Chapter 11**

If a plan is not confirmed, the Bankruptcy Cases may be converted to Chapter 7 liquidation cases. In a Chapter 7 case, a trustee would be elected or appointed to liquidate the assets of the Debtors. The proceeds of the liquidation would be distributed to the Creditors and Holders of Equity Interests of the Debtors in accordance with the priorities established by the Bankruptcy Code. Except as otherwise ordered by the Bankruptcy Court in the FirstBank Lender Liability Adversary Proceeding, because the Liens of FirstBank exceed the value of the Debtors' assets, there would likely be no distribution in Chapter 7 to Unsecured Creditors. The Debtors have attached hereto as Exhibit 2 a Liquidation Summary which shows that Unsecured Creditors would receive no distribution in a Chapter 7 proceeding.

In general, the Debtors believe that liquidation under Chapter 7 would result in diminution of the value of the interests of the Creditors because of (a) additional administrative expenses involved in the appointment of a trustee and attorneys, accountants and other professionals to assist such trustee; (b) additional expenses and claims, some of which might be entitled to priority, which would arise by reason of the liquidation; (c) failure to realize the full value of the Debtors' assets; (d) the inability to utilize the work product and knowledge of the Debtors and their Professionals; and (e) the substantial delay which would elapse before Creditors would receive any distribution in respect of their Claims.

In a liquidation under Chapter 11, the Debtors' assets would be sold in an orderly fashion over a more extended period of time than in liquidation under Chapter 7. The Debtors believe that the Plan is superior to liquidation under Chapter 7 or Chapter 11.

## SUMMARY, RECOMMENDATION AND CONCLUSION

The Plan provides for an orderly and prompt distribution to Holders of Allowed Claims against the Debtors.  The Debtors believe that their efforts to maximize the return for Creditors have been full and complete.  The Debtors further believe that the Plan is in the best interests of all Creditors.   In the event of a liquidation of the Debtors' assets under Chapter 7 of the Bankruptcy Code, the Debtors believe there would be no distribution to Unsecured Creditors. For these reasons, the Debtors urge that the Plan is in the best interests of all Creditors and that the Plan be accepted.

Dated as of July 11, 2014         Respectfully submitted,

**Scrub Island Development Group Limited**

By:    CIH Loft LLC,
       Its Director

       By:    _____
            Joe C. Collier III
            Managing Member


**Scrub Island Construction Limited**

By:    CIH Loft LLC,
       Its Director

       By:    _____
            Joe C. Collier III
            Managing Member


/s/ Charles A. Postler
Harley E. Riedel (Florida Bar No. 183628)
Charles A. Postler (Florida Bar No. 455318)
STICHTER, RIEDEL, BLAIN & PROSSER, P.A.
110 East Madison Street, Suite 200
Tampa, Florida 33602
Telephone:    (813) 229-0144
Facsimile:    (813) 229-1811
Email: hriedel@srbp.com
       cpostler@srbp.com
Counsel for Debtors and Debtors in Possession

# EXHIBIT 1

Projections for Reorganized SIDG for the Period
from November 30, 2014 through December 31, 2019

[TO BE FILED BY SUPPLEMENT BY NO LATER THAN
SEVEN (7) DAYS PRIOR TO THE DEADLINE TO FILE
OBJECTIONS TO THE DISCLOSURE STATEMENT]

# EXHIBIT 2

Liquidation Summary

[TO BE FILED BY SUPPLEMENT BY NO LATER THAN
SEVEN (7) DAYS PRIOR TO THE DEADLINE TO FILE
OBJECTIONS TO THE DISCLOSURE STATEMENT]