UNITED STATES BANKRUPTCY COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION
www.flmb.uscourts.gov

In re:                                        Case No. 8:13-bk-15285-MGW
                                              Case No. 8:13-bk-15286-MGW
                                              Chapter 11

Scrub Island Development Group Limited
Scrub Island Construction Limited,

     Debtors.
_____/

**MEMORANDUM OPINION AND ORDER ON FIRSTBANK
PUERTO RICO'S EMERGENCY MOTION FOR STAY PENDING APPEAL**

This Court recently confirmed a chapter 11 plan that provides for the payment of

approximately $122 million to FirstBank Puerto Rico over 30 years. To make the plan work, the

Debtors, who operate a resort in the British Virgin Islands, had to acquire two partially

constructed villas owned by creditors and a desalinization plant that provides fresh water to the

resort. The primary argument advanced by the Bank in support of its contention that this Court's

confirmation order has no chance of withstanding an appeal is that it improperly interferes with

the Bank's first mortgage on the villas and purchase option on the desalinization plant. This

Court must now decide whether to stay its confirmation ruling pending the Bank's appeal on

those (and other) issues.

While the Court acknowledges that stays pending appeal are appropriate in certain cases,

the Bank's request here is the latest in a long line of bad-faith attempts to keep the Debtors from

successfully restructuring their business. Among other things, the Bank secretly conspired with

the individual employee charged with running the resort on behalf of the Debtors to thwart their

efforts to take the Bank up on its offer to buy out its loans for a discounted amount before this

case was filed.[1] Then during this case, the Bank rejected proposed plan treatment that was identical to a $37.5 million term sheet the Bank signed with a third-party investor and, instead, exercised its rights under § 1111(b) requiring the Debtors to pay the Bank the full amount of its $119 million claim. When, presumably to the surprise of the Bank, the Debtors were able to confirm a plan that complied with § 1111(b), the Bank appealed the Court's confirmation ruling by essentially challenging the Debtors' means of implementing the plan.

The Court concludes that it is unlikely the Bank will prevail on its appeal. The Bank's motion is premised entirely on a misrepresentation as to the terms of the confirmed plan in this case and a misunderstanding of the confirmation process in general. To hear the Bank tell it, the Bank is being stripped of its liens entirely on the villas and being forced to give up its liens on the rest of the Debtors' property in exchange for less valuable, more volatile liens on substitute collateral. And the Bank says the Court cannot confirm a plan that strips it of its liens or forces it to accept liens on substitute collateral that is less valuable and more volatile because the Bankruptcy Code does not expressly authorized that treatment.

In actuality, the Bank is keeping its liens on the villas until they are sold (and the Bank is paid in full), and as for the remainder of its collateral, the Bank is either receiving the proceeds from the sale of individual lots or villas or a lien on a "sinking fund" that is being used to enhance the Bank's remaining collateral. This treatment is permissible under the Bankruptcy

---

[1] These allegations are set out in an adversary proceeding that was consolidated for trial with the trial on confirmation: *Scrub Island Development Group Limited, Scrub Island Construction Limited, and The Official Committee of Unsecured Creditors, Plaintiffs, vs. Firstbank Puerto Rico, Defendant.* (Adv. P. No. 8:14-Ap-000534-MGW). In this adversary proceeding, the Debtor alleged that the Bank conspired in a breach of fiduciary duty owed by the individual employee charged with running the resort on behalf of the Debtors, and as a result materially breached its loan agreements with the Debtors, and that such breaches entitle the Debtors to various forms of relief including completely excusing the Debtors' performance under its loan agreements, disallowance of all the Bank's claims, and compensatory and punitive damages. At the conclusion of the consolidated trial, the Court confirmed the Plan, found with respect to the adversary proceeding that the Bank had conspired with the breach of fiduciary duty by the individual employee charged with running the resort on behalf of the Debtors, but scheduled further proceedings to consider the appropriate remedy given the Bank's actions in this case. The issues pending in the Adversary Proceeding have not been concluded are not the subject of the Bank's appeal.

Code. The Bankruptcy Code provides a chapter 11 debtor with great flexibility to formulate a plan—limited only by the debtor's creativity and the prohibition in § 1123(b)(6) that the plan provisions not be in "inconsistent" with the Bankruptcy Code. Because the Debtors' confirmed plan is not inconsistent with the Bankruptcy Code, the Bank will not be able to persuade a district court on appeal that this Court's confirmation ruling was clearly erroneous.

And it is abundantly clear that the Debtors will be irreparably harmed if the Court stays its confirmation ruling pending the appeal. A carefully tailored feasible plan of reorganization will be destroyed. The Debtors will be denied essential funding, which will result in their resort being shut down, and the Bank will accomplish what it could not during the confirmation process. Finally, public policy favors permitting Debtors an opportunity to implement their confirmed plan. Because the Bank is attempting to use the requested stay pending appeal to keep the Debtors from implementing a confirmed plan that easily satisfies the confirmation requirements under the Bankruptcy Code, the Bank's request for a stay will be denied.

## Background[2]

The Debtors in this case are Scrub Island Development Group Limited and Scrub Island Construction Limited. Scrub Island Development owns Scrub Island, a 230-acre island located in the British Virgin Island. Scrub Island consists of Big Scrub Island and Little Scrub Island, which are connected by an isthmus. Scrub Island Development owns the Scrub Island Resort, which is located on Big and Little Scrub Islands, and Scrub Island Construction was created to construct villas in the resort.

---

[2] The factual recitations set forth in this Memorandum Opinion are taken from this Court's findings of fact and conclusions of law stated orally in open court after the conclusion of an eight-day trial on confirmation. Transcript of Ruling in Open Court on Dec. 30, 2014, Doc. No. 459 (Docketed Jan. 12, 2015).

Scrub Island Development contracted with Mainsail Lodging & Development to be the exclusive developer and operator of the Scrub Island Resort. Joe Collier is a principal of Mainsail. Collier is also a principal and essentially CEO of Scrub Island Development and Scrub Island Construction.

<u>Development of Scrub Island</u>

The development of Scrub Island was somewhat by happenstance. In 2003, Collier visited Scrub Island while on a sailing trip to the British Virgin Islands. During that visit, Collier met the owners of Scrub Island—Pam McManus and her two sons. At the time, the McManuses were running a restaurant on the island and had thoughts of developing the island one townhouse at a time through Scrub Island Development. Between 2003 and 2005, Collier pitched the owners of Scrub Island on his vision for a condominium-hotel project on the island and began the process for implementing that vision.

As envisioned, the condominium-hotel would consist of 26 ocean view guest rooms in what would be known as Marina Village, hillside and ocean view villas (known as Long View and Ocean Villas), a 55-slip deep-water marina, a pool, three restaurants, a spa, and a fitness center. The idea was to sell the villas as condominiums and have the owners participate in a rental program where their condominiums are rented out as hotel rooms when not used by the owners. By law, unit owners cannot be compelled to participate in the rental program. But the Debtors took sort of a "carrot and stick" approach to encouraging participation in the rental program. The "carrot" was that the Debtors would completely furnish (furniture, linens, pots, pans, etc.) and maintain (clean, cut grass, etc.) the unit if the owner participated in the rental program. The "stick" was that unit owners who did not participate in the rental program were responsible for common area maintenance fees for the resort. Ultimately, all of the unit owners

4

participated, which meant that when they were not using their units, they were put into the rental program and the owners earned revenue when they were rented out.

### Funding for the Project

Early on, funding for the project came from Scrub Island Development's shareholders. Between 2003 and 2005, Scrub Island's current and former shareholders provided $2.9 million in funding. Of course, Scrub Island Development ultimately needed bank financing for the proposed development. So it began putting together a bank package to solicit financing from lenders.

The point person for putting the bank package together was James Talton. Talton, who Collier described as "my guy," was Vice President of Development for the project. In that role, he was essentially running the development. Talton, with the help of Juli Corlew, put together schematics, pro formas, and projections for banks to consider, and then Collier and his team began interviewing banks. Eventually, Scrub Island struck a deal with FirstBank Puerto Rico.

Beginning in November 2005, Scrub Island Development entered into a series of loan agreements with the Bank. Although the loan transactions are somewhat complicated, essentially the Debtors (Scrub Island Development and Scrub Island Construction) ended up with three loans with the Bank. One loan was for a little over $99 million, the second for $7 million, and the third for $2.8 million. In total, the Bank loaned the Debtors nearly $110 million  to finance construction of the Scrub Island Resort and development of the island.

### Construction of the Resort

The Debtors broke ground on the resort in 2005. They quickly had success selling condominium units. Within the first 18 months, the Debtors had over 30 contracts for condominium units. And by February 2010, the Scrub Island Resort, Spa & Marina opened.

## Default Under the Loan Agreements

Not long after it opened, though, the resort began to struggle. The resort's struggles were attributable to a number of factors. For starters, a number of buyers walked out of their contracts. Although the Debtors had sold 22 of the 26 Marina Village units preconstruction, only 11 of the buyers closed; the other 11 walked away from their deposits. Making matters worse, although the resort had opened, construction of the commercial components of the Marina Village, as well as some of the Ocean and Long View villas, had not been completed.

In particular, Scrub Island Construction had failed to complete construction of five Long View Villas. The partially constructed Long View Villas were owned by: Blue Water Traders Ltd.; Pablo Dardet; Thomas Frederick; Arturo Linares and David Foster ("Linares/Foster"); and, Oscar and Anabel Rivera. As it turns out, the Bank provided construction loans to the owners of two of the villas: Blue Water Traders and Linares/Foster.

By early 2011, about a year after the resort opened, the Debtors had defaulted under their loan agreements and, as of May 2011, owed the Bank a little more than $101 million. Around that time, the Debtors and the Bank attempted to negotiate the restructuring of the Debtors' loan obligations. In June 2010, the Debtors and Bank entered into a workout agreement.

## The Workout Agreement

The workout agreement contained several critical terms. First, the Bank agreed to forbear its collection efforts against the Debtors. Second, the Bank agreed to advance additional funds to the Debtors to complete the Marina Village and the Ocean—but not Long View—villas. Third, the Debtors agreed to get the resort flagged as part of the Marriott hotel franchise. Fourth, the Debtors agreed to make certain improvements to the hotel that were necessary to become part of the Marriott hotel franchise. As required under the workout agreement, the Debtors made the

necessary improvements and got the resort flagged as part of the Marriott Autograph Collection in December 2011.

The Debtors also began looking for investors to take out the Bank's loans. Sometime before the parties entered into the workout agreement, the Bank suggested the Debtors find a "friendly" note buyer who would be willing to either pay off or buy the Bank's loans at a discounted amount. So the Debtors started meeting and sharing financial projections with potential investors. Over time, the Debtors identified a number of prospects who were potentially interested in acquiring the loans, several of whom made offers to the Bank.

The offer that showed the most promise came from Lance Shaner. Shaner offered to buy the Debtors' loans from the Bank for $40 million cash. The Bank actually signed a $40 million letter of intent. The Shaner letter of intent included a due diligence period, and the $40 million deal eventually fell through during the due diligence phase.

The Secret Communications

Unknown to the Debtors, the Bank employee responsible for their loans, Sammy Pastrana, was secretly conspiring with Talton to gain confidential business information while the Debtors were trying to find an investor. As project manager, Talton was instrumental in putting together the materials for soliciting lenders for the project in the first place, was the one who ultimately brought the Bank on to finance the project, and remained the Bank's contact throughout the development. Talton was also present at shareholder meetings where discussions about the status of the project and where it was headed took place. And in his role as project manager, he had access to the Debtors' confidential business information, including shareholder documents, shareholder financials, and the Debtors' internal financials (Talton was actually the one responsible for preparing the internal financials for Scrub Island).

The secret communications between Talton and Pastrana were sent to or from Talton's Hotmail account rather than his work account. Others were sent by text message. This was done to maintain secrecy from Collier. While Talton now implausibly claims he made the secret communications because he was concerned the Debtors were attempting to drive down the price of their property, Talton's real motives were twofold. First, if the Bank were to take over the property, Talton would be available to run the project. Second, if Talton could find a buyer for the Bank's notes, he would receive a commission under a commission sharing agreement he had secretly entered into. Talton's secret communications, however, came to light sometime in late 2002.

When the Bank learned about the secret communications, it began an internal investigation. Calixto Garcia, Pastrana's immediate supervisor and the Bank's head of special assets, acknowledged that the fee sharing agreement created a conflict of interest and that it would have been inappropriate for the Bank, which knew Talton was Collier's right-hand man and owed a fiduciary duty to the Debtors, to continue dealing with him had it known about the fee sharing agreement. The Bank's internal investigation had not been completed as of the Court's confirmation ruling. When the Debtors learned about the secret communication, Talton was terminated.

<u>The Receivership Proceeding</u>

Following Talton's termination, the Debtors and the Bank continued negotiating a buy-out of the Bank's loans. And in late 2013, the Bank agreed to accept $40 million to release and satisfy its loans or transfer its liens and collateral to a third party for that amount. The Bank gave the Debtors approximately six months to raise the $40 million. Although the Debtors accepted the Bank's offer to sell the notes for $40 million, the Bank nonetheless filed a receivership

proceeding in the British Virgin Islands—without the Debtors' knowledge—presumably to gain control of the property.

### The Debtors' Bankruptcy Case

In order to regain control of their project, the Debtors filed this chapter 11 case. By filing this case, the Debtors sought to terminate the receivership proceeding and reorganize its debt with the Bank on the terms previously agreed to by the parties or by having this Court value their property and paying the Bank's claim as provided for under the Bankruptcy Code based on that value. The Debtors also planned to—and, in fact, did—file an adversary proceeding seeking to, among other things, equitably subordinate the Bank's claims and recover damages based on the Bank's conspiracy with Talton to thwart the Debtors' efforts to find an investor to take out the Bank's loans. That adversary proceeding was tried concurrently with the trial on confirmation and has been substantially completed except for the issue of the Debtors' entitlement to punitive damages given the finding that the Bank had conspired with Talton in his breach of fiduciary duty. Accordingly, the adversary proceeding is not the subject of the Bank's appeal of the confirmation order.

### The New Shaner Deal

While this case was pending, the Debtors continued to negotiate with the Bank. The Debtors were able to convince Shaner to get back into the deal that he previously backed out of. Eventually, the Debtors, Shaner, and the Bank were able to agree to a new deal to buy out the Bank's loans for $37.5 million on the following terms:

- A $7.5 million down payment, with the balance ($30 million) amortized at 450 basis points over the 30-day LIBOR (with a 4.25% floor) with a five-year balloon

- The note payments would be interest only for the first two years and then principal and interest for the next three years

- The borrower would fund a $6 million escrow for capital improvements

- The parties agreed on a release price of 50% of the net proceeds from the sale of any units or lots on Big Scrub or Little Scrub Island.

- The Bank agreed title to the Blue Water Traders and Linares/Foster villas would be conveyed to the Debtor.

Shaner had some concern the Bank was shopping around his deal to other buyers. So the Court entered a no-shop order. Unfortunately, for reasons that are not relevant to this ruling, Shaner ended up not closing on the $37.5 million deal.

<u>The Debtors' Plan</u>

Because the Shaner deal fell through, the Debtors moved forward with confirmation. In concept, the Debtors' plan was simple: The Debtors sought a capital infusion so that they could acquire and complete the partially constructed villas, make other capital improvements to Scrub Island, and ultimately develop and sell the undeveloped lots on Big Scrub and Little Scrub Islands. Completing construction of the partially constructed villas would remove an eyesore, making it easier to rent the existing units and develop and sell the undeveloped lots. The revenue generated from increased rentals and lot sales would easily be sufficient to pay the Bank and other creditors. In practice, though, putting together a plan that would satisfy all of the constituencies was exceedingly complex.

Principally, there were three major constituencies the Debtors had to deal with: the Bank, the owners of the partially constructed villas (particularly Blue Water Traders and Linares/Foster), and Scrub Island Utilities, owner of the desalinization plant. After substantial negotiations and numerous modifications, the Debtors were able to put together a plan that balanced the interests of all three constituencies.

At this point, it is important to discuss the actual plan treatment of these three constituencies because the Bank's stay motion reads as if it is discussing a plan entirely different from the one this Court confirmed. According to the Bank, the Debtors will acquire the partially constructed villas from Blue Water Traders and Linares/Foster—with no mention by the Bank that Blue Water Traders or Linares/Foster have agreed to the transfer—free and clear of the Bank's lien and without payment of the Bank's loan. Instead, the Debtors will be substituted in place of Blue Water Traders and Linares/Foster as the borrowers on the loans, and the Bank will be required to wait some specified time until receiving "full payment" (the Bank's scare quotes). Meanwhile, the Bank argues, the Bank's right to immediate payment on those defaulted loans—however that would be achieved—are eviscerated. Making matters worse, according to the Bank, the Bank is completely stripped of its option to purchase a desalinization plant (whose sole customer is the resort) and is forced to give up its lien on the remainder of the Debtors' property in favor of some undescribed—but less valuable and more volatile—collateral. Curiously absent from the Bank's motion is any reference to what it will be paid under the plan. Unfortunately, the Bank's characterization of its plan treatment bears little resemblance to the plan treatment actually confirmed.

### Plan Treatment of Blue Water Traders and Linares/Foster

Both Blue Water Traders and Linares/Foster asserted claims against Scrub Island Construction for breach of a construction contract. At the same time, those two villas, along with the Long View villas owned by others, are integral to the Debtors' overall plan. The partially constructed villas are an eyesore that is keeping the Debtors from running a first-class resort. Complicating matters is the fact that the Bank has a first-priority mortgage lien on the partially constructed villas owned by Blue Water Traders and Linares/Foster. But the Debtors were able

to devise plan treatment that satisfies each of the parties' interests and was agreed to by Blue

Water Traders and Linares/Foster.

Under the Debtors' plan, Blue Water Traders and Linares/Foster have agreed to convey

their villas to the Debtors free and clear of all liens other than those held by the Bank. The

Debtors will immediately assume the obligations under the Blue Water Traders and

Linares/Foster loans and cure the existing defaults. Blue Water Traders and Linares/Foster

remain liable on the loans, but the Court has enjoined the Bank from suing them so long as the

Debtors remain current on the loans. The Bank will retain its liens on the two partially

constructed villas until they are sold by the Debtors, at which point the Bank will be paid in full.

Treatment of Scrub Island Utilities

Scrub Island Utilities holds a $1.5 million claim under its prepetition contract with the

Debtors. The Debtors' contract with Scrub Island Utilities is critical because the desalinization

plant owned by Scrub Island Utilities is the sole source of fresh water for Scrub Island. Under the

Debtors' plan, the Debtors are deemed to have exercised their $1.2 million purchase option. The

$1.2 million purchase price will be paid out once the plan becomes effective. The Bank's option

to purchase the desalinization plant is deemed rejected under the plan. Scrub Island Utilities has

agreed to its plan treatment.

Treatment of the Bank

The Bank's treatment is by far the most complicated. The Bank holds two claims—a

$119 million claim against Scrub Island Development and a $3 million claim against Scrub

Island Construction. According to the Bank, its claim against Scrub Island Development was

secured in the amount of $60.6 million, with the balance (approximately $58.6 million

12

unsecured). Its entire $3 million claim against Scrub Island Construction was secured. The Debtors ultimately proposed two options for treating the Bank's claims.

The first option—Option A—mirrored the Shaner deal the Bank had previously agreed to. Under Option A, the Bank would have an allowed secured claim in the amount of $37.5 million. The Debtors would pay $7.5 million up front, with the balance paid over five years on the same terms as the Shaner deal—i.e., interest at 350 basis points over the 30-day LIBOR (with a 4.25% floor); interest payments over the first two years; principal and interest payments over the next three years; and a five-year balloon payment. The Bank's new note would be secured by all of the Debtor's real property, other than the partially constructed villas (the Blue Water Traders and Linares/Foster villas would, as discussed above, continue to secure the Bank's rights under the Blue Water Traders and Linares/Foster loans). The release price for any of the Debtors' collateral would be 50% of the net sale proceeds.

The second option—Option B—was designed to satisfy the Bank's 1111(b) election. Under Option B, the Bank would have an allowed secured claim in the amount of approximately $122.5 million. The $122.5 million secured claim would be paid over 30 years, with the present value of the income stream of those payments being at least $37.2 million. The Bank's $122.5 million claim would be paid through three revenue sources.

First, certain Scrub Island Development Group shareholders will deposit $1,767,000 into an interest-bearing account in the Bank's name. That money shall constitute a payment for the first four quarterly payments. The Bank shall draw on those funds to satisfy the first four quarterly payments, with any balance remaining in the reserve account returned to the Debtors.

Second, the Debtors shall continue to make annual payments to the Bank in the amount of $1,767,000 from its general revenues. Those annual payments shall be made in quarterly

installments. The $1,767,000 annual payments shall continue until the Bank is paid in full on its $122.5 million claim.

Third, the Debtors can use the proceeds from the sale of the Bank's collateral to pay down the $122.5 million secured claim. Under Option B, the Bank retains a lien on all of the Debtor's property. The Debtors are free to sell any of the Bank's collateral free and clear of the Bank's lien, but the Debtors are required to pay the sales proceed to the Bank or deposit the proceeds into a "sinking fund."

Any sales proceeds deposited into the sinking fund were required to first be used to complete any infrastructure projects on Little Scrub Island. Once those capital improvements were complete, the money in the sinking fund could be used to fund capital improvements to Big Scrub Island. The Debtors were also authorized to use money in the sinking fund to fund purchase money mortgages on commercially reasonable terms for buyers interested in acquiring an existing villa.

The Bank was granted a lien on the sinking fund and any property acquired with a purchase money mortgage funded by the sinking fund. In addition, the Bank was entitled to payment of money in the sinking fund under two circumstances: once the capital improvements on Big Scrub and Little Scrub Island were completed, the Bank was entitled to any amount in the sinking fund in excess of $5 million; and the Bank was entitled to any payments made under notes secured by purchase money mortgages funded by the sinking fund.

<u>Funding for the Plan</u>

The Debtors are going to fund the plan principally from two sources (other than operating revenue and proceeds from the sale of real estate). First, the plan funder—RCB Equities—will immediately finance $2.2 million to fund the acquisition of the partially constructed villas, the

$1.2 million purchase price for the desalinization plant, and $1 million in capital improvements. Second, RCB Equities will fund another $11 million line of credit to cure the existing defaults on the Blue Water Traders and Linares/Foster loan and complete construction of the villas. Third, some of the Debtors' principals will contribute $6 million. All of the capital infusion—over $18 million—will be used to enhance the Bank's collateral.

The FEH on Confirmation

The Bank, of course, objected to the Debtors' plan and disclosure statements. In fact, the Bank filed two objections totaling more than 80 pages. In those filings, the Bank raised the same arguments in its motion for stay (although the jurisdiction argument is nowhere to be found). On the first day of the trial, the Bank reiterated its objections. The Court overruled the Bank's objections preliminarily and proceeded to hold an eight-day trial on confirmation and the Debtors' lender liability adversary proceeding.

The Court issued tentative findings of fact and conclusions of law on the final day of trial and then ordered the parties to mediation. When mediation was ultimately unsuccessful, on December 30, 2014, the Court issued its findings of fact and conclusions of law confirming the Debtors' chapter 11 plan.[3] The Court left certain issues in the lender liability adversary proceeding unresolved. Those issues can only inure to the Debtors' benefit here. The Bank has appealed the Court's confirmation ruling and now seeks a stay of that ruling pending appeal.

<strong>Conclusions of Law</strong>

The Bank correctly cites the standard for a stay pending appeal. To obtain a stay pending appeal under Rule 8005, the Bank must demonstrate (i) it has a likelihood of success on the merits of its appeal; (ii) it will suffer irreparable harm if the Court does not stay its confirmation

---

[3] Doc. No. 459.

order; (iii) the Debtors (or other parties) will not be substantially harmed if the confirmation order is stayed; and (iv) the public interest will be served if the confirmation order is stayed.[4]

The first factor—a likelihood of success on the merits of the appeal—is the most important.[5] To satisfy that factor, the Bank must show it is probable that the district court will find this Court's confirmation ruling clearly erroneous.[6] It is only when the second, third, and fourth factors heavily weigh in favor of a stay that the standard for showing a likelihood of success on the merits of the appeal drops from "probable" to "substantial."[7] Here, the Bank fails to satisfy any of the four elements for obtaining a stay.

<u>The Bank does not have a likelihood of success on the merits of its appeal</u>

The Bank essentially asserts three arguments why this Court's confirmation order should be overturned on appeal. First, it appears the Bank contends that the Court does not have jurisdiction to affect the Bank's interest in property located in the British Virgin Islands. Second, the Court does not have statutory authority to affect the Bank's property interest in the partially constructed villas or the desalinization plan. Third, the Debtor's plan fails to provide for the Bank's retention of its liens until its claim is paid in full or that the Bank will receive the indubitable equivalent of its claims.[8] For a variety of reasons, none of the Bank's arguments have merit.

---

[4] Fed. R. Bankr. P. 8005; *In re F.G. Metals, Inc.*, 390 B.R. 467, 471-72 (Bankr. M.D. Fla. 2008).

[5] *In re F.G. Metals*, 390 B.R. at 472.

[6] *Id.*

[7] *Id.*

[8] The Bank also raises a fourth issue: the confirmation order requires the Bank to dismiss the BVI receivership proceeding. The Bank says that is impossible. It cannot unilaterally dismiss the receivership proceeding. But the Bank acknowledges that it can and will request that the receivership proceeding be dismissed. And that is all that is required under the confirmation order. As the Debtors point out, the Bank's fear that it will be subject to a contempt order in the event the BVI receivership court refuses to dismiss the receivership is too remote or speculative to create an appealable issue—at least one that warrants a stay pending appeal.

*The Court does have jurisdiction to grant the relief contained in the confirmation order*

The Bank's jurisdictional argument is largely a red herring. This Court, of course, has jurisdiction under 28 U.S.C. § 1334(e) over all property of the estate wherever located, even if it is outside the United States.[9] Laced throughout the Bank's arguments, however, are references to "non-debtor property" located in the British Virgin Islands. Although not explicitly stated, those references presumably are intended to persuade this Court that it has acted outside the jurisdictional scope of § 1334. It is true that this Court does not have jurisdiction over non-debtor property located outside of the United States. But this Court has not exercised *in rem* jurisdiction over non-debtor property located in the British Virgin Islands.

To imply that the Court has, the Bank mischaracterizes the relief the Court granted in its confirmation order. Under the confirmed plan, Blue Water Traders and Linares/Foster agreed to convey their partially constructed villas to the Debtors, who, in turn, are permitted to sell those units to third parties. Upon sale of the villas, the Bank's loans will be paid in full. In the interim, the Debtors are obligated to cure any arrearages and assume the obligations under the Blue Water Traders and Linares/Foster loans. And so long as those obligations are current, the Bank is enjoined from pursuing the original borrowers. As for the desalinization plant, the confirmed plan provides that the Debtor will reject a tri-party agreement between Scrub Island Utilities, the Debtors, and the Bank that provides the Bank with an option to acquire the plant. It is plain from the confirmation order that this Court is simply modifying the Bank's contractual rights and enjoining it from pursuing claims against non-debtors.[10]

---

[9] 28 U.S.C. § 1334(e); *In re British Am. Ins. Co.*, 488 B.R. 205, 225 (Bankr. S.D. Fla. 2013); *In re Int'l Admin. Servs., Inc.*, 211 B.R. 88, 93 (Bankr. M.D. Fla. 1997).

[10] In fact, the Bank seems to acknowledge this fact. That is why the Bank is left to argue that these transactions are "by any other name" sales of non-debtor property located in the British Virgin Islands free and clear of the Bank's liens.

And there is no question the Court has personal jurisdiction over the Bank. After all, the Bank is headquartered and does business in the United States. Besides, it has submitted itself to the jurisdiction of this Court by filing proofs of claim and seeking other affirmative relief in this bankruptcy case. In the end, the Bank's complaint about this Court's confirmation ruling is not really about jurisdiction. The Bank's chief complaint—if it has one at all—is that this Court lacked statutory authority to grant the relief contained in the Debtors' confirmed plan.

*The Court does have authority to modify the Bank's contractual rights*

The Bank's argument that this Court somehow does not have the authority to grant the relief contained in the confirmation order results from a fundamental misunderstanding of the confirmation process. In the Bank's view, the Bankruptcy Code is sort of a Procrustean bed: Congress authorizes a uniform set of permissible plan provisions, and any provision that is not expressly authorized under the "one size fits all" conception of the Bankruptcy Code must be excised from the plan.[11] As the Court explained in its confirmation ruling, the Bank's formulation is inconsistent with the purposes of chapter 11.

Each chapter 11 case is unique. Chapter 11 cases—whether individual or corporate—run the gamut from simple to exceedingly complex. It would be impossible for Congress to anticipate every possible tool a debtor would need to restructure its business. To be sure, when Congress passed the Bankruptcy Reform Act of 1978, it created a single chapter for reorganizing all types of businesses.[12] But it was designed to provide debtors with as much flexibility as

---

[11] In Greek mythology, Procrustes owned a house by the side of the road somewhere between Athens and Eleusis. He would invite strangers passing by his house to spend the night in a special iron bed that he had. The strangers were told the bed was unique because it was exactly the right size for whoever slept in it. What the strangers did not know was that if they were too short for the bed, Procrustes would put them on a rack and stretch them until they fit. If they were too tall for the bed, he would simply chop off their legs. The phrase "Proscutean bed," in common usage, has come to mean forcing something into an arbitrary scheme or pattern. Encyclopedia of Greek Mythology: Procrustes - Mythweb (http://www.mythweb.com/encyc/entries/procrustes.html).

[12] Hon. Leif M. Clark, Chapter 11—Does One Size Fit All?, 4 Am. Bankr. Inst. L. Rev. 167, 167-68 (Spring 1996).

possible to formulate a plan. As one former bankruptcy judge observed, "the extraordinary flexibility of chapter 11 has proven itself in handling a wide panoply of business enterprises— and business problems."[13] So the Bank's view that a plan provision is permissible only if it is expressly authorized by the Bankruptcy Code is entirely inconsistent with the statutory framework of chapter 11 and would be entirely unworkable.

But more important, numerous courts, including the United States Supreme Court, have rejected the Bank's view of chapter 11.[14] A good example is the Supreme Court's decision in *United States v. Energy Resources Co.*[15] The issue in that case was whether the bankruptcy court was authorized to order the IRS to treat tax payments made by the debtor as trust fund payments. The bankruptcy court did so—in the absence of specific statutory authority—because it was necessary for a successful reorganization. In holding that the bankruptcy court had authority to order relief not expressly provided for in the Bankruptcy Code, the Supreme Court looked to the interplay between Bankruptcy Code §§ 1123(b)(5) and 105 in rejecting an argument similar to the one advanced by the Bank in this case:

> The Bankruptcy Code does not explicitly authorize the bankruptcy courts to approve reorganization plans designating tax payments as either trust fund or nontrust fund. The Code, however, grants the bankruptcy courts residual authority to approve reorganization plans including "any . . . appropriate provision not inconsistent with the applicable provisions of [title 11]." The Code also states that bankruptcy courts may "issue any order, process, or judgment that is necessary or appropriate to carry out the provisions" of the Code. These statutory directives are consistent with the traditional understanding that bankruptcy courts, as courts of equity, have broad authority to modify creditor-debtor relationships.[16]

---

[13] *Id.* at 183-84.

[14] *United States v. Energy Resources Co.*, 495 U.S. 545, 549 (1990).

[15] *Id.*

[16] *Id.* at 549 (internal citations omitted).

The Court, in confirming the Debtors' plan here, followed the precise approach taken by the Supreme Court in *Energy Resources*. As the Court explained in its confirmation ruling, Bankruptcy Code § 1123 provides a list of permissible plan provisions: a plan may provide for the transfer of part or all of the debtor's property, authorize the sale of the debtor's property subject to or free and clear of liens, provide for the satisfaction or modification of any lien, provide for the curing or waiving of any default, extend the maturity date of a mortgage, and provide for the changing of an interest rate.[17] While the list of provisions in § 1123(a)(5) is broad and wide-ranging in scope, it is nonetheless non-exclusive. This Court, like the Supreme Court in *Energy Resources*, recognized that § 1123(b)(6) expressly authorized it to approve any plan provision that was not inconsistent with applicable Bankruptcy Code provisions.

Also like the *Energy Resources* Court, this Court recognized that § 1123(b)(6) is supplemented by § 105, which likewise grants broad discretion to enter any order that is necessary to effectuate the provisions of the Bankruptcy Code. This Court has recognized numerous other times that its authority under § 105 is not unfettered.[18] Whatever equitable powers this Court has naturally must be consistent with the Bankruptcy Code. The question on appeal is whether some relief granted by this Court in its confirmation order runs afoul of a specific prohibition in the Bankruptcy Code.

The Bank fails to point to any Bankruptcy Code provision that bars the Court from enjoining the Bank from pursuing claims against non-debtors—its chief complaint. Instead, the Bank relies on the Eleventh Circuit's decision in *AAL High Yield Bond Fund v. Deloitte &*

---

[17] 11 U.S.C. § 1123(a)(5)(B), (D), (E), (G) & (H).

[18] *In re Fundamental Long Term Care, Inc.*, 501 B.R. 770, 776 (Bankr. M.D. Fla. 2013); *In re Fundamental Long Term Care, Inc.*, 500 B.R. 147, 155–56 (Bankr. M.D. Fla. 2013); *In re Fundamental Long Term Care, Inc.*, 2012 WL 4815321, at *8 n.56 (Bankr. M.D. Fla. Oct. 9, 2012) (citing *Norwest Bank Worthington v. Ahlers*, 485 U.S. 197, 206 (1988)).

*Touche*[19] to argue this Court exceeded its authority in enjoining the Bank's claims against Blue

Water Traders and Linares/Foster. Obviously, Eleventh Circuit precedent is binding on this

Court. The problem with the Bank's argument is that the court in *AAL High Yield* was not

considering a bankruptcy court's authority to enter a bar order under § 105.[20] That case involved

an appeal of a district court order approving a class action settlement that included a sort of bar

order. Absent binding Eleventh Circuit precedent, this Court finds Judge Jennemann's oft-cited

decision in *In re Transit Group*[21] instructive.

      In *Transit Group*, the court considered whether a third-party release in a chapter 11 plan

was permissible. At the outset, the court correctly noted that § 105 grants bankruptcy courts

broad equitable power to issue any order necessary to carry out the provisions of the Bankruptcy

Code but that it cannot be used to grant relief that is prohibited by another Bankruptcy Code

provision.[22] The court recognized that § 524(e) arguably prohibits third-party releases since it

provides that the discharge of a debtor does not affect the liability of any other entity. The circuit

courts were—and still are—split on whether third-party releases contravene § 524(e).

Acknowledging the split of authority, the court in *Transit Group* concluded that third-party

releases were permissible in unusual cases so long as they were fair and necessary.[23]

      As the *Transit Group* court pointed out, the difficulty is determining when a third-party

release is fair and necessary. The *Transit Group* court chose to rely on the seven factors

articulated by the Sixth Circuit in *In re Dow Corning Corp.*: whether the debtor and third party

---

[19] 361 F.3d 1305 (11th Cir. 2004).

[20] *Id.* at 1307-08.

[21] 286 B.R. 811 (Bankr. M.D. Fla. 2002).

[22] *Id.* at 815.

[23] *Id.* at 817-18.

share an identity of interest; whether the third party has contributed substantial assets to the

reorganization; whether the third-party release is essential to reorganization; whether the

impacted class has overwhelmingly voted in favor of the plan; whether the plan provides a

mechanism for paying the impacted class in full; whether the plan provides an opportunity for

claimants who choose not to settle to recover in full; and whether the bankruptcy court made

specific factual findings that support its conclusion.[24] This Court agrees with the approach taken

in *Transit Group*.[25]

And to the extent they apply, the factors identified in *Transit Group* overwhelmingly

support the bar order in this case. In fact, of the six factors that apply, the Debtors only fail to

satisfy two: there is no identity of interest between the Debtors and Blue Water Traders or

Linares/Foster; and the Bank has not voted in favor of the plan. The "substantial identity of

interest" factor, however, is not particularly relevant here, and the fact that the Bank voted

against the plan is negated by the fact that it will ultimately be paid in full (approximately $122

million). In short, this Court's extensive findings of fact and conclusions of law made in open

court at the conclusion of the trial on confirmation, make clear that Blue Water Traders and

Linares/Foster are conveying their partially constructed villas to the Debtors as part of an overall

plan to complete construction of the villas and sell them so the Bank can be paid in full on its

loans (with the Debtors, Blue Water Traders, and Linares/Foster) in exchange for the Bank not

suing them so long as the Debtors keep current on the Blue Water Traders and Linares/Foster

loans, which the Debtors are assuming. On these facts, it is highly unlikely that the district court

---

[24] *Id.* at 817 (citing *In re Dow Corning Corp.*, 280 F.3d 648 (6th Cir. 2002)).

[25] This Court has previously relied on the *Transit Group* analysis in approving a bar order in *J.C. Householder Land Trust #1*, 501 B.R. 441, 457-58 (Bankr. M.D. Fla. 2013).

on appeal would conclude that this Court's finding that this is an unusual case and that the bar

order is fair and necessary to the Debtors' reorganization is somehow clearly erroneous.

*The Debtors' plan satisfies § 1129(b)(2)(A)*

So far as the Court can tell, the Bank can only point to one Bankruptcy Code provision

that the Court's confirmation order plausibly runs afoul of: § 1129(b)(2)(A). Bankruptcy Code §

1129(b)(1) allows the Court to confirm the Debtors' plan over the Bank's objection so long as

the plan is fair and equitable and does not discriminate unfairly.[26] Section 1129(b)(2)(A), in turn,

provides minimum requirements the Debtors must establish for their plan to be fair and

equitable. Under that section, the plan in this case is fair and equitable if the Bank retains the

liens securing its claims and receives deferred cash payments equal to or greater than the present

value of its claim (as of the effective date of the plan) or if the Bank receives the indubitable

equivalent of its claim. The Bank contends it is not retaining its lien or receiving the indubitable

equivalent of its claim because it is being forced to substitute substantial collateral.

Although not discussed in its motion, the Bank relied on two cases for that proposition: *In

re McCarty*[27] and *River East Plaza*.[28] In *McCarty*, the court rejected a plan provision that

deprived a bank of its lien on the debtor's property.[29] In *River East Plaza*, the Seventh Circuit

held that $13.5 million in 30-year Treasury bonds was not the indubitable equivalent of a

mortgage lien.[30] This Court explained in its confirmation ruling that both of the cases relied on

by the Bank were easily distinguishable.

---

[26] 11 U.S.C. § 1129(b)(1).

[27] 69 B.R. 377 (Bankr. M.D. Fla. 1987).

[28] 669 F.3d 826 (7th Cir. 2012).

[29] 69 B.R. at 378.

[30] 669 F.3d at 830-32.

In *McCarty*, the debtor sought to cram down a bank that held a mortgage lien on its property and the sale of soil from the property. The debtor intended to fund its plan by excavating the property that the bank had a lien on. But the debtor's plan failed to give the bank a lien on the proceeds from the sale of the soil.[31] Here, unlike in *McCarty*, the proceeds from the sale of the Bank's collateral will be added to a sinking fund, which will either be paid to the Bank or used to enhance the Bank's collateral and in any event will remain subject to the Bank's lien.

In *River East Plaza*, a bank made a § 1111(b) election, and the debtor proposed to pay the bank, whose claim was secured by a mortgage lien, the indubitable equivalent of its claim by giving the bank a promissory note secured by a 30-year Treasury bond. The Seventh Circuit held that the 30-year Treasury bonds did not satisfy the indubitable equivalent standard because the property was going to appreciate substantially more than the Treasury bonds. So *River East Plaza* does not stand for the proposition that substitute collateral cannot satisfy the "indubitable equivalent" standard, only that it fails to do so when the substitute collateral is less valuable or more volatile than the original collateral. Here, the substitute collateral is worth more and is less volatile than the Bank's original collateral, and because the Bank fails to show otherwise, it cannot show that the Court's conclusion that the Debtors' plan satisfies § 1129(b)(2)(A) is clearly erroneous.

<u>The Bank will not be irreparably harmed if the confirmation order is not stayed</u>

The Bank devotes surprisingly little of its analysis to the irreparable harm it will suffer if the confirmation order is not stayed. The Bank simply contends that the Debtors will likely close their acquisition of the Blue Water Traders and Linares/Foster villas and the desalinization plant

---

[31] *Id.* at 377-78.

if the confirmation order is not stayed, and as a result, the Bank will lose valuable lien rights. It is clear that this is not true as a factual matter. The Bank, in fact, retains its lien rights until the Blue Water Traders and Linares/Foster villas are sold, at which time the Bank will be paid in full on its loans secured by those villas. Likewise, the Bank will have a security interest in the desalinization plant. So it is clear to the Court that the Debtors' acquisition of the Blue Water Traders and Linares/Foster villas, along with the desalinization plant, does not irreparably harm the Bank.

What the Bank appears to be getting at—even if it does not exactly say it—is that its appeal could become moot if the Debtors, among other things, acquire the partially constructed villas and desalinization plant. Appellate courts have, in fact, held that an appeal may be equitably moot where a debtor has substantially consummated its plan.[32] A plan is substantially consummated where the Debtor has transferred all or substantially all of the property to be transferred under the plan; assumed the business or management of all or substantially all of the property dealt with under the plan; and started making distributions under the plan.[33] But the mere fact that a plan has been substantially consummated does not mandate dismissal of an appeal as moot.[34] And in any event, the majority of courts have held that the risk that an appeal may become moot does not by itself constitute irreparable harm."[35]

---

[32] *In re Allied Holding, Inc.*, 2008 WL 3919403 (11th Cir. Aug. 27, 2008).

[33] *Ala. Dep't of Economic & Community Affairs v. Ball Healthcare-Dallas, LLC (In re Lett)*, 632 F.3d 1216, 1225 (11th Cir. 2011).

[34] *In re Lett*, 632 F.3d at 1225.

[35] *See, e.g., In re F.G. Metals, Inc.*, 390 B.R. 467, 477 (Bankr. M.D. Fla. 2008) (citing *In re Fullmer*, 323 B.R. 287, 304 (Bankr. D. Nev. 2005); *In re Goss*, 2008 WL 824303, at *2 (Bankr. E.D. Okla. Mar. 26, 2008)).

<u>The Debtors will suffer substantial harm if the confirmation order is stayed</u>

This Court plainly stated in its confirmation ruling that, based on the evidence, it is essential for the Debtors to launch its reorganized operations at the beginning of 2015. In order for that to happen, the confirmation order needs to become effective so that the Debtors can obtain an $18.5 million capital infusion—$12.5 million coming from the plan funder (RCB Equities) and the remaining from the Debtors' shareholders. That money will immediately be used to acquire the partially constructed villas and desalinization plant, make capital improvements to the resort, and refinance its current DIP loans. Without the capital infusion, the Debtors' resort cannot survive, and every day that passes without the Debtors being able to essentially relaunch their resort materially diminishes the likelihood that the Debtors' reorganization efforts will be successful.

From the Courts' perspective, that is the real purpose of the Bank's stay motion. The Bank has been attempting to thwart the Debtors' efforts to reorganize since well before this case was filed. And those efforts have continued throughout this case—whether by rejecting proposed plan treatment that was identical to a term sheet it signed during this case or exercising an 1111(b) election that it surely thought the Debtors could not comply with. Granting a stay in this case would accomplish what has been the Bank's goal all along: preventing the Debtors' from successfully reorganizing.

At a minimum, a stay will substantially delay the Debtors' reorganization efforts. And a delay in administering an estate surely harms the Debtors' creditors. In fact, Judge Glenn expressly recognized that delaying distributions to creditors under a chapter 11 plan is a

26

substantial harm that warrants denial of a stay pending appeal.[36] Whether it is the Debtors or

creditors, parties other than the Bank will be substantially harmed by a stay pending appeal.

<u>The public interest will not be served by a stay of the confirmation order</u>

Bankruptcy courts have long recognized the public's interest in allowing a chapter 11

debtor an opportunity to implement its confirmed plan.[37] Likewise, there is a great public policy

in ensuring that the Debtors' estate is preserved and maximized in an orderly and efficient

manner. Those interests are not outweighed by the perceived need for judicial clarity or judicial

comity, neither of which is implicated in this case. For the reasons discussed above, granting a

stay will prevent the Debtors from implementing their confirmed plan—contrary to public

policy.

**Conclusion**

The Bank has tried everything it could to keep the Debtors from reorganizing. Of course,

the Bank has the right to appeal this Court's confirmation order if it thinks the Court was wrong.

But the Bank does not have the right to use a stay pending appeal to accomplish what it could not

during the confirmation process—i.e., thwarting the Debtors' reorganization efforts. Because the

Bank cannot satisfy any of the requirements for a stay pending appeal, its request must be

denied. Accordingly, it is

---

[36] *In re F.G. Metals, Inc.*, 390 B.R. 467, 477 (Bankr. M.D. Fla. 2008).

[37] *Id.*

**ORDERED** that the Emergency Motion for Stay Pending Appeal of Order Confirming

Debtors' First Amended Joint Plan of Reorganization Filed by FirstBank Puerto Rico (Doc. No.

476) is DENIED.

**DATED**: _January 26, 2015_____.

_____
Michael G. Williamson
United States Bankruptcy Judge


Attorney Harley E. Riedel is directed to serve a copy of this Memorandum Opinion and Order on
interested parties and file a proof of service within 3 days of entry of the order.


**Harley E. Riedel, Esq.**
**Charles A. Postler, Esq.**
**Stichter, Riedel, Blain & Prosser, PA**
*Attorneys for Debtors*

**W. Keith Fendrick, Esq.**
**Holland & Knight, LLP**
*Attorneys for FirstBank Puerto Rico*